```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

 4   UNITED STATES OF AMERICA,        )  Docket No. 15 CR 623
                                      )
 5                    Plaintiff,      )
                                      )
 6           vs.                      )
                                      )
 7   MICHAEL P. HALDORSON,            )  Chicago, Illinois
                                      )  September 15, 2017
 8                    Defendant.      )  9:40 o'clock a.m.

 9
            TRANSCRIPT OF PROCEEDINGS - EVIDENTIARY HEARING
10            BEFORE THE HONORABLE MATTHEW F. KENNELLY
                         VOLUME 1-A
11

12   APPEARANCES:

13
     For the Plaintiff:        HON. ZACHARY T. FARDON
14                             United States Attorney
                               BY:  MR. BOLLING W. HAXALL
15                                   MR. BRIAN S. WALLACH
                               219 S. Dearborn St., Suite 500
16                             Chicago, Illinois  60604

17

18   For the Defendant:        BLAINE & VANZANT, LLP
                               BY:  MS. HOLLY NICOLE BLAINE
19                             922 Davis Street
                               Evanston, IL  60201
20                             (312) 788-7584

21
     Also Present:             MS. CHRISTA GREEN, PRETRIAL SERVICES
22

23
     Court Reporter:           MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                             Official Court Reporter
                               219 S. Dearborn Street, Suite 2102
25                             Chicago, Illinois  60604
                               (312) 435-5639
```

1   (The following proceedings were had in open court:)

2          THE COURT:  Case No. 15 CR 623, USA v. Haldorson.

3          MR. HAXALL:  Good morning, your Honor.  Bolling

4   Haxall and Brian Wallach on behalf of the United States.

5          MR. LIPUMA:  Good morning, your Honor.  Frank Lipuma

6   on behalf of Michael Haldorson, who is present in court.

7          THE COURT:  Okay.  So why don't we just first talk

8   about the lineup and the batting order.

9          MR. HAXALL:  Yes.

10          THE COURT:  Okay.

11          MR. HAXALL:  And actually, I was -- given the number

12   of motions, I was actually wondering if I could give a

13   two-minute, essentially, opening statement just to highlight

14   everything?

15          THE COURT:  Yeah.  I've never heard a lawyer give a

16   two-minute opening statement, so this will be an experience.

17          MR. HAXALL:  Well, two minutes of lawyer time, which,

18   as you know --

19          THE COURT:  Which means like eight?  Yeah.

20          MR. HAXALL:  Judge, it's our understanding at this

21   point there's three primary issues before the Court.  One is

22   the constitutionality of the search of the defendant's car.

23   In that regard, the defendant in his affidavit, which is

24   located at docket number 105, pages 7 or 8, speaks only to one

25   issue, and that is whether or not the red lights installed in

1  his car -- to the front of his car were illuminated.  And I

2  actually have on the screen in front of the Court something

3  that you will see.

4          THE COURT:  Not until the thing gets tweaked so that

5  it's broadcasting, so give me a second.

6          Do you have it on the computer?

7          MR. HAXALL:  I have it on my laptop.  There it is.

8          So, Judge, you will see this morning a squad cam

9  video, and the black car to the right of your screen is the

10  defendant's Pontiac G8.  You will hear testimony from Officer

11  Friddle that as the car came down the street, the red lights

12  that are kind of to the top of the car were illuminated, he

13  saw them, and it's our view that you can see the lights

14  illuminated on that car.

15          Ultimately, however, Judge, our view is it doesn't

16  matter.  Basically, the defendant was driving to a location

17  because a local narcotics group ordered up drugs from him, and

18  they stopped him as a result of that, and they had probable

19  cause to do so.

20          This was also based on a prior controlled purchase of

21  cocaine from the defendant approximately 22 days earlier, on

22  June 1st of 2015.

23          So it's the government's view, your Honor, that for

24  multiple reasons, the search of the defendant's car was

25  constitutional.

1        The second issue is whether or not the defendant was
2   Mirandized prior to giving a statement, and, again, calling
3   the Court's attention to Mr. Haldorson's affidavit located at
4   docket number 105, pages 7 or 8, he says he was not Mirandized
5   prior to being interviewed and that the written Miranda waiver
6   was only executed approximately 2:00 a.m. as he was being let
7   out of the jail to -- or let out of the Plainfield Police
8   Department.

9        You will hear from three officers who will testify
10  that at approximately 9:30, he was Mirandized off of a
11  preprinted form that Mr. Haldorson signed.  You will also hear
12  from special agent Howard Marcus, who will say that at about
13  midnight, he went in to interview the defendant and reviewed
14  the Miranda waiver again with the defendant.  So not only had
15  that waiver been executed prior to 2:00 a.m., it had been
16  reviewed twice with the defendant.

17        So that is the second pending motion.

18        The third pending motion, your Honor, has to do with
19  the initial sweep of the defendant's locked bedroom, whether
20  or not that was constitutional.  You will hear that a search
21  of the common areas of the apartment occurred with the consent
22  of his roommate, that based on the explosives that agents had
23  recovered from the defendant's car and his repeated lies to
24  them about where he lived, the agents were concerned for the
25  safety of the building and those in the area, they did an

1   initial sweep of the defendant's room, found some high-grade
2   fireworks, cleared those out, then held the scene until they
3   were able to get a search warrant to go back into the room and
4   conduct a thorough search.

5       So it's the government's understanding that those are
6   the three issues facing the Court.

7       As I indicated, we are going to go slightly out of
8   order.  You are going to hear from Special Agent Marcus first.
9   He has had back and neck surgeries and really doesn't have the
10  ability to sit around all day, so we are going to go slightly
11  out of order.

12      You will then hear from Officer Friddle, who will
13  talk about the red lights and the traffic stop, although,
14  again, it's the government's position that, one, the lights
15  were illuminated as is depicted in this video, but, two, it
16  doesn't even matter whether or not they were, given the
17  investigation at that point.

18      After that, you will hear from the narcotics team
19  regarding their investigation up until that point.

20      THE COURT:  Okay.  So let me ask Mr. Lipuma, do you
21  agree that those are the motions that are in front of me and
22  that those are the issues?

23      MR. LIPUMA:  Judge, I would add, if I could, for the
24  record, because it's already in the record what's been pending
25  when I moved into this case --

1        THE COURT:  Yeah.

2        MR. LIPUMA:  -- 75 and 76, the original motions, it's

3   a motion and a memorandum, and I think the Court has

4   identified that those particular motions are the ones that are

5   pending, 75 and 76.

6        THE COURT:  Hang on a second.

7        Right.  75 is the motion.  76 is the memorandum in

8   support.

9        MR. LIPUMA:  Correct, Judge.

10       THE COURT:  Yeah.

11       MR. LIPUMA:  And then the second set, Judge, would

12  be 83 and 84.  83 --

13       THE COURT:  That's the one on the statement.

14       MR. LIPUMA:  Yes, Judge.  83 and 84.

15       And then 105.

16       THE COURT:  And 105 is the one on the home, right?

17       MR. LIPUMA:  It's partially the home, and it's

18  partially the search warrants and some of the false statements

19  and/or admissions that were mentioned in those affidavits.

20       THE COURT:  Got it.  And so --

21       MR. LIPUMA:  And then, Judge, you did allow Mr.

22  Haldorson's last counsel to kind of do a -- more of a summary

23  motion or maybe it added on some points, and that would be

24  document 244.

25       THE COURT:  244.  Let me -- oh, it was a supplement

1   to something.

2           MR. LIPUMA:  Correct, Judge.

3           THE COURT:  So let me just -- let me just pull that

4   up.

5           MR. HAXALL:  Judge --

6           THE COURT:  Mr. Haxall, while I'm pulling that up,

7   can you remind me, if you have it, the date on which I went

8   through the motions and said which ones we were going to have

9   hearings on?

10          MR. HAXALL:  Yeah, I will look for that, Judge.

11          I agree, with the exception of 105.  My understanding

12  is 105 is not pending.  It would have been March 20th, your

13  Honor.

14          THE COURT:  Of?

15          MR. HAXALL:  Of I'm assuming this year.  I have the

16  date wrong.

17          THE COURT:  Yeah.  March 20th of this year?  Okay.

18          All right.  So, Mr. Lipuma, the number on the last

19  one was what?  244, you said?

20          MR. LIPUMA:  244, your Honor.  Yes, Judge.

21          And, Judge, to answer your last question --

22          THE COURT:  Supplement to motion to suppress

23  evidence.  Yeah.  Okay.

24          MR. LIPUMA:  Judge, to answer your last question, I

25  couldn't hear Mr. Haxall well --

1    THE COURT:  I was asking him the date on which I had
2    identified which motions we were going to have a hearing on,
3    and Mr. Haxall said -- you said March the -- how many?
4    MR. HAXALL:  I believe it was March 20th, but I
5    believe counsel also actually requested the transcript of
6    one --
7    THE COURT:  What's the date?
8    MR. LIPUMA:  June 13th, 2016.
9    THE COURT:  That sounded -- that sounds more right to
10   me.  Do you have -- there's a transcript?
11   MR. LIPUMA:  Yes, Judge.
12   THE COURT:  Because I have the rough one.  I
13   probably --
14   MR. LIPUMA:  Yes, Judge, I have a rough transcript.
15   You did go through each of those particular --
16   THE COURT:  So what you are looking off is the rough
17   one.
18   MR. LIPUMA:  I am looking off the rough one, Judge.
19   THE COURT:  Okay.  That's what I have, so let me just
20   take a second to look at it and refresh my memory.
21   MR. HAXALL:  I do show also on that date the Court
22   addressed some of the issues --
23   THE COURT:  June 13th of 2017, right?
24   MR. LIPUMA:  '16, your Honor.
25   MR. HAXALL:  '16.  And then I show again on

1    March 20th of this year, it was addressed briefly.

2            THE COURT:  All right.  So I am going to have to pull

3    these up.

4            So tell you what.  Take a load off your feet, have a

5    seat for a second, and let me just pull those up.

6            So June 13th of 2016 and 3/20 of 2017.

7            So there's June -- there's -- I mean, the case has

8    been up a bunch of times, so let me just look at the 13th of

9    June and see what it says.

10           MR. HAXALL:  June 21st I show is for status hearing

11   and hearing on the motions and that we went through them all

12   just because my notes have bullet point by bullet point.

13           THE COURT:  So the second date you gave me,

14   Mr. Haxall, you said was the 21st of June?

15           MR. HAXALL:  Yes, sir.

16           THE COURT:  Just a moment.

17           MR. HAXALL:  I mean, we do agree that the fruit issue

18   pertains to certain forms and things like that, consent

19   searches, but there was no additional consent claim that the

20   father's or roommate's consents was invalid for any reason.

21           THE COURT:  All right.  So on the 13th of June

22   of 2016, I am going to -- and I am looking at the same rough

23   transcript that you all have.

24           So after denying some of the motions, I get to

25   number 25 -- or 75, motion to suppress evidence, and I also

1   mention 83 concerning the statements and 105, which I said in
2   some ways overlaps with the other two or with the motion to
3   suppress, but it specifically concerns a couple of other
4   things.

5           So I said on the motion to suppress the statements,
6   it appears to have two bases -- I am paraphrasing -- partly
7   based on the proposition that the statements were a fruit of
8   the unlawful search, so that in that sense, it depends on
9   docket -- on motion No. 75; and secondly, there's the Miranda
10  issue.

11          I said -- Mr. Haldorson says he wasn't given the
12  Miranda warnings until after he had given the statements,
13  essentially, so there is a dispute of fact about that.  There
14  has to be a hearing on that one.

15          On the motion to suppress relating to the
16  circumstances surrounding the seizure of the defendant and the
17  search of the car, I said, It strikes me that there are enough
18  circumstances alleged in support regarding erroneous false
19  statements given by the officer who pulled over the vehicle,
20  Officer Friddle.  Does that sound right?

21          MR. HAXALL:  Friddle.

22          THE COURT:  Friddle.

23          And I understand that there's an argument that --
24  sort of inevitable discovery argument that there would have
25  been an inventory search, but that also depends on the

1    proposition that it was appropriate to take Mr. Haldorson into
2    custody.  I think there is going to need to have a hearing on
3    that one.
4            And then on 105 -- hang on a second.
5            No.
6            And then I go on to say, To me, the things that are
7    problematic had to do with the circumstances under which
8    Mr. Haldorson was pulled over and what the basis for that was
9    and whether there was probable cause to search the vehicle,
10   which may be based on events of June the 1st, which are argued
11   to be stale as of June 23rd, but it may be based on events of
12   June the 23rd, but I think there is a legitimate contention
13   that that wouldn't have provided a basis for probable cause to
14   believe the vehicle contained evidence of illegal activity.
15           So there's going to need to be a hearing on that one.
16   So that's still on 75.
17           On motion number 105, I said, There are three things
18   argued.  One is that the searches of the fruits of the
19   unlawful arrest and the allegedly unlawful search of the car,
20   so that extent, they depend on the other motion, which I think
21   would be 75, and they're still alive.
22           The other two arguments that are made is that false
23   statements were made to obtain one or more of the warrants and
24   that the consent that was given on some of the searches by
25   people other than Mr. Haldorson was tainted in the sense that

1    it was involuntarily.

2           I go on to say, On those points, I am persuaded by

3    the government's argument that, number one, the items or the

4    matters that are claimed to have been false really weren't

5    even presented in the applications for the warrants, or if

6    they were, they were immaterial.  I don't see anything in the

7    motion that would provide any basis to undermine a consent

8    that was given by the two individuals, one of whom I think is

9    Mr. Haldorson's father, if I am recalling correctly, and the

10   other is a woman.  There's some things alleged about what was

11   said to them, but I don't have any kind of an affidavit from

12   them to suggest that their will was overborne or anything like

13   that, and the circumstances that are alleged aren't enough to

14   give rise, in my view, to a genuine dispute of fact about

15   that.  Really what's left of the motion to quash the consent

16   search is the search warrants -- you know, what's left is

17   whatever -- the extent to which they're based on the

18   proposition that they, too, are a fruit of the allegedly

19   unlawful arrest of Mr. Haldorson and the search of his

20   vehicle.

21          So those are the three that are, I guess, kind of

22   alive, is what I said.

23          And then on -- some clarification given on the 21st

24   of June, so I say in that -- again, looking at the rough

25   transcript -- I was asked to clarify what I thought was fair

1   game for the evidentiary hearing that I ordered on three of

2   the motions, 75, 83, and 105.  To my way of thinking, 75 is

3   really the primary one.  The contention is there wasn't

4   probable cause to stop Mr. Haldorson's vehicle, there wasn't

5   probable cause to arrest him, there wasn't a proper basis to

6   search the vehicle, and that pretty much everything else that

7   was obtained in the case is alleged to have been a fruit in

8   one way or another of that episode.  That would be some of it

9   was used in the applications for search warrants, and the

10  contention is that the statement that was given was also a

11  fruit of this.  What needs to be addressed at a hearing is the

12  basis to stop Mr. Haldorson's vehicle and arrest him.  The

13  fact that there was -- and the fact that there was a basis to

14  stop the car doesn't necessarily mean that there was a basis

15  to search the car.

16          I talk again about this issue of staleness, the issue

17  of claim of inevitable discovery and inventory search.

18          So I conclude by saying, I think what you honestly

19  ought to assume is that everything in motion number 75 is the

20  subject of an evidentiary hearing.

21          Motion No. 83, I say, I guess somewhat inconsistently

22  with what I had said before, it's based on three things:

23  Number one, fruit of the allegedly illegal arrest or search;

24  number two, no Miranda warnings given prior to the statement;

25  number three, there is a general allegation of deceit and

1   trickery.  That's not supported by affidavit or anything else,
2   so I don't really regard that as an open issue.
3          Then we get to 105.  So I kind of repeat what I had
4   said at the June 13th hearing.  There's no support, i.e., an
5   affidavit or some other form of support for any contention
6   that the consent given by Mr. Haldorson's father or by
7   Ms. Figas, F-i-g-a-s, was involuntary, so I don't regard that
8   as an open issue.  There's no basis that's been given to show
9   that this is a genuine dispute that would require a hearing.
10  The general allegation that there were false statements made
11  to get the search warrants is not supported, so I don't see
12  any basis to order a hearing under Franks v. Delaware.  So I
13  think that what's left is the contention that the search
14  warrants and the searches were also a fruit of the allegedly
15  unlawful arrest and search of the vehicle.  That's a Brown v.
16  Illinois issue.  So you have to figure out for yourselves
17  whether there's an attenuation issue that you have to put
18  evidence on or not.
19         So I think -- I mean, I think I pretty much said the
20  same thing in both of those hearings.
21         So there's a -- issues in motion 75 that surround the
22  stop of the vehicle, search of the vehicle, and the arrest of
23  Mr. Haldorson, not necessarily in that order.  Everything is
24  claimed to have been a fruit of that.
25         And then there is a second set of issues that have to

1    do with the statement.  Part of it relates back to the fruits
2    issue, part of it relates to the Miranda issue.
3            On the search of the home, which is motion
4    number 105, I believe that what I said is really all that's
5    left of that is whether that's a fruit of the allegedly
6    unlawful stop, arrest, and search of the car.
7            So now I need to look -- I don't know whether there's
8    something that you're contending that's in document 244 that
9    should change that.  I am going to be blunt with you.  I
10   didn't -- I looked at 244 when it came in, but I really didn't
11   look at it to see whether that opened up --
12           MR. HAXALL:  We believe that one is before the Court,
13   and we will be presenting evidence on that issue.
14           THE COURT:  Fine.  Then I don't need to worry about
15   it.  Okay.  If you are planning to cover it, then we are good
16   on that.  Because I am looking -- I am noting now as I'm
17   looking through it again that there's issues raised about
18   consent and stuff like that.  So you are planning to cover it.
19           MR. HAXALL:  Yes, sir.
20           THE COURT:  Fine.  Good.  Then I think we are all on
21   the same page.  Do you think so?
22           MR. LIPUMA:  I would add that 244, Judge, adds the
23   argument that the application for the warrant misstates
24   material facts and/or omits material facts which taints the
25   subsequent search, so that was raised by Ms. Blaine in 244.

1         THE COURT:  So tell me -- I've got 244 up on the

2   screen.  What page or pages should I be looking at?

3         MR. HAXALL:  Judge, my recollection is it wasn't a

4   Franks issue.  It was instead a taint issue in that the agents

5   included a fact from the search of the defendant's --

6         THE COURT:  See, the way I read that -- and I

7   don't -- I am not as conversant with the circumstances of the

8   events, obviously, as you all are.  The way I read that is

9   that when the search or sweep or look or whatever you want to

10   call it of the house was done, there was not a warrant at that

11   point and that later a warrant was obtained to go look in the

12   computers or maybe at other things.

13         MR. HAXALL:  Judge, I believe the evidence will show

14   that the officers had consent to search the common areas of

15   the apartment from the roommate.  I don't believe counsel is

16   challenging that consent.

17         The defendant had a locked bedroom there.

18         THE COURT:  Right.

19         MR. HAXALL:  The officers, and we will explain why

20   based on pipe bombs, did an initial sweep of the bedroom

21   without a warrant.  They recovered some fireworks, took them

22   out, then basically locked down the place, went and got a

23   warrant to go back and search the whole apartment, which

24   included the bedroom.

25         I don't believe the argument raised in Ms. Blaine's

1    motion was a Franks argument --

2              THE COURT:  About that warrant.

3              MR. HAXALL:  Right.  I believe what it was is that

4    the warrant was tainted because it included information

5    obtained from the initial sweep of the bedroom.  That's my

6    understanding.

7              THE COURT:  That, and I think she also made an

8    argument that some of the things that the officers said in

9    their application for a warrant were inconsistent with their

10   contentions regarding how they had gotten the consent to begin

11   with.

12             But that's not a Franks issue.  That's an issue about

13   consent.  I mean, you cross-examine him based on that, I would

14   think.

15             What am I missing, Mr. Lipuma?

16             MR. LIPUMA:  Judge, at page 6, it's laid out at

17   page 6 of that motion --

18             THE COURT:  I have that in front of me.

19             MR. LIPUMA:  Yes.  Initially, page 1, you don't have

20   to go to that, Judge, but she does state, The application for

21   the warrant misstates key facts, tainting the subsequent

22   search pursuant to the warrant.

23             THE COURT:  But back up a second.  The warrant is

24   obtained after they've gone into the bedroom, right?

25             MR. LIPUMA:  Yes, Judge.

1      THE COURT:  Okay.  So what's done pursuant to the

2  warrant as you understand it?

3      MR. LIPUMA:  What's done --

4      THE COURT:  In other words, they have gone into the

5  bedroom, they have seen what they are going to see, they have

6  segregated what they are going to segregate, then they get the

7  warrant, and then what do they do pursuant to the warrant once

8  they get it?

9      MR. LIPUMA:  Okay.  One little statement there,

10  Judge, they did take out --

11      THE COURT:  That's what I meant by "segregate."

12      MR. LIPUMA:  -- fireworks.

13      THE COURT:  That's what I meant by "segregate."

14      MR. LIPUMA:  Okay.  I'm sorry, Judge.

15      THE COURT:  Yeah.

16      MR. LIPUMA:  They came back and they did a full --

17  they executed the search in the bedroom --

18      THE COURT:  And did they find anything additional --

19      MR. LIPUMA:  Yes, Judge.

20      THE COURT:  What?

21      MR. LIPUMA:  They found his computers, for instance,

22  his two laptops, which the government retrieved a lot of

23  information from.  They retrieved --

24      THE COURT:  Okay.  So we have computers.  What else?

25      MR. LIPUMA:  Various types of narcotics.

1          THE COURT:  So the warrant discovered in the initial

2    sweep, search, whatever we call it, they are discovered after

3    they go back pursuant to the warrant.

4          MR. LIPUMA:  According to the reports.

5          THE COURT:  Okay.  All right.  What else?  Computer,

6    narcotics.  What else?

7          MR. LIPUMA:  There's no further explosive material in

8    there.

9          THE COURT:  Yeah, but not finding something under a

10   warrant isn't a basis to suppress something --

11         MR. LIPUMA:  I think it's related drug paraphernalia,

12   Judge.

13         THE COURT:  Drug paraphernalia.  Okay.

14         MR. LIPUMA:  But the key, Judge --

15         THE COURT:  So what -- hang on a second.  I just want

16   to try to do this in some semi-organized way here.

17         So what you're saying is that motion number 244 tees

18   up an issue regarding whether false statements were made to

19   get the warrant pursuant to which the law enforcement searched

20   the computer, found the additional narcotics, and found

21   whatever paraphernalia there was.

22         MR. LIPUMA:  Yes, Judge.

23         THE COURT:  And I will say, honestly, I've probably

24   never addressed that issue.  I can't guarantee that I haven't

25   because the case has been up a couple of dozen times, but I

1    think I've probably never addressed it.  Because if I'm

2    recalling correctly, this was -- this was all getting filed

3    around the time that Ms. Blaine was starting to be on her way

4    out of the case, I have a feeling.  It's not that long ago.

5              Oh, no, I'm sorry.  It was before we were going to do

6    the hearing in May.

7              MR. WALLACH:  Correct, your Honor.

8              THE COURT:  So I'm now looking at document

9    number 250.  It's a minute entry.  The Court has determined

10   that it will hold an evidentiary hearing on defendant's

11   supplemental motion to suppress evidence, docket 244, to be

12   conducted in conjunction with the hearing already set for

13   May 10th and 11th, which is when it was set for.

14             So, actually, Mr. Lipuma is right.  You're right.

15   There you go.  I've already concluded that.

16             I will tell you as I walked out here today, I didn't

17   remember it, but it's right here.  I am looking at it.  It's

18   docket entry 250.

19             I suspect -- I suspect that what happened -- there

20   was a status on May the 4th.  I suspect that what happened is

21   that this issue was flagged for me on May the 4th, I said I

22   was going to take it under advisement, and then I issued -- I

23   looked at it and issued an order the next day.

24             MR. WALLACH:  Your Honor, your supposition is

25   correct.

1          THE COURT:  All right.  Fine.  Let's do something.

2          Do you want to give any --

3          MR. LIPUMA:  I do, Judge.  A couple housekeeping

4    matters I want to address.

5          THE COURT:  That's fine.  Go ahead.

6          MR. LIPUMA:  It looks like there may not be any

7    witnesses in here for the government.  We would make a motion

8    to exclude witnesses --

9          THE COURT:  Motion to exclude is granted.

10         MR. LIPUMA:  Okay.  And then, Judge, we did file a

11   motion for leave to file a motion for immediate disclosure of

12   favorable evidence and timely production of impeachment

13   information --

14         THE COURT:  What is it you're asking for?

15         MR. LIPUMA:  Judge, it's a traditional Brady/Giglio

16   motion.  It had not been filed in this case except under the

17   context of seeking the CI's -- the informant's file, and that

18   was denied.  So there really has been no traditional

19   Brady/Giglio motion filed, and I feel that --

20         THE COURT:  Is there something -- and I get it,

21   obviously.  I mean, I'm looking at the motion right now.

22         Is there something about this that you think pertains

23   to today?

24         MR. LIPUMA:  Well, first of all, let me say this.  I

25   would not accuse the prosecutors of any misconduct, but I do

1    believe that there is going to be testimony today or evidence

2    elicited today that's going to reflect misconduct on behalf of

3    the police officers in the way they controlled the CI and

4    their statements to a judge, for instance.

5            So, yes, I do think there's --

6            THE COURT:  My question was a little bit different.

7    So, I mean, you know, if you bring out evidence today that

8    there was misconduct, you've got that, obviously.

9            What I was more asking, is there something that you

10   think that is out there that exists already that you think you

11   need in order to cross-examine a witness or witnesses at

12   today's hearing or present evidence?  And if so, what do you

13   think it is?

14           MR. LIPUMA:  No, sir.

15           THE COURT:  Okay.  Then I am just not going to worry

16   about it right now.  We will worry about it at the end.

17           MR. LIPUMA:  As I am trying to be a competent

18   criminal defense lawyer and to provide --

19           THE COURT:  You don't have to try.  You already are.

20   You don't have to try.  You already are.  Seriously.

21           MR. LIPUMA:  Thank you for saying that, but I do feel

22   that something should be filed in every case in which you have

23   contested issues.

24           THE COURT:  I don't disagree with you.

25           MR. LIPUMA:  Thank you, Judge.

1          MR. HAXALL:  And, Judge, just to be clear, to the

2     extent that we have any Brady or Giglio material, they have

3     been tendered.  I mean, we've tendered everything I've got.

4          THE COURT:  All right.  Any other --

5          MR. LIPUMA:  I would like to make a two-minute --

6          THE COURT:  Go for it.

7          MR. LIPUMA:  Okay, Judge.

8          I would like to say, Judge, that I want to keep my

9     opening as general as possible because based on the reports

10    and various accounts of the witnesses from the government thus

11    far, it's impossible to know which version of the events the

12    government will say served as the reason for the stop; what

13    caused the probable cause.  Was it the June 1st purported drug

14    deal?  Was it the alleged illuminated lights on the vehicle?

15    Was it the -- and I'll get to that in a second.  Was it the --

16    was it the alleged June -- the alleged attempt delivery of

17    drugs on June 23rd?

18         Judge, the government has advanced different

19    positions when this case was initially presented in the state

20    court.  They had certain positions.  It's changed since it's

21    been here.  I think we are going to be able to develop that

22    for you.

23         The proffer was no probable cause for the stop of the

24    car.  To some extent, the government has said that Insley, who

25    is, I think, going to be the critical witness in the case,

1   relied on a tip from an informant.  There is going to be

2   issues about the reliability of the informant, the control of

3   the informant by the agents.

4          And with respect to the -- you know, and so

5   everything kind of stems from there, Judge.  They did not have

6   probable cause to make that stop, and they certainly didn't

7   have probable cause -- I think you are going to hear multiple

8   reasons, the June 1st deal, the alleged illuminated lights,

9   there's supposedly a warrant for his arrest, he supposedly

10  screeched his tires, he supposedly got into an altercation

11  with someone.  All of that is falsehood.  None of that -- we

12  are going to show that all of that is false.

13         And so, Judge, from there, everything that goes

14  beyond that is fruit of the poisonous tree, in our view, as

15  based on this motion.

16         I will concede this much, Judge.  We think the

17  apartment search, the Plainfield apartment search, we think

18  the Joliet home search, we don't think any of that should be

19  introduced into evidence, but -- because it's fruit of the

20  poisonous tree.  But we do not contest the position that

21  Mr. Haldorson's father, Raymond Lee Haldorson, consented to

22  the search of the home, and we do not dispute the proposition

23  that his roommate, Allyson Figas, in Plainfield, consented to

24  the search of the common area of their apartment.  But we

25  still think that's -- all of that that was recovered through

1 those consent searches need to be suppressed as well as fruit
2 of the poisonous tree.

3         I think the government is relying, to a large extent,
4 Judge -- you know, I've already covered the false statements.
5 I think you're going to hear some false statements by these
6 various witnesses.  It's going to be cumulative.  I hope it's
7 not too boring to the Court.  We'll try to get to the material
8 things and not the immaterial things.

9         But, Judge, I think the government principally is
10 going to be relying on the automobile exception, but there
11 still must be probable cause to stop that car.  There must be
12 probable cause.  And so if the government is relying on --
13 Judge, if the government is relying on this particular car
14 being illuminated and a traffic officer stops it, the
15 subsequent search is limited to evidence related to that
16 infraction, not to a complete search of the entire vehicle,
17 because probable cause is lacking for that.

18         Judge, the government is basically trying to string
19 together a series of events that they allege raises the issue
20 of probable cause when Mr. Haldorson was stopped and his car
21 was searched, but these are just suspicions by the police,
22 they lack objective evidence, and they're insufficient to
23 establish probable cause.

24         What this case boils down to, Judge, is the
25 government -- the state police officers flipped a CI and

1    wanted that CI to set up some other people, so he set up some

2    of his friends, including he tried to set up Mr. Haldorson.

3    They had a hunch, the officers had a hunch, that a

4    transaction -- a drug transaction was going to go down on

5    June 23rd.  They saw nothing obviously suspicious.  They got

6    tired of waiting, watching, and recording conversations,

7    which, under Illinois law, at least, on the June 1st

8    recording, would be illegal, and what -- if this evidence

9    isn't suppressed, this would give a green light, basically, to

10   the government or the state, police officers and agents, to --

11   when they subjectively believe that there's contraband in a

12   car, it would allow them to do that.

13          And, Judge, about this picture, that's not the

14   illumination.  You will see photographs of what this car looks

15   like illuminated.  It's nothing like this.  That's plastic red

16   trim on the vehicle itself.

17          THE COURT:  Okay.  Which car?  It's the black one?

18          MR. HAXALL:  It's the black one with the lights and

19   the kind of -- we have still shots.  I just paused it.

20          THE COURT:  In the vents in the front is what you're

21   talking about?

22          MR. HAXALL:  Up top.  Correct, your Honor.

23          MR. LIPUMA:  In the vent area.

24          THE COURT:  All right.  I just wanted to make sure I

25   understood what you were talking about.

 1            Okay.  You can call the first witness.

 2            MR. HAXALL:  The government calls special agent

 3   Howard Marcus.

 4            THE COURT:  I assume this notebook is supposed to be

 5   up here for him?

 6            MR. HAXALL:  Yes, sir.  And actually, we do have a

 7   copy --

 8            THE COURT:  I wanted to make sure it wasn't from my

 9   last case or something else.

10            MR. HAXALL:  We do have copies.  Just for the record,

11   we have given counsel a copy previously.

12            MR. LIPUMA:  Yes, I have it.

13      (Witness sworn.)

14            THE COURT:  All right.  Mr. Haxall, you can go ahead.

15            MR. HAXALL:  Thank you, Judge.

16                             - - -

17            HOWARD MARCUS, DIRECT EXAMINATION

18   BY MR. HAXALL:

19   Q.  Sir, can you please state your full name and spell your

20   last name?

21   A.  Howard Marcus, M-a-r-c-u-s.

22   Q.  Are you currently employed or are you retired?

23   A.  At this time, I'm retired, sir.

24   Q.  And prior to your retirement, what did you do for a

25   living?

Marcus - direct by Mr. Haxall

28

1    A.  I was a special agent with the Department of Justice.

2    Q.  In particular, what unit of the Department of Justice?

3    A.  I was a senior special agent and certified explosives

4    specialist with the Bureau of Alcohol, Tobacco, Firearms and

5    Explosives.

6    Q.  How long did you serve as a special agent with ATF?

7    A.  Approximately 30 years.

8    Q.  You mentioned a specialty within that role.  Can you

9    please tell Judge Kennelly the nature of your specialty at

10   ATF?

11              THE COURT:  Before you do that, I am going to move

12   this thing, so you don't feel like you have to lean into it.

13              THE WITNESS:  Thank you, Judge.

14              THE COURT:  There you go.

15              THE WITNESS:  Can you repeat what you asked me, sir?

16   BY MR. HAXALL:

17   Q.  Sure.  You indicated you had kind of a specialty at ATF;

18   is that correct?

19   A.  Yes, sir.

20   Q.  Can you just describe in general terms that specialty for

21   Judge Kennelly?

22   A.  I certified in several specialty areas.  Particularly

23   germane to this case, I was a certified explosives specialist,

24   which involved technical training and experience and academic

25   training involving the safety of explosives, use of

1    explosives, and destruction of unsafe explosives, handling of

2    those materials.

3    Q.  And based on that specialty, would you receive certain

4    call-outs to assist local police departments?

5    A.  Yes, sir, I routinely responded to assist fire departments

6    and bomb squads, hazardous materials teams, with matters

7    related to explosives.

8    Q.  You mentioned that you retired from ATF.  Approximately

9    how long ago approximately did you retire?

10   A.  At the end of March of this year.

11   Q.  And why did you retire?

12   A.  I have some physical maladies over the course of time that

13   developed that are preventing me from being able to physically

14   do all the duties of an agent.

15   Q.  Had you also reached an age that you were able to retire?

16   A.  Yeah, I was eligible for a full retirement, so I am not

17   medically washed out, but it was time.

18   Q.  Okay.  Without getting into too many specifics, in general

19   terms, what was the nature of the physical issues that

20   prompted you to decide to retire?

21   A.  I've had a variety of issues involving my cervical spine,

22   my lumbar spine, my knees, and then probably unrelated, but

23   some GI issues, and taken together were making it difficult to

24   travel and meet some of the physical demands of being an agent

25   in the field.

Marcus - direct by Mr. Haxall

1    Q.   Okay.  Is there anything about your physical condition

2    that is making it difficult for you to understand me or to

3    recall events?

4    A.   No, sir.

5    Q.   I'm assuming you have prescriptions for these issues?

6    A.   I have prescriptions for a variety of medical situations.

7    I'm being treated by a physician.

8    Q.   Are there any issues with the medicines you take or you're

9    prescribed to take that are interfering with your ability to

10   understand these proceedings or to recall the events of June

11   of 2015?

12   A.   No, sir.

13   Q.   I'd like to move ahead to June 23rd of 2015.

14          On that date, did you receive a request to assist law

15   enforcement in Plainfield?

16   A.   I did.  I think the initial request may have been on

17   the -- I think that was the 22nd, though.

18   Q.   I'm sorry.

19   A.   The initial call-out.

20   Q.   In any event, did you respond to the Plainfield Police

21   Department?

22   A.   Yes, sir.

23   Q.   Do you know who contacted you?

24   A.   Personally, I was contacted by the Cook County Sheriff's

25   Police bomb squad to assist with an explosives matter.

1  Q.  And did you respond to the Plainfield police?

2  A.  Yes, sir.

3  Q.  Were there any other ATF personnel that responded as well?

4  A.  At that time, Special Agent Tony Zito, Anthony Zito, also

5  responded with me.

6  Q.  And so you eventually arrived at Plainfield PD; is that

7  correct?

8  A.  Yes, sir.

9  Q.  And can you just describe in general terms what you

10  observed when you arrived at Plainfield PD that was

11  particularly relevant to your specialty?

12  A.  Upon my arrival, I noticed that an area of the parking lot

13  was being isolated and was flagged down by the commander of

14  the Cook County Sheriff's Police bomb squad, and he told me

15  they were preparing to search a car and that some explosive

16  material had been seized -- seen in the vehicle, and they were

17  asking for my assistance in searching it and safely handling

18  whatever material might be recovered.

19  Q.  Did you assist at that time?

20  A.  I did, sir.

21  Q.  And can you again just describe generally for Judge

22  Kennelly what you observed during that search?

23  A.  During that search, we found a variety of explosive

24  materials ranging from several pipe bombs, improvised

25  explosive device, some commercial fireworks, and some consumer

1    fireworks.

2           There was other stuff in the car, but my particular

3    area of expertise involved any the fireworks or explosives.

4    Q.  And did you observe that these devices, the IEDs, as you

5    described them, were rendered safe or isolated from people and

6    property?

7    A.   Initially, they had not been rendered safe.  They were

8    still in the vehicle.  What we did is removed them from the

9    vehicle to a safe area, segregated them by type and

10   compatibility, and then the sheriff's police bomb technicians

11   did the render safe work with the pipe bombs, and I moved on

12   to doing some other stuff at that point.  They no longer

13   needed my assistance at that time.

14   Q.  And I'd like to move on to the "other stuff," as you put

15   it.

16          Moving ahead to approximately 12:15 in the morning,

17   so going from the 23rd into the 24th, did you participate in

18   an interview of an individual at the Plainfield police?

19   A.   I did, sir.

20   Q.  Are you -- do you see the person you interviewed present

21   in court today?

22   A.   I do, sir.

23   Q.  Could you please point to that person and describe an

24   article of clothing that person is wearing?

25   A.   The gentleman with the crew cut and the white polo shirt.

Marcus - direct by Mr. Haxall

33

1    MR. HAXALL:  Judge, can the record reflect the
2    witness has identified the defendant?
3        THE COURT:  That's correct.
4    BY MR. HAXALL:
5    Q.  So I'd like to talk briefly about the start of the
6    investigation and going into it.  I'm assuming you wanted to
7    interview the defendant about what was recovered; is that
8    correct?
9    A.  Yes, sir.  My particular interest would be in the
10   explosive materials.
11   Q.  Okay.  Prior to starting that interview, did you talk to
12   local law enforcement about any interviews they had conducted?
13   A.  I did, sir.
14   Q.  And in very general terms, what had they -- what did you
15   ask them and what did they tell you?
16   A.  I asked them generally what we were doing there, what the
17   case was, how they came to encounter the gentleman, and what
18   they had learned so far, and I also asked them if he had been
19   Mirandized.
20   Q.  When you say "he," what do you mean?
21   A.  The defendant, the subject that I was about to interview.
22   Q.  When you asked the officers if the defendant had been
23   Mirandized, what was their response?
24   A.  They indicated that he had, and I asked them if there was
25   a written waiver or if this was just verbal.  They told me it

Marcus - direct by Mr. Haxall

1   was in writing, and I asked if I could see a copy of the form.

2   Q.  Did they give you a copy of the form?

3   A.  They gave me the original, yes, sir.

4   Q.  Okay.  And we'll put it on the screen in just a second,

5   but can you just describe in general terms what that form was?

6   A.  It was a waiver of rights form.  It had room for the date

7   and time, the initials of the person who was being Mirandized,

8   and the signature of that person, and the signature of the

9   officers that were Mirandizing him.

10  Q.  After you were given that form, what did you do?

11  A.  I went into the interview room and met with the subject.

12  Q.  Okay.

13  A.  I advised him of my title, what I was doing there, what my

14  job was, and then asked -- go ahead.

15  Q.  Just to take a step back, where was the interview

16  conducted?  Can you describe the room?

17  A.  There was an interview room in the lockup area in the

18  Plainfield police station.

19  Q.  Were you the only person present with the defendant during

20  the interview?

21  A.  No, there were members of the CPAT team, the Will County

22  Police Assistance Team, that were present.  It varied who was

23  with me at different times.

24  Q.  Okay.  So you went to the room at approximately 12:15 in

25  the morning.  Does that sound about right?

Marcus - direct by Mr. Haxall

1   A.   Reasonably, yes, sir.

2   Q.   And you obviously had the form before you walked into that

3   room; is that correct?

4   A.   Yes, I asked if I could have the form with me.

5   Q.   And when you walked in the room, can you please -- after

6   you introduced yourself and who you were, what happened next?

7   A.   I asked the individual that we were about to interview if

8   he had been given his rights.  He indicated that he had.  I

9   asked him if the form that I was holding was familiar to him.

10  He indicated that it was.  And then we went over that form.

11          MR. HAXALL:  And, Judge, at this point, I am going to

12  ask if the witness' screen can have --

13          THE COURT:  You know, it's -- we can just -- you

14  don't have to go through those formalities.  Everybody can see

15  it.  I've got it up on all of the screens.

16  BY MR. HAXALL:

17  Q.   So, Agent Marcus, I'm putting in front of you --

18  A.   Bear with me one moment.

19          Sorry about that.

20  Q.   So calling your attention to the screen in front of you,

21  and it's also probably in the notebook in front of you,

22  Government Exhibit Miranda Waiver.  Do you recognize that

23  item?

24  A.   Yes, sir.

25  Q.   What is that?

1  A.  That's the waiver of rights form that I was provided with

2  by the officers prior to entering the room.

3  Q.  Okay.  And is this the form that you went over with the

4  defendant as you just indicated?

5  A.  Yes, sir.

6  Q.  Could you please just describe for Judge Kennelly how you

7  went over the form with the defendant at approximately 12:15

8  that morning?

9  A.  I initially said hello and identified myself and then

10  asked if he had been advised of his rights.  He indicated that

11  he had.  I showed him the form.  We went over each of the

12  rights.  I asked were those his initials.  He indicated that

13  they were.  I asked if that was his signature.  He said that

14  it was.  And then I asked him if he understood his rights.

15  Q.  When you say you went over each of his rights, did you

16  read it to him?  Did you have him read it?  How did you do it?

17  A.  I asked him to read it, and then I went over the general

18  language.  He indicated he was capable of reading, and then

19  each one in turn, I said, do you understand this, do you

20  understand that.

21  Q.  And what was his response each time?

22  A.  He indicated that he understood it, that those were his

23  initials and it was his signature.

24  Q.  When the defendant read each right to you, did you have

25  any difficulty understanding him?

1   A.  No, sir.

2   Q.  Did he seem -- or did he indicate in any way that he did

3   not understand the rights he was reading?

4   A.  No, sir.

5   Q.  And did you ask him to -- you may have already said

6   this -- identify his signature on the bottom of the page?

7   A.  I did, sir.

8   Q.  And did he confirm -- or how did he confirm whether or not

9   that was his signature?

10  A.  He told me that it was.

11  Q.  Did the defendant agree to speak to you?

12  A.  I asked him if he was willing to speak to me, and he said

13  that he was.

14  Q.  Without getting into the specifics of the interview, it's

15  beyond this hearing, did you conduct an interview at that

16  time?

17  A.  I did, sir.

18  Q.  Okay.  How many questions about the facts of this case did

19  you ask the defendant prior to going over Government Exhibit

20  Miranda Waiver with him?

21  A.  None.

22  Q.  Is Government Exhibit Miranda Waiver a true and accurate

23  copy -- obviously, it has a -- it is a Xerox and it has a

24  sticker on it, but is it a true and accurate copy of the

25  Miranda waiver that you went over with the defendant at

1   approximately 12:15 in the morning on June 24th of --

2   A.  Yes, sir.

3          MR. HAXALL:  Judge, the government seeks leave to

4   admit Government Exhibit Miranda Waiver.

5          THE COURT:  It's admitted.

6     (Above-mentioned exhibit was received in evidence.)

7   BY MR. HAXALL:

8   Q.  So moving ahead, after the Miranda -- or, sorry, after the

9   interview, did you accompany members of the Will County

10  Cooperative Police Assistance Team to any other locations?

11  A.  I did, sir.

12  Q.  And --

13         THE COURT:  What is that, the Cooperative Assistance

14  Team, or I may have gotten --

15         THE WITNESS:  CPAT are units, and it's the

16  Cooperative Police Assistance Team organized by the Illinois

17  State Police, and they're made up of investigators from the

18  Illinois State Police and communities within the county --

19         THE COURT:  Got it.

20         THE WITNESS:  -- that address specific issues.

21         THE COURT:  Got it.

22         MR. HAXALL:  And, Judge, I believe you will hear from

23  several members of that team.

24         THE COURT:  Okay.

25  BY MR. HAXALL:

Marcus - direct by Mr. Haxall

39

1  Q.  Now, did you accompany the officers from CPAT to both the

2  defendant's parents' house and to an apartment in Plainfield?

3  A.  I did, sir.

4  Q.  What was your purpose in accompanying the officers to

5  those locations?

6  A.  Among the items that they were looking for and they were

7  concerned might be found were explosive materials, and I was

8  there to provide technical assistance and ensure their safety

9  and also help recognize any explosive materials that may be

10 there.

11 Q.  I don't want to talk about the parents' house right now.

12 Let's talk about the Plainfield apartment.  Were you present

13 at the Plainfield apartment with CPAT officers?

14 A.  I was, sir.

15 Q.  And were you present when a locked bedroom was discovered?

16 A.  I was, sir.

17 Q.  What were some of your concerns, based on your expertise

18 and what you had seen earlier, technically, the prior evening,

19 as you were standing in that Plainfield apartment?

20 A.  The materials that were taken from the vehicle would

21 represent a threat to public safety if they were in a

22 dwelling.

23 Q.  Why is that?

24 A.  The pipe bombs, of course, by design can injure people;

25 they're made to explode, they may produce fragmentation, the

1   heat effect that could create fire, and that would be a

2   problem for people.  Any 1.3 explosives, commercial

3   explosives, are by law required to be stored in an explosives

4   magazine and cannot be in a residential structure.  And the

5   other fireworks-type material is still a fire hazard.

6           So the concern would be that any materials not

7   properly stored could be a threat to the safety of the

8   community or the people in that building.

9   Q.  Did you express these concerns to the CPAT team?

10  A.  Absolutely, yes, sir.

11  Q.  Okay.  And based on your concerns, are you aware whether

12  or not entry was made into the defendant's locked bedroom?

13  A.  Yes, sir.

14  Q.  Okay.  After entry was made, can you just describe what

15  happened?

16  A.  The entry was limited once we saw materials that indicated

17  there was an explosive threat, that there were materials in

18  the bedroom.  Some of the materials in plain view were

19  removed, we secured the scene, meaning we left that apartment,

20  and then we stayed on scene to ensure public safety while

21  other officers went from the state police to obtain a state

22  search warrant to continue our search.

23           MR. HAXALL:  If I could have one moment?

24           THE COURT:  Sure.

25           MR. HAXALL:  No other questions at this point, your

Marcus - cross by Mr. Lipuma

41

1   Honor.

2           THE COURT:  Mr. Lipuma.

3           MR. LIPUMA:  Thank you, Judge.

4                      - - -

5           HOWARD MARCUS, CROSS-EXAMINATION

6   BY MR. LIPUMA:

7   Q.  Good morning, Agent Marcus.

8   A.  Good morning, sir.

9   Q.  So you weren't involved in any aspect of the investigation

10  on June 1st, correct?

11  A.  June 1st, that's correct.

12  Q.  And you weren't involved in any aspect of the

13  investigation up until June 23rd, correct?

14  A.  June -- you have me confused.

15          June 22nd.  We were called the night of the traffic

16  stop.

17  Q.  Okay.  May I ask, are you referring to some -- a document

18  in front of you?

19  A.  The waiver of rights form, sir.

20  Q.  Oh, okay.  So -- is that dated June 22nd, it's hard to

21  tell, or June 23rd?

22  A.  June 22nd, sir.

23  Q.  Okay.

24  A.  They had started earlier.

25  Q.  But you arrived on -- when you met Mr. Haldorson, it was

1    June 23rd, correct?

2             THE COURT:  It was after midnight?

3             THE WITNESS:  Yeah, it was after midnight.  I had

4    been there earlier dealing with issues in the parking lot.  I

5    did not come in to actually speak to him until after midnight.

6    That's correct.

7    BY MR. LIPUMA:

8    Q.  And when you met him after midnight, that actually is

9    June 24th, isn't it?

10   A.  I believe the 23rd would be after the 22nd.

11   Q.  Okay.  Well, that part is true.

12            Well, let me ask you this.  If I showed you a report

13   of investigation, would that help your memory as to when you

14   actually met Mr. Haldorson or when you were called?

15   A.  It might.  I'm willing to look.

16            MR. LIPUMA:  Judge, if I may approach?

17            THE COURT:  Sure.

18   BY MR. LIPUMA:

19   Q.  Sir, I'm handing you what is identified as ATF Report of

20   Investigation Report No. 1 and just ask you to take a look at

21   the top section there.

22   A.  Specifically where, sir?

23   Q.  It's your very first entry, sir, paragraph 1.

24   A.  Okay.  So this appears to have the wrong date.  My

25   understanding is that they took their enforcement action on

 1   the 22nd.

 2   Q.  Okay.

 3   A.  The confusion would be because my interview was on

 4   the 23rd.

 5          MR. LIPUMA:  I don't want to create an issue here,

 6   Judge, but --

 7          MR. HAXALL:  We'll stipulate that the 23rd was the

 8   arrest, and then I think the interview continued past into

 9   the 24th.

10          THE COURT:  Okay.

11          MR. LIPUMA:  The consent, the waiver form --

12          MR. HAXALL:  I think the 3 is just hard to read

13   there.

14   BY MR. LIPUMA:

15   Q.  It's a 3, not a 2 --

16   A.  Okay.

17   Q.  -- but it's hard to tell.

18          THE COURT:  I would have looked at it and said 2 as

19   well, but I get what you're saying.  That's fine.

20          MR. LIPUMA:  Very small point.

21   BY MR. LIPUMA:

22   Q.  So you didn't -- you weren't involved in any aspect of the

23   investigation until June 23rd, correct?

24   A.  At this point, you have me slightly confused.  I was

25   called the first day, the 23rd, in the evening.

1  Q.  Yes.

2  A.  I didn't come into the police station until after midnight

3  the following.

4  Q.  The 24th?

5  A.  We crossed the midnight.

6  Q.  Okay.  So you arrived at the Plainfield Police Department

7  around midnight, would you say, shortly after midnight?

8  A.  No, well before.  We worked in the parking lot dealing

9  with the explosives in the car.

10 Q.  Okay.  Okay.  Okay.  But it's fair to say that you had no

11 involvement in this investigation until after Michael

12 Haldorson was arrested; is that correct?

13 A.  That is correct, sir.

14 Q.  You have no personal knowledge of the investigation prior

15 to those days, correct?

16 A.  That is correct, sir.

17 Q.  But you were told things when you arrived by the

18 investigating officers, correct?

19 A.  Yes, sir.

20 Q.  Okay.  In fact, they told you, as you testified, that

21 Mr. Haldorson had signed a Miranda waiver, correct?

22 A.  Yes, sir.

23 Q.  With the advice of rights form, right?

24 A.  Yes, that's correct.

25 Q.  Okay.  And so who was present with you when you first

Marcus - cross by Mr. Lipuma

45

1   entered and presented Mr. Haldorson with the already executed

2   Miranda waiver?

3   A.   There were several members of the CPAT team.  I have not

4   previously worked with those individuals, so I don't know them

5   all by name, and at different times, different officers from

6   that unit were around.

7   Q.   Okay.  But I'm looking at the precise moment that you're

8   talking to Mr. Haldorson about the waiver form in front of

9   you.  Do you know or not know who was in the room with you at

10  that time?

11  A.   I don't recall which officer was there.  Several came into

12  the room initially.

13  Q.   Okay.  And you said they were coming in and out during

14  this interrogation, correct?

15  A.   During the interview, yes, sir, they came in and out a

16  couple times.

17  Q.   Okay.  And who was coming in and out?

18  A.   Individual officers from the CPAT unit.

19  Q.   And you don't know any of their names?

20  A.   I'm sorry?

21  Q.   Do you know any of their names?

22  A.   Not really.  I know Wayne is the master sergeant in

23  charge, but I do not know all their names.  I had not

24  previously met these people.  I was asked to come out to

25  assist.  And we didn't want to fill the room up with agents or

1    officers, so, occasionally, they swapped out.  But we tried to

2    minimize the number of people in the room so we could have a

3    meaningful discussion with the individual.

4    Q.  So do you remember the name of the officer who told you

5    that Mr. Haldorson had already executed a Miranda form?

6    A.  I do not.

7    Q.  Okay.  You do not.

8        Do you know -- did you get other information from

9    those officers about what happened earlier in the evening?

10   A.  Very general, yes, sir.

11   Q.  Correct.

12       And, basically, you were told that there was a

13   traffic violation that a police officer responded to and that

14   that's how the initial stop was conducted, correct?

15   A.  I was told that they had made the traffic stop and that

16   there were explosives in the vehicle.  I didn't go into a

17   great deal of detail beyond that.  It wasn't germane to the

18   reason I was there.

19       Remember, the time that I actually arrived, the car

20   was in the lot and explosive material was in view, so I was

21   there specifically to deal with the explosive problem.

22   Q.  I just want to focus on one little aspect of that.

23   A.  Yes, sir.

24   Q.  When you arrived at the Plainfield Police Department, did

25   one or more officers tell you that Mr. Haldorson had been

Marcus - cross by Mr. Lipuma

1   arrested as a result of traffic violations?

2   A.  I was told a traffic stop, I believe.  If you'd like me to

3   look at my report, I'd be glad to.  I don't know if he was

4   cited for a traffic violation or not.  I don't recall.

5   Q.  I'm not saying whether he was cited for it.  I'm asking

6   you whether you reported -- based on information from the

7   arresting officers or the officers who were present at the

8   Plainfield Police Department, they told you that it was a

9   result of a traffic violation?

10  A.  Again, sir, I was told a traffic stop, not a major

11  difference, but I don't recall if they described what

12  violation or specifically.

13  Q.  Okay.

14  A.  If you'd like me to look at my report, I'd be glad to.

15  Q.  Yeah, could you, please?

16  A.  Yeah.  I believe you have it.

17  Q.  Okay.  You brought your report with you?

18  A.  No --

19  Q.  Okay.  I'm going to give your report to you and direct

20  your attention to the same paragraph, and I'd ask you to look

21  down to line 3 and review that to yourself, please.

22  A.  Okay.  Yeah.

23  Q.  Have you had a chance to review that, sir?

24          MR. HAXALL:  Counsel, which paragraph?

25          MR. LIPUMA:  Paragraph 1, line 3.

1        THE WITNESS:  Yes, sir.

2    BY MR. LIPUMA:

3    Q.  Did you have a chance to review that, sir?

4    A.  Yes.

5    Q.  And did it refresh your recollection as to what you had

6    put down in your report about what the officers had told you?

7    A.  Yes, sir.

8    Q.  And what was that?

9    A.  That they had stopped the vehicle for an equipment

10   violation and they had been surveilling the vehicle as part of

11   a drug investigation.

12   Q.  You don't remember who told you that?

13   A.  No, sir, not particularly.  I met a group of people all at

14   once.

15   Q.  Okay.  When you did your interview of -- or interrogation,

16   however you want to call it, of Michael Haldorson, was Agent

17   Zito with you?

18   A.  No, sir.  He stayed in the parking lot and continued to

19   work with the bomb squad members.

20   Q.  Okay.

21   A.  And that's the reason we always had one of the CPAT

22   officers with me.  It's not considered safe or prudent to

23   interview someone alone.

24   Q.  And this -- in your report, you indicated that officers

25   Insley and Kaminski were present with you.  Do you remember

1    that aspect of it?

2    A.  I remember the officers, and I remember the names, yes,

3    sir.

4    Q.  Okay.  And were they two of the officers who were in the

5    interview room with you?

6    A.  Can you please explain what you're really asking me.

7    That's two names, yes, sir.

8    Q.  Was Kaminski in the interview with you?

9    A.  Some of the time, yes, sir.

10   Q.  Okay.  And Insley in there with you?

11           THE COURT:  What's the second name?  Insley?

12           MR. LIPUMA:  Insley, I-n-s-l-e-y, your Honor.

13           THE COURT:  Thank you.

14   BY MR. LIPUMA:

15   Q.  But they were in and out.  Is that what you're saying?

16   A.  Someone was always with me.  Sometimes more than one.

17   Q.  Okay.  Now, I want to ask you about the Plainfield

18   apartment search.  You were involved in that, correct?

19   A.  Yes, sir.

20   Q.  You went to Plainfield with several other officers, right?

21   A.  You mean we went to the apartment?

22   Q.  Correct.

23   A.  Yes, sir.

24   Q.  And that's on Lockwood Street, correct?

25   A.  We were on Lockport Street.  I believe that's the address

1  of the apartment.  Again, I'd need to see the report.

2  Q.  Now, you didn't know the precise address, did you?

3  A.  I did not, no, sir.

4  Q.  Nobody did, did they?  None of the officers knew the

5  precise address where Mr. Haldorson lived, correct?

6  A.  That's correct.  We had a description of the address from

7  Mr. Haldorson's father.

8  Q.  Okay.  And, indeed, you were with the officers when they

9  were going down the street trying to open doors, correct?

10  A.  Knocking on doors.

11  Q.  You were knocking on doors, correct?

12  A.  Yes, sir.

13  Q.  Were you doing it, or who was doing it?

14  A.  The local officers.

15  Q.  Pardon me?

16  A.  The state police and local officers.

17  Q.  Do you remember who in particular?

18  A.  No, sir.

19  Q.  Okay.

20  A.  The entire unit, but I do not know who was on which door.

21  Q.  Now, when you came to Mr. Haldorson's apartment, prior to

22  meeting his roommate, you actually went to the door with the

23  other officers, and that door was locked, correct?

24  A.  I don't know.  I was still in the stairway at the time

25  they made the entry in the --

1  Q.  No, no.  This is before you went to the apartment, before
2  you ascended the stairways.
3  A.  Then I was outside further back on the sidewalk.
4  Q.  Okay.  Well, what I want to ask you is this.  When you
5  finally arrived at Mr. Haldorson's apartment and you're all
6  standing outside the apartment on the first floor on the
7  street, on Lockport, that door was locked, correct?
8  A.  I don't know, sir.
9  Q.  Did you see any police officers take keys and open that
10 locked door in order to enter Mr. Haldorson's apartment?
11 A.  I don't recall.  They did have some keys, and I don't
12 recall if that was used to open that door or not.
13 Q.  Okay.  Was -- did they tell you whose keys they were?
14 A.  I don't believe so, no, sir.
15 Q.  They didn't tell you that they were Mr. Haldorson's keys
16 from his arrest earlier -- from the day before, actually?
17 A.  No, sir.  Remember, I was at the back of the line to
18 provide assistance with matters dealing with explosives at
19 that time.
20 Q.  Certainly.  I don't doubt that.  And -- but I want to ask
21 you, did you see any officers take those keys and unlock that
22 door before you ascended up those -- up that staircase?
23 A.  No.  Again, I could not see the doorknob at the time.  I
24 was at the back of the group following along behind them at
25 that point.

1   Q. Let me ask you about this group. How many people were

2   there?

3   A. I think in the neighborhood of three to five at that time.

4   Q. Okay. Indeed, Ladd, you mentioned Ladd, Wayne Ladd,

5   correct? He was present?

6   A. Yes, sir.

7   Q. He was kind of -- he was the one in charge there, wasn't

8   he, because he's a master sergeant?

9   A. That's correct.

10  Q. Okay. And LeStrong was present, correct?

11  A. I don't recall which officers by name.

12  Q. Was Kaminski present, the same officer who had been in the

13  interview with you?

14          THE COURT: Are we still talking about right before

15  they go into the house?

16          MR. LIPUMA: Yes, your Honor.

17          THE COURT: Or the apartment, rather.

18          MR. LIPUMA: Yes.

19          THE COURT: Okay. Fine. I just want to make sure I

20  got it.

21          THE WITNESS: I believe so. Again, I had not met

22  these officers prior to that night, so I did not have all the

23  names and faces sorted out.

24  BY MR. LIPUMA:

25  Q. Okay. You did go up to -- you did -- let me -- let's talk

1    about what you observed.  You're standing on Lockport Street,

2    you have a storefront in front of you, correct?  So multiple

3    stores on that street, correct?

4    A.  Yeah, there were stores, and then there were doorways that

5    led to stairs to the apartments over the stores.

6    Q.  So the door that led to the stairway that you eventually

7    ascended, you said don't you remember if it was locked or

8    unlocked, you don't remember if they used keys to get in there

9    or not, but the point is you did ascend the stairs with the

10   others, correct?

11   A.  Right.  Entry was made, and I don't know if they needed to

12   unlock the door or not.  I was far enough back that I did not

13   see how that was done.

14   Q.  Okay.  And you ascended the doors, and you saw three

15   doors, correct?

16   A.  Yeah, in all honesty, I saw the back of the people in

17   front of me.  I was back down the stairway some way.

18   Q.  At some point, they entered a door or more than one door,

19   correct?

20   A.  I don't know how many doors they entered, to be honest

21   with you.  My recollection is there may have been two doors

22   that both led into the apartment, but I'm not certain.

23   Q.  Okay.  Were those doors locked or unlocked?

24   A.  Again, I don't know.  I was back down the stairway about

25   two-thirds of the way.

1   Q.  Someone knocked on the door?

2   A.  I believe so.

3   Q.  Did someone knock on the door?

4   A.  Yeah, again, I believe so, but I wasn't at the top of the

5   stairs.

6   Q.  Did someone come to the door?

7   A.  At some point, I believe they were speaking to a young

8   lady.  I was not party to that.  I was back down the stairway,

9   sir.

10  Q.  Did the young lady allow you to enter the apartment?

11  A.  I know entry was made.  I don't know if she consented, if

12  the officers just asked to come in.  You're going to have to

13  talk to the people that actually encountered her.

14  Q.  And once everybody came in the apartment, including you,

15  what did you observe?

16  A.  The front area had a couch in it and some furniture, I

17  believe there was a kitchen area in and to the right and then

18  a bedroom all the way through, straight through.

19  Q.  Okay.  And let's talk about that -- let's talk about that

20  bedroom.

21          There was actually two bedrooms in that apartment,

22  correct?

23  A.  Again, I don't recall.  There was a front room where I

24  believe the young lady was sleeping.  I don't know if that's

25  what you're considering a bedroom or not.

1    Q.  Let me ask you this.  Did there come a point in time where

2    that young lady directed you to Mr. Haldorson's bedroom?

3    A.  Directed the local officers there, yes.

4    Q.  Okay.  I'm asking if you observed it.  Did you observe

5    that?

6    A.  They were up near the doorway to the bedroom by the time I

7    actually came into the apartment.

8    Q.  Okay.

9    A.  I want you to realize how big everyone is and how small

10   the stairway is.

11   Q.  Now, you know that door was locked, the door to

12   Mr. Haldorson's bedroom was locked?

13   A.  That's my understanding, yes, sir.

14   Q.  Well, you saw them take out keys and try various different

15   keys to unlock that door, correct?

16   A.  I didn't see them trying keys.  They may well have been

17   doing it, but I don't know if that's what occurred or not.

18   Q.  Eventually, you went into that bedroom, didn't you?

19   A.  Yes, sir.

20   Q.  And what you're saying is you don't know if that door was

21   locked or unlocked?

22   A.  I did not open it.  I believe it was locked, but I didn't

23   unlock it, so I don't know how they made entry.

24   Q.  I don't think anybody is saying you did, but did you

25   observe someone take keys and unlock that door?

Marcus - cross by Mr. Lipuma

1   A.  No, sir.

2   Q.  Okay.  When you went into that apartment, that bedroom,

3   did you notice there was another door that had access to that

4   bedroom?

5   A.  Yes, sir.

6   Q.  Okay.  And did you notice whether that door was locked or

7   unlocked?

8   A.  People had been in the room before me by the time I was

9   there.  It was unlocked, and my understanding is it was

10  unlocked at the time we made entry, but I wasn't in a position

11  to know its original condition.  You would have to ask the

12  people that first came in.

13  Q.  And so what you did is -- what you did is you saw

14  fireworks, correct, in that bedroom?

15  A.  We saw a variety of fireworks and explosives, yes, sir.

16  Q.  And you collected those fireworks?

17  A.  Yes, sir, the stuff that was in plain view, to secure it,

18  that's correct.

19  Q.  You secured it, took it out of the apartment, put it down

20  in an ATF vehicle that houses such type of explosive material,

21  correct?

22  A.  Yes, sir.

23  Q.  And during this whole time, Mr. Haldorson's roommate

24  remained in the apartment, didn't she?

25  A.  I believe so.  I wasn't the person dealing with her.

1  Q.  But you saw --

2  A.  One of the local officers was, so I don't know at what

3  point she walked out or left.

4  Q.  But you saw her in the apartment, correct?

5  A.  Initially, yes, sir.

6  Q.  And she -- in fact, she joked about making you guys

7  breakfast, didn't she?

8  A.  I don't recall that.  She may have.  I didn't have any

9  protracted dealings with her.  Once they made entry into the

10 bedroom and saw materials that they thought may be explosive,

11 I was asked to come forward and assess those and determine

12 what the risk was and what, if any, action we needed to take

13 regarding evacuation or safe handling.

14 Q.  After that point in time, the apartment was vacated,

15 correct?

16 A.  Yes, sir.

17 Q.  And officers secured a search warrant, correct?

18 A.  Yes, sir.

19 Q.  And then you went back into the apartment with a search

20 warrant, correct?

21 A.  That's correct.  A group of us stood by at the scene to

22 ensure public safety, make sure nothing was removed, and to be

23 available if there was a problem involving explosives, to

24 conduct the evacuation, make sure the fire department knew

25 what the problem was.  So we secured the scene.

1          Other officers from CPAT proceeded to obtain a

2    warrant, and then we did make another entry once the warrant

3    was obtained.

4    Q.  Okay.  And did you obtain any additional explosive

5    material when you went back in there pursuant to the search

6    warrant?

7    A.  I would probably need to look at my report to be certain.

8    I believe we did.

9    Q.  Okay.

10          MR. LIPUMA:  If I may approach, Judge?

11          THE COURT:  Yes, that's fine.

12   BY MR. LIPUMA:

13   Q.  I'll show you report number 6, sir.

14   A.  In paragraph 4, I indicate that a variety of explosives,

15   drugs, and drug paraphernalia was recovered.  So, yeah,

16   apparently, we found additional material in the second search.

17   Q.  Okay.  I'm --

18   A.  The first not really being a search, but just what was in

19   view when we made entry before we backed out to obtain the

20   warrant.

21   Q.  My question was, sir, did you find any other explosive

22   material after the search warrant was obtained and executed at

23   the apartment?

24   A.  Yes, sir.  In paragraph 4, I indicate it.

25   Q.  So it's your testimony that when you went back into the

1   apartment with the search warrant, you found additional

2   explosive material.  Is that your testimony?

3   A.  That's what I have written in this report.  That's what I

4   recall.  We didn't open a lot of containers or drawers or any

5   containers or drawers until we came back with the search

6   warrant.  Remember that explosives can be very big or as small

7   as M-80s, about the size of your thumb, so once we had the

8   search warrant to look for explosives, we needed to check all

9   the areas they could conceivably be.

10          Did you want that back?

11  Q.  I do.  Thank you.

12          And just to be clear, the first time you went in

13  there without the search warrant, you took out and secured and

14  you took it out of the apartment a number of fireworks that

15  you say were in plain view in the bedroom, correct, on the

16  floor in the bedroom, correct?

17  A.  Yes, sir.  We picked up the explosives that were out and

18  obvious so they could be secured.

19  Q.  Did you call any -- the Plainfield Fire Department for

20  backup?

21  A.  Not at that time, no, sir.

22  Q.  Did you ever call the Plainfield Fire Department for

23  backup?

24  A.  No, sir.

25  Q.  When you said "not at that time," what did you mean?  When

Marcus - cross by Mr. Lipuma

60

1  did you call it?

2  A.  I also indicated we never called them.

3  Q.  You never called the Plainfield Police -- Fire Department?

4  A.  I believe that's correct.  They may have been notified by

5  other officers.  I did not request them to the scene.

6  Q.  Did you request any explosives expertise, other agencies,

7  to come to the scene?

8  A.  At that time, Special Agent Zito, another explosives

9  specialist, was with me, and, no, these were within the

10  purview of what we could handle.  The fire department I've

11  worked with extensively, and they are but a phone call away.

12          So, no, we did not --

13  Q.  You did make that phone call?

14  A.  We did not ask for anybody else to respond to the scene.

15  We had the scene secure and so no additional emergency that

16  required resources beyond what we had at the time.

17  Q.  You just said you had the scene "secured."  What do you

18  mean by that?

19  A.  We were present to ensure nobody came or went, and if

20  there were any problems with the explosives, that we could

21  notify the proper authorities -- in this case, the fire

22  department -- and begin the evacuation of any people in the

23  building.

24  Q.  And, sir --

25  A.  Otherwise, our job was just to secure the scene so that

1   nothing changed while the other officers were obtaining the

2   search warrant.

3   Q.  And you'll agree with me Mr. Haldorson was in custody at

4   the time?

5   A.  I'm sorry, sir?

6   Q.  You'll agree with me that Mr. Haldorson was in custody at

7   the time at the Plainfield Police Department?

8   A.  He was at the Plainfield Police Department, yes, sir.

9   Q.  The roommate had been removed from the apartment at some

10  point?

11  A.  Yes, sir, I believe so.  I remember her sitting on the

12  sidewalk, and then I basically lost track of her.  I don't --

13  Q.  The only other people remaining in the apartment were you

14  and fellow law enforcement officers, correct?

15  A.  While waiting for the warrant?

16  Q.  At that time, yes.

17  A.  No, sir.  We were outside.

18  Q.  When you had entered the apartment before you went to get

19  the search warrant, it was you and other agents and officers

20  in that apartment, correct?

21  A.  Again, I don't know when the roommate left and went

22  downstairs.  At some point, she left.  Whether she was there

23  the whole time we were inside or not, I don't know.

24  Q.  And that would have left you and other law enforcement

25  personnel as the only people in that apartment, correct?

```
 1   A.  If she was gone at that time, that's correct, yes, sir.
 2             MR. LIPUMA:  That's all, Judge.
 3             THE COURT:  Redirect.
 4             MR. HAXALL:  None, your Honor.
 5             THE COURT:  Thanks.  You can step down.
 6             THE WITNESS:  Thank you.
 7             THE COURT:  Please call the next witness.
 8             MR. WALLACH:  Your Honor, the government calls
 9   Michael Friddle.  Just so the Court is aware, I am going to be
10   toggling back and forth between video, your Honor, the dash
11   cam, and then our exhibits.
12             THE COURT:  Okay.  Is it all hooked up to this
13   laptop?
14             MR. WALLACH:  It will be.  I just put the CD in
15   there.
16     (Witness sworn.)
17                              - - -
18             MICHAEL FRIDDLE, DIRECT EXAMINATION
19   BY MR. WALLACH:
20   Q.  Good morning.  Could you please state and spell your first
21   and last name for the court reporter.
22   A.  Michael Friddle, M-i-c-h-a-e-l, F-r-i-d-d-l-e.
23   Q.  And are you currently employed?
24   A.  Yes.
25   Q.  Where are you currently employed?
```

Friddle - direct by Mr. Wallach

1   A.  Plainfield Police Department.

2   Q.  And approximately how long have you worked at the

3   Plainfield Police Department for?

4   A.  23 years.

5   Q.  As of today, what is your current position at the

6   Plainfield Police Department?

7   A.  Patrol officer.

8   Q.  And if I could direct your attention back to June 2015,

9   what was your position or role at Plainfield Police Department

10  at that point in time?

11  A.  I was a night shift patrol officer.

12  Q.  And in that position as a night shift patrol officer,

13  generally what were your responsibilities?

14  A.  Patrolling the Village of Plainfield.

15  Q.  Now, I want to direct your attention specifically to

16  June 23rd, 2015.  Were you actually working that day?

17  A.  Yes.

18  Q.  And were you serving in that capacity you mentioned, as

19  the night shift patrol officer, that day?

20  A.  Yes.

21  Q.  Now, on June 23rd, 2015, what, if any, events were going

22  on in the town of Plainfield that evening?

23  A.  Our standard Tuesday night car show during the summer.

24  Q.  And what is that car show called?

25  A.  Plainfield Cruise Nights.

1   Q.  And for the Court's edification, generally what does

2   Plainfield Cruise Night involve?

3   A.  They shut down our downtown Lockport Street and have

4   classic and custom cars on both sides of the street, and

5   closed to all vehicle traffic except for the car show traffic.

6   Q.  And I think this is implicit in your last statement, but

7   what is the impact of this Cruise Night on traffic in that

8   downtown Plainfield area?

9   A.  They close Lockport Street from Route 59 to -- west all

10  the way to Fox River.

11  Q.  Now, at some point on June 23rd, 2015, did you become

12  involved in an investigation involving the Will County

13  Cooperative Police Assistance Team?

14  A.  Yes.

15  Q.  And if it's okay with you going forward, I'll refer to

16  that team as CPAT?

17  A.  Yes.

18  Q.  How is it that you came to be involved in a CPAT

19  investigation that day?

20  A.  I received a phone call from Agent Marzetta.

21  Q.  Now --

22          THE COURT:  M-a-r-z-e-t-t-a?

23          THE WITNESS:  I believe so.

24          THE COURT:  Okay.

25          MR. WALLACH:  And, your Honor, I expect that you will

1    actually hear from Agent Marzetta today.

2         THE COURT:  Oh, okay.  All right.

3    BY MR. WALLACH:

4    Q.  Now, that day, to step back here for a second,

5    approximately what time did your shift start?

6    A.  1800 hours or 6:00 p.m.

7    Q.  Okay.  And that phone call you mentioned from Agent

8    Marzetta, did that come in approximately two hours or so after

9    your shift started?

10   A.  Yes.

11   Q.  Where were you at the time that you received this phone

12   call?

13   A.  I was at the police station.

14   Q.  And the phone number that Agent Marzetta called you on,

15   could you please provide the last four digits of that phone

16   number?

17   A.  5272.

18   Q.  That's 5272?

19   A.  Yes.

20   Q.  Okay.  Now, this call you mentioned a moment ago with

21   Agent Marzetta, was that the only call you had with him that

22   night?

23   A.  No.

24   Q.  Now, if I could step back, prior to June 23rd, 2015, did

25   you know Agent Marzetta?

Friddle - direct by Mr. Wallach

1    A.  Yes.

2    Q.  How?

3    A.  He is an officer with our police department that was

4    assigned to CPAT.

5    Q.  Okay.  And prior to June 23rd, 2015, had you been asked to

6    assist in other CPAT investigations?

7    A.  Yes.

8    Q.  Approximately how many would you estimate?

9    A.  Probably five.

10   Q.  And based on your involvement in those investigations,

11   generally speaking, what type of crimes did CPAT investigate

12   at that period of time?

13   A.  Narcotics.

14   Q.  Now, if we can return to that first call with Agent

15   Marzetta, the one that took place about two hours after your

16   shift started, did he tell you why he wanted your assistance

17   that evening, the evening of June 23rd, 2015?

18   A.  To make a traffic stop on a vehicle.

19   Q.  And what, if anything, did he tell you about the vehicle

20   that he wanted the assistance with the traffic stop on?

21   A.  He said it was a black Pontiac G8 with White Sox license

22   plates and may or may not have red lights in the grilles of

23   the hood.

24   Q.  Okay.  And did he tell you anything about where this

25   vehicle may be located or traveling towards?

Friddle - direct by Mr. Wallach

1  A.  He said it was in our downtown area, the area of the

2  Cruise Night.

3  Q.  And during this call, did Agent Marzetta provide you with

4  any information about the individual who he believed was in

5  the vehicle?

6  A.  He said it was a subject named Mike Haldorson who also

7  goes by the name of Mike Jones.

8  Q.  And what, if anything, did he tell you about Mr. Haldorson

9  or Mr. Jones?

10  A.  He said they had probable cause for an arrest.  That's why

11  they wanted me to stop him.

12  Q.  Did he mention what the basis was for that?

13  A.  Narcotics.

14  Q.  And what, if anything, did Agent Marzetta say about where

15  Mr. Haldorson or Mr. Jones was supposed to be going that

16  night?

17  A.  He said he would be driving from the downtown area towards

18  Caton Farm Road using Route 59.

19  Q.  And did he tell you anything about why Mr. Haldorson was

20  driving in that direction?

21  A.  Based on the information from a confidential informant.

22  Q.  Now, did Agent Marzetta give you any background about

23  Mr. Haldorson other than what you've already mentioned in your

24  testimony?

25  A.  He stated that they were aware that he was possibly in

1    possession of a firearm.

2    Q.  And did he tell you where the basis for that awareness

3    came from?

4    A.  From a previous traffic stop.

5    Q.  Now, you testified a moment ago that you had additional

6    calls with Agent Marzetta after this initial call that we've

7    been discussing; is that correct?

8    A.  Yes.

9    Q.  Generally speaking, what were those additional calls

10   about?

11   A.  Updates on better times when he would be passing by my

12   location.

13   Q.  Now, after that first call with Agent Marzetta, what, if

14   anything, did you do?

15   A.  I drove from the police department and set up at the

16   corner of Fox -- I'm sorry -- Fort Beggs and Route 59.

17   Q.  And that night, what type of vehicle were you driving?

18   A.  A Chevy Tahoe, fully marked, black-and-white.

19   Q.  Was anyone else with you in that Chevy Tahoe?

20   A.  No.

21   Q.  So it was just you in the car?

22   A.  Correct.

23          MR. WALLACH:  Your Honor, I guess I'll follow the

24   same practice as Mr. Haxall.  We have an exhibit we want to

25   show the witness.

Friddle - direct by Mr. Wallach

1    THE COURT:  That's fine.

2    MR. WALLACH:  Okay.

3    THE COURT:  I'm just going to leave it on everybody's

4  screen.  It's easier that way.

5  BY MR. WALLACH:

6  Q.  If you could direct your attention to the monitor in front

7  of you, I'm showing you what's been marked as Government

8  Exhibit PCHSAIR.  Do you recognize this exhibit?

9  A.  Yes.

10  Q.  What is this exhibit?

11  A.  It's an aerial view of Plainfield Central High School,

12  Plainfield Plaza and also Route 59 and Fort Beggs Drive.

13  Q.  And how is it you recognize this exhibit?

14  A.  I've been -- I've seen this hundreds of times.

15  Q.  It's fair to say you've driven past the school and this

16  intersection many times?

17  A.  Yes.

18  Q.  And is this exhibit a fair and accurate representation of

19  what the intersection of Route 59 and Fort Beggs Drive as well

20  as the surrounding areas liked like on June 23rd, 2015?

21  A.  Yes.

22    MR. WALLACH:  Your Honor, we move to admit Government

23  Exhibit PCHSAIR at this time.

24    THE COURT:  It's admitted.

25   (Above-mentioned exhibit was received in evidence.)

1  BY MR. WALLACH:

2  Q.  You testified a minute ago, Officer Friddle, about the

3  intersection of Route 59 and Fort Beggs Drive?

4  A.  Yes.

5  Q.  Using the screen in front of you, could you just circle on

6  Government Exhibit PCHSAIR where that intersection is on this

7  exhibit.

8          THE COURT:  Just use your finger and just draw on it.

9          MR. WALLACH:  Okay.  And so the record is clear, the

10  officer has placed a circle around a T area where the two

11  streets on the exhibit actually intersect.

12          THE COURT:  Correct.  On the right-hand side.

13  BY MR. WALLACH:

14  Q.  Now, you testified a moment ago that after this initial

15  call with Agent Marzetta, you went over towards this

16  intersection; is that correct?

17  A.  Yes.

18  Q.  Approximately how long after the call with Agent Marzetta

19  did you arrive at this location?

20  A.  Five, ten minutes.

21  Q.  And in case the Court isn't familiar with the downtown

22  Plainfield area, approximately how far is this intersection

23  from the area where the Cruise Night car show was taking

24  place?

25  A.  Approximately 10 blocks north of there.

1  Q.  Now, coming back to the exhibit on the left side of the
2  image, there appears to be a large building.  Do you see that?
3  A.  Yes.
4  Q.  What is that building?
5  A.  That's Plainfield Central High School campus.
6  Q.  Am I correct that you actually used to work as an officer
7  at that school?
8  A.  Yes.
9  Q.  Now, after you parked at the intersection of Route 59 and
10  Fort Beggs, what happened next?
11  A.  Agent Marzetta called me and stated that the vehicle
12  should be traveling in my direction in the next few minutes.
13  Q.  Okay.  And after you received that call from Agent
14  Marzetta, what, if anything, did you see?
15  A.  I looked to the north at southbound traffic and saw a
16  vehicle coming at me with red lights in the hood.
17  Q.  And what street was that on?
18  A.  Route 59.
19  Q.  And you mentioned the red lights in the hood.  Where
20  approximately was the car, was this vehicle when you saw those
21  red lights in the hood?
22  A.  Just past the intersection of Union Street.
23  Q.  Can you just circle for the Court or for the record where
24  that would be?
25          THE COURT:  You know, I am going to actually suggest

1  that you fix that so that it isn't such a broad thing, that

2  you can make the lines finer, because the way it's looking

3  now, it kind of blots out everything.  I may be able to do it

4  from here.

5           MR. WALLACH:  It's the second button on the left.

6           THE COURT:  That's too narrow.  I also hate the

7  color.  So I am going to change the color.  There we go.

8  That's better.

9           All right.  So I am going to clear these all out.

10  Why don't you circle the intersection again and then ask your

11  question again.

12           MR. WALLACH:  Yes, your Honor.

13  BY MR. WALLACH:

14  Q.  So to return to the question now, Mr. Friddle, you

15  testified a moment ago that you first saw the lights on that

16  vehicle as it was crossing Union Street; is that correct?

17  A.  Correct.

18  Q.  Could you now circle on the government Exhibit PCHSAIR

19  approximately where Union Street is.

20           MR. WALLACH:  And so the record is clear, the

21  officer's placed a circle on the road that appears at the top

22  right portion of Government Exhibit PCHSAIR that extends off

23  to the right side of the screen.

24           THE COURT:  So Union Street is an east-west road?

25           THE WITNESS:  Yes.

1                THE COURT:  Okay.

2    BY MR. WALLACH:

3    Q.  I think you mentioned this a moment ago, but just to go

4    back to it.  What direction was this vehicle traveling in at

5    that point in time that you observed the red lights?

6    A.  Southbound.

7    Q.  And was that towards you or away from you?

8    A.  Towards me.

9    Q.  Now, at this point in time, could you see anything about

10   the license plate that was on this black Pontiac G8?

11   A.  At the point where I saw the light, no.  I saw the

12   lights -- that was the first thing that drew my attention.

13   Q.  At a later point in time, were you able to see anything

14   about the license plate?

15   A.  Yes.  When I got closer, I could see it was black license

16   plates, which means it's White Sox specialty plates.

17   Q.  Now, what did you do after you saw this black Pontiac

18   approaching you?

19   A.  I started to pull out towards Route 59 to go towards the

20   exit for that plaza that's on Fort Beggs.

21   Q.  And am I correct that the black Pontiac actually took a

22   right onto Fort Beggs street and Route 59?

23   A.  Yes.

24   Q.  So when you were pulling out, you were actually following

25   the black Pontiac at that point in time?

1    A.  Yes.

2    Q.  Now, after you pulled out and followed that black Pontiac,

3    what happened next?

4    A.  I activated my emergency lights to curb the vehicle.

5    Q.  And approximately where did the vehicle actually pull

6    over?

7    A.  The west entrance of Plainfield Central High School.

8    Q.  If you could just circle that on the government exhibit in

9    front of you.

10              MR. WALLACH:  For the record, the witness has placed

11   a circle on the screen on the left side just before Fort

12   Beggs, your Honor.

13              THE COURT:  Right.

14   BY MR. WALLACH:

15   Q.  Now, the stopping of this vehicle, was it videotaped?

16   A.  Yes.

17   Q.  How was it videotaped?

18   A.  Our dash cam in our vehicle.

19   Q.  And the way the dash cam is set up in the Plainfield

20   Police Department vehicle is do the audio and video start at

21   the same time?

22   A.  No.

23   Q.  How is it or why is it that they start at different times?

24   A.  The manufacturer or our police department sets it so that

25   the video actually starts one minute before the audio and

Friddle - direct by Mr. Wallach

1   before we activate our lights.

2   Q.  And when did the audio -- so the audio starts a minute

3   after the prerecord, so to speak?

4   A.  Yes.

5   Q.  And the audio also turns on at the point in time where you

6   actually activate your lights?

7   A.  Within a few seconds, yes.

8   Q.  Now, if you could look at the binder in front of you.

9   A.  Yes.

10  Q.  And turn to the tab that's been marked as Government

11  Exhibit TR Stop.  Do you recognize this exhibit?

12  A.  Yes.

13  Q.  How is it that you recognize this exhibit?

14  A.  I initialed it on August 22nd of last year.

15  Q.  Okay.  And so your initials are visible on that exhibit?

16  A.  Yes.

17  Q.  As well as that date you mentioned, August 22nd, 2016?

18  A.  Yes.

19  Q.  What is contained on Government Exhibit TR Stop?

20  A.  It is the dash cam video of my traffic stop.

21  Q.  And prior to your testimony today, have you had the chance

22  to review the contents of Government Exhibit TR Stop?

23  A.  Yes.

24  Q.  Do the contents of Government Exhibit TR Stop fairly and

25  accurately reflect the video of your stop of Mr. Haldorson in

1   that black Pontiac G8 on the evening of June 23rd, 2015?

2   A.  Yes.

3         MR. WALLACH:  Your Honor, the government moves to

4   admit into evidence Government Exhibit TR Stop and to actually

5   put it up on the screen.

6         THE COURT:  That's fine.  It's admitted.

7     (Above-mentioned exhibit was received in evidence.)

8   BY MR. WALLACH:

9   Q.  Now, before we start the video, I want to ask, Officer

10  Friddle, what is it that we're looking at as this video

11  starts?

12  A.  That is the intersection of Route 59 and Fort Beggs Drive.

13  Q.  Okay.  So directly in front of the screen on this video,

14  there is a street.  Do you see that?

15  A.  Yes.

16  Q.  What is the name of that street?

17  A.  That is Route 59 running left to right.

18  Q.  Okay.  And then just on the right side of the video, there

19  is -- that was actually slightly --

20        Mr. Friddle, I apologize.  I had to rewind the video

21  a little bit.  So you testified a minute ago that is the same

22  street, Route 59, that's directly in front of you?

23  A.  Yes.

24  Q.  And off to the right in the video, what is the name of

25  that street?

Friddle - direct by Mr. Wallach

1  A.  That is Fort Beggs route.

2  Q.  And, again, the video that -- or the screen that we are

3  looking at right now, the images, these are from the dashboard

4  camera that were in your police car on June 23rd, 2015?

5  A.  Yes.

6  Q.  Could you just describe generally where the dashboard

7  camera is located in your car.

8  A.  It is up near the rearview mirror on the windshield.

9  Q.  And is the camera always looking forward, so in the same

10 direction that the car is pointed?

11 A.  Yes.

12 Q.  So if there were events that took place to the left or to

13 the right, the camera can't swivel to capture those events; is

14 that correct?

15 A.  Correct.

16 Q.  I am going to start the video, Officer Friddle, and I'm

17 going to pause it at various points in time.

18         Now, what is happening at this point in the video?

19 A.  The black vehicle with the red lights in the hood made a

20 right turn onto Fort Beggs Drive from southbound Route 59.

21 Q.  And am I correct that you actually started moving your

22 vehicle at this point in time?

23 A.  Yes.

24 Q.  Now, can you describe where on the screen that black

25 vehicle is?

1    A.  All the way to the right.

2    Q.  Okay.  At that time, how is it that you recognize this

3    black vehicle as the car that Agent Marzetta had asked you to

4    assist in stopping?

5    A.  He said it was a black Pontiac G8 with White Sox specialty

6    plates, and it may have the red lights illuminated in the

7    hood.

8    Q.  Okay.  And you testified a moment ago that this black

9    Pontiac G8 you were able to see that it had a black White Sox

10   plate?

11   A.  Yes.

12   Q.  And then as it was driving down Route 59, you were able to

13   see red lights in the hood?

14   A.  Correct.

15   Q.  And based on your experience as an officer in the

16   Plainfield area, was the car that Agent Marzetta described and

17   the car that you saw a common car around the Plainfield area?

18   A.  No.

19   Q.  And in terms of the timing of this black Pontiac G8

20   turning on Fort Beggs, how did that compare with the updates

21   that you received from Agent Marzetta?

22   A.  It was within the time frame.

23   Q.  Now, you testified earlier that you had a chance to review

24   this video prior to your testimony today.

25   A.  Yes.

1  Q.  And during your review of this video, were you able to

2  review it frame by frame with myself and other law enforcement

3  officers?

4  A.  Yes.

5  Q.  And when you went through frame by frame, did you see red

6  lights on the front of the car in any of the frames?

7  A.  Yes.

8  Q.  Now, if you could look at the binder in front of you and

9  turn to the next tab.  If you could direct your attention to

10 what's been marked as Government Exhibit G8 Stills.

11 A.  Yes.

12 Q.  Do you recognize this exhibit?

13 A.  Yes.

14 Q.  And does this exhibit contain some of the still frame

15 images of the G8 that you observed during your review of

16 Government Exhibit TR Stop?

17 A.  Yes.

18 Q.  Specifically five still frame images?

19 A.  Yes.

20 Q.  And have you had the chance to review the images on

21 Government Exhibit G8 Stills prior to your testimony today?

22 A.  Yes.

23 Q.  Actually, on the front of that exhibit, are those your

24 initials?

25 A.  Yes, they are.

Friddle - direct by Mr. Wallach

1    Q.  The date on which you reviewed the images on this CD?

2    A.  Yes.

3    Q.  And do the images on this CD fairly and accurately reflect

4    the still frame images that you saw during your review of

5    Government Exhibit TR Stop?

6    A.  Yes.

7            MR. WALLACH:  Your Honor, the government will move to

8    admit into evidence what is contained on Government Exhibit G8

9    Stills.

10           THE COURT:  It's admitted.

11      (Above-mentioned exhibit was received in evidence.)

12   BY MR. WALLACH:

13   Q.  Now, Officer Friddle, I am going to put the images that

14   are contained on Government Exhibit G8 Stills up on the screen

15   one by one.

16           And I'm showing you what's been marked -- I guess

17   what is G8 Stills 1.  Where, if anywhere, do you see the red

18   lights in the front of the car in this image?

19   A.  In the hood.

20   Q.  And if we could turn to G8 Stills 2, where, if anywhere,

21   do you see the red lights on the front of the car in this

22   exhibit?

23   A.  In the hood.

24   Q.  And could you just circle that on the screen just so it's

25   clear when you say "in the hood."

1      MR. WALLACH:  And so the officer has circled the two

2   indentations at the top part of the hood on the front of the

3   black Pontiac G8.

4   BY MR. WALLACH:

5   Q.  If you could turn to Government Exhibit -- or the third

6   item, G8 Stills 3, where, if anywhere, do you see the red

7   lights on the front of this car?

8   A.  The same place.

9   Q.  Same thing for G8 Stills 4?

10   A.  Yes.

11   Q.  So you see them on the hood area of the front of the car?

12   A.  On the left side more than the right.

13   Q.  Okay.  And then --

14      THE COURT:  Left side looking at the car, meaning the

15   right side of the car.

16      THE WITNESS:  Left side of the screen, yes, the

17   passenger side.

18   BY MR. WALLACH:

19   Q.  And then, finally, G8 Stills 5, where, if anywhere, do you

20   see the red light on the front of the car in this image?

21   A.  In the one visible hood vent.

22   Q.  Okay.  And, once again, could you circle that on the

23   screen.

24      And to make sure the record is clear, Officer

25   Friddle, each of the stills that we have just walked through

1    is from a different moment during the recording contained on

2    Government Exhibit TR Stop; is that correct?

3    A.  Yes.

4    Q.  If you could return to the video and resume playing it

5    from where we left off.

6            THE COURT:  Actually, you know what, let's take a

7    break right now.  10 minutes.  And then we're going to go

8    about 12:30 before we break for lunch.

9      (Short break.)

10           THE COURT:  All the parties are back.  Lawyers are

11   back, as is Mr. Haldorson.

12           You can proceed, Mr. Wallach.

13           MR. WALLACH:  Thank you, your Honor.

14   BY MR. WALLACH:

15   Q.  Officer Friddle, we are going to go back to the video now,

16   and I'm going to play a portion of the video.  And we'll stop

17   at a later portion in time.

18     (Video played.)

19   BY MR. WALLACH:

20   Q.  I want to pause Government Exhibit TR Stop there, Officer

21   Friddle.

22           We just heard a voice coming over the video.  Whose

23   voice is that?

24   A.  That would be mine.

25   Q.  And what is it that you were radioing in -- or what were

Friddle - direct by Mr. Wallach

83

1  you doing at this point in time?

2  A.  Radioing the traffic stop.

3  Q.  And what, in particular, were you radioing in at that

4  point in time?

5  A.  Location, license plate of the vehicle, and description of

6  the vehicle.

7  Q.  And for the record, what were those license plate letters

8  that you were radioing in?

9  A.  MKJNZ.

10  Q.  And what kind of license plate was it?

11  A.  A White Sox specialty plate.

12  Q.  Okay.  Now, at this point in time, could you tell how many

13  occupants there were in the vehicle?

14  A.  It looked like one, but I couldn't really tell.  It was

15  tinted windows.

16  Q.  Okay.  I don't know if you can see it at the point where I

17  stopped it, but were you able to see a hand coming out of the

18  driver's side of the window?

19  A.  Yes.

20  Q.  I am going to resume.

21          MR. WALLACH:  Your Honor, maybe the courtroom volume

22  needs to go up.  This is as loud as we can make it.

23          THE COURT:  Sure.

24          MR. LIPUMA:  Thank you, Judge.

25          THE COURT:  Just one second.  Go ahead.

Friddle - direct by Mr. Wallach

84

1    (Video continued.)

2   BY MR. WALLACH:

3   Q.  I am going to pause it right there.

4        Officer Friddle, when you initially approached the

5   car, you immediately mentioned the red lights on the front?

6   A.  Yes.

7   Q.  Why?

8   A.  Because I saw them.

9   Q.  And when you mentioned this to the driver of the vehicle,

10  did he deny that he had them on?

11  A.  No.

12  Q.  In fact, was his response, "yeah"?

13  A.  Correct.

14        MR. WALLACH:  Your Honor, we would ask that the Court

15  take judicial notice of Government -- or sorry -- 625 ILCS

16  5/12-212, which had been marked as Government Exhibit ILCS

17  Lamp.  It should be, I believe, in the binder of exhibits that

18  was handed to the Court earlier.

19        THE COURT:  Okay.  Well, if it's a statute, yeah,

20  that's fine.

21  BY MR. WALLACH:

22  Q.  I believe, Officer Friddle, this statute should also be in

23  the copy of the binder that was placed in front of you behind

24  the exhibit tab with that name.

25  A.  It is.

1    Q.  Do you see it?

2    A.  Yes.

3            THE COURT:  Whereabouts is it in here?

4            MR. WALLACH:  I believe it's the fifth or sixth

5    exhibit, your Honor.

6            MR. HAXALL:  It might actually be fourth.

7            THE COURT:  I think maybe I don't have that one.  Oh,

8    no, I've got it.  It's here.  Thanks.

9            All right.  Are we waiting for something?

10           MR. WALLACH:  I am just pulling it up on the screen,

11   your Honor.

12           THE COURT:  Okay.

13   BY MR. WALLACH:

14   Q.  Officer Friddle, just two quick questions on this statute.

15   If I could direct your attention to the article section of the

16   statute, what is written there?

17   A.  Okay.

18   Q.  I'm sorry?

19   A.  Oh, I'm sorry.  You want me to read it?

20   Q.  Yes, please.

21           THE COURT:  You know what, the whole purpose of

22   taking judicial notice of it is you don't have to do it.

23           MR. WALLACH:  Don't have to read it.

24           THE COURT:  So keep going.

25           MR. WALLACH:  Thank you, your Honor.

1    And just to be clear, your Honor, this was the

2  statutory section that was in place in June 2015, which, of

3  course, is the relevance of it.

4    THE COURT:  All right.

5  BY MR. WALLACH:

6  Q.  Now, after you had this initial discussion about the red

7  lights, Officer Friddle, you mentioned a car show.

8  A.  Yes.

9  Q.  Were your statements about the car show true?

10  A.  No.

11  Q.  Why did you make those statements up?

12  A.  To put the person at the traffic stop at ease.

13  Q.  And why in this case were you concerned about putting the

14  person in the traffic stop at ease?

15  A.  Because Agent Marzetta said that he was possibly armed.

16    MR. WALLACH:  I am going to go ahead and resume the

17  video here.  I will pause it in just a second.

18    (Video continued.)

19  BY MR. WALLACH:

20  Q.  Now, during that portion of the video that we just viewed,

21  you told the individual in the car that they would have to sit

22  tight until the officer that saw him arrived; is that correct?

23  A.  Yes.

24  Q.  Why did you say that?

25  A.  To give time for Agent Marzetta to get to the scene of the

1    stop.

2              MR. WALLACH:  I am resuming the video again.

3      (Video continued.)

4    BY MR. WALLACH:

5    Q.  Okay.  I am going to pause the video at this point in

6    time.

7              Officer Friddle, when you got back into the car, is

8    that your voice again?

9    A.  Yes.

10   Q.  What were you doing at this point in time?

11   A.  Calling in his driver's license number.

12   Q.  All right.  Do you recall, was there a name on the

13   driver's license as well?

14   A.  Yes.

15   Q.  What was the name on the driver's license?

16   A.  Michael Haldorson.

17   Q.  And what, if anything, did you find out about

18   Mr. Haldorson after you called in the driver's license number?

19   A.  He had a clear driver's license, but had an alert for gang

20   crime activity.

21   Q.  At this point in time, did you find out whether he had any

22   outstanding warrants?

23   A.  They did not acknowledge any.

24     (Video continued.)

25   BY MR. WALLACH:

1   Q.  I believe we just heard a second voice on the video; is

2   that correct?

3   A.  Yes.

4   Q.  Whose voice is that?

5   A.  Agent Marzetta.

6   Q.  And he mentioned a Rogers.  Who is Rogers?

7   A.  Rookie officer on our department.

8   Q.  Okay.  And after that did Agent Marzetta tell you to tell

9   the individual in the vehicle, Mr. Haldorson, that he's got a

10  warrant?

11  A.  Yes.

12  Q.  At that point in time, did you know whether or not this

13  was true?

14  A.  No.

15    (Video continued.)

16  BY MR. WALLACH:

17  Q.  Now I am going to pause the video for a moment here as

18  well.

19          There are now three individuals that are visible on

20  this screen.  Do you see that?

21  A.  Yes.

22  Q.  One of those individuals is you?

23  A.  Yes.

24  Q.  There's another individual who is wearing a vest that says

25  "Police" on the back with camouflage shorts.  Who is that

1   individual?

2   A.  That's Agent Marzetta.

3   Q.  And there is a third individual visible on this screen.

4   Who is that individual?

5   A.  That's Mr. Haldorson.

6   Q.  And all three individuals are standing on the left side of

7   the car if you are looking at the screen at this point in

8   time?

9   A.  Yes.

10  Q.  Where is Mr. Haldorson in terms of the order of the three

11  individuals?

12  A.  He is in front of me closest to the car.

13  Q.  Okay.  And the individual who you arrested on that day,

14  who you are putting the handcuffs on right now, do you see him

15  in court today?

16  A.  Yes.

17  Q.  Can you identify him by an article of clothing that he is

18  wearing as well as where he is sitting?

19          MR. LIPUMA:  Judge, we will stipulate.

20          THE COURT:  It's stipulated that he identified the

21  defendant.

22          MR. WALLACH:  I am going to go ahead and resume the

23  video and play it through to the end at this point in time.

24    (Video continued.)

25  BY MR. WALLACH:

1    Q.  During that video portion that we just viewed, Officer

2    Friddle, was there also -- was there one other plainclothes

3    police officer who was visible during the video in addition to

4    Agent Marzetta?

5    A.  Yes.

6    Q.  Do you know who that was?

7    A.  Agent Kaminski.

8    Q.  Now, towards the end of that video, Mr. Haldorson asked

9    you what they were doing with his car.

10   A.  Yes.

11   Q.  And you told him they were taking it back to where he was

12   going?

13   A.  Yes.

14   Q.  Where was he going?

15   A.  Plainfield Police Department.

16   Q.  Now, if you could turn your attention to the binder in

17   front of you, Officer Friddle, specifically, the exhibit

18   that's been marked Government Exhibit Inventory Policy.  Do

19   you see that?

20   A.  Yes.

21   Q.  And does Government Exhibit Inventory Policy actually

22   contain two policies or general orders of the Plainfield

23   Police Department?

24   A.  Yes.

25   Q.  The first being the towed and impounded vehicle policy?

Friddle - direct by Mr. Wallach

1   A.  Yes.

2   Q.  And the second, the warrantless search and seizure general

3   order policy?

4   A.  Yes.

5   Q.  Do you recognize both of the policies or general orders

6   that are contained in Government Exhibit Inventory Policy?

7   A.  Yes.

8   Q.  How do you recognize these?

9   A.  They are our general order policies in our policy manual.

10  Q.  And are these true and accurate copies of these policies?

11  A.  Yes.

12          MR. WALLACH:  Your Honor, the government would move

13  to admit what's been marked as Government Exhibit Inventory

14  Policy.

15          THE COURT:  It's admitted.

16     (Above-mentioned exhibit was received in evidence.)

17  BY MR. WALLACH:

18  Q.  Now, Officer Friddle, if I could direct your attention to

19  page 5 of the first policy, the towed and impounded vehicle

20  policy.  It should be in front of you but also up on the

21  screen.  Is there a section entitled "Arrest Tow"?

22  A.  Yes.

23  Q.  And does the policy provide that generally after an arrest

24  of an individual driving a car, the car will be towed?

25  A.  Yes.

1  Q.  In this case if CPAT had not moved the car, what, if
2  anything, would Plainfield Police Department have done with
3  the G8 that Mr. Haldorson had been driving?
4  A.  It would have been towed to our police department.
5  Q.  And that was because of the arrest of Mr. Haldorson?
6  A.  Yes.
7  Q.  Was there another reason why Plainfield Police Department
8  would have actually towed the car in addition to that arrest?
9  A.  Because it was parked on the high school property.
10  Q.  And why is it a problem that it was parked on high school
11  property?
12  A.  No one is allowed to park on the high school property
13  unless they are doing business at the high school.
14  Q.  Now, as part of the towing process, does Plainfield Police
15  Department require an inventory search of the items that are
16  found in the car?
17  A.  Yes.
18  Q.  And as part of this section -- actually, if I could turn
19  your attention to the second general order, the warrantless
20  search and seizure policy -- actually, I apologize.  If you
21  could look back to page 5 of the initial policy.
22  A.  Yes.
23  Q.  In that section entitled "Arrest Tow" is one of the first
24  points there that after a towed vehicle has been completed by
25  an individual -- or sorry.

Friddle - direct by Mr. Wallach

1    After a towed vehicle has taken place and the

2    individual who was driving the vehicle has been arrested, the

3    officer shall conduct an inventory of the arrestee's vehicle

4    in accordance with general order 08-109, warrantless search

5    and seizure?

6    A.  Yes.

7    Q.  So if we could now turn to the warrantless search and

8    seizure general order.  I am going to pull it up on the screen

9    in front of you, page 18 of Government Exhibit Inventory

10   Policy.

11         This is the first page of that warrantless search and

12   seizure order?

13   A.  Yes.

14         THE COURT:  Can you just tell me approximately

15   where -- this is a really long exhibit -- where this is.

16         MR. WALLACH:  I think it is about 8 pages from the

17   end, your Honor.

18         THE COURT:  Okay.  Thank you.

19   BY MR. WALLACH:

20   Q.  Now, if you turn to -- and I will put it up on the screen

21   as well -- the bottom of page 3 of this general order.  Is

22   there a section labeled "Inventory Searches"?

23   A.  Yes.

24   Q.  And does that section state as one of the reasons to

25   conduct an inventory search to discover any potential danger?

1   A.  Yes.

2   Q.  Does it note that the car must have been lawfully obtained

3   by the officers?

4   A.  Yes.

5   Q.  What is an example of a car having been lawfully obtained

6   by an officer?

7   A.  Arrest.

8   Q.  On the next page, so page 4 of 6, does it provide that

9   during this inventory search, all containers and possessions

10  in the vehicle shall be searched?

11  A.  Yes.

12  Q.  And if you turn back to page 3, does the inventory policy

13  also set out additional reasons as to why this complete

14  inventory is required pursuant to the general order?

15  A.  Yes.

16  Q.  And those are set forth in 1, 2, 3, and 4 on that page?

17  A.  Correct.

18  Q.  Now, after you drove Mr. Haldorson back to the Plainfield

19  Police Department, did you, at a later point in time, take

20  photographs of the items that were discovered in his vehicle?

21  A.  Yes.

22  Q.  If you could turn your attention to what's been marked as

23  Government Exhibit Explosives 1 through 6.  And just look

24  through those quickly and let me know when you are done

25  looking through them.

Friddle - cross by Mr. Lipuma

95

1   A.  Okay.

2   Q.  Do you recognize the photographs that are contained in

3   what's been marked as Government Exhibit Explosives 1 through

4   6?

5   A.  Yes.

6   Q.  Did you take these photographs?

7   A.  Yes.

8   Q.  And do these photographs truly and accurately depict items

9   that were found in Mr. Haldorson's vehicle during the

10  post-arrest search of the vehicle?

11  A.  Yes.

12        MR. WALLACH:  Your Honor, the government would move

13  to admit Government Exhibits Explosives 1 through 6.

14        THE COURT:  It's admitted.

15    (Above-mentioned exhibits were received in evidence.)

16        MR. WALLACH:  May I have one moment?

17        THE COURT:  Sure.

18        MR. WALLACH:  Nothing else at this point in time,

19  your Honor.

20        THE COURT:  Mr. Lipuma.

21                         - - -

22            MICHAEL FRIDDLE, CROSS-EXAMINATION

23  BY MR. LIPUMA:

24  Q.  Good morning, Officer Friddle.

25  A.  Good morning.

1   Q.  You say you started your shift at 6:00 p.m.

2   A.  Correct.

3   Q.  And about two hours later, you received a call from -- is

4   it officer, inspector, or Agent Marzetta?

5   A.  Agent.

6   Q.  Agent Marzetta.  Okay.

7        And you say he is a member of the Plainfield Police

8   Department like yourself?

9   A.  Yes.

10  Q.  But he is assigned to the task force?

11  A.  Correct.

12  Q.  Okay.  So you prepared a report.  You indicated that you

13  received a call from Marzetta, and it was more like 7:52,

14  correct?

15  A.  I believe so.

16  Q.  Okay.  And you also said you received multiple calls from

17  him; is that right?

18  A.  Yes.

19  Q.  And basically, what Agent Marzetta told you to do -- he

20  called you on the phone --

21  A.  Yes.

22  Q.  -- at 7:52, and he wanted you to assist him in stopping a

23  vehicle, correct?

24  A.  Yes.

25  Q.  He said, I want you to stop a black Pontiac G8 with White

Friddle - cross by Mr. Lipuma

97

1   Sox plates?

2   A.  Yes.

3   Q.  Is that right?

4       And he said, and it has red lights in the front

5   grille and hood vents, correct?  But he said the front grille,

6   right?  That's what you testified to, right?

7   A.  Yes.

8   Q.  Okay.  And he indicated to you he should be driving south

9   on Route 59 toward Caton Farm Road area, correct?

10  A.  Yes.

11  Q.  Okay.  And he also told you that CPAT -- which is

12  Cooperative Police Assistance Team?

13  A.  Yes.

14  Q.  -- had probable cause for an arrest of the driver on

15  narcotics charges.  Is that what he told you?

16  A.  Yes.

17  Q.  So some 35 minutes later, about 8:27, you actually see the

18  G8, correct?

19  A.  Yes.

20  Q.  So for those 35 minutes, were you in that area then just

21  sitting on that area where the dash cam shows where you were

22  sitting?

23  A.  And I drove to that area.

24  Q.  You drove to that area about what time?

25  A.  It took me probably 10 minutes after the phone call.

Friddle - cross by Mr. Lipuma

98

1  Q.  And you sat there for how long before you actually saw the

2  G8?

3  A.  15 or 20 minutes.

4  Q.  Okay.  And your testimony today is he wanted you to make a

5  traffic stop on that vehicle, correct?

6  A.  Yes.

7  Q.  Because he said he may or may not have lights in the

8  grille area, correct?

9  A.  Yes.

10  Q.  Okay.  And he also, according to you, said that this

11  individual, this suspect, is possibly in possession of a

12  firearm, correct?

13  A.  Yes.

14  Q.  Okay.  Now, you prepared a report of this incident,

15  correct?

16  A.  Correct.

17  Q.  You never mentioned the gun, did you?

18  A.  I believe I did.

19  Q.  Okay.  Let me tender it to you.

20       MR. LIPUMA:  If I may approach, Judge?

21       THE COURT:  Sure.

22  BY MR. LIPUMA:

23  Q.  I am tendering the witness' report 6/23/15, report

24  15-4080.

25  A.  You are correct.  The report does not mention the firearm.

1  Q.  Okay.  So you neglected to put that remark by Agent

2  Marzetta about a gun in your report, correct?

3  A.  Yes.

4  Q.  I mean, you're an experienced police officer, right?

5  You've been a police officer a number of years, over ten

6  years, correct?

7  A.  Correct.

8  Q.  And you understand it's important to put all material

9  information in your reports, correct?

10 A.  Yes.

11 Q.  And they teach you that in basic training when you become

12 a police officer, correct?

13 A.  Yes.

14 Q.  And I'm sure you have other training.  Every year you

15 probably have training with respect to your duties as a law

16 enforcement officer, correct?

17 A.  Yes.

18 Q.  And you knew you should have put that gun remark into this

19 report, correct?

20 A.  Possibly.

21 Q.  Okay.  And you also testified that Agent Marzetta told you

22 that he's possibly in possession of a firearm from a previous

23 traffic stop.  Do you remember that testimony?

24 A.  Yes.

25 Q.  When did he say that traffic stop occurred?

Friddle - cross by Mr. Lipuma

1  A.  Within the last -- I believe it was a month or so.

2  Q.  Did he say where the traffic stop occurred?

3  A.  No.

4  Q.  Did he say who witnessed that prior traffic stop?

5  A.  No.

6  Q.  Did he give you any other information about this prior

7  traffic stop in which the suspect allegedly had a gun?

8  A.  No.

9  Q.  And, of course, that raises some very important serious

10  concerns for you given the fact that law enforcement officers

11  are, you know, sometimes in fear of their lives for the duties

12  they have to do for the rest of us, for the rest of us

13  citizens, correct?

14  A.  Yes.

15  Q.  Now, you looked at this --

16        MR. LIPUMA:  Can I get the map again, please?

17  BY MR. LIPUMA:

18  Q.  Do you have the map in front of you, Mr. Witness?

19  A.  Yes.

20  Q.  Okay.  And I want you to indicate again, if you could,

21  please, directly where you were parked.

22  A.  On the screen?

23  Q.  Yes, please.

24  A.  Approximately right about -- a little to the right of that

25  circle.

Friddle - cross by Mr. Lipuma

1  Q.  Okay.  Actually, you just put a circle on a building,

2  correct?

3  A.  Correct.

4  Q.  Okay.  So the red circle that you put there, should it be

5  down further, lower, to the right?

6  A.  Down to the right just a little bit.  I was parked just

7  sticking out past that building a little bit.

8  Q.  Just sticking out past that building a little bit?

9  A.  To the east.

10 Q.  And can you indicate where you say you saw Mr. Haldorson's

11 vehicle for the first time?

12 A.  Just past -- he was southbound just past this

13 intersection.

14 Q.  Okay.  And he was in the right -- what lane was he in at

15 that point in time?

16 A.  He was in the right lane, I believe.  There's only two

17 lanes going that direction.

18 Q.  Right.  And so he eventually turned into the right lane to

19 take a right on Fort Beggs Drive, correct?

20 A.  Yes.

21 Q.  But when you say you saw him, what lane was he in?

22 A.  From that distance, I actually couldn't tell.  He may have

23 been in the left or right lane.

24 Q.  Okay.  You couldn't tell because Route 59 is a busy

25 street, isn't it?

Friddle - cross by Mr. Lipuma

1  A.  Yes.

2  Q.  And there's a lot of traffic there, correct?

3  A.  Yes.

4  Q.  And it's quite a distance from where you were parked to

5  Union Street.  It looks like -- well, you got the plaza right

6  there.  You got the shopping center right there, which you're

7  parked next to, correct?

8  A.  Correct.

9  Q.  And at that point in time, that was undergoing

10 renovations, correct?

11 A.  No, I don't believe so.

12 Q.  Okay.  And then there is another larger building beyond

13 the shopping center, correct?

14 A.  Yes.

15 Q.  And then once you get past that, that's where Union Street

16 is, isn't it?

17 A.  Yes.

18 Q.  And that's where you say you saw Mr. Haldorson?

19 A.  Just south of that intersection.

20 Q.  Okay.  You indicated it wasn't a common car, and that kind

21 of caught my attention.  It's a Pontiac, correct,

22 American-made car?

23 A.  Yes.

24 Q.  And you say it's not common for people in that area.  What

25 kind of vehicle is common for people out there on Route 59 in

Friddle - cross by Mr. Lipuma

1  Plainfield and Joliet?

2  A.  Most any other car, the Pontiac G8 was kind of a

3  high-performance version of the Pontiac.

4  Q.  It was an older car, though, wasn't it?

5  A.  It was a little bit older.

6  Q.  It was quite old, right, several years older?  It wasn't a

7  new car, was it?

8  A.  No, no.

9  Q.  And you said that when this car, which you did not know

10  was in -- which lane it was in --

11  A.  Correct.

12  Q.  -- heading south, you didn't know if it was in the right

13  lane or left lane heading south.

14  A.  Correct.

15  Q.  But you say at that point in time you saw lights emanating

16  or illuminating from the hood, correct?

17  A.  From the front of the vehicle.

18  Q.  Okay.  Well, I thought you said, in your direct testimony,

19  you said the red lights were in the hood.  Wasn't that what

20  you just testified to a few moments ago?

21  A.  Yes.

22  Q.  Okay.  And Marzetta had told you earlier that they were in

23  the grille, correct?

24  A.  Yes.

25  Q.  And I think what you saw when we watched that video is

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 104 of 292 PageID #:3166
Friddle - cross by Mr. Lipuma
104

1   once the light turned red, there were -- there were a number

2   of cars that passed before you before Mike Haldorson turned

3   right on Fort Beggs Drive, correct?

4   A.  Correct.

5   Q.  I think I counted seven vehicles.  Would you agree with me

6   on that?  He was the seventh car in the right-turn lane?

7   A.  I didn't count.

8   Q.  Okay.  But you would agree with me there were a number of

9   cars that were ahead of him at the light, correct?

10  A.  Yes.

11  Q.  Okay.  And he was the first car to take a right, correct?

12  A.  Yes.

13  Q.  And a second car followed him taking a right, correct?

14  A.  Yes.

15  Q.  And you pulled up -- you pulled out behind the second car,

16  right?

17  A.  Yes.

18  Q.  You said you saw red lights in the hood area.  When you

19  stopped the car, did you notice that the hood area of that car

20  had a plastic red insert on the hood?

21  A.  No.

22  Q.  Did you look for that?

23  A.  No.

24  Q.  Did you search the car?

25  A.  I did not.

Friddle - cross by Mr. Lipuma

Q.  Now, in this still photo, it's Government Exhibit 4, I
believe, you see Mr. Haldorson's vehicle, correct?

A.  Yes.

Q.  Okay.  And you see a couple, it looks like, pickup trucks
behind his car, a yellow one and a white one, correct?

A.  Yes.

Q.  And you've identified, when you circled this earlier, the
area on the hood that looks like it's a little bit red,
correct?

        Okay.  But you also see other lights on the vehicle,
correct?

A.  Yes.

Q.  You see his headlights; isn't that true?

A.  I believe that's a turn signal, but, yes, it's in the
headlight area.

Q.  Well, it looks like the headlights -- the head lamps or
the lamps of the car are on, correct?

A.  Yes.

Q.  And in the bumper area below the headlights, it looks like
there is a light illuminated, correct?

A.  Yes.

Q.  And -- but you don't see anything in the grille, do you,
completely dark, correct?

A.  Not in the grille.

Q.  Let me ask you this.  By the way, there were other

Friddle - cross by Mr. Lipuma

1    officers involved other than you and Marzetta and that other

2    officer who was there at the time of the arrest, right?

3    Another officer showed up on the scene; isn't that true?

4    A.  Yes.

5    Q.  And that was a Joliet Police Department officer, correct?

6    A.  Yes.

7    Q.  And he was stationed on another street, correct?

8    A.  I don't know.

9    Q.  Well, you were in Plainfield?

10   A.  Yes.

11   Q.  But you had a Joliet police officer pull up as well,

12   right?

13   A.  Yes.

14   Q.  And you heard the video, correct?

15   A.  Yes.

16   Q.  And you heard there's a reference to:  We didn't know

17   which way he was going to go.  Didn't you hear that?

18   A.  Yes.

19   Q.  And who said that?  Was that Marzetta who said that?

20   A.  I believe so.

21   Q.  And he said it to you and the Joliet Police Department

22   officer, right?

23   A.  Yes.

24   Q.  And that's because the Joliet Police Department officer

25   was stationed on Lincoln highway waiting for the same vehicle,

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 107 of 292 PageID #:3169
Friddle - cross by Mr. Lipuma
107

1  correct?

2  A.  I don't know.

3  Q.  Did you know that officer?

4  A.  I do now.  I did not know him at that time.

5  Q.  Okay.  Did it surprise you that a Joliet Police Department

6  officer showed up at a Plainfield operation?

7  A.  No.

8  Q.  Did you receive any communications that a Joliet police

9  officer would be showing up?

10  A.  No.

11  Q.  You made the traffic stop, correct, as directed?

12  A.  Yes.

13  Q.  You asked for Mr. Haldorson's driver's license, and he

14  gave it to you, correct?

15  A.  Yes.

16  Q.  Didn't give you a phony ID or anything like that?

17  A.  No.

18  Q.  You say you told -- you told him about the red lights out

19  in the front, and he answered affirmatively, correct?

20  A.  Yes.

21  Q.  Okay.  And at that time, are you saying that those red

22  lights were still on?

23  A.  I don't know.  I wasn't in front of the vehicle.

24  Q.  Okay.  Well, you could see the hood, correct?

25  A.  Yes.

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 108 of 292 PageID #:3170
Friddle - cross by Mr. Lipuma
108

1  Q.  If the lights were on, you would have seen it on the hood,

2  right?

3  A.  Not standing next to the vehicle, no.

4  Q.  When Mr. Haldorson passed, you pulled out immediately,

5  right?

6  A.  Yes.

7  Q.  Because you are going to stop the car and you knew they

8  were going to take him into custody, correct?

9  A.  They told me to stop the vehicle.  That's --

10  Q.  Because they said they had probable cause to arrest him on

11  previous narcotics charges, correct?

12  A.  Yes.

13  Q.  And you asked him, were you just at the car show; is that

14  right?

15  A.  Yes.

16  Q.  And he answered affirmatively, correct?

17  A.  Yes.

18  Q.  And then you asked if he got into a pissing match with

19  someone, correct?

20  A.  Yes.

21  Q.  And he said no, correct?

22  A.  Correct.

23  Q.  And basically, you're just feeling him out at this time or

24  you're just -- why are you asking him did you get into a

25  pissing match with someone?

Friddle - cross by Mr. Lipuma

1  A.  To put him at ease.

2  Q.  To put him at ease, because you were concerned he had a

3  gun?

4  A.  Possibly.

5  Q.  You were concerned he possibly had a gun, so you asked him

6  if he was involved in a pissing match with somebody?

7  A.  Yes.

8  Q.  You also asked him if he did a burnout?

9  A.  Yes.

10  Q.  Okay.  And these -- were these things someone told you to

11  say to him, or did you come up with this independently?

12  A.  Independently.

13  Q.  Okay.  You said the guy said your car was a sweet G8 with

14  red lights, correct?

15  A.  Correct.

16  Q.  And you said you heard -- you took off fast, and he

17  squealed his tires.  And an officer yelled at him, and he

18  didn't stop, correct?

19  A.  Correct.

20  Q.  And this is stuff you're making up, right?

21  A.  Yes.

22  Q.  And you also said to him, the officer is going to come and

23  take a look at you, and if it's not you, you are going to be

24  out of here in 30 seconds, right?

25  A.  Yes.

Friddle - cross by Mr. Lipuma

1   Q.  And you went back to your vehicle, and dispatch ran the

2   driver's license, correct?

3   A.  Correct.

4   Q.  And told you valid.

5   A.  Yes.

6   Q.  Valid license, actually told you where he lives in Joliet,

7   correct?

8   A.  Yes.

9   Q.  And you had that on his driver's license.  You had his --

10  did you know he had his parents' address?

11  A.  No.

12  Q.  You had an address for him on the driver's license for a

13  residence in Joliet, Illinois; isn't that true?

14  A.  I believe so.

15  Q.  And you also said, you can tell -- and this is when you're

16  in the car -- you said, you can also tell Rogers he can come

17  over here.  And someone said, he's going to shoot.  And that's

18  you and Marzetta shooting the shit about -- pardon my

19  language.  That's you and him going back and forth about

20  another law enforcement officer, correct?

21  A.  Yes.

22  Q.  Okay.  And at that point, Marzetta tells you, we'll just

23  take him.  Tell him he's got a warrant.  Right?  You heard

24  that.  You heard Marzetta tell you that, correct?

25  A.  Correct.

Friddle - cross by Mr. Lipuma

1    Q.  And you said, okay.  Right?

2    A.  Yes.

3    Q.  A lot of the statements you made to Michael Haldorson at

4    that point in time were just not true.  You were lying to him,

5    correct?

6    A.  Yes.

7    Q.  And you had him step outside the vehicle, and you patted

8    him down, right?

9    A.  Correct.

10   Q.  And you asked him if there was anything that could hurt

11   him, and you pulled out a little Swiss Army knife, correct?

12   A.  I believe it was a locked blade.

13   Q.  Okay.  But it was contained; the blade wasn't exposed,

14   correct?

15   A.  Yes.

16   Q.  But there was no gun on him, correct --

17   A.  No.

18   Q.  -- when you searched him.

19          In fact, you know from activities later that night,

20   the Plainfield Police Department, the vehicle was searched,

21   correct?

22   A.  Yes.

23   Q.  And you know that that search revealed no firearm,

24   correct?

25   A.  Not to my knowledge.

Friddle - cross by Mr. Lipuma

1  Q.  You also heard during that video -- you took -- strike

2  that.

3          You took Michael out of the car, patted him down, and

4  you told him, I found out the guys don't need to be here

5  because of your warrant.  You did that, correct?

6  A.  Yes.

7  Q.  And then Michael asks Marzetta and you why he's being

8  arrested, and you heard Marzetta say, we'll talk about it,

9  correct?

10 A.  Yes.

11 Q.  And then Michael asked again, why am I being arrested?

12 And Marzetta tells him, we'll explain it to you, right?

13 A.  Yes.

14 Q.  And then Michael asks him a third time, why am I being

15 arrested?  And Marzetta says, you got a warrant, dude,

16 correct?

17 A.  Yes.

18 Q.  And that's a lie, right, an out-and-out lie?  There was no

19 warrant pending, correct?

20 A.  Not that I was aware of.

21 Q.  Okay.  At that point you weren't aware of an arrest

22 warrant or a search warrant at that time, were you?

23 A.  No.

24 Q.  When you were searching Michael, you found currency on his

25 person, correct?

Friddle - cross by Mr. Lipuma

1    A.  Yes.

2    Q.  Okay.  You did the pat-down search and found the currency,

3    not Marzetta, correct?

4    A.  Correct.

5    Q.  And at 8:32 was when Mr. Haldorson was formally arrested;

6    is that right?

7    A.  I believe so.

8    Q.  And you took him into custody not on your charges, but on

9    their charges; isn't that true?

10   A.  Yes.

11   Q.  And, indeed -- did you prepare a traffic stop data sheet

12   citizen contact from the Plainfield Police Department?

13   A.  Yes.

14   Q.  Okay.  And isn't it true that on that document, you had --

15   you wrote out Michael Haldorson's address?

16   A.  Yes.

17   Q.  And you also wrote his address as I think it's 3460

18   Lockner, in Joliet, Illinois?  If you need to look at the

19   report to refresh your recollection, I can give it to you.

20   A.  Yes.  I don't remember.

21        MR. LIPUMA:  I am tendering to the witness Plainfield

22   Police Department report 15-4080 entitled A Traffic Stop Data

23   Sheet Citizen Contact.

24        THE WITNESS:  Yes.

25

Friddle - cross by Mr. Lipuma

1  BY MR. LIPUMA:

2  Q.  And I ask you to take a look at that.  Do you see if there

3  is an address on there?

4  A.  Yes.

5  Q.  Okay.  And you went to the address.  If you could just

6  read it?

7  A.  3460 Lockner, Joliet, Illinois.

8  Q.  Okay.  And underneath that, you see where it says primary

9  reason for stop?

10  A.  Yes.

11  Q.  What -- did you check a box there?

12  A.  Equipment.

13  Q.  Okay.  And when it says the result of the stop, what --

14  did you check a box there?

15  A.  Yes.

16  Q.  What did you check?

17  A.  Written warning.

18  Q.  Okay.  And at the bottom under "offenses," what did you

19  write?

20  A.  "Improper lighting."

21  Q.  And you signed that?

22  A.  Yes.

23  Q.  And that's your badge number?

24  A.  Correct.

25  Q.  May I take that back from you?

Friddle - cross by Mr. Lipuma

1   A.  Sure.

2   Q.  And the government asked you some questions about the

3   inventory policy for the Plainfield Police Department.

4   A.  Okay.

5   Q.  Do you remember that?

6   A.  Yes.

7   Q.  The questioning.

8         The first -- it's under the index of inventory

9   policy, correct, the two policies that are in there?  The

10  first one is a general order?

11  A.  Yes.

12  Q.  Now, that's not the inventory policy, is it?

13  A.  I believe that's the second one.

14  Q.  I know.  But I want to do the first one first.  The

15  general order 09-704 --

16  A.  Yes.

17  Q.  -- that's not -- that's not the inventory policy, is it?

18  A.  Correct.

19  Q.  Okay.  So then let's turn to the next general order, which

20  is 08-109.

21  A.  Okay.

22  Q.  I would direct your attention to page 3 where you were

23  directed earlier with Mr. Wallach under "inventory searches."

24  Do you see that?

25  A.  Yes.

Friddle - cross by Mr. Lipuma

1  Q.  So, basically, this inventory search, at least for the

2  first three lines, it tells you the purpose of an inventory

3  search, doesn't it?

4  A.  Yes.

5  Q.  Okay.  It doesn't tell you how to conduct an inventory

6  search, does it?

7  A.  No.

8  Q.  Okay.  And then at point 4, it says "limitations on the

9  searches include," and that basically just says what limits

10 you, when you cannot do an inventory search, correct?

11 A.  Yes.

12 Q.  And it says, in fact, at B -- at A it says, the search --

13 "The property to be searched must have lawful" -- "have come

14 lawfully into possession of the officer," correct?

15 A.  Yes.

16 Q.  And point B says, "The inventory must be conducted

17 pursuant to standard operations and policies prescribed by the

18 department," correct?

19 A.  Yes.

20 Q.  If you turn to the next page, page 4, item 5, it talks

21 again about searched and/or impounded vehicles, correct?

22 A.  Yes.

23 Q.  And it basically says the same thing as the other general

24 order said, which it must be inventoried and recorded on a tow

25 report; isn't that true?

1    A.  Yes.

2    Q.  So then we look at 5A and 5B, and that's what we are down

3    to here.  If a vehicle is inventoried, all containers and

4    possessions in the vehicle shall be searched.  That's what it

5    says, correct?

6    A.  Yes.

7    Q.  The next line says when no key is available, so that's not

8    relevant because a key was available, right?  You had the keys

9    from searching Mr. Haldorson, correct?

10   A.  Yes.

11   Q.  Okay.  And then at point B it says, "Standard procedures

12   for vehicle inventory may be located in general orders 07-700,

13   traffic enforcement; 07-703, motorist assist, roadway hazards;

14   and 08-704, towed and impounded vehicles."

15        And we looked at 08-704, but we haven't seen the

16   others, have we?

17   A.  Correct.

18   Q.  At point 6 it says, "Additional items that might be

19   subject to an inventory search:  Found property, property

20   towed owned by citizens for safe keeping, property returned by

21   a citizen for destruction, and abandoned property," correct?

22   A.  Yes.

23   Q.  Point 6 isn't relevant here, is it?

24   A.  No.

25   Q.  Okay.  So really we're focusing on point 5; is that

Friddle - redirect by Mr. Wallach

1   correct?

2   A.  Yes.

3   Q.  And that's the sum and totality of Plainfield Police

4   Department's inventory policy, at least based on the materials

5   you provided us with in your testimony today; isn't that true?

6           MR. LIPUMA:  Judge, that's all I have.

7           THE COURT:  Redirect?

8           MR. WALLACH:  May I have one moment, your Honor?

9           THE COURT:  Sure.

10    (Brief pause.)

11                              - - -

12            MICHAEL FRIDDLE, REDIRECT EXAMINATION

13  BY MR. WALLACH:

14  Q.  Officer Friddle, you were asked a couple questions by

15  defense counsel about how long you were out on the corner of

16  the intersection of Fort Beggs and Route 59.  Do you recall

17  those?

18  A.  Yes.

19  Q.  During the time you were sitting on that intersection, how

20  many other black Pontiac G8s with red lights anywhere on the

21  front of the car did you see on Route 59 other than the one

22  that you stopped and that we observed in the video?

23  A.  Zero.

24  Q.  How many with red lights and White Sox specialty plates?

25  A.  Zero.

Friddle - redirect by Mr. Wallach

1  Q.  And just to be clear about one point that I think you were

2  asked about on cross, you testified earlier that a black

3  Pontiac G8 with red lights on the front of the car and White

4  Sox specialty plates, that that combination is not common in

5  the Plainfield area; is that correct?

6  A.  Correct.

7         MR. WALLACH:  No further questions, your Honor.

8         THE COURT:  Mr. Lipuma, anything else?

9         MR. LIPUMA:  Nothing further, Judge.

10        THE COURT:  You are excused.

11        Please call the next witness.

12        MR. HAXALL:  The government calls Mario Marzetta.

13        THE COURT:  The sum total number of witnesses you are

14  calling?  This is the third.

15        MR. HAXALL:  After Marzetta, there is two long and

16  two short.

17        THE COURT:  And long is more like the last two or

18  longer than the last two?

19        MR. HAXALL:  No, like this.

20        THE COURT:  Okay.

21        MR. HAXALL:  At least as far as direct goes.

22        THE COURT:  Sure.

23   (Witness sworn.)

24        THE COURT:  You can go ahead, Mr. Haxall.

25        MR. HAXALL:  Thank you.

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 120 of 292 PageID #:3182
Marzetta - direct by Mr. Haxall
120

1                        - - -

2              MARIO MARZETTA, DIRECT EXAMINATION

3   BY MR. HAXALL:

4   Q.  Sir, can you state your full name and spell your last

5   name.

6   A.  Mario Marzetta, M-a-r-z-e-t-t-a.

7   Q.  How are you currently employed?

8   A.  With the Village of Plainfield.

9   Q.  In what capacity?

10  A.  Police officer.

11  Q.  How long have you been in law enforcement?

12  A.  Fourteen years.

13  Q.  What is your current assignment with the Plainfield Police

14  Department?

15  A.  I'm assigned patrol.

16  Q.  Were you previously assigned to a specialized unit?

17  A.  I was.

18  Q.  What unit was that?

19  A.  Will County Cooperative Police Assistance Team.

20  Q.  And is it okay if I refer to that as CPAT?

21  A.  Yes.

22  Q.  Can you please describe for Judge Kennelly the general

23  kinds of cases that CPAT handles.

24  A.  We are under -- "under narcotic" -- undercover narcotics

25  group, and we take any narcotics case that comes across us,

Marzetta - direct by Mr. Haxall

1   whether it be running informants, conducting search warrants,

2   buys of drugs ourselves, informants buys a drug.

3   Q.  And is this a team that's made up of officers from local

4   police departments under the umbrella of the Illinois State

5   Police?

6   A.  It is.

7   Q.  And approximately how long were you with CPAT yourself?

8   A.  From 2011 to 2015.

9   Q.  Can you -- approximately how many narcotics cases do you

10  think you handled during your time at CPAT?

11  A.  Just in CPAT, under -- that I've started?

12  Q.  How many were you --

13  A.  Or together as a whole unit?

14  Q.  -- the lead investigator on first?  Let's do that.

15  A.  Over a hundred.

16  Q.  And how many did you assist on?

17  A.  Several hundred.

18  Q.  And did you ultimately assist in an investigation that led

19  to charges in this case?

20  A.  I did.

21  Q.  One of the things you mentioned was informants.  Let's

22  talk about informants for a second.

23          Who is responsible for maintaining the informant

24  relationship?

25  A.  The case agent or handler of the informant.

Marzetta - direct by Mr. Haxall

1  Q.  And other than handling informants, what are case agent's

2  primary responsibilities?

3  A.  They run the case from aspects of times and dates and what

4  we're doing.

5  Q.  In your time as a case agent with CPAT, approximately how

6  many times did you handle informants?

7  A.  How many times did I handle informants?

8  Q.  Yes, sir.

9  A.  A couple dozen.

10  Q.  Was it your practice to protect the identity of your

11  informants?

12  A.  Yes.

13  Q.  How did you do that?

14  A.  We never used their real name.  We assigned them a fake

15  name as well as a number.

16  Q.  Anything else as far as reporting?

17  A.  Reporting, we'd keep them out of the reports if need be.

18  Q.  And why would you do this with respect to informants?

19  A.  If a document were to come up where the defendant would

20  see it and it had the informant's name, it could jeopardize

21  his safety.

22  Q.  What impact would that also have on your ability to

23  acquire informants moving forward?

24  A.  Less people would want to work for us.

25  Q.  Now, you indicated -- you talked about case agents.  Who

Marzetta - direct by Mr. Haxall

1   was the case agent in the investigation that led to the

2   charges in this case?

3   A.  Inspector Insley.

4   Q.  Prior to this investigation, were you personally familiar

5   with an individual named Michael Haldorson?

6   A.  No, I was not.

7   Q.  I'd like to direct your attention to June 1st of 2015.  Do

8   you recall that evening?

9   A.  I do.

10  Q.  What was your role in the investigation that evening?

11  A.  Surveillance.

12  Q.  Surveillance of what?

13  A.  Of narcotics deal.

14  Q.  Okay.  And where was that narcotics deal supposed to

15  occur?

16  A.  At the Walmart.  I don't remember the exact address, but

17  it was at the intersection of Theodore and 59.

18  Q.  And who told you where you were going to be conducting

19  surveillance that evening?

20  A.  Inspector Insley.

21  Q.  What other instructions did Inspector Insley give you as

22  far as what you should be on the lookout for?

23  A.  I got a description of the vehicle to be on the lookout

24  for.

25  Q.  And what was that description?

Marzetta - direct by Mr. Haxall

1   A.   A black Pontiac G8 with Illinois White Sox plates MKJNZ.

2   Q.   And based on the instructions that Inspector Insley gave

3   you at approximately 9:15 p.m. on June 1st, did you go to that

4   Walmart?

5   A.   I did.

6   Q.   Can you describe -- I'll just take that back.

7        Were you driving a marked or an unmarked car?

8   A.   Unmarked car.

9   Q.   And while you were conducting surveillance, how were you

10  in contact with other members of your team?

11  A.   Through cell phone and police radio.

12  Q.   In addition to cell phone and police radio, were you

13  listening to anything else relevant to your investigation?

14  A.   Yeah.  We had a device called an overhear device.

15  Q.   Okay.  And what did that allow you to do?

16  A.   It allowed us to hear conversations between the informant

17  and defendant.

18  Q.   Okay.  And so at approximately 9:15, did you go to that

19  Walmart?

20  A.   I did.

21  Q.   At approximately 9:20, what information were you provided

22  about the informant's arrival or his location?

23  A.   That he was pulling into the parking lot and parked on the

24  north side.

25  Q.   What did you observe at that time?

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 125 of 292 PageID #:3187
Marzetta - direct by Mr. Haxall
125

1   A.  I observed him park his car.

2   Q.  Okay.  Did you know what kind of car he was going to be

3   driving?

4   A.  Yes.

5   Q.  Approximately how far away from where you were conducting

6   surveillance did the informant park his car?

7   A.  Two to three spots north of me.

8   Q.  Was your view obstructed?

9   A.  No.

10  Q.  Now, did you continue to monitor the audio from the

11  source's transmitter at that point?

12  A.  I did.

13  Q.  So I'd like to move ahead approximately 15, 20 minutes

14  later at around 9:34 p.m.  Did you observe anything specific

15  to this investigation?

16  A.  I did.

17  Q.  What did you observe?

18  A.  The black Pontiac G8 Illinois White Sox plates MKJNZ

19  pulled into the parking lot, had red lights illuminated on the

20  front grille as well as orange lights on the bottom.

21  Q.  Okay.  And where did that car go?

22  A.  It parked directly next to the informant's car.

23  Q.  Now, as the car was pulling in, could you see the license

24  plate or only after it parked?

25  A.  After it parked, I could see it.

Marzetta - direct by Mr. Haxall

126

1  Q.  Okay.  Just wanted to clarify that.

2        And once the black G8 with the license plate MKJNZ

3  parked next to the informant's car, what did you observe

4  happened next?

5  A.  The informant got out of his car and got in the passenger

6  seat of the Pontiac.

7  Q.  During this period of time, were you able to continue to

8  listen to the overhear transmission?

9  A.  I was.

10  Q.  How long was the informant in the car?

11  A.  One to two minutes.

12  Q.  Which seat did the informant get into?

13  A.  It appeared that it was the front passenger seat.

14  Q.  Now, at that point, were you able to make out who the

15  driver of the black G8 was?

16  A.  No.

17  Q.  What happened next?

18  A.  The informant got out of the car and into his car and

19  drove away.

20  Q.  And about how long was the informant in that black G8

21  total?

22  A.  One to two minutes.

23  Q.  So I just want to kind of slow it down for a second.  So

24  you said the informant got into his car.  What happened?  What

25  was the next thing?

Marzetta - direct by Mr. Haxall

1   A.  The small conversation took place.

2   Q.  Sorry.  When the informant got back into his own car, did

3   you observe cars moved?

4   A.  Yeah.  The Pontiac left and the informant left.

5   Q.  Okay.  When the Pontiac -- so did the Pontiac leave first?

6   A.  Yes.

7   Q.  What did you do as the Pontiac left?

8   A.  I followed it.

9   Q.  Where did you go?

10  A.  Or attempted to.

11  Q.  I'm sorry.  You said you attempted to.

12  A.  Attempted to, yes.

13  Q.  What happened?

14  A.  I got caught at a red light.  He did not.  Or it did not.

15  Sorry.

16  Q.  And were you able to continue following the car?

17  A.  Once the light turned green for me, I continued driving,

18  but I couldn't find the car.

19  Q.  Okay.  Now, was your operational plan on June 1st to stop

20  the G8?

21  A.  No.

22  Q.  Why not?

23  A.  We wanted to see if we could make another transaction with

24  him to continue the case.

25  Q.  Now, did you later receive information about a firearm

Marzetta - direct by Mr. Haxall

128

1  potentially being involved on June 1st?

2  A.  We did.

3  Q.  Who provided you that information?

4  A.  Inspector Insley provided us with that information.

5  Q.  And what did he tell you?

6  A.  He told us that the informant claimed to have seen a

7  firearm in the waistband of Haldorson.

8  Q.  Okay.  Prior to you trying to follow that G8, were you

9  aware of that information?

10 A.  No.

11 Q.  All right.  I'd now like to move ahead to June 23rd of

12 2015, that evening.  Did you have communications with

13 Inspector Insley about the investigation on that date as well?

14 A.  I did.

15 Q.  How were you in communication with Insley?

16 A.  Cell phone or radio, police radio.

17 Q.  As you understood it, what was the initial operational

18 plan for the evening of June 23rd?

19 A.  We were going to stop and arrest Haldorson.

20 Q.  Okay.  Where was that supposed to take place?

21 A.  That was supposed to take place in the Joliet area of 59

22 Caton Farm.

23 Q.  Okay.  And --

24        THE COURT:  59?

25        THE WITNESS:  And Caton Farm.

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 129 of 292 PageID #:3191
Marzetta - direct by Mr. Haxall
129

1    THE COURT:  Caton Farm, spell that.

2    THE WITNESS:  C-a-t-o-n, space, F-a-r-m.

3    THE COURT:  Thanks.

4  BY MR. HAXALL:

5  Q.  And just to be clear, how far away are Joliet and

6  Plainfield from each other?

7  A.  We connect.

8  Q.  Okay.  So based on the initial plan of stopping and

9  arresting the defendant, where did you go?

10  A.  We all went to the area where it was originally going to

11  happen, 59 and Caton Farm.

12  Q.  Now, was the plan for a transaction to occur or to stop

13  the person before?

14  A.  He was going to be stopped by a marked police car before

15  the transaction could be completed.

16  Q.  Why was that?

17  A.  To keep the informant out of it.

18  Q.  Okay.  Now, sometime between approximately 7:00 p.m. and

19  8:00 p.m. on June 23rd of 2015, did you receive information

20  from Inspector Insley indicating that there was a change in

21  the plan?

22  A.  Yes.

23  Q.  Did Insley indicate why the plan had changed?

24  A.  Yeah.  The plan had changed due to traffic issues near

25  Haldorson's residence.

Marzetta - direct by Mr. Haxall

1  Q.  Now, are you familiar with something called Cruise Nights

2  in Plainfield?

3  A.  I am.

4  Q.  What is that?

5  A.  It's a car show where they block the entire downtown of

6  Plainfield and park classic cars so people can walk on the

7  streets and in between cars and look at them.

8  Q.  Based on your experience as a Plainfield officer, what's

9  the impact on traffic?

10  A.  It's horrific.  I mean, even if you live in the area and

11  you need to get out, you have to have somebody move

12  barricades.

13  Q.  Okay.  So did Inspector Insley indicate where the location

14  of the stop and arrest was going to occur based on this

15  traffic situation?

16  A.  Yeah.  The Plainfield Central High School.

17  Q.  And after learning that the location was being changed

18  from Joliet to Plainfield, what did you personally do?

19  A.  I contacted a Plainfield police dispatch center.

20  Q.  Why did you do that?

21  A.  To see which police officers were working.

22  Q.  For what purpose?

23  A.  To make the traffic stop in Plainfield.

24  Q.  Okay.  Now, why were you the individual that was

25  responsible for finding a Plainfield officer to assist?

Marzetta - direct by Mr. Haxall

1  A.  Because I am the only Plainfield officer assigned to the

2  unit.

3          MR. HAXALL:  Judge, at this time, pursuant to

4  Rule 902-11, the government is going to seek to admit

5  Government Exhibit Verizon Records.

6          THE COURT:  Okay.  Yeah, I think I saw this in there

7  somewhere.  There is an authenticating affidavit with them.

8  Is that right?

9          MR. HAXALL:  There is a certificate with --

10          THE COURT:  That's what I meant, yeah.  It's sworn

11  under penalty of perjury.  All right.  That's admitted.

12    (Above-mentioned exhibit was received in evidence.)

13          MR. HAXALL:  I ask to admit and to publish one of the

14  pages.

15          THE COURT:  That's fine.

16  BY MR. HAXALL:

17  Q.  So, Officer Marzetta, I am going to start with calling

18  your attention to the part that says "detail for Mario, Mario

19  815-931-5326."

20          Are you familiar with that telephone number?

21  A.  I am.

22  Q.  What telephone number was that?

23  A.  That was the number that was assigned to me, my cell phone

24  when I was in narcotics with CPAT.

25  Q.  Is that currently your phone number?

Marzetta - direct by Mr. Haxall

132

1    A.  No.

2    Q.  All right.  And so are these the records for the phone

3    number that you used for June 23rd into the 24th?

4    A.  Yes.

5    Q.  And I'm going to call your attention to approximately 7:34

6    and the following times.  All right.  Starting at 7:34 -- I'm

7    going to put my cursor there just because I know there's a lot

8    of lines -- are you familiar with the number with the area

9    code 815 ending in 2031?

10   A.  Yes.

11   Q.  What number is that?

12   A.  That's our dispatch center.

13   Q.  Okay.  So was that when you were calling to find an

14   officer, as you indicated?

15   A.  Yes.

16   Q.  Now, moving ahead to 7:44, the number ending in 5272, do

17   you know whose number that is?

18   A.  Yes.

19   Q.  Whose number was that?

20   A.  Officer Friddle.

21   Q.  So between seven -- sorry.  So why did --

22          THE COURT:  The first one was 2831, so it's the

23   second one from the top there; is that right?

24          THE WITNESS:  Yes.

25          MR. HAXALL:  Yes, sir.

Marzetta - direct by Mr. Haxall

133

1    THE COURT:  Okay.  Thanks.  I'm sorry.  You're moving

2    pretty fast.  I'm just trying to stay up.

3    MR. HAXALL:  Sorry.  I'll slow down, Judge.  I

4    apologize.

5    BY MR. HAXALL:

6    Q.  Beginning at 7:44 and continuing until approximately 8:26,

7    did you have multiple phone contacts with Officer Friddle?

8    A.  I did.

9    Q.  Why?

10   A.  Advising him of the situation, what we were looking for

11   and the changes and times that were happening.

12   Q.  Okay.  Now, during that period of time I just talked about

13   between approximately 7:34 when you first called dispatch and

14   approximately 8:30 in that evening, did you continue to

15   communicate with Inspector Insley?

16   A.  I did.

17   Q.  And what information were you receiving from Insley

18   between around 7:45 p.m. and about 8:20 p.m.?

19   A.  He is giving us updates that the CS was receiving from the

20   conversation between him and Haldorson.

21   Q.  What kind of updates?

22   A.  Just location, time.

23   Q.  And what would you do with this information when you

24   received it?

25   A.  Relay it to Officer Friddle.

Marzetta - direct by Mr. Haxall

134

1   Q.  Why did you do that?

2   A.  Just so he knew what area to try and be in.

3   Q.  Now, did you tell Officer Friddle about the car he should

4   be on the lookout for?

5   A.  Yes.

6   Q.  What did you tell him?

7   A.  I described it as a black Pontiac G8, big black White Sox

8   sticker in the back window, Illinois license plates MKJNZ.

9   And I told him that the last time I had saw, it had red lights

10  illuminated in the grille.

11  Q.  Okay.  And did you describe the license plate as White Sox

12  plates?

13  A.  Yes.

14  Q.  Did you provide Officer Friddle with any information

15  relevant to officer safety?

16  A.  I did.

17  Q.  What did you tell him?

18  A.  I advised him the last time we had an occurrence with the

19  defendant that the informant told us he had a firearm in his

20  waistband.

21  Q.  Okay.  Now, where were you waiting during this period of

22  time?

23  A.  We were down in the area of 59 and Renwick, which is about

24  half a mile to a mile south of the high school.

25  Q.  Okay.  So south on 59?

Marzetta - direct by Mr. Haxall

135

1  A.  Yes.  59 and Renwick would be the biggest intersection

2  there.

3  Q.  Okay.  So just moving kind of north to south, it's

4  downtown Plainfield, Fort Beggs Road, and then an area farther

5  south is where you were?

6  A.  Yes.

7  Q.  Now, based on your conversations with Insley, did you

8  believe that the target was en route and would be headed in

9  your direction?

10  A.  Yes.

11  Q.  What did you do with that information?

12  A.  I relayed it to Officer Friddle.

13  Q.  Did you then receive any information that caused you to

14  relocate from where you were to a location near the high

15  school?

16  A.  Yes.

17  Q.  What information was that?

18  A.  Officer Friddle had told me that he had located the

19  vehicle and was pulling a traffic stop on it at the entrance

20  of Plainfield Central High School on Fort Beggs.

21  Q.  And calling your attention to the call listed at 8:26 --

22        MR. HAXALL:  And I apologize, Judge.  I'm using the

23  color you don't like.

24        THE COURT:  No, that's okay.  That's actually not it.

25  This is more beige.  The other one was more doughnut colored.

Marzetta - direct by Mr. Haxall

136

1    BY MR. HAXALL:

2    Q.   Okay.   In calling your attention, Officer Marzetta, to

3    that 5272, was that a call with Friddle?

4    A.   Yes.

5    Q.   And was that one outgoing or incoming, according to these

6    phone records?

7    A.   That one says incoming.

8    Q.   Okay.   So was that the call you received from Officer

9    Friddle?

10   A.   I believe so.

11   Q.   And based on the information from Officer Friddle, what

12   did you do and where did you go?

13   A.   Relocated to where the traffic stop was.

14   Q.   How long did that take you?

15   A.   A minute, two minutes, not long.

16   Q.   When you arrived at the high school, what did you --

17            THE COURT:   This is where we're going to pause right

18   here.   We're going to break for lunch.

19            MR. HAXALL:   Yes, sir.

20            THE COURT:   All right.   It looks like you're getting

21   into what happened.

22            MR. HAXALL:   I actually have about six more questions

23   for him.

24            THE COURT:   Fine.   Let's finish the six, and then

25   we'll stop right there.   Thanks for telling me that.

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 137 of 292 PageID #:3199
Marzetta - direct by Mr. Haxall
137

1          MR. HAXALL:  Sure.

2    BY MR. HAXALL:

3    Q.  When you arrived at the high school, what did you observe?

4    A.  Friddle had had the Pontiac traffic stop.

5    Q.  Did you see the driver of that car at this time?

6    A.  Yes.

7    Q.  Is that person present in court?

8    A.  Yes.

9          MR. LIPUMA:  We stipulate the identification.

10          THE COURT:  The identification is stipulated.

11   BY MR. HAXALL:

12   Q.  When you arrived at the high school, did you direct

13   Officer Friddle to tell the defendant he was being arrested

14   for a warrant?

15   A.  I did.

16   Q.  And did you also tell the defendant that yourself?

17   A.  Yes, I did.

18   Q.  Was that true?

19   A.  No.

20   Q.  Why did you tell Officer Friddle to tell the defendant

21   that, and why did you tell him yourself?

22   A.  Because we were trying to save the informant still.  I

23   don't want to tell him that we're arresting you because we

24   know you're going to sell drugs to our informant.  And, also,

25   it creates some confusion in their head, and if they are

Marzetta - direct by Mr. Haxall

1   armed, maybe it gives us that second or two for them to think

2   before they react.

3   Q.  After the defendant was arrested, did you go to the

4   Plainfield Police Department?

5   A.  I did.

6   Q.  And did you assist in the search of that car?

7   A.  I did.

8   Q.  In general terms, what did you find?

9   A.  In the passenger compartment, I located a black backpack,

10  multiple zippers.  Inside there, there's two false compartment

11  cans.  One was AriZona tea; one was a Monster Energy.  All in

12  all in there we found psilocybin mushrooms, MDMA, cocaine,

13  cannabis, multiple prescription pills, a prescription note for

14  Mike Haldorson.

15  Q.  Did you relay this information to other members of your

16  team?

17  A.  I did.

18  Q.  Did you also relay information as far as explosive devices

19  to your commanding officer?

20  A.  I did.

21  Q.  Did you request the assistance of other law enforcement?

22  A.  We did.

23  Q.  Who was that?

24  A.  ATF and Cook County bomb squad.

25  Q.  And did they respond?

Marzetta - direct by Mr. Haxall

139

1    A.   They did.

2              MR. HAXALL:   No other questions, your Honor.

3              THE COURT:   All right.   We will stop right there.   We

4    will break for lunch.   We will resume at 1:30.

5       (Hearing adjourned at 12:30 to 1:30 p.m.)

140

```
 1                    IN THE UNITED STATES DISTRICT COURT
                         NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    UNITED STATES OF AMERICA,            )     Docket No. 15 CR 623
                                           )
 4                        Plaintiff,       )
                                           )
 5              vs.                        )
                                           )
 6    MICHAEL P. HALDORSON,                )     Chicago, Illinois
                                           )     September 15, 2017
 7                        Defendant.       )     1:30 o'clock p.m.

 8            TRANSCRIPT OF PROCEEDINGS - EVIDENTIARY HEARING
              BEFORE THE HONORABLE MATTHEW F. KENNELLY
 9                            VOLUME 1-B

10    APPEARANCES:

11
      For the Plaintiff:       HON. ZACHARY T. FARDON
12                             United States Attorney
                               BY:  MR. BOLLING W. HAXALL
13                                  MR. BRIAN WALLACH
                               219 S. Dearborn St., Suite 500
14                             Chicago, Illinois  60604

15

16    For the Defendant:       LAW OFFICE OF FRANCIS C. LIPUMA
                               BY:  MR. FRANCIS C. LIPUMA
17                             105 West Adams Street, 35th Floor
                               Chicago, IL  60603
18                             (312) 675-0089

19

20

21
      Court Reporter:          MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
22                             Official Court Reporter
                               219 S. Dearborn Street, Suite 2102
23                             Chicago, Illinois  60604
                               (312) 435-5639
24

25
```

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 141 of 292 PageID #:3203
Marzetta - cross by Mr. Lipuma
141

1    (The following proceedings were had in open court:)

2         THE CLERK:  Case 15 CR 623, USA v. Haldorson.

3         THE COURT:  All right.  The lawyers are here as is

4    Mr. Haldorson.  Everybody ready to resume?

5         MR. HAXALL:  Yes, Judge.

6         MR. LIPUMA:  Yes.

7         THE COURT:  Mr. Lipuma, I believe you have the floor.

8         MR. LIPUMA:  Thank you, Judge.

9                         - - -

10             MARIO MARZETTA, CROSS-EXAMINATION

11   BY MR. LIPUMA:

12   Q.  Good afternoon, sir.

13   A.  Good afternoon, sir.

14   Q.  I know your last name is Marzetta, but I'm not sure if I

15   should address you as an officer or an agent or an inspector.

16   A.  I am an officer now.

17   Q.  So you are back with the Plainfield Police Department?

18   A.  Yes, sir.

19   Q.  Okay.  And just to start off with that really quickly.

20   Plainfield Police Department is a relatively new building?

21   A.  It's been in service since, oh, man, 2008 or '9, I

22   believe.  It is new, sorry.

23   Q.  Yeah.  That's okay.

24        And there's a lot of cameras internally, inside the

25   building?

Marzetta - cross by Mr. Lipuma

142

1   A.  Yes.

2   Q.  In the lockup area, in the processing area, towards the

3   interview rooms and all that, correct?

4   A.  Even more so now, yes.

5   Q.  Are you aware that we did subpoena the records or the

6   videos from the booking areas?

7   A.  Okay.

8   Q.  Okay.  Are you aware of that or no?

9   A.  No.

10  Q.  Okay.  Let me ask you this.  Seeing you're a Plainfield

11  Police Department officer, are you aware that in the interview

12  rooms there's cameras?

13  A.  Yes.

14  Q.  And those cameras can record interviews or interrogations

15  of suspects, correct?

16  A.  Yes, sir.

17  Q.  Are you aware whether a video was made of the interview or

18  interrogation of Michael Haldorson?

19  A.  I am not.

20  Q.  You are not aware, or you --

21  A.  I'm not aware if there was or not.  I wasn't in that room.

22  Q.  Okay.  But the capacity was there?

23  A.  Yes.

24  Q.  Okay.  And let's start off with June 1st.  Okay?

25  A.  Yes, sir.

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 143 of 292 PageID #:3205
Marzetta - cross by Mr. Lipuma
143

1  Q.  Now, you said on June 1st, you were conducting
2  surveillance in Joliet?
3  A.  Correct.
4  Q.  Later at night, correct?
5  A.  Yes.
6  Q.  Now, after that surveillance was completed on June 1st,
7  did you prepare a report?
8  A.  I did not.
9  Q.  Did anyone prepare a surveillance report?
10  A.  I don't know.
11  Q.  Okay.  But you didn't?
12  A.  I did not, correct.
13  Q.  Okay.  And who was present on June 1st as part of this
14  operation?  You and Insley?
15  A.  Myself, Insley, and I don't know the rest of the officers
16  that were there off the top of my head.
17  Q.  Okay.  You mentioned a CI was involved.
18  A.  Yes.
19  Q.  Okay.  Now, who was the CI's control agent?
20  A.  Insley.
21  Q.  Insley was his control agent?
22  A.  Yes, I believe so.
23  Q.  Okay.  All right.  You say that an overhear device was
24  used.
25  A.  Yes.

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 144 of 292 PageID #:3206
Marzetta - cross by Mr. Lipuma
144

1  Q.  And were you there when the overhear device was placed on

2  the CI?

3  A.  No, I was not.

4  Q.  Okay.  Okay.  Do you know whether the CI gave consent?

5  A.  No, I do not.

6  Q.  Okay.  You said you had an unobstructed view of this

7  meeting that took place, according to your testimony, between

8  Mr. Haldorson and the CI, correct?

9  A.  Yes, sir.

10  Q.  How far away were you from the meeting site?

11  A.  He was -- I'm trying to give you a decent picture here.

12  He was north of me facing south, and then you have the rows

13  where there would be normal parking at like Walmart.  And I

14  was two away from him, so one full row, but two north/south

15  spots, if that makes sense.  I could draw it on paper if it's

16  easier.  I know it's hard to explain.

17  Q.  How about in terms of feet?  Can you give approximately --

18  it doesn't sound like it's that far away.

19  A.  No.  Within 30 feet.

20  Q.  Okay.  And it's dark?

21  A.  Correct.

22  Q.  And is the store still open or closed at that time of

23  night?

24  A.  It was still open.

25  Q.  Okay.  A lot of cars in the parking lot?

Marzetta - cross by Mr. Lipuma

1  A.  I don't recall how many were in the area.

2  Q.  Okay.  And did you take photos?

3  A.  I did not.

4  Q.  Did you have a camera available?

5  A.  I did not.

6  Q.  Have you ever had a camera available when you were doing

7  surveillance?

8  A.  At some investigations, we have.  At this one, I was not

9  given a camera.

10  Q.  Okay.  Have you, in your hundreds of investigations, ever

11  used a camera when you're conducting surveillance?

12  A.  There's been a few times, yes.

13  Q.  Okay.  And at some point on June 1st, you guys tried to

14  follow the car that the CI went into, correct?

15  A.  The car that -- yes.

16  Q.  The --

17  A.  The black Pontiac.

18  Q.  The black Pontiac G8.

19  A.  Yes.

20  Q.  You tried to follow it?

21  A.  Yes, sir.

22  Q.  Was that you or some other agent?

23  A.  That was myself.

24  Q.  Okay.  Were you with somebody else?

25  A.  Somebody else was in another car.  I believe it was

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 146 of 292 PageID #:3208
Marzetta - cross by Mr. Lipuma
146

1    Lestronge, but I don't want to say for sure because I don't

2    recall.

3    Q.  You received information from the CI right afterwards that

4    the -- that he claimed to have seen Mr. Haldorson with a

5    weapon?

6    A.  I received that information from Inspector Insley.

7    Q.  You received that from Insley because Insley was with the

8    informant?

9    A.  Yes.

10   Q.  Okay.  And yet you did not pursue Mr. Haldorson or the

11   person in the Pontiac G8 who had just sold cocaine and who

12   allegedly had a gun?

13   A.  I attempted to.

14   Q.  Okay.  You attempted to?

15   A.  Yes.

16   Q.  Okay.  And what happened?

17   A.  I got stuck at a red light.

18   Q.  Okay.  And so when the light changed, what happened?

19   A.  I went in the last direction that I saw the Pontiac.

20   Q.  Okay.  But you lost him?

21   A.  Correct.  I couldn't find him.

22   Q.  But you knew where to find him?

23   A.  I didn't.

24   Q.  Well, you knew where he lived?

25   A.  I don't recall if at that time I knew where he lived.

Marzetta - cross by Mr. Lipuma

1   Q.   Okay.  You had an unobstructed view of the car.

2   A.   Yes.

3   Q.   You could see the license plate.

4   A.   Correct.

5   Q.   You could run the license plate.

6   A.   Correct.

7   Q.   The license plate would give you a driver's license.

8   A.   Correct.

9   Q.   And that driver's license would contain an address.

10  A.   Correct.

11  Q.   Indeed, you know that at some point you learned that the

12  address on Mr. Haldorson's driver's license was a home in

13  Joliet.

14  A.   I don't recall that.

15  Q.   Okay.

16  A.   I did not -- at that time I did not have the capabilities

17  of running any plates.

18  Q.   Okay.  If you wanted to, you could have run that plate at

19  that time and found out --

20  A.   I could have made a phone call.

21  Q.   You could have made a phone call and got that information.

22  A.   Correct, correct.

23  Q.   But you weren't concerned enough about a man who had just

24  sold cocaine to an informant and this man is armed on the --

25  on Route 59, a busy street, busy neighborhood, and you weren't

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 148 of 292 PageID #:3210
Marzetta - cross by Mr. Lipuma
148

1  concerned enough to go arrest him?

2  A.  Correct.

3          MR. HAXALL:  Objection to the form of the question.

4          THE COURT:  Overruled.  The answer can stand.

5  BY MR. LIPUMA:

6  Q.  Let's turn to June 23rd.  Now, you authored one report

7  during this investigation as it relates to Mr. Haldorson,

8  correct?

9  A.  Yes, sir.

10  Q.  And that was your June 23rd report?

11  A.  Correct.

12  Q.  Document -- and its purpose of it was called Document

13  Collection of Evidence From Traffic Stop, correct?

14  A.  Correct.

15  Q.  And you indicated that the purpose of the traffic stop was

16  to arrest Haldorson on probable cause from a previous delivery

17  of cocaine that occurred on June 1st, 2015; is that right?

18  A.  Correct.  Correct.

19  Q.  Okay.  Now, on June 1st after this alleged deal went down

20  and the man had the gun and you couldn't find him, did you do

21  anything in relation to the investigation on June 2nd?

22  A.  Not that I recall me doing.

23  Q.  Okay.  June 3rd?

24  A.  Not my case.  I don't recall.

25  Q.  Okay.  When you say it's not your case --

Marzetta - cross by Mr. Lipuma

1  A.  Inspector Insley --

2  Q.  Okay.

3  A.  -- was the one running the aspects of this case.

4  Q.  But in actuality, nothing occurred between June 1st and

5  June 23rd?

6  A.  Okay.

7  Q.  I'm asking you.

8  A.  Well, I don't know what Inspector Insley did with this

9  case.

10  Q.  But to your personal knowledge.

11  A.  From my personal knowledge, I know that I don't believe I

12  did anything with this case.

13  Q.  Okay.  And how many weeks passed between June 1st and

14  June 23rd?

15  A.  Three.

16  Q.  Okay.  Three weeks passed.

17  A.  Off the top of my head.

18  Q.  Okay.  You indicated on June 23rd that the deal was

19  originally supposed to take place at Route 59 and Caton Park

20  Road in Joliet, correct?

21  A.  Caton Farm Road, correct.

22  Q.  Caton Farm Road.  Thank you.

23          But the location was changed to Plainfield Central

24  High School?

25  A.  That's what I was told, yes.

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 150 of 292 PageID #:3212
Marzetta - cross by Mr. Lipuma
150

1  Q.  Okay.  So Insley told you that it was supposed to go down

2  at Plainfield Central High School.

3  A.  Or in that area.

4  Q.  Okay.  There's nothing in any report about that, though,

5  is there?  Did you ever look at Insley's report?

6  A.  I did briefly.

7  Q.  Yeah.  That's not contained in that report, is it?

8          MR. HAXALL:  Objection.  He is crossing him with what

9  another person put in his report.

10          THE COURT:  It's a hearing on this.  Do you know?

11          THE WITNESS:  I don't know.

12          THE COURT:  Okay.  The answer can stand.

13          MR. LIPUMA:  Thank you, Judge.

14  BY MR. LIPUMA:

15  Q.  And, sir, at some point then you called Officer Friddle on

16  several occasions, correct?

17  A.  Correct.

18  Q.  But were you in contact with another officer, a Joliet

19  Police Department officer?

20  A.  I was not in contact with a Joliet police officer.

21  Q.  Okay.  Later after the stop, the Joliet Police Department

22  officer showed up, correct?

23  A.  I believe so.

24  Q.  Okay.  We'll get to that in a minute.

25  A.  Okay.

Marzetta - cross by Mr. Lipuma

1  Q.  And you told Officer Friddle that this vehicle, this G8

2  had red lights illuminated in the grille, correct?

3  A.  I said last time I saw it, it had those red lights

4  illuminating the grille.

5  Q.  Perfect.

6         When was the last time you saw it?

7  A.  June 1st.

8  Q.  So you're saying on June 1st, the car had red lights

9  illuminated in the grille?

10  A.  Yes.  During the narcotics transaction.

11  Q.  Okay.  How about earlier on June 23rd?  Did you go to the

12  Plainfield Cruise Night?  Did you see Mr. Haldorson at the

13  Plainfield Cruise Night?

14  A.  I had not.

15  Q.  Okay.  When is the first time you saw him, his vehicle?

16  A.  On the traffic stop.

17  Q.  Okay.  You weren't following him down Route 59?

18  A.  I wasn't.

19  Q.  Okay.  But at some point you said he should be there in a

20  couple minutes?

21  A.  Correct.

22  Q.  To Friddle, right?  You told Friddle he should be coming

23  that way soon?

24  A.  Correct.

25  Q.  Right.  How did you know that if you weren't following

Marzetta - cross by Mr. Lipuma

1   him?

2   A.  Based on communication.

3   Q.  From who?

4   A.  With Insley.

5   Q.  Okay.  So Insley was following him?

6   A.  I don't recall if anybody was following him.

7   Q.  On June 23rd -- of course, I am going to go into a little

8   bit more detail, but on June 23rd, Mr. Haldorson didn't have a

9   gun on him, did he?

10  A.  No.

11  Q.  Okay.  And you were there when the search was conducted by

12  Officer Friddle?

13  A.  Yes.

14  Q.  You searched the vehicle later?

15  A.  Yes.

16  Q.  And no firearm?

17  A.  Correct.

18  Q.  And did you tell Officer Friddle that on a previous

19  occasion that Mr. Haldorson, or the suspect who was dealing

20  with the CI, had a prior traffic stop?

21  A.  Yeah, he was stopped previously by Plainfield.

22  Q.  When was he stopped previously by Plainfield?

23  A.  No idea without looking at the officer's report.

24  Q.  What officer would have that report?

25  A.  Plainfield Police Department would have a report of it,

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 153 of 292 PageID #:3215
Marzetta - cross by Mr. Lipuma
153

1    but from my understanding, it was a traffic stop for speeding.

2    Q.  Okay.  And it wasn't at that occasion that that officer

3    who pulled him over for speeding noticed a gun, correct?

4    A.  No.

5    Q.  Obviously, if an officer had pulled someone over and this

6    person had a gun, that would create an issue, right?

7    A.  Absolutely.

8    Q.  And when you searched the car, there was no video of that

9    search of the car, was there?

10   A.  No.

11        THE COURT:  Hang on a second.  I want to make sure

12   you asked the question you wanted to ask.  You asked when you

13   searched the car, there was no video, which the way it reads

14   on the transcript suggests there was a video in the car.  It's

15   probably not what you intended to convey.

16        MR. LIPUMA:  Not what I intended, Judge.  I

17   apologize.  Let me clarify.

18   BY MR. LIPUMA:

19   Q.  When you were searching the car back at the Plainfield

20   Police Department -- correct?

21   A.  Correct.

22   Q.  -- the cameras were available there.  They're in the sally

23   port; there are really cameras everywhere, aren't there?

24   A.  Yeah, there's cameras on the outside.

25   Q.  Okay.  But the search of the vehicle wasn't captured in a

Marzetta - cross by Mr. Lipuma

1   video?

2   A.  We did not record it.

3   Q.  Okay.

4   A.  Is that what you're asking?

5   Q.  Yes.

6   A.  Yes.

7   Q.  When you called Friddle and said you wanted him to stop

8   that car because we had probable cause on a prior delivery --

9   and you were referring to the June 1st meeting, correct?

10  A.  Correct.

11  Q.  -- and you told him, pull him over, did you have an arrest

12  warrant?

13  A.  No.

14  Q.  Did you even try to go to a judge or an ASA for an arrest

15  warrant?

16  A.  It was not my case to do that on.

17  Q.  Do you know whether someone tried to contact an ASA or a

18  judge for an arrest warrant?

19  A.  I don't believe they did.

20  Q.  Okay.  You've seen the dash cam video in this case?

21  A.  Yes.

22  Q.  You have, right?

23  A.  Yes.

24  Q.  Because you show up on it, right?

25  A.  Yes.

Marzetta - cross by Mr. Lipuma

1    Q.  As does Inspector Kaminski, correct?

2    A.  Yes.

3    Q.  And, of course, Officer Friddle is there.

4    A.  Yes.

5    Q.  Okay.  And at some point you simply told Friddle that

6    you'll take him, and just tell him he's got a warrant, right?

7    A.  Yes.

8    Q.  You told Friddle to tell Haldorson that he had a warrant,

9    right?

10   A.  Yes.

11   Q.  And you knew he did not have a warrant?

12   A.  Correct.

13   Q.  There was no warrant, an arrest warrant for him for

14   June 1st?

15   A.  There was not.

16   Q.  There was no arrest warrant for any other date or

17   activity, correct?

18   A.  There was not.

19   Q.  And so Michael asked you on several occasions, what am I

20   being arrested for?  And you said to him, we'll talk about it.

21   We'll explain it all to you.  And then finally you said, you

22   got a warrant, dude, right?

23   A.  Yes.

24   Q.  And you were lying.

25   A.  Yes.

Marzetta - cross by Mr. Lipuma

1   Q.  You were lying.

2           And you said you were lying because you were trying

3   to placate him because you were concerned he might have a gun?

4   A.  I was trying to what?

5   Q.  Placate him or calm him down so he wouldn't react?

6   A.  Distract, yeah.

7   Q.  Distraction?

8   A.  Yes.

9   Q.  Okay.  So when you tell someone they have a warrant, you

10  don't think that that would cause an adverse reaction?

11  A.  It would take their mind off the fact that they are just

12  en route to sell drugs to somebody.

13  Q.  Okay.  But you sent Friddle in there -- you said you told

14  Friddle that there was a report that he had a gun.  You sent

15  Friddle in there alone.

16  A.  We were right there with him.

17  Q.  You were behind him, but he approached the car alone

18  initially?

19  A.  Correct.

20  Q.  Okay.  And you also said that he was going to go either

21  one way or the other, referring to Haldorson's car.  Do you

22  remember that?

23  A.  I said that?

24  Q.  Yeah.  Did you say that?

25  A.  I don't recall.

Marzetta - cross by Mr. Lipuma

1  Q.  He was either going to go one way or the other?

2  A.  I don't recall saying that.

3  Q.  Did you know which way Haldorson was going to go?

4  A.  I don't know what you're referring to.

5  Q.  When he was driving down Route 59 --

6  A.  Okay.  I was taking --

7  Q.  -- did you know he was going to take a right at Fort Beggs

8  Drive?

9  A.  No.

10  Q.  Did you have another officer in place in case he didn't

11  turn right at Fort Beggs Drive?

12  A.  We -- myself and Officer Lestronge and Kaminski and my car

13  were down at Renwick and 59 area, which is just further

14  south -- a little bit south of the location.

15  Q.  And you were present when Officer Friddle was heading down

16  and searching Mr. Haldorson, correct?

17  A.  Correct.

18  Q.  And he took money out of his pockets, correct?

19  A.  Correct.

20  Q.  So you wrote a report basically saying that you located

21  the $167 and the $2,000, didn't you?

22  A.  Possibly.

23  Q.  Okay.  If I show you your report, would that refresh your

24  recollection?

25  A.  Yes.

Marzetta - cross by Mr. Lipuma

158

1    MR. LIPUMA:  Judge, if I may approach.

2    THE COURT:  Sure.

3  BY MR. LIPUMA:

4  Q.  Showing an Illinois State Police investigative report

5  62315, reporting Agent Marzetta.  And may I tender it to you

6  and have you look at it?  And I'm going to ask you to look at

7  paragraph 2 and ask you if that refreshes your recollection.

8  A.  Okay.

9  Q.  Do you see that?

10  A.  Yes.

11  Q.  Did you write that you located the money?

12  A.  Yes.

13  Q.  But that's not, in fact, true, is it?

14  A.  Officer Friddle was the one that searched him.

15  Q.  So he recovered the money, not you, correct?

16  A.  Correct.

17  Q.  At the time you were at the Plainfield Police Department

18  as you still are, correct?

19  A.  Correct.

20  Q.  And you've seen the traffic stop data sheet, citizen

21  contact sheet --

22  A.  Correct.

23  Q.  -- from the Plainfield Police Department?

24  A.  Yes.

25  Q.  Okay.  And you are aware that it indicates in there that

Marzetta - cross by Mr. Lipuma

1  the primary reason for the stop was an equipment violation,

2  correct?

3  A.  I have not seen this report.

4  Q.  If I show it to you, would it refresh your recollection?

5  A.  Yes.  Is this a report I completed, or was it a report

6  that Officer Friddle completed?

7  Q.  I am not entirely sure.

8  A.  Okay.

9  Q.  I'll ask you if you have seen this report before.

10  A.  I have not seen it to my recollection.

11  Q.  Okay.  You didn't prepare that report or see that

12  report --

13  A.  Officer Friddle's badge number is on it, so it would be

14  his report.

15  Q.  That's another badge number on it.

16  A.  That's a supervisor.  The top line is always the officer;

17  the bottom line would be his supervisor signing it.

18       MR. LIPUMA:  Judge, I thought this witness would be

19  following up with respect to Officer Friddle on this

20  particular document.  I move to admit this Plainfield Police

21  Department traffic stop data sheet, citizen contact.

22       THE COURT:  Is there any objection to that?

23       MR. HAXALL:  No, Judge.

24       THE COURT:  Okay.  It's admitted.  That's fine.

25    (Above-mentioned exhibit was received in evidence.)

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 160 of 292 PageID #:3222
Marzetta - cross by Mr. Lipuma
160

1    MR. LIPUMA:  Thank you.

2  BY MR. LIPUMA:

3  Q.  Okay.  So I want to ask you about activity on June 24th,

4  the next day.  I mean, this investigation carried overnight

5  from the 23rd into the 24th, correct?

6  A.  Yes.

7  Q.  And so you actually thereafter arrived at Mr. Haldorson's

8  apartment, correct?

9  A.  Right.

10  Q.  Okay.  And that's in Plainfield.

11  A.  Correct.

12  Q.  It's on Lockport Street.

13  A.  Yes.

14  Q.  And the entrance to the apartment -- you gain access to

15  the apartment from the sidewalk on that street, correct?

16  A.  Correct.

17  Q.  Okay.  So when the search was conducted of Mr. Haldorson

18  on the 23rd, keys were confiscated from him, right?

19  A.  Correct.

20  Q.  And when you guys arrived in Plainfield looking for his

21  apartment -- because you didn't know the exact location,

22  correct?

23  A.  Correct.

24  Q.  -- (continuing) you guys went down the street and tried

25  opening several doors; isn't that true?

Marzetta - cross by Mr. Lipuma

1   A.  Correct.

2   Q.  And, indeed, when you arrived at the apartment that

3   Mr. Haldorson shared with a roommate, the door to that

4   apartment at street level on the sidewalk was locked; isn't

5   that true?

6   A.  I don't believe it was.  The street-level door?

7   Q.  The street-level door.

8   A.  I believe the street-level door was unlocked.

9   Q.  Did you take a key or did anybody in your presence take a

10  key and use a key to unlock the door?

11  A.  For that one, I don't believe so.

12  Q.  Were you --

13  A.  The street-level one was a door that would be like if you

14  had an apartment building and there was a stairway to the

15  actual apartments and your apartment doors are up there.

16  Q.  And this is before you ascend the stairway?

17  A.  Yes.

18  Q.  Are you saying that door was locked?

19  A.  I don't recall.

20  Q.  You don't recall?

21  A.  I don't.

22  Q.  However, you did, or someone in your presence, a law

23  enforcement officer in your presence did take that set of keys

24  once entry was gained into the apartment to open a locked door

25  that Mr. Haldorson used as his bedroom, correct?

Marzetta - cross by Mr. Lipuma

162

1   A.  Correct.

2   Q.  Okay.  Now, who was that that took that key and opened

3   that lock?

4   A.  I believe that was me.

5   Q.  That was you?

6   A.  I believe so.

7   Q.  Okay.  So did you know what key to use?

8   A.  No.

9   Q.  Did you have a number of keys?

10  A.  Yes.

11  Q.  Okay.  Were you holding the keys as you entered the

12  apartment down at the street level, or did someone else have

13  the keys at that time?

14  A.  I don't recall.  Possibly on me because I drove the car

15  last.

16  Q.  Okay.  But you don't remember if you used the keys to

17  enter that doorway, whether that doorway was locked or

18  unlocked?

19  A.  Which doorway?

20  Q.  The first doorway.

21  A.  The first doorway, I don't recall.

22  Q.  And there was a second doorway into that bedroom as well,

23  correct?

24  A.  I don't recall.

25  Q.  Did you have a warrant when you entered Mr. Haldorson's

Marzetta - cross by Mr. Lipuma

163

1   bedroom --

2   A.  No.

3   Q.  -- the first time --

4   A.  No, I did not.

5   Q.  -- when you used a key to unlock his door?

6   A.  We did not.

7   Q.  Okay.  Did you -- while you were in that apartment, you

8   were in there with Ladd, correct?

9   A.  Correct.

10  Q.  And a couple other officers.  Do you know who they were?

11  A.  ATF was there.

12  Q.  Okay.

13  A.  Without looking at a report saying who was there, I don't

14  want to say and be wrong.

15  Q.  Okay.  That's okay.  The roommate was there for a while,

16  right?

17  A.  Yes.

18  Q.  How long did she stay up there?

19  A.  The entire time.

20  Q.  Okay.  Eventually she was asked to leave -- when you say

21  "the entire time," how much is the entire time?

22  A.  To my knowledge, she was there while we were there.

23  Q.  Okay.  How long were you there before you left in order to

24  get a search warrant, approximately?

25  A.  I don't recall the time.

Marzetta - cross by Mr. Lipuma

164

1  Q.  Was it -- can you say whether it was five minutes or ten
2  minutes or a half an hour?
3  A.  I have no idea.
4  Q.  You don't.  But she remained up there with you while you
5  were searching the common area of the apartment --
6  A.  Correct.
7  Q.  -- and while you used the key to unlock the door to get
8  into Mr. Haldorson's bedroom, correct?
9  A.  Correct.
10  Q.  At some point, you all left the apartment?
11  A.  At some point, we did.
12  Q.  Including the roommate?
13  A.  Okay.
14  Q.  I'm asking.  Is that true?
15  A.  I don't know.  I don't know if she left or not.
16  Q.  You don't remember the roommate leaving with you guys?
17  A.  I do not.
18  Q.  Okay.  Mr. Haldorson was in custody at the time, though,
19  correct?
20  A.  Correct.
21  Q.  Nobody else had access to the apartment, correct?
22  A.  Correct.
23  Q.  The apartment was secured, I guess is what I'm asking,
24  right?  You guys were in there; the apartment was secured,
25  correct?

Marzetta - cross by Mr. Lipuma

1   A.  When we left, it was secured do you mean?

2   Q.  Yeah.

3   A.  I personally did not.

4   Q.  Let me ask you this.  Did you feel the apartment was

5   secured when you and several other agents are standing in the

6   apartment, or did you feel the apartment was secured?

7   A.  Yes.

8   Q.  Did the CI -- I'm going to change the subject here.  Did

9   the CI initially work for you or Insley?

10  A.  For Insley.

11  Q.  Okay.

12          MR. LIPUMA:  If I could have a moment, Judge?

13          THE COURT:  Sure.

14  BY MR. LIPUMA:

15  Q.  Let me just ask you.  On your direct, did you testify,

16  Officer, that you were able to hear the overhear device?

17  A.  Yes.

18  Q.  So you heard the conversation that the CI was having with

19  Insley?

20  A.  I don't know if mine was on at that time.

21  Q.  When did you turn it on?

22  A.  When the informant -- I'm sorry.  When the target showed

23  up, that's when I would have turned mine on, just prior to it

24  to make sure it was working.

25  Q.  So you didn't or you don't recall if you heard the

Marzetta - redirect by Mr. Haxall

166

1 conversation between the CI and Insley?

2 A.  I don't recall hearing a conversation between them.

3         MR. LIPUMA:  That's all I have, Judge.

4         THE COURT:  Redirect?

5         MR. HAXALL:  Thank you.  I will be brief.

6                        - - -

7         MARIO MARZETTA, REDIRECT EXAMINATION

8 BY MR. HAXALL:

9 Q.  Defense counsel asked you about when you learned about the

10 gun and efforts to pursue the black G8.  Do you remember that?

11 A.  Yes.

12 Q.  Did you learn or did -- did Insley tell you about the gun

13 before or after you had already lost sight of the G8?

14 A.  After we lost sight.

15 Q.  And the defense attorney also asked you a little bit about

16 getting a warrant for Mr. Haldorson's arrest.

17 A.  Correct.

18 Q.  Do you agree you probably could have gotten one June 2nd

19 or 3rd based on --

20 A.  We could have.

21 Q.  Okay.  In your experience as a police agent, what are some

22 of the risks of getting a warrant for somebody the day after

23 or a couple days after a CI-controlled purchase of cocaine

24 from that person?

25 A.  Well, the warrants are public record.  Anybody can look

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 167 of 292 PageID #:3229
Marzetta - redirect by Mr. Haxall
167

1   them up.  And we actually have several informants that are

2   constantly looking to see who is wanted for what, so it would

3   have been pretty easy for him to pick that up.

4   Q.  So what potential safety impact could a close-in-time

5   warrant have had on the source in this case?

6   A.  They would have been able to find out, well, the last

7   person I sold to was this person; now I have a warrant.

8   Q.  Now, what is the impact on an arrest warrant on your

9   ability to sometimes flip a person or have them cooperate if

10  there's a warrant for them?

11  A.  If we would have issued a warrant for him and tried to get

12  him to work and help himself out, further our investigation,

13  we wouldn't be able to do so until he had been booked and

14  bonded on that warrant.

15  Q.  So he would have had to have gone to bond court before you

16  would have been able to try and work him?

17  A.  Correct.

18  Q.  Now, defense counsel also asked you a few questions just

19  about where you were set up and change of plans and things

20  like that.

21  A.  Uh-uh.

22  Q.  When you were -- when you were posted south of Fort Beggs

23  Road on 59 at approximately 8:25 in the evening, did you

24  believe that that black G8 was going to be headed in your

25  direction?

Marzetta - recross by Mr. Lipuma

1  A.  Yes.

2  Q.  Is that why you were there?

3  A.  Yes.

4  Q.  And was that based on information that Insley had provided

5  you?

6  A.  Correct.  It was also kind of a catch if Friddle did not

7  see him and he continued south, we were further south.

8  Q.  So you were essentially the fallback for Friddle?

9  A.  Yes.

10  Q.  Defense counsel also asked you about the money.  Officer

11  Friddle initially removed the money from the defendant's

12  person; is that right?

13  A.  Correct.

14  Q.  Who took possession of it then?

15  A.  I did.  I was a foot away from him while he was doing it.

16  Q.  And who counted it and secured that money?

17  A.  I did.

18          MR. HAXALL:  No additional questions, your Honor.

19          THE COURT:  Anything further, Mr. Lipuma?

20          MR. LIPUMA:  Yes.  Really quickly, Judge.

21                      - - -

22          MARIO MARZETTA, RECROSS-EXAMINATION

23  BY MR. LIPUMA:

24  Q.  Officer Marzetta, you could have arrested Mr. Haldorson on

25  June 1st, correct?

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 169 of 292 PageID #:3231
Marzetta - recross by Mr. Lipuma
169

1   A.  Could have.  It would have been a different operation,
2   but, yes.
3   Q.  Well, you just said you could have gotten a warrant for
4   his arrest for what happened on June 1st, right?
5   A.  Yes.
6   Q.  Okay.  The fact of the matter is you didn't get a warrant,
7   though, did you?
8   A.  We did not.
9   Q.  And you actually took no action, did you?
10  A.  I did not.
11  Q.  Okay.  And you didn't contact an ASA?
12  A.  I did not.
13  Q.  You didn't contact a judge?
14  A.  I did not.
15  Q.  You didn't even go to Mr. Haldorson's known address in
16  Joliet, did you?
17  A.  I did not.
18  Q.  And the second point I want to make is your report says
19  you located the money, correct?
20  A.  Yes.
21  Q.  You didn't locate the money, did you?
22  A.  Correct.
23          MR. LIPUMA:  Thank you.
24          THE COURT:  Mr. Haxall, anything else?
25          MR. HAXALL:  No, not on that.

Insley - direct by Mr. Haxall

170

1      THE COURT:  You are excused.

2      Please call the next witness.

3      MR. HAXALL:  We call Tom Insley.

4   (Witness sworn.)

5      MR. HAXALL:  May I proceed, your Honor?

6      THE COURT:  Yes.

7                          - - -

8           THOMAS INSLEY, DIRECT EXAMINATION

9   BY MR. HAXALL:

10  Q.  Sir, could you please state your full name and spell your

11  last name.

12  A.  Sure.  It's Thomas Insley, spelled I-n-s-l-e-y.

13  Q.  How are you currently employed?

14  A.  Currently employed with the Village of Northfield.

15  Q.  And what is your job with Northfield?

16  A.  Police officer.

17  Q.  How long have you been with Northfield?

18  A.  Approximately a year and a half.

19  Q.  Prior to joining the Northfield Police Department, were

20  you in law enforcement?

21  A.  Yes.

22  Q.  How long have you been in law enforcement altogether?

23  A.  A total almost nine years.

24  Q.  And what was your prior police department before

25  Northfield?

Insley - direct by Mr. Haxall

1    A.  The Village of Rockdale.

2    Q.  And what was your position with Rockdale?

3    A.  Patrol officer.

4    Q.  Why did you leave Rockdale to go to the Northfield Police

5    Department?

6    A.  It was a better job.

7    Q.  Financially?

8    A.  Financially, yes.

9    Q.  Now, while you were employed by the Rockdale Police

10   Department, did you have any specialized assignments?

11   A.  Yes.

12   Q.  What was that?

13   A.  I worked for -- it's called CPAT, Will County Cooperative

14   Assistance Team.

15   Q.  And in general terms, what kind of investigations does

16   that team run?

17   A.  Narcotics.

18   Q.  Approximately when did you join that group?

19   A.  That would have been September 2013.

20   Q.  And when did you leave?

21   A.  December 2015.

22   Q.  And is that when you switched to the Northfield police?

23   A.  Yes.

24   Q.  You were no longer in that region; is that correct?

25   A.  Correct, yes.

Insley - direct by Mr. Haxall

1   Q.  Now, at CPAT, what was your official title?

2   A.  Inspector.

3   Q.  And what were the general responsibilities of an inspector

4   at CPAT?

5   A.  Case agent.  We deal with search warrants, informants.

6   Q.  So is it fair to say you would run the investigations?

7   A.  Correct, yes.

8   Q.  While you were at CPAT, approximately how many

9   investigations did you serve as case agent for?

10  A.  Approximately probably 30 to 50.

11  Q.  And how many additional investigations did you assist in

12  other capacities?

13  A.  Probably a couple hundred.

14  Q.  When you joined CPAT, did you have any kind of specialized

15  training for the group?

16  A.  Yes.  They put us on a two-week narcotics training class.

17  Q.  Now, were you the case agent for the investigation that

18  led to charges in this case?

19  A.  Yes.

20  Q.  In the course of the investigation, did you become

21  familiar with a person named Michael Haldorson?

22  A.  I did.

23  Q.  At some point were you involved in a post-arrest interview

24  of that person?

25  A.  I was.

Insley - direct by Mr. Haxall

1  Q.  Do you see that person present in court today?

2  A.  I do.

3          MR. LIPUMA:  We will stipulate to the identification.

4          THE COURT:  All right.  It's stipulated.

5  BY MR. HAXALL:

6  Q.  Now, prior to your involvement in this specific

7  investigation, were you familiar with the defendant?

8  A.  No.

9  Q.  How did the defendant first come to your attention?

10 A.  It came through an informant.

11 Q.  Okay.  Do you recall approximately, in relationship to the

12 arrest, approximately how long before the arrest the informant

13 told you about the defendant?

14 A.  Probably a month or two.

15 Q.  And in general terms, what did the informant tell you

16 about the defendant?

17 A.  Just saying that the informant would be able to do a

18 narcotics buy from the defendant.

19 Q.  Okay.  And did the informant give you a name of the person

20 that he believed he would be able to buy narcotics from?

21 A.  He did.

22 Q.  What was the name?

23 A.  Mike Jones.

24 Q.  Did the informant give you any other information about --

25 to help you figure out who this person was?

Insley - direct by Mr. Haxall

174

1   A.  He did.

2   Q.  What was that?

3   A.  It was a cell phone number and a picture off of Facebook

4   of the vehicle that Mike Jones drives.

5   Q.  Okay.  Can you describe that picture that the informant

6   provided to you.

7   A.  Sure.  It was a black vehicle, Pontiac, I believe, had a

8   big White Sox symbol on the back of it and had a White Sox

9   license plate on it.

10  Q.  Do you recall what the license plate was?

11  A.  Yes.

12  Q.  What was it?

13  A.  It would have been MJK -- MJ --

14  Q.  Was it --

15  A.  I am trying to think.  I apologize.  I am trying to

16  remember what it was.  I know it spelled out Mike Jones, but

17  it was all initials.  I apologize.  I can't remember what it

18  is right now.

19  Q.  Sure.

20          Now, was this Mike Jones person the only person the

21  source provided you information about?

22  A.  No.

23  Q.  Approximately how many people in total did the source

24  provide you information on?

25  A.  Probably about four.

Insley - direct by Mr. Haxall

1   Q.  Now, was the source trying to work off a case, or was the

2   source working for money?

3   A.  Working for money.

4   Q.  And what was CPAT offering the source in exchange for the

5   information the source provided?

6   A.  It would have been monetary value, depending on what the

7   outcome was.

8   Q.  What do you mean?  Can you describe how CPAT determined

9   how much money a source was going to get.

10  A.  If they do a buy by themselves, maybe 50 bucks.  If they

11  intro an agent to anybody, it could be a hundred bucks.  And

12  then after that, the arrest and whatever else, you know,

13  compounds on top of it.

14  Q.  Who determines the amount of the payment to sources?

15  A.  Master Sergeant Wayne Ladd.

16  Q.  And that's based in part on the case agent's

17  recommendation?

18  A.  Absolutely.  We sit down and talk about it, you know, what

19  has the person done prior to this?  Is it -- all the

20  information given, you know, valid?

21  Q.  Okay.  Now, you were the chief handler of this particular

22  source; is that right?

23  A.  Yes.

24  Q.  Altogether, not just the case that we are here for today,

25  altogether, approximately how much money was this source paid

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 176 of 292 PageID #:3238
Insley - direct by Mr. Haxall
176

1   by CPAT for his assistance?

2   A.  It was under a thousand dollars.

3   Q.  Now, I want to go back to the initial debriefing about

4   Mike Jones.  So once the -- so you were given a telephone

5   number, and you were also given a picture of his car; is that

6   correct?

7   A.  Yes.

8   Q.  And I know you said you can't remember it now.  Based on

9   the license plate info you were given, though, what did you

10  do?

11  A.  I then took all the information and then used the law

12  enforcement database to try to figure out who the registered

13  owner of that vehicle is and also to see, as far as that phone

14  number, if it comes back to anybody.

15  Q.  Okay.  And we'll get into that in a second.

16          MR. HAXALL:  Your Honor, pursuant to Rule 902-11, the

17  government seeks leave to admit Government Exhibit MKJNZ

18  Records.

19          THE COURT:  Let me just take a quick peek.  It's

20  admitted.

21    (Above-mentioned exhibit was received in evidence.)

22          MR. HAXALL:  And I ask to publish.

23          THE COURT:  Yeah, that's fine.  It's still turned on.

24  Okay.

25  BY MR. HAXALL:

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 177 of 292 PageID #:3239
Insley - direct by Mr. Haxall
177

1  Q.  And, Officer Insley, I'm going to call your attention to

2  that.  So the license plate MKJNZ, does that refresh your

3  recollection as to the specific license plate that was

4  depicted in the picture shown to you by the source?

5  A.  It does.

6  Q.  Okay.  Was that that license plate?

7  A.  It was.

8  Q.  Now, calling your attention to this secretary of state

9  records, who was license -- White Sox plate MKJNZ registered

10  to in June of 2015?

11  A.  Michael Haldorson.

12  Q.  And I am going to now go to the next page of the document,

13  the same records, which is title information.  Calling your

14  attention to over here, what was the year, make, model, and

15  color of that car?

16  A.  It was a 2009 Pontiac G8, black.

17  Q.  Okay.  And was that consistent with the photograph that

18  the source showed you?

19  A.  It was.

20  Q.  Now, once you determined that the car was registered to an

21  individual by the name of Michael Haldorson, did you attempt

22  to gather additional information about that person?

23  A.  Yes.

24  Q.  How did you do that?

25  A.  I then took his name and then also went through a database

Insley - direct by Mr. Haxall

1  to find out as much as we possibly could about him and what

2  Mike Haldorson looked like.

3  Q.  Okay.  And how did you do that?

4  A.  Through this database known as STIG (phonetic), it's what

5  we used, basically, a database that a lot of our narcotics

6  units use.  And they basically send back everything we give

7  them, and it came back with the driver's license picture of

8  the defendant and all the other information as far as related

9  to --

10 Q.  I just want to make sure --

11 A.  Okay.  Sorry.

12 Q.  Based on the name, you were able to get a driver's license

13 number?

14 A.  Correct, yes.

15 Q.  What did you do with that photo in an attempt to confirm

16 the identity?

17 A.  I blew it up so no name, no other information was showing.

18 I took a picture of just the picture itself, sent it to the

19 informant, and I asked, who is this person?

20 Q.  What was the informant's response?

21 A.  "That's Mike Jones."

22 Q.  Okay.  So the -- just the photograph associated with

23 Michael Haldorson's driver's license was identified by the

24 informant as Mike Jones?

25 A.  Correct.

Insley - direct by Mr. Haxall

1  Q.  Okay.  Now, did you take any effort to find out if

2  Mr. Haldorson/Jones had any criminal history?

3  A.  Yes.

4  Q.  What did you do?

5  A.  Used the same database to try to get any background

6  history on him.

7  Q.  And what did you find?

8  A.  He had an extensive criminal history, different arrests,

9  different drug arrests.  So that just kind of gives us

10  ammunition of who we are kind of dealing with prior to any

11  contact.

12  Q.  When you are deciding whether or not to purchase drugs

13  from a target, does it help to know whether or not they have a

14  background in narcotics cases?

15  A.  Absolutely, yes.

16  Q.  Now, did you give the CI -- sorry -- the informant any

17  instructions with respect to Mike Jones at that point?

18  A.  Just tell him to try to make contact with the defendant,

19  try to make a deal.

20  Q.  What do you mean "make a deal"?

21  A.  If he's -- he called him up, see if he's willing to sell

22  any narcotics to the informant.

23  Q.  Okay.  I'd like to direct your attention to approximately

24  June 1st of 2015.  On or just before that date, did the source

25  provide you with any information about being successful in

Insley - direct by Mr. Haxall

1   setting up a purchase of narcotics from Mike Jones?

2   A.  Yes.  The informant gave me a call letting me know that

3   there is a chance that we could set up a deal with the

4   defendant.

5   Q.  Now, on June 1st, was that the only investigation the

6   source -- the informant assisted you with?

7   A.  It was not, no.

8   Q.  Okay.  On that date, was there another controlled purchase

9   completely unrelated?

10  A.  Yes.

11  Q.  Okay.  I'd like to just talk about this investigation.

12          Did you meet with the source on June 1st?

13  A.  Yes.

14  Q.  What instruction did you give the informant about

15  contacting Mike Jones?

16  A.  Told him to find out where we can meet up, how much, you

17  know, what can he actually buy, just so we have the best idea

18  we can have of what kind of our game plan is going to be.

19  Q.  Did the source get back to you about your request?

20  A.  Yes.

21  Q.  And did the source provide you information about what he

22  believed you'd be able to purchase that day?

23  A.  Yes.  He said he'd be able to buy some cocaine from the

24  defendant.

25  Q.  Now, based on that information, what did you do to prepare

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 181 of 292 PageID #:3243
Insley - direct by Mr. Haxall
181

1  for a controlled purchase?

2  A.  So then what we do is I got the paperwork ready as far as

3  the money.  We take pictures of it.  We sign it.  We also go

4  over kind of the game plan of what our plan is going to be as

5  far as what I was told the information I got at that time so I

6  can let the surveillance team or anybody else who is with us

7  have an idea -- so we are all on the same page basically, what

8  our plan is.

9  Q.  And did you do anything with respect to this source -- the

10  informant's person or car to prepare for the transaction?

11  A.  Yes.  What we do is once we have our game plan figured

12  out, we then talk to the informant.  I search the informant

13  and his person and his car.  I also hand him over a wire and

14  explain to him that we are going to do like a preamble.  And

15  when I turn it on, don't turn it off, you know, have it hidden

16  the best you can, and to basically follow my instructions the

17  best that that person can.

18  Q.  On June 1st prior to the controlled purchase of cocaine,

19  did you find anything when you searched this informant's

20  person?

21  A.  No.

22  Q.  How about his car?

23  A.  No.

24  Q.  Now, shortly before 9:00 p.m., did you give the source

25  instructions about again trying to contact Mike Jones?

Insley - direct by Mr. Haxall

1   A.  Yes.

2   Q.  Did you witness the informant place a phone call?

3   A.  Yes.

4   Q.  To what number?

5   A.  To the 815-999-2664 number.

6   Q.  Now, was that the same telephone number that the source

7   had indicated belonged to Mike Jones when you first talked

8   about him?

9   A.  Yes.

10  Q.  And how do you know the source dialed that number?

11  A.  I was standing next to him when he called.

12  Q.  Were you able to see it?

13  A.  Yes.

14      MR. HAXALL:  Judge, at this time the government is

15  going to seek leave to admit, pursuant to Rule 902-11,

16  Government Exhibit AT&T Subscriber Records.

17      THE COURT:  Let me just quickly take a look at them.

18  You said AT&T?

19      MR. HAXALL:  Yes, sir, AT&T Subscriber Records.

20      THE COURT:  They are admitted.

21    (Above-mentioned exhibit was received in evidence.)

22      MR. HAXALL:  Thank you.  I ask leave to publish.

23      THE COURT:  That's fine.

24  BY MR. HAXALL:

25  Q.  Officer Insley, calling your attention to the item in

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 183 of 292 PageID #:3245
Insley - direct by Mr. Haxall
183

1    front of you, the user information for telephone number

2    815-999-2664, according to AT&T, who is that phone registered

3    to from September 2013 to July of 2015?

4    A.  Michael P. Haldorson.

5    Q.  And what's the address listed?

6    A.  3460 Lockner Boulevard, Joliet, Illinois 60431.

7         MR. HAXALL:  Judge, the government is also going to

8    seek leave to admit Government Exhibit AT&T Mobility Usage.

9    It's actually on a disk.  We do have a selection of those

10   pages, however, pulled out.  They have been previously

11   provided to counsel.

12        THE COURT:  Okay.  It's admitted.

13     (Above-mentioned exhibit was received in evidence.)

14        MR. HAXALL:  Thank you.

15   BY MR. HAXALL:

16   Q.  Sir, I'm going to ask you to turn in your book, and I am

17   going to see if I can put it on the screen in front of you,

18   are you familiar with Government Exhibit 6/1/2015 Chart?

19   A.  Yes.

20   Q.  And is this a chart of phone calls between telephone

21   number 815-999-2664 and telephone number 815-997-0607 for

22   June 1st, 2015, from approximately 7:17 p.m. to 9:34 p.m.

23   Central daylight time?

24   A.  It is.

25   Q.  And have you had a chance to review this document against

Insley - direct by Mr. Haxall

184

1    the records in those pages and on that disk prior to

2    testifying today?

3    A.  I have.

4    Q.  And does this chart truly and accurately reflect a summary

5    of those telephone records for these two phone numbers during

6    that time period?

7    A.  It does.

8           MR. HAXALL:  Your Honor, I would ask to admit

9    Government Exhibit 6/1/2015 Chart.

10          THE COURT:  It's admitted.

11     (Above-mentioned exhibit was received in evidence.)

12   BY MR. HAXALL:

13   Q.  I am going to start by calling your attention to the

14   telephone number.  Now the 2664 number, that's the same number

15   we just talked about, correct?

16   A.  Correct.

17   Q.  Now, telephone number 815-997-0607, are you familiar with

18   who that belongs to?

19   A.  Yes.

20   Q.  During June of 2015, who did that -- who used that number?

21   A.  The informant.

22   Q.  And just drawing your attention generally to the columns

23   here, there is a Central daylight time, are you familiar with

24   UTC time?

25   A.  Yes.

Insley - direct by Mr. Haxall

185

1   Q.  What is that?

2   A.  It's basically Greenwich time.

3   Q.  So the records came in UTC time, and we had to convert it?

4   A.  Yes.  Five-hour difference, I believe.

5   Q.  Between Central daylight time and UTC?

6   A.  Right.

7   Q.  Just calling your attention, is it fair to say that the

8   bold ones are connected -- phone calls where there is a

9   duration listed and highlighted are calls originating with the

10  2664 number?

11  A.  Yes.

12  Q.  All right.  I'd like to direct your attention to 8:50, the

13  telephone call of duration of 42 seconds.  Is that consistent

14  with the time that you observed the source or the informant

15  place a call to that 2664 telephone number?

16  A.  Yes.

17  Q.  And that's the one that you were able to observe?

18  A.  Correct, yes.

19  Q.  Were you able to hear the call?

20  A.  Yes.

21  Q.  How is that?

22  A.  I had the informant put the phone on speakerphone.

23  Q.  How far away were you from the informant at that point?

24  A.  The informant was sitting in the driver's seat, and I was

25  just right outside the car.

Insley - direct by Mr. Haxall

1  Q.  And now directing your attention to approximately

2  9:00 p.m.  According to this, what was the originating number

3  for that telephone call?

4  A.  815-999-2664.

5  Q.  Okay.  Did you witness the informant receive a call at

6  about 9:00 o'clock?

7  A.  Yes.

8  Q.  Were you able to hear the call?

9  A.  Yes.

10  Q.  How so?

11  A.  I was standing next to him.

12  Q.  Based on the communications between the informant and the

13  2664 number registered to Michael Haldorson, what did you

14  believe was going to happen shortly after 9:00 o'clock on

15  June 1st of 2015?

16  A.  There would be a narcotics deal.

17  Q.  So what did you do next with respect to the transmitter at

18  that point?

19  A.  I turned the transmitter back on and gave it to the

20  informant.  We did a preamble and advised him not to turn it

21  off, you know, and follow the informant to the meeting place.

22  Q.  Where did you understand the meeting place was going to be

23  that night?

24  A.  It was going to be at the Walmart on 59.

25  Q.  Now, the audio device that you just talked about, was that

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 187 of 292 PageID #:3249
Insley - direct by Mr. Haxall
187

1   a transmitter, recorder, or both?

2   A.  It's both.

3   Q.  Okay.  So were you able to listen in realtime to the

4   transmission?

5   A.  Yes.

6   Q.  Sir, in front of you there is a -- the next page probably

7   in that book, there is a disk under the tab that says

8   Government Exhibit 6/1/2015 Recording.  Do you see that item?

9           THE COURT:  If you want to come up, go over.

10          THE WITNESS:  Got it.

11  BY MR. HAXALL:

12  Q.  I am going to pull it out and show it to you for a second.

13  Do you recognize that item?

14  A.  Yes.

15  Q.  How is it that you recognize it?

16  A.  By my signature.

17  Q.  Okay.  Your initials?

18  A.  Yes.

19  Q.  Have you reviewed the recording on that disk prior to

20  testifying today?

21  A.  Yes.

22  Q.  When you listened to it, was there any indication that the

23  recording has been tampered with, shut off, edited, or altered

24  in any way?

25  A.  No.

Insley - direct by Mr. Haxall

1  Q.  Is the recording consistent with what you heard in

2  realtime over the transmitter that night?

3  A.  Yes.

4  Q.  Is the recording a true and accurate audio recording of

5  the events of June 1st, 2015, from approximately 9:00 p.m.

6  until approximately 9:35 p.m.?

7  A.  It is.

8           MR. HAXALL:  Judge, the government seeks leave to

9  admit Government Exhibit 6/1/2015 Recording and ask to publish

10  it.  That's obviously the original, but we have it loaded into

11  the system.

12           THE COURT:  It's admitted.  You can publish it.

13    (Above-mentioned exhibit was received in evidence.)

14           THE COURT:  Are you going to do the transcript along

15  with?

16           MR. HAXALL:  I will, yes.

17           THE COURT:  Okay.

18  BY MR. HAXALL:

19  Q.  Actually, inspector -- Officer Insley, if you can turn to

20  the next page, Government Exhibit 6/1/2015 Transcript.  Do you

21  recognize that?

22  A.  Yes.

23  Q.  What is it?

24  A.  It's the transcript of the wire for that night.

25  Q.  Did you have a chance to review that transcript for

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 189 of 292 PageID #:3251
Insley - direct by Mr. Haxall
189

1   accuracy?

2   A.  Yes.

3   Q.  How did you do that?

4   A.  I listened to it and read along with it.

5   Q.  Were there any times that you were unable to clearly hear

6   what was being said?

7   A.  Yes.

8   Q.  How is that indicated in the transcript?

9   A.  As a UI.

10  Q.  And in the transcript where the speaker is indicated as

11  Insley, what does that mean?

12  A.  That's me.

13  Q.  Approximately how many times have you talked to the

14  informant in person or over the phone?

15  A.  Prior to that time, probably at least 50 times.

16  Q.  In the course of your dealings with the informant, did you

17  have a chance to become familiar with his voice?

18  A.  Yes.

19  Q.  Calling your attention to the transcript where the speaker

20  is indicated as CS, what does that mean?

21  A.  That would be the informant.

22  Q.  Have you had the opportunity to become familiar with the

23  defendant's voice?

24  A.  Yes.

25  Q.  Have you conducted an interview of him?

Insley - direct by Mr. Haxall

1   A.  Yes.

2   Q.  In the transcript where the speaker is indicated as

3   Haldorson, what does that mean?

4   A.  That would be the defendant.

5   Q.  Defendant speaking?

6   A.  Yes.

7   Q.  Does Government Exhibit 6/1/2015 Transcript truly and

8   accurately reflect what was said and the speakers in the

9   recording contained on Government Exhibit 6/1/2015 Recording?

10  A.  Yes.

11        MR. HAXALL:  The government seeks leave to admit the

12  transcript, Judge, and I'd ask the Court to be able to review

13  it as we play this.

14        THE COURT:  Yes, it's admitted.

15    (Above-mentioned exhibit was received in evidence.)

16  BY MR. HAXALL:

17  Q.  So, Officer, I am going to play the first couple minutes

18  of the recording, and then I'm going to ask you to discuss

19  that.  Okay?

20  A.  Okay.

21    (Audio recording played.)

22        MR. HAXALL:  I'm going to stop this at about the

23  one-minute mark.

24  BY MR. HAXALL:

25  Q.  Officer Insley, was that the preamble you discussed?

Insley - direct by Mr. Haxall

1    A.   Yes.

2    Q.   And who are the two people speaking in that portion of the

3    tape?

4    A.   It would have been myself and the informant.

5    Q.   Now, after activating the transmitter, doing the preamble,

6    what happened next?

7    A.   At that point, I spoke to my surveillance team to kind of

8    get them out there.  That's why I said give us two minutes so

9    they can be ahead of us, and then followed the informant to

10   the meeting place where we thought the deal was going to go

11   down.

12   Q.   What kind of car were you driving that night, marked or

13   unmarked?

14   A.   Unmarked.

15   Q.   And where did you go?

16   A.   I went to the Walmart on Route 59.

17   Q.   While you were following the informant, did you lose sight

18   of his car?

19   A.   No.

20   Q.   I'm going to put on the screen in front of you Government

21   Exhibit Walmart Aerial.  Do you recognize what's depicted in

22   this exhibit?

23   A.   Yes.

24   Q.   What is this?

25   A.   A picture of Walmart.

Insley - direct by Mr. Haxall

1   Q.  Is this the Walmart where you followed the informant to?

2   A.  Yes.

3   Q.  And does this truly and accurately depict the Walmart, the

4   surrounding streets, and the Walmart parking lot as it

5   appeared on or about June 1st of 2015?

6   A.  It does.

7           MR. HAXALL:  The government seeks leave to admit

8   Government Exhibit Walmart Aerial, your Honor.

9           THE COURT:  It's admitted.

10    (Above-mentioned exhibit was received in evidence.)

11  BY MR. HAXALL:

12  Q.  Now, I know the orientation is a little bit off.  North is

13  to the right here.  Can you describe where you observed the

14  informant drive to.

15  A.  It was on the north side of the parking lot of Walmart.

16  Q.  And what did you do at that point?

17  A.  At that point, I just kind of see where the informant

18  parked.  I parked maybe an aisle or two over so I could have

19  eyes on the informant at that time.

20  Q.  And about how far away were you?

21  A.  Probably at least an aisle over.

22  Q.  Were you the primary eyes on the informant?

23  A.  Yes.

24  Q.  Did you have other surveillance officers who were also

25  acting as primary eyes?

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 193 of 292 PageID #:3255
Insley - direct by Mr. Haxall
193

1  A.  Absolutely, yes.

2  Q.  Now, did you continue to listen to the audio transmitter

3  in realtime?

4  A.  Yes.

5  Q.  And, again, you indicated you've listened to this tape

6  before today.  From about the one-minute mark that we just

7  listened to to about the 13-minute mark, other than general

8  background noise and driving, is there anything pertinent to

9  this investigation?

10  A.  No.

11      MR. HAXALL:  Your Honor, I am going to seek leave to

12  publish another portion of this recording.

13      THE COURT:  Is this the portion that's next on the

14  transcript?

15      MR. HAXALL:  Yes, sir.

16      THE COURT:  Okay.

17      MR. HAXALL:  I'm going to forward it -- if I can --

18  I'm going to move to the 13-minute and 4-second mark.

19    (Audio recording played.)

20      MR. HAXALL:  For the record, I stopped the recording

21  at the 15-minute and 59-second mark.

22  BY MR. HAXALL:

23  Q.  Between that point and approximately the 22:30 minute

24  mark, is there anything significant recorded on this

25  recording?

Insley - direct by Mr. Haxall

194

1    A.  There is not, no.

2          MR. HAXALL:  I'm now going to seek leave to publish

3    starting at about the 22:30 minute mark.

4      (Audio recording played.)

5          MR. HAXALL:  And I'm pausing the recording at the

6    23-minute and 13-second mark.

7    BY MR. HAXALL:

8    Q.  Now, while you were listening to the transmitter, were you

9    able to hear those phone calls?

10   A.  Yes.

11   Q.  A short time later, what did you observe happen?

12   A.  Once I heard almost like a car door open and then it shut,

13   so I can only assume that was the informant getting out of his

14   car.

15   Q.  Did you see the informant get out of his car?

16   A.  I did not, no.

17   Q.  Why not?

18   A.  Because by that time, there was cars blocking my view.

19   Q.  Were you able to hear what was going on?

20   A.  Yes.

21   Q.  So you heard what was going on over the transmitter; is

22   that correct?

23   A.  Correct, yes.

24         MR. HAXALL:  I'm going to ask leave to play then the

25   next portion of this recording, starting at the 29-minute and

Insley - direct by Mr. Haxall

1    40-second mark.

2      (Audio recording played.)

3            MR. HAXALL:  And I just stopped the recording at the

4    31-minute and 37-second point.

5    BY MR. HAXALL:

6    Q.  So you weren't able to see what was going on.  Is that

7    accurate?

8    A.  Correct.

9    Q.  Were you able to hear?

10   A.  Yes.

11   Q.  Based on what you heard, what did you believe had just

12   transpired?

13   A.  A narcotics deal.

14   Q.  What happened next?

15   A.  Next I seen a black vehicle drive away that possibly

16   matched the description of the defendant, and I informed the

17   other surveillance guys to keep an eye on that vehicle and

18   make sure it gets out of the area.  And once it does, I can

19   tell the informant it's safe to drive away.  And then we would

20   meet at a prearranged location to meet up to get the narcotics

21   from him.

22   Q.  Was your initial plan to have officers stop and arrest the

23   person in that black car?

24   A.  No.

25   Q.  Why not?

Insley - direct by Mr. Haxall

1   A.  Because we were just starting our investigation into it.

2   Q.  Why was it important for you then to follow that person or

3   have other agents do so if you weren't going to stop him?

4   A.  Make sure for counter surveillance.  He might have brought

5   someone else with him watching who was leaving the parking lot

6   shortly after the defendant was.

7   Q.  So did you follow then the source's car back to the

8   meeting location?

9   A.  Yes.

10  Q.  While you were following the source, did you lose track of

11  his car?

12  A.  No.

13  Q.  When you arrived at the meeting location, what did you do?

14  A.  I arrived with them.  By then -- well, the informant

15  handed over a couple baggies of suspected cocaine.  I also

16  searched his person, the vehicle to make sure there was

17  nothing else, no other dealing that went on.  And he also

18  informed me at that point that he believed that defendant had

19  a handgun on him at the deal.

20  Q.  What did you do with that information?

21  A.  I then radioed surveillance to say, hey, are you -- still

22  got eyes on that person?  Because at that point, we want to

23  stop him now.

24  Q.  And were they able to do so?

25  A.  They were not, no.

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 197 of 292 PageID #:3259
Insley - direct by Mr. Haxall
197

1  Q.  Let's just talk very quickly.  The two baggies that you

2  referred to, did you conduct field tests of the substance

3  inside?

4  A.  Yes.

5  Q.  What was the result?

6  A.  It came back positive for cocaine.

7  Q.  Are you aware whether or not that substance in those

8  baggies was subsequently tested by the crime lab?

9  A.  Yes.

10  Q.  And what was the result?

11  A.  It came back positive.

12  Q.  Did you have the opportunity to debrief the source at that

13  time?

14  A.  Yes.

15  Q.  Who did the source say provided him with the white powdery

16  substance that field tested positive for cocaine?

17  A.  Mike Jones.

18  Q.  I'd like to now move ahead to June 23rd of 2015.  Between

19  June 1st and June 23rd, did you remain in contact with the

20  informant?

21  A.  Yes.

22  Q.  What instruction did you give the informant with respect

23  to Mike Jones?

24  A.  Try to set up another deal.

25  Q.  Did you go get an arrest warrant for Mr. Haldorson between

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 198 of 292 PageID #:3260
Insley - direct by Mr. Haxall
198

1    June 1st and June 23rd?

2    A.  No.

3    Q.  Why not?

4    A.  We are still actively investigating him.

5    Q.  What did you think would be the impact on your source's

6    anonymity if you sought an arrest warrant for him providing

7    cocaine to the source on that date?

8    A.  It would have easily burned him of who it was.

9    Q.  Now, going ahead to June 23rd, on or about that date, did

10   the informant inform you that he believed a deal could be set

11   up for that date?

12   A.  Yes.

13   Q.  Did you meet with the informant on June 23rd of 2015?

14   A.  I did.

15   Q.  Where?

16   A.  The State Police building, District 5.

17   Q.  Initially, what was your operational plan for that day?

18   A.  Was to set up a deal, never actually have the informant

19   meet up with the defendant, and just have a marked squad pull

20   over the defendant.

21   Q.  Why was that your plan?

22   A.  Based on the information about the possible gun

23   involvement, we just wanted him to have no part of being

24   involved there.  It would put other -- his life in danger and

25   other officers in danger as well.

Insley - direct by Mr. Haxall

1   Q.  What was your hope if the defendant showed up with

2   narcotics on your ability to keep the source out of this case

3   entirely?

4   A.  That was -- that would have worked out great if that would

5   have happened, because then we could have just charged the

6   defendant with what we found on him at that time.  And now

7   you'd have to do a date of sale.

8   Q.  Initially, where did you intend to have the defendant

9   stopped and arrested on June 23rd?

10  A.  In Joliet.

11  Q.  Based on that, where did you go?

12  A.  We met at an arranged location in Joliet to speak with

13  Joliet officers and kind of give them an up-to-date of what

14  our plan was.

15  Q.  Why did you need Joliet officers?

16  A.  Because they were marked.  We wanted a marked squad that

17  was in Joliet.

18  Q.  So who did you think was going to conduct the stop of the

19  defendant that day?

20  A.  The Joliet police officers.

21  Q.  Now, who was present with you at that point?

22  A.  At that point, it would have been the informant and

23  everybody else on our surveillance team.

24  Q.  While you were with the informant, did Joliet police

25  arrive as well?

Insley - direct by Mr. Haxall

200

1   A.  Yes.

2   Q.  Okay.  While you were with the informant, did you ask him

3   to do anything with respect to contacting the defendant?

4   A.  To give him a call and find out what the deal is.

5   Q.  And what telephone number did the source contact?

6   A.  He contacted the 815-999-2664 number.

7   Q.  How do you know that?

8   A.  I know his number was the defendant's --

9   Q.  Okay.  But how do you know that's the number the source

10  used?

11  A.  I watched him dial it.

12        MR. HAXALL:  Your Honor, at this point the government

13  is going to seek to put on the screen Government Exhibit

14  6/23/2015 Chart.

15        THE COURT:  Okay.

16  BY MR. HAXALL:

17  Q.  All right.  Officer Insley, calling your attention to

18  Government Exhibit 6/23/2015 Chart, are you familiar with this

19  chart?

20  A.  Yes.

21  Q.  And is this a chart for phone contacts between the 2664

22  number registered to the defendant and that same 0607 number

23  that was identified as belonging to the informant?

24  A.  Yes.

25  Q.  Have you had the chance to review the phone records for

Insley - direct by Mr. Haxall

1   contacts between those two phone numbers from June 23rd, 2015,

2   from approximately 5:54 p.m. to 8:29 p.m. Central daylight

3   time?

4   A.  Yes.

5   Q.  And does this chart accurately summarize the records from

6   the much broader phone records?

7   A.  It does.

8       MR. HAXALL:  Your Honor, the government seeks leave

9   to admit Government Exhibit 6/23/2015 Chart.

10      THE COURT:  It's admitted.

11    (Above-mentioned exhibit was received in evidence.)

12  BY MR. HAXALL:

13  Q.  I'd like to start, Officer Insley, to direct your

14  attention to the contacts from about 6:00 o'clock to just

15  before 7:00 -- or sorry -- just before 7:05.  Were there any

16  text messages from the informant to Mr. Haldorson?

17  A.  Yes.

18  Q.  Were there phone calls from the informant to

19  Mr. Haldorson?

20  A.  Yes.

21  Q.  Were there any, during this period of time, calls or texts

22  from the defendant's phone to the informant's phone?

23  A.  No.

24  Q.  So is it fair to say you kept asking the informant to try

25  and contact the defendant?

Insley - direct by Mr. Haxall

1  A.  Yes.

2  Q.  Now, directing your attention to the period of time from

3  7:05 to 7:42 p.m., is it fair to say the highlighted calls are

4  calls in which there is a duration -- sorry -- the bold calls

5  are those indicating there is a duration of more than a few

6  seconds, and the highlighted ones are the ones originating

7  from the 2664 number?

8  A.  Yes.

9  Q.  So at 7:05, according to the phone records, how long of a

10  telephone call was there between the defendant's phone and the

11  source's?

12  A.  One minute, 34 seconds.

13  Q.  And were you able to hear connected phone calls between

14  the source and that 2664 number?

15  A.  Yes.

16  Q.  How so?

17  A.  I was sitting in the car with him.

18  Q.  And did the source have it to his ear, on speakerphone?

19  How was it done?

20  A.  No, it was on speakerphone.

21  Q.  Now, did the voice on the phone calls that the source was

22  speaking to sound familiar to you from the June 1st deal?

23  A.  It did, yes.

24  Q.  Now, moving ahead to the 7:42 call, 1 minute and

25  21 seconds, according to the phone records, who placed that

Insley - direct by Mr. Haxall

1  call?

2  A.  The informant.

3  Q.  Okay.  Now, Officer, is it true that you testified before

4  the grand jury investigating this case?

5  A.  Yes.

6  Q.  And during that testimony, were you asked the following

7  question and gave the following answer:

8      "Now, did the CI later receive another call from

9  Mr. Haldorson a short time later?

10     "ANSWER:  Yes."

11     Was that your testimony?

12  A.  Yes.

13  Q.  In reviewing the phone records, did you realize that you

14  made a mistake during your prior testimony?

15  A.  Yes, I did.

16  Q.  What was that mistake?

17  A.  I was wrong.  It was the informant calling the defendant.

18  Q.  Okay.  But did you hear a phone call at approximately

19  7:42 p.m. between the informant and a person using that 2664

20  number registered to the defendant?

21  A.  Yes.

22  Q.  Based on the communications during this period of time

23  between the source and the 2664 number, did you believe the

24  plan had changed?

25  A.  Yes.

Insley - direct by Mr. Haxall

1  Q.  In what way?

2  A.  That it was going to most likely be moved to Plainfield.

3  Q.  Did you communicate this change of plans to anyone?

4  A.  Yes.  Everybody on my team.

5  Q.  Did you specifically relate this information to Marzetta?

6  A.  Yes.

7  Q.  Why to him?

8  A.  Because if this was going to happen in Plainfield, I

9  wanted a Plainfield police officer to make the stop.

10  Q.  Are you familiar with the telephone number with an 815

11  area code ending in 7825?

12  A.  Yes.

13  Q.  What number was that?

14  A.  That would have been my CPAT phone number.

15  Q.  Now, did the source, after the 7:42 call, continue to

16  communicate with that 2664 number?

17  A.  Yes.

18  Q.  And did you witness that?

19  A.  Yes.

20  Q.  I'd like to direct your attention to text messages from

21  between approximately 8:10 p.m. to 8:19 p.m., and they do

22  split over two pages.

23        So between 8:10 and about 8:19, how many text

24  messages were exchanged between the source's phone and the one

25  registered to the defendant?

Insley - direct by Mr. Haxall

1   A.  It looks like eight of them.

2   Q.  Were they entirely from the informant's phone or were

3   there also some coming from the 2664 phone?

4   A.  It was back and forth.

5   Q.  In general terms, what were the text messages about?

6   A.  Just trying to figure out where we're going to -- where

7   they're going to meet up at.

8   Q.  What did you do with the information -- so is it fair to

9   say those were updates about the deal?

10  A.  Yes.

11  Q.  What did you do with that update information?

12  A.  I was letting Inspector Marzetta know that this possibly

13  might go down in Plainfield.

14  Q.  Now, directing your attention to 8:19 -- sorry -- 18 and

15  then 8:19 p.m., how many text messages were sent from the

16  defendant's phone to the source?

17  A.  Three.

18  Q.  Sorry.  Particularly from the 2664 at 8:18 and the 2664 at

19  8:19, were there --

20  A.  I'm sorry.  One.

21  Q.  From the phone?

22  A.  Yes.

23  Q.  I'm sorry.

24          How many highlighted ones are 8:18 and 8:19?

25  A.  There's two.

Insley - direct by Mr. Haxall

1  Q.  And did you pass that information along to Marzetta?

2  A.  Yes.

3  Q.  I'd like to kind of continue along.

4      At some point, did you learn that the defendant's car

5  had been stopped?

6  A.  Yes.

7  Q.  Approximately what time was that?  Do you recall?

8  A.  Maybe around 8:25, 8:20-ish, somewhere in that general

9  area.

10 Q.  And how did you learn that the defendant's car had been

11 stopped?

12 A.  Marzetta I think called me on the radio and said, hey,

13 Officer Friddle is going to stop it or whatever.

14 Q.  After learning that the car was stopped, did the source or

15 the informant receive another text from that 2664 number?

16 A.  Yes.

17 Q.  And according to these records, what time was that?

18 A.  It would have been at like 8:29.

19 Q.  And do you recall what that message said?

20 A.  I know it didn't say that I just got rolled up on.

21 Q.  And how do you know what the message said?

22 A.  Because the informant showed me.

23 Q.  What did "I just got rolled up on" mean to you?

24 A.  It means that he got stopped by the police.

25 Q.  I'd like to talk to you a little bit about the report from

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 207 of 292 PageID #:3269
Insley - direct by Mr. Haxall
207

1    June 23rd.  Initially, when you first wrote your reports in

2    this case, did you write a report detailing the communications

3    in which the informant ordered cocaine from the defendant on

4    that date?

5    A.  No.

6    Q.  Why not?

7    A.  Because I wanted to try to keep the informant out of this

8    whole situation as much as possible.

9    Q.  Okay.  What did you believe would be the impact on your

10   informant potentially if the defendant were to learn that he

11   was stopped and arrested as a result of the informant's

12   cooperation?

13   A.  His life could have been in danger.

14   Q.  What did you believe could be the impact on the

15   informant's ability to continue to assist you in other

16   investigations if that happened?

17   A.  The informant would never work with us again.

18   Q.  Is it your general practice to include as much information

19   as possible about an informant in your police reports?

20   A.  It's not, no.

21   Q.  What are some of your concerns about doing that?

22   A.  For the safety of the person and the safety of the

23   officers that are going to be involved in any deals, because

24   if the defendant knows who it is prior to us even getting

25   there, we don't know what's going to happen.  It's the

Insley - direct by Mr. Haxall

1    unknown.

2    Q.  Have you had cases in which an informant's identity, even

3    a transactional informant, remained undisclosed during the

4    entirety of a prosecution?

5    A.  No.

6    Q.  You've never had a case where an informant stayed unknown

7    throughout?

8    A.  All the way through?

9    Q.  Yeah.

10   A.  I have had to where the defense wanted to have it

11   discovered.

12   Q.  And then what happened?

13   A.  And that's where I asked the informant, do you want to

14   testify?  And a hundred percent of the time they say no.

15   Q.  So what do you do?

16   A.  So we just -- I let the state's attorney know, whoever it

17   is, that the informant does not want to be disclosed, and

18   whatever they want to do with the case, they can, because it's

19   not worth someone's life.

20   Q.  Now, did you eventually prepare a report detailing the

21   informant's contacts with the defendant on June 23rd?

22   A.  Yes.

23   Q.  I'd like to discuss that report with you for a few

24   minutes, and you've reviewed it before, haven't you?

25   A.  Yes.

Insley - direct by Mr. Haxall

1  Q.  Now, did you prepare that report at the same time that you

2  prepared other reports about June 23rd?

3  A.  No.

4  Q.  Okay.  Approximately when did you actually prepare that

5  report?

6  A.  Probably about two months later.

7  Q.  And on the top of that report, though, does it indicate

8  that it was dated June of 2015?

9  A.  Yes.

10  Q.  Why is that?

11  A.  It was just the heading that I used for every report, and

12  I just -- it was my mistake by not changing it.

13  Q.  I would now like to move ahead -- or actually move back to

14  June 23rd to the interview of the defendant.

15          After being informed of the defendant's arrest, where

16  did you go?

17  A.  To the Plainfield Police Department.

18  Q.  Between your arrival at the Plainfield Police Department

19  and approximately 9:30 that night, were you made aware of the

20  results of the search of the defendant's car?

21  A.  Yes.

22  Q.  In general terms, what were you told about what was found?

23  A.  There was some pipe bombs and -- or suspected pipe bombs

24  and narcotics.

25  Q.  Did you conduct an interview with the defendant at

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 210 of 292 PageID #:3272
Insley - direct by Mr. Haxall
210

1  approximately 9:30?

2  A.  Yes.

3  Q.  Where was that interview conducted?

4  A.  Plainfield Police Department.

5  Q.  Who else was present for the interview?

6  A.  It would have been Inspector Diehl and Inspector Kaminski.

7  Q.  And the defendant?

8  A.  And the defendant, yes.

9  Q.  How did the interview begin?

10 A.  I walk in, and I read him the verbatim of an Illinois

11 State Police constitutional rights form.

12 Q.  I'd like to publish what's previously been admitted as

13 Government Exhibit Miranda Waiver.  Do you recognize that

14 item?

15 A.  Yes.

16 Q.  What is that?

17 A.  That's the constitutional rights and waiver form that I

18 have for the defendant the night of the 23rd.

19 Q.  Okay.  I'd like you to explain kind of step by step how

20 you went through this with the defendant.  So if you please,

21 what was the first thing you did with respect to this form?

22 A.  I sat down, and I just read the top part of it verbatim,

23 Illinois State Police constitutional rights and waiver.  I

24 then explain that I am going to read this verbatim to the

25 defendant, and I would like -- at the end of each line, I

Insley - direct by Mr. Haxall

1   would like the defendant to verbally tell me yes, that they

2   understand what I just explained to them.

3   Q.  Okay.  So, for example, did you read to him "You have the

4   right to remain silent"?

5   A.  Yes.

6   Q.  What was his response when you asked if he understood it?

7   A.  He said yes, and I had him initial it.

8   Q.  Did you then read him "Anything you say can and will be

9   used against you in court or other proceedings"?

10  A.  Yes.

11  Q.  What was the defendant's response when you asked him if he

12  understood that?

13  A.  Verbally said yes and initialed it.

14  Q.  How about the third item there, was it the same?

15  A.  Same, verbally said yes.

16  Q.  And the fourth?

17  A.  Same thing, verbally said yes.

18  Q.  While you were reading those to the defendant, did he

19  indicate that he had any difficulty understanding what you

20  were saying?

21  A.  No.

22  Q.  Okay.  So after you went through those first four rights,

23  what happened next?

24  A.  So I went through it.  I explained if he can sign it, it's

25  not admitting guilt, saying you understand the rights that I

Insley - direct by Mr. Haxall

1   have just read to you.

2   Q.  And did the defendant indicate he was willing to do so?

3   A.  Yes.

4   Q.  How did he indicate that?

5   A.  By -- he signed it understanding the rights, and he

6   verbally told me that he is willing to talk.

7   Q.  Okay.  So you had him sign it, and then you asked him if

8   he was willing to talk to you?

9   A.  Um-hmm.

10  Q.  I'm sorry.  Yes or no?

11  A.  I'm sorry.  Yes.

12  Q.  And how did he indicate that?

13  A.  He verbally said yes.

14  Q.  I don't want to get into the details of the interview, but

15  did you conduct an interview of the defendant?

16  A.  Yes.

17  Q.  Drawing your attention to the portion I'm going to circle

18  on the right-hand portion of that document where it says

19  "signature of person receiving rights," whose signature is

20  that?

21  A.  The defendant's.

22  Q.  Did you -- did he sign that before or after you asked him

23  any questions about that case?

24  A.  It was before.

25  Q.  Did you witness -- or how many agents did you witness ask

1   the defendant questions about his case before you went over

2   that form with him?

3   A.  Nobody.

4   Q.  Now, are you aware whether or not federal agents had the

5   opportunity to interview the defendant?

6   A.  Yes.

7   Q.  Did you give them this form so they could go over it with

8   the defendant?

9   A.  No.  I believe they had their own form.

10  Q.  Okay.  And do you know who would have done that interview?

11  A.  I believe the last name was Marcus -- or I'm sorry.  It

12  would have been ATF Howard.

13  Q.  Okay.  Is it Howard Marcus?

14  A.  Howard Marcus, gosh, I don't remember.

15          MR. HAXALL:  If I could have one moment, your Honor.

16    (Brief pause.)

17          MR. HAXALL:  No other questions at this point, your

18  Honor.

19          THE COURT:  Mr. Lipuma.

20          MR. LIPUMA:  Thank you, Judge.

21                          - - -

22              THOMAS INSLEY, CROSS-EXAMINATION

23  BY MR. LIPUMA:

24  Q.  Good afternoon, sir.

25  A.  Good afternoon, sir.  How are you doing?

Insley - cross by Mr. Lipuma

1  Q.  Prior to June 1st of 2015, you didn't know Michael

2  Haldorson from Michael Jones from anybody else, correct?

3  A.  Correct, sir, yes.

4  Q.  It was on what date, according to your testimony, did the

5  CI tell you about Michael Jones or Mike Jones?

6  A.  It was -- it might have been a few weeks prior to the

7  actual June 1st deal.

8  Q.  Okay.  And so we can agree that there's no prior -- other

9  than your June 1st report, there's no prior reports prepared

10  by you regarding Mike Jones or Mike Haldorson, correct?

11  A.  That is correct, yes.

12  Q.  And you did not prepare a report in which you debriefed

13  the informant about his prior activities with Haldorson; isn't

14  that true?

15  A.  That is correct, yes.

16  Q.  Meaning you did not prepare a report about a debriefing,

17  correct?

18  A.  Correct, yes.

19  Q.  Okay.  Now, you indicated that the CI provided you with a

20  picture of the defendant's car, and this would have been when?

21  A.  Probably maybe two or three weeks prior to --

22  Q.  June 1st.

23  A.  -- the June 1st deal, yes.

24  Q.  Okay.  And so was it one picture or more pictures than

25  one?

Insley - cross by Mr. Lipuma

215

1   A.  I believe it was just one, just the backside of the car.

2   Q.  Okay.  And where is -- what did you do with the photo of

3   that car?

4   A.  He would have probably sent it to me on my old phone, so I

5   don't know where my phone is at now, but that's what it would

6   have been on.

7   Q.  Okay.  So you did not take the initiative to document the

8   fact that an informant gave you an item of evidence about a

9   prospective suspect, correct?

10  A.  That is correct, yes.

11  Q.  You deleted that photo rather -- did you delete that

12  photo?

13  A.  I have no idea.  That's been two years now, over two

14  years.

15  Q.  Okay.  But you never reduced it to writing, did you?

16  A.  I did not, no.

17  Q.  Okay.  You didn't even put that in your June 1st report,

18  did you?

19  A.  No.

20  Q.  Now, you indicated in your testimony that the informant

21  was working for money; isn't that true?

22  A.  That is true.

23  Q.  Well, isn't it a fact that you and/or Agent Marzetta

24  actually caught the informant engaging in criminal activity?

25  A.  I did not, no.

Insley - cross by Mr. Lipuma

216

1  Q.  Did Marzetta?

2  A.  I have no idea.  You'd have to ask him.

3  Q.  Well, you are the control agent, correct?

4  A.  Yes.

5  Q.  You control this informant, right?

6  A.  Yes.

7  Q.  And isn't it true that you and/or Marzetta proposed to the

8  informant after catching him in criminal activity that he

9  could work off his offense by giving up three people?

10  A.  It was not me.  It might have been Officer Marzetta.

11  Q.  Well, you had the initial contact with the informant,

12  correct?

13  A.  I did not have the initial one.  I was given him as an

14  informant.

15  Q.  Okay.  And Marzetta gave you him as an informant, correct?

16  A.  Correct.

17  Q.  Because Marzetta had been engaged in an operation in which

18  the informant had been caught in criminal activity; isn't that

19  true?

20      MR. HAXALL:  Objection.  The witness said he didn't

21  know.

22      THE COURT:  Overruled.

23      THE WITNESS:  I have no idea.

24  BY MR. LIPUMA:

25  Q.  Isn't it a fact that the informant gave you three names

Insley - cross by Mr. Lipuma

1   and set up three people for you to arrest?

2   A.  That's the plan, yes.

3   Q.  Pardon me?

4   A.  I said that is the plan to work off any -- if someone has

5   any issues or anything.

6   Q.  Right.  And you admitted in your prior testimony -- in

7   your direct that the CI was working for you guys on other

8   cases, correct?

9   A.  Correct, yes.

10  Q.  And in this instance, he was working off his case?

11  A.  Oh, no, he was working for money with me.

12  Q.  Okay.  Isn't it true that you told him that if you give

13  him three people and make three cases, he can walk?

14          MR. HAXALL:  Objection, asked and answered.

15          THE COURT:  Overruled.

16          THE WITNESS:  He worked for me for money.  I can't

17  speculate on anything else that he said prior to that.

18  BY MR. LIPUMA:

19  Q.  You recruited this informant in 2014, correct?

20  A.  Sounds right.

21  Q.  Well, you know that the informants have numbers, correct?

22  A.  That's true.

23  Q.  And this informant's number began with a 14 dash to be

24  followed by another number, correct?

25  A.  Absolutely, yes.

Insley - cross by Mr. Lipuma

1  Q.  And the 14 indicates that he became an informant for you

2  in 2014; isn't that true?

3  A.  Yes.  It would have been December actually.

4  Q.  In December of 2014?

5  A.  Correct.

6  Q.  Okay.  And isn't it true that Illinois State Police have a

7  directive on dealing with confidential sources?

8  A.  Yes.

9  Q.  Okay.  And isn't it true that part of that protective --

10  part of that directive is that a CI should be terminated if he

11  commits an authorized criminal act?

12  A.  Yes.

13          THE COURT:  You said an authorized or an

14  unauthorized?

15          MR. LIPUMA:  An unauthorized.

16  BY MR. LIPUMA:

17  Q.  An unauthorized criminal act, you would be required to

18  terminate his services; isn't it true?

19  A.  Yes.

20  Q.  Isn't it true that you knew one week before June 1st that

21  the CI had been arrested in Peoria with obstruction of justice

22  and criminal trespass to land?

23  A.  Yes.  Thinking about it now, yep, I do remember that.

24  Q.  I'm going to show you the booking photo.

25          MR. LIPUMA:  And, Judge, I'm not going to introduce

Insley - cross by Mr. Lipuma

1    this into evidence because it identifies the informant.

2              THE COURT:  Okay.

3              MR. LIPUMA:  I'm not going to mention his name.  I've

4    made a copy and provided it to Mr. Haxall, but I do want to

5    show the witness so we can ask some questions about this.

6    BY MR. LIPUMA:

7    Q.  Is this the informant that you used in this case?

8              MR. HAXALL:  Judge, I'm going to object because any

9    confirmation on either the record --

10             THE COURT:  I got to say that based on the testimony

11   that he's just given, I think there is a substantial need for

12   it.  So we are going to do it the way Mr. Lipuma says, but,

13   you know, if I need to have a protective order on anything,

14   I'll do that.  I think there is a basis for it at this point.

15   BY MR. LIPUMA:

16   Q.  Do you recognize that document?

17   A.  Yes.

18   Q.  Okay.  So the informant told you on -- so this indicates

19   the informant was arrested on May 22, 2015, correct?

20   A.  Correct.

21   Q.  In Peoria County, right?

22   A.  Yes.

23   Q.  And he was in custody in the Peoria County sheriff's

24   office; is that right?

25   A.  Yes.

Insley - cross by Mr. Lipuma

1    Q.  And he was charged with obstruction of justice, inducing a

2    witness, correct?

3    A.  Yes.

4    Q.  And criminal trespass to land, correct?

5    A.  Yes.

6    Q.  How did you find out about this information?

7    A.  He called me.

8    Q.  And he told you?

9    A.  Yeah.

10   Q.  What happened?

11   A.  I believe.  I can't -- I don't remember for sure, but I

12   may have come in contact with an officer down there to find

13   out what the story was.

14   Q.  Okay.  And I just want to make sure we understand the --

15           MR. LIPUMA:  And this is something else, Judge, that

16   was turned over pursuant to a protective order.  It's a

17   confidential document.  The government does have a copy of

18   this.

19           THE COURT:  Okay.

20   BY MR. LIPUMA:

21   Q.  But I would like to point out if this is the directive you

22   are referring to for the Illinois State Police for

23   confidential sources.

24   A.  It looks like it, yep.  Yes, sir.

25   Q.  Okay.  I'd like to direct your attention to page 7 of that

Insley - cross by Mr. Lipuma

1  eight-page directive and direct your attention to the middle

2  of the page, point 3H, termination of CS services.  Do you see

3  that, sir?

4  A.  Yep.

5  Q.  And what does that read?

6  A.  It says "termination of CS services."

7  Q.  Why should -- when should you terminate an informant?

8  A.  Let's see.  So the ISP designates a CS is undesirable

9  because he or she commits an unauthorized criminal act or

10  violates any condition of the policy outlined in paragraphs.

11  Q.  Now, when you learned of that information, did you convey

12  that -- have you ever conveyed that to the prosecutors in this

13  case?

14  A.  No.

15  Q.  You never told them the fact that your informant was

16  involved in criminal activities one week before he set up my

17  client?

18  A.  No.

19  Q.  Okay.  And do you recognize this gentleman back here?

20  A.  Yes.

21  Q.  Who is he?

22  A.  Agent Gallagher.

23  Q.  And he is with ATF, correct?

24  A.  Yes.

25  Q.  Did you ever tell Agent Gallagher that your informant was

Insley - cross by Mr. Lipuma

1   arrested on May 22nd, 2015, a week before setting up Mike

2   Haldorson?

3   A.  No.

4   Q.  Have you ever told anybody that your informant was

5   arrested?

6   A.  I'm sure I talked to my boss about it.  I wouldn't --

7   Q.  Who's your boss?

8   A.  Master Sergeant Wayne Ladd.

9   Q.  And who else did you talk to about it?

10  A.  I would imagine whoever he was arrested by to try to work

11  off his case through us.

12  Q.  Are you aware that at least three search warrants were

13  executed in state -- Will County as a consequence of this

14  case?

15  A.  Yes.

16  Q.  Are you aware that Agent Gallagher also testified in a

17  complaint and in a -- in a complaint in an affidavit about the

18  informant and his capacity for reliability?

19  A.  I did not know that, no.

20  Q.  Okay.  You don't know that when you get warrants, you have

21  to explain that you consider the informant to be reliable.

22  A.  Yes, I do understand that.

23  Q.  You do know that.  But you didn't tell anybody that, did

24  you, who had to go into court or a judge, for that matter,

25  about your informant's arrest one week before setting up Mike

Insley - cross by Mr. Lipuma

1  Haldorson?

2  A.  I did not, no.

3  Q.  And that's because you wanted to keep that information

4  quiet; isn't it true?

5  A.  No.

6  Q.  Why did you not want to disclose that information to

7  issuing judges who are issuing search warrants or even to an

8  ATF agent who is conducting an investigation?

9  A.  Honestly, until you said it now, I forgot about that whole

10  thing.

11  Q.  Okay.  On your direct, you said you made a couple

12  mistakes, right?

13  A.  Yes.

14  Q.  You made a mistake in the federal grand jury by lying to

15  the grand jury about the timing or the direction of phone

16  calls, correct?

17  A.  Yes.

18  Q.  And I'm going to grant that that could be just a simple

19  mistake, but how many years have you been a police officer?

20  A.  Almost nine.

21  Q.  In 2015, how many years have you been a police officer?

22  A.  It would have been seven, six and a half.

23  Q.  And so, you know, you went through basic training as a

24  police officer, correct?

25  A.  Correct.

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 224 of 292 PageID #:3286
Insley - cross by Mr. Lipuma
224

1  Q.  You received other training with the Illinois State

2  Police?

3  A.  Yes.

4  Q.  With the Rockdale Police Department?

5  A.  Yes.

6  Q.  And they consistently tell you that when you have an -- if

7  there's particular problems in handling informants, isn't

8  there?

9  A.  Yes.

10  Q.  And you are directed, as this directive says, to terminate

11  their services when they participate in unauthorized criminal

12  activity; isn't it true?

13  A.  That's -- yes.

14          THE COURT:  Are you changing topics?

15          MR. LIPUMA:  Yes, Judge.

16          THE COURT:  Okay.  We are going to take a break here

17  for ten minutes.  You are being cross-examined, so you can't

18  discuss your testimony with anyone.  Do you understand?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.  Ten minutes.

21    (Short break.)

22          THE COURT:  All right.  Mr. Lipuma, you can proceed.

23          MR. LIPUMA:  Thank you, Judge.

24          Judge, I spoke with the government about this, and

25  I'm going to be moving to admit as Defendant's Exhibit 2 the

Insley - cross by Mr. Lipuma

225

1   Illinois State Police directive and Defendant's Exhibit 3, the

2   booking photo and information.  And I ask that that

3   information be maintained under seal.

4           THE COURT:  Okay.  So here's the deal.  One, the

5   exhibits don't get filed until there's an appeal.  Two, I'm

6   not going to partially seal part of this transcript.  I'm just

7   not.  So it's too hard to administer.  So the exhibit, fine;

8   the rest of it, no.

9     (Above-mentioned exhibits were received in evidence.)

10          MR. LIPUMA:  Very good, Judge.

11  BY MR. LIPUMA:

12  Q.  Officer Insley, have you ever been disciplined as a police

13  officer?

14  A.  As far as --

15  Q.  In your --

16  A.  -- suspension or anything like that?

17  Q.  In your employment, have you ever been disciplined?

18  A.  I have been given a verbal warning.

19  Q.  Okay.  When were you given a verbal warning?

20  A.  Like a month ago, maybe.

21  Q.  Pardon me?

22  A.  A month ago maybe, two months ago.

23  Q.  Okay.  And that was with the -- you are with who now, the

24  Northfield Police Department?

25  A.  Northfield Police Department, yeah.

Insley - cross by Mr. Lipuma

1  Q.  And what was the verbal warning of?

2  A.  Because one day I was three minutes late for work due to a

3  major accident on the highway, and then I was like 15 minutes

4  late for work due to another issue on the highway.

5  Q.  Were you ever disciplined when you were with the Illinois

6  State Police task force?

7  A.  No.

8  Q.  Were you ever disciplined when you were at the Rockdale

9  Police Department?

10  A.  No.

11  Q.  I'm going to ask you about the wire on June 1st that we

12  have heard.

13         You wired up the informant, correct?

14  A.  Yes.

15  Q.  And you put a transmitter on him, correct?

16  A.  Yes.

17  Q.  To overhear any conversations he might have with the

18  person he's meeting with, correct?

19  A.  Correct.

20  Q.  And you received his consent to record that conversation,

21  correct?

22  A.  Yes.

23  Q.  And if I read this transcript correctly and heard the tape

24  recording correctly, you said, I also give consent to this

25  recording; is that correct?

Insley - cross by Mr. Lipuma

227

1   A.  Yes.

2   Q.  And you are aware that under Illinois law, which you were

3   operating at the time as an Illinois state police officer and

4   as a Rockdale police officer, that such a recording would be

5   illegal, correct?

6           MR. HAXALL:  Objection.  It's not illegal.  It's just

7   not admissible, Judge.

8           THE COURT:  Well, I will let him answer the question.

9           THE WITNESS:  I just know it's an officer safety

10  overhear.

11  BY MR. LIPUMA:

12  Q.  Are you aware in 2015 when you were doing this, were you

13  aware that it was either unlawful to record a conversation

14  unless you had the consent of both parties or that such

15  evidence would be inadmissible?

16  A.  I did not know that you could not -- I knew this does not

17  go into evidence.  It's only for officer safety purposes only,

18  so --

19  Q.  And your original plan in this case was to refer this

20  case, which you did, to the Will County State's Attorney's

21  Office, correct?

22  A.  Correct.  Like we would any other case, yes, sir.

23  Q.  And you got actually three cases filed against Michael

24  Haldorson, didn't you?

25  A.  If it's three, then, yeah.

Insley - cross by Mr. Lipuma

1    Q.  Yeah.  Well, you got three different CF numbers against

2    him as a result of this investigation, correct?

3    A.  That's correct.

4    Q.  And is it your testimony that you did not intend to use

5    the June 1st recording as part of that prosecution?

6    A.  Correct.  It's just officer safety.

7    Q.  So you -- so you -- if this case was prosecuted in state

8    court, you were going to tell the state's attorney that you

9    cannot use this recording and this transcript because I didn't

10   comply with Illinois law about getting consent of both

11   parties?

12   A.  That's not my job to do that.

13   Q.  Whose job -- it's not your job to disclose to prosecutors

14   material information about the case?

15   A.  I would give the prosecutors everything we have, and they

16   do whatever they do with it.  I'm not a prosecutor.  So, no, I

17   don't know, sir.  I'm sorry.

18   Q.  Right.  And like in similar vein, you were supposed to

19   tell the Will County state's attorneys about your informant's

20   arrest while he was working for you, correct?  You knew that.

21   A.  At the time, correct.  I should have, yes.

22   Q.  And you withheld it.  You withheld it intentionally,

23   didn't you?

24   A.  No.  I normally would never -- never have done that.

25   Q.  Well, you testified that after the deal on June 1st that

Insley - cross by Mr. Lipuma

229

1   you met with the CI at some predetermined location, correct?

2   A.  Correct.

3   Q.  And you got a couple bags from him, correct?

4   A.  Correct.

5   Q.  What else did you get from him?

6   A.  The change.

7   Q.  And what is the change?

8   A.  Would have been $30.

9   Q.  But you didn't -- you didn't note that in your report,

10  correct?

11  A.  Correct.

12  Q.  You forgot -- is that a mistake?

13  A.  Just forgot to do it.

14  Q.  Well, you also know that the Illinois State Police has a

15  directive about OAF, official advance funds, correct?

16  A.  Yes.

17  Q.  And they need to be documented with specific forms,

18  correct?

19  A.  Absolutely, yes.

20  Q.  Okay.  And you did not execute those forms, did you?

21  A.  I did the forms, correct.  I have.

22  Q.  May I ask you where those forms are?

23  A.  They would probably be sealed -- you have to ask --

24  honestly, you have to ask someone from the Illinois State

25  Police because that's a separate paperwork that we do.

Insley - cross by Mr. Lipuma

230

1  Q.  Did you ever turn that documentation over to the Will

2  County State's Attorney's Office?

3  A.  I don't think so.

4  Q.  Did you ever turn that information over to the United

5  States Attorney's Office?

6  A.  I don't think we ever do that unless they request that,

7  but that's beyond my control.  Once I turn it in, we have no

8  part of that anymore.  We turn it in each month for whatever

9  amount of money we used.  We turn it in, and from there, it's

10 not in my -- actually, it's none of my business from there.

11 Q.  You indicated on your direct that once you met with the

12 informant that the informant told you that the person he met

13 with had a gun, correct?

14 A.  Correct.

15 Q.  And you indicated you told others about the gun, correct?

16 A.  Correct.

17 Q.  Who did you tell?

18 A.  The other surveillance team.

19 Q.  And who was that?

20 A.  Whoever was out there, which would have been Inspector

21 Kaminski, Diehl, and I think Billy Marzetta was out there.

22 Q.  Okay.  And they were -- and they were following the black

23 Pontiac, correct?

24 A.  Until it was out of the area, yes, sir.

25 Q.  Okay.  Well, you heard from them that they got stuck at a

Insley - cross by Mr. Lipuma

231

1    red traffic light, correct?

2    A.  Correct.

3    Q.  And then when the traffic light turned green, they did not

4    continue their pursuit?

5    A.  Correct.

6    Q.  Okay.  And so you allowed a purported gun-wielding man who

7    is selling cocaine out of his car to continue on his way down

8    Route 59 or whatever route he was on as an armed, convicted

9    felon distributing cocaine.

10   A.  Correct.

11   Q.  That was your decision?

12   A.  Yes.

13   Q.  And you had an address for Michael Haldorson at that very

14   moment, didn't you?

15   A.  Yes.

16   Q.  You did --

17   A.  Yes.

18   Q.  -- because it showed up on the 2015 Illinois registration.

19   A.  Yep.

20   Q.  And that registers to 3640 Lockner Boulevard, correct?

21   A.  That is correct.

22   Q.  And that is the boyhood home of Michael Haldorson,

23   correct?

24   A.  I don't know if it's the boyhood home, but that's what it

25   came back to.

Insley - cross by Mr. Lipuma

232

1  Q.  Well, you know that your fellow agents went to that

2  residence on June 23rd and/or June 24th following

3  Mr. Haldorson's arrest, correct?

4  A.  That's what I heard.

5  Q.  Right.

6  A.  I was not there.

7  Q.  You weren't there --

8  A.  Yeah.

9  Q.  -- but you knew they went there.

10  A.  Later on, yes.

11  Q.  But you had that information about Michael Haldorson

12  before June 1st?

13  A.  Correct.

14  Q.  You prepared an arrest synopsis sheet in this case, didn't

15  you?

16  A.  Yes.

17  Q.  And you indicated in that arrest synopsis sheet, you

18  identified the CI's number, correct?

19  A.  Correct.

20  Q.  Okay.  And am I allowed to give the number -- well, I am

21  allowed to give the number because --

22  A.  Yes.

23  Q.  Okay.  So that's number 14-15828, correct?

24  A.  Yes, sir.

25  Q.  Okay.  Now, on that same report, you indicated that

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 233 of 292 PageID #:3295
Insley - cross by Mr. Lipuma
233

1  Michael Haldorson was arrested on previous charges.  Do you

2  remember that?

3  A.  Yes.

4  Q.  But, indeed, no charges were then pending, correct?

5  A.  Correct.

6  Q.  You didn't go to -- after June 1st, you didn't go to a

7  state's attorney to stake a complaint against Michael

8  Haldorson, did you?

9  A.  No.

10  Q.  June 2nd?

11  A.  No.

12  Q.  June 3rd?

13  A.  No, sir.

14  Q.  Any days between June 1st and June 23rd, did you take any

15  action to try to seek an arrest warrant on Michael Haldorson?

16  A.  No, sir.

17  Q.  Three weeks passed, right?

18  A.  Yes, sir.

19  Q.  You did not -- there was no activity between June 1st and

20  June 23rd on this investigation, correct?

21  A.  Correct.

22  Q.  Not one report was prepared between June 1st and

23  June 23rd, correct?

24  A.  That is correct.

25  Q.  You did prepare a report for June 1st; isn't that true?

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 234 of 292 PageID #:3296
Insley - cross by Mr. Lipuma
234

1   A.  Yes, sir.

2   Q.  And in that report, you documented the number of the CI as

3   14-15828, correct?

4   A.  Correct.

5   Q.  Which is the previous number, the number I just mentioned

6   a few moments ago, correct?

7   A.  It sounds right, yes.

8   Q.  But you also prepared an identical report with a different

9   CI number; isn't that true?

10  A.  If it's on there that I said that, yes.

11  Q.  Well, let me show you to just make sure that we're

12  understanding the same point.

13          Let me show you what we just were talking about, your

14  report of June 1st, 2015.

15  A.  Okay.

16  Q.  Are you familiar with that report?

17  A.  Yep.

18  Q.  And in that report, do you identify the CI as 14-12947?

19  A.  Yes.

20  Q.  Okay.  And do you see a Bates number at the bottom of that

21  page?

22  A.  What's that?

23  Q.  At the very bottom of the page, bottom right, do you see

24  where it says United States v. Michael P. Haldorson, 15 CR

25  623-000001?

Insley - cross by Mr. Lipuma

235

1  A.  Yes, sir, I do.

2  Q.  Okay.  Now turning your attention to this document.

3  Actually, hold onto it.

4  A.  Thank you.

5  Q.  Do you see on that particular report that the CI is

6  identified as CI 14-15828?

7  A.  Yes.

8  Q.  Okay.  In every other respect, other than the CI's numbers

9  and the Bates stamp at the bottom of the federal production,

10  are these documents exactly the same?

11  A.  Yes.

12  Q.  You prepared two reports with two different CI numbers.

13  Is that what you did?

14  A.  It looks like I put the wrong number in at first, and I

15  had to go back and correct it.

16  Q.  Okay.  You put -- well, let's see.  You actually said the

17  15828 number was the correct number, correct?

18  A.  Without looking at his actual file.

19  Q.  Well, in every other report it's 15828.

20  A.  Then that's what it is, sir.

21  Q.  Okay.  And this is what you produced to Will County,

22  correct?

23  A.  Correct.

24  Q.  To the federal government, you provided an identical

25  report, except you've identified the CI's number as 12947.

Insley - cross by Mr. Lipuma

236

1   A.  That's what it looks like, yes.

2   Q.  Okay.  And you did it -- and that's been changed on three

3   occasions in this report; isn't that true?

4   A.  Correct.

5   Q.  And that's because you're trying to conceal more

6   information about this informant; isn't that true?

7   A.  No, sir.

8   Q.  When did you prepare these two identical reports with the

9   different CI numbers?

10  A.  I have no idea, to be honest with you.  Within whatever

11  the time frame is.

12  Q.  Which one did you prepare first?

13  A.  I have no idea.  I know I prepared one, must have looked

14  it over and realized I put the wrong informant's number on

15  there, so I was correcting my mistake.

16  Q.  Okay.  Well, let's step back.

17  A.  Okay.

18  Q.  Because the document you gave to the state's attorney was

19  the correct CI number.

20  A.  Okay.

21  Q.  The CI number you gave to the government was an incorrect

22  and different CI number.

23  A.  Okay.

24  Q.  So was the number that was provided to the Will County

25  state's attorney prepared first?

Insley - cross by Mr. Lipuma

1    A.  I would think so, yes.

2    Q.  When did you prepare this second report of the same exact

3    -- same exact document except for the CI's numbers, when did

4    you prepare that and give that to the government?

5    A.  Datewise, I don't know, but obviously, I realized I put

6    the wrong number on there.

7    Q.  Did you ever document in any report that you incorrectly

8    used the CI's number when you provided it to the federal

9    government?

10   A.  No.  That's my fault.  I should have done that.

11   Q.  So this is, what, your fourth mistake, if I'm counting

12   correctly, or your fifth?

13            MR. HAXALL:  Objection, argumentative.

14            THE COURT:  Sustained, argumentative.

15   BY MR. LIPUMA:

16   Q.  Mr. Haxall asked you a question about another report of

17   yours, the June 23rd report.

18   A.  Yes, sir.

19   Q.  Okay.  Now, the June 23rd report, you are going to have to

20   help me out here a little bit because you actually have two

21   reports from June 23rd, and I want to make sure I'm talking

22   about the right one.  You actually have three, including the

23   Haldorson interrogation.  And we know it's not that one.

24            You prepared one report called "Purpose:  To document

25   surveillance for an ongoing narcotics investigation."

Insley - cross by Mr. Lipuma

238

1              Do you remember that?

2    A.  Yes.

3    Q.  And a second report, same date, "To document the attempted

4    purchase of cocaine from Mike Haldorson."

5              Is that correct?

6    A.  Correct.

7    Q.  Okay.  Now, which of those two documents is the one you

8    talked to -- you just mentioned on your direct with

9    Mr. Haxall?

10   A.  It would have been the non-surveillance one.

11   Q.  The non-surveillance, "To document the attempted purchase

12   of cocaine from Mike Haldorson"?

13   A.  Correct.

14   Q.  Okay.  So let's stick with this document for a second.

15   And I want to ask you, did you -- does it indicate on this

16   report that the incident occurred on June 23rd?

17   A.  Yes.

18   Q.  And does it also indicate that you typed this report on

19   June 25th?

20   A.  Yes.

21   Q.  And isn't it true that you did not type this report on

22   June 25th?

23   A.  The surveillance report?

24   Q.  The report we are discussing is the report that you and

25   Mr. Haxall were discussing, which you said was "To document

Insley - cross by Mr. Lipuma

1    the attempted purchase of cocaine from Mike Haldorson."

2    A.  Okay.  Sorry about that.  Correct.  It was not done on

3    that date.

4    Q.  It was not done on June 25th.

5    A.  Correct, sir.

6    Q.  It wasn't done in June at all --

7    A.  Correct.

8    Q.  -- in 2015.  It wasn't done in July at all in 2015.

9    A.  That is correct.

10   Q.  It wasn't done in August at all in 2015?

11   A.  Correct.

12   Q.  It wasn't done in September of 2015.

13   A.  I thought it was September, but I don't -- I don't know

14   for sure.  I just know it wasn't on that date.

15   Q.  Are you sure it wasn't October of 2015?

16   A.  It could have been.

17   Q.  Because what you did, and by then you're out of Rockdale,

18   right?

19   A.  No, sir.  I was out in December.

20   Q.  Okay.  So you're still with Rockdale.  You're still with

21   the Illinois State Police Department?

22   A.  Correct.

23   Q.  Okay.  Isn't it true that the report -- you created this

24   report -- well, first of all, how did Mr. Haxall get involved

25   with this investigation?  Did ATF reach out to him, or did he

Insley - cross by Mr. Lipuma

1  reach out to you?

2  A.  I believe --

3       THE COURT:  You said "ATF."  He is not ATF.

4       MR. LIPUMA:  I'm sorry.

5  BY MR. LIPUMA:

6  Q.  Did Illinois State Police reach out to the federal

7  government?

8  A.  No.  I believe ATF reached out to Mr. Haxall.

9  Q.  And then Mr. Haxall at some point contacted you?

10 A.  Correct.

11 Q.  And asked for your information about this investigation,

12 correct?

13 A.  Yes.

14 Q.  And did you inform him at that time that you didn't

15 prepare a report about an attempted drug transaction on

16 June 23rd?

17 A.  Correct.

18 Q.  Did he -- how did that come up?

19 A.  He just asked me to do it because we didn't do it

20 originally because our plan was to just make a stop on the

21 defendant and not actually do any type of drug transaction.

22 And he wanted to show this is what our intent was, everything

23 behind it.  I was basically trying to keep the informant safe

24 and keep the report simple, to be honest.  That's why --

25 that's how it all came about, sir.

Insley - cross by Mr. Lipuma

1   Q.  Because, I mean, you know, as a very experienced police

2   officer, you need to document things, right, for this very

3   reason, so when you go into court, you can testify about what

4   happened, right?

5   A.  Correct.

6   Q.  But you failed to do that on this June 23rd attempted drug

7   deal, didn't you?

8   A.  No, sir.  I just -- I left out some information based on

9   the informant.

10  Q.  Pardon me?

11  A.  I just left information out that would basically say who

12  the informant was.

13  Q.  You didn't just leave information out; you didn't even

14  type one key stroke for a report.

15  A.  Correct.

16  Q.  And, in fact, after you spoke to Mr. Haxall, you went back

17  into the database on October 29, 2015, at 11:30 in the morning

18  and prepared this report, and then gave it to Mr. Haxall.

19  A.  Sounds right.  I believe you, sir.  If you're saying --

20  Q.  Can I show you the Bates number?

21  A.  Yes.  Thank you.

22  Q.  Does this refresh your recollection as to when you

23  prepared the report?

24  A.  Sure.

25  Q.  When?

Insley - cross by Mr. Lipuma

242

1    A.  Thursday, October 29, 2015, 11:29 and 39 seconds a.m.

2    Q.  Four months after the event, correct?

3    A.  Correct.

4    Q.  But your report says you prepared it on June 25th, 2015,

5    right?

6    A.  Yes.

7    Q.  Did you tell Marzetta to tell Friddle that CPAT had

8    probable cause for an arrest of the owner of the car?

9    A.  I probably did, yeah.  So I was afraid of what was going

10   on and why we asked them to stop him.

11   Q.  And in that June 23rd report, isn't it true that at

12   Mr. Haxall's request, you prepared that report and wrote that

13   Michael Haldorson was placed under arrest on narcotics

14   charges?

15   A.  Correct.

16   Q.  What narcotics charges are you referring to?

17   A.  It would have been from the date of sale from June 1st.

18   Q.  Okay.  And on June 1st, no charges were pending from that

19   -- there were no charges pending in any court, correct?  We

20   already established that.

21   A.  Not in any court, no.

22   Q.  Just in your head?

23   A.  No, sir.  I --

24            MR. HAXALL:  Objection.

25            THE COURT:  Sustained.

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 243 of 292 PageID #:3305
Insley - cross by Mr. Lipuma
243

1   BY MR. LIPUMA:

2   Q. On your direct regarding this June 23rd report, Mr. Haxall

3   asked you, did you write the report much later? And you said

4   yes. And he asked you why, and you said, because I was trying

5   to keep the CI out of it as much as possible, correct?

6   A. Of why the date was different? Is that what you are

7   asking me, sir?

8   Q. I'm asking you about that report.

9   A. Correct. Okay.

10   Q. And he asked you why you did not prepare a report, and you

11   testified, in response to his question, to try to keep the CI

12   out of it as much as possible.

13   A. Yes.

14   Q. Words to that effect, right?

15   A. Absolutely.

16   Q. Because you thought that if you prepared a report for

17   June 23rd, that someday it might be disclosed to Mike

18   Haldorson.

19   A. Possibly, yes.

20   Q. And you wanted to protect him.

21   A. Absolutely.

22   Q. But you prepared a report for the June 1st transaction,

23   didn't you?

24   A. Yes.

25   Q. And in that June 1st report, you clearly identified the

Insley - cross by Mr. Lipuma

244

1    fact that a CI set up Mike Haldorson, and you put the CI's

2    number on there, correct?

3    A.  Yes.

4    Q.  It's a little inconsistent, isn't it, Officer?

5          MR. HAXALL:  Objection.

6          THE COURT:  Sustained.  Argumentative.

7    BY MR. LIPUMA:

8    Q.  You knew that the June 1st report would be disclosed to a

9    defendant, right, in part of discovery?

10   A.  Yes.

11   Q.  You also prepared another report for June 23rd, "to

12   document surveillance for an ongoing narcotics investigation."

13   That's what we referenced, correct?

14   A.  Yes.

15   Q.  You prepared one report for this or more than one report

16   for this?

17   A.  For that particular thing, one report.

18   Q.  Okay.  You were asked questions about the interrogation of

19   Mr. Haldorson at the Plainfield Police Department.  Do you

20   remember those questions?

21   A.  Yes.

22   Q.  I believe you were asked by Mr. Haxall, did you give --

23   and we're referring to the waiver of Miranda rights.

24   A.  Yes.

25   Q.  Do you know what that document is?

Insley - cross by Mr. Lipuma

245

1  A.  Yes, sir.

2  Q.  Mr. Haxall asked you, did you give that to the ATF agents?

3       And you said, no, they had their own, correct?

4  A.  I would assume so, yes.

5  Q.  They had their own, right?

6  A.  I would think so, yes, sir.

7  Q.  Did you see an ATF waiver of rights form at any time?

8  A.  I didn't see one, no.

9  Q.  Okay.  But you did not give ATF your copy.

10 A.  No.

11 Q.  You also knew on June 23rd that Mr. Haldorson was living

12 in an apartment in downtown Plainfield, right?

13 A.  Yes.

14 Q.  Because you had seen his car parked on Lockport Street on

15 numerous occasions; isn't that right?

16 A.  Correct.

17 Q.  And that interrogation that you had of Mr. Haldorson

18 wasn't recorded, was it?

19 A.  No, sir.

20 Q.  Did you know that you had the capacity to record it?

21 A.  I did not know, no.

22 Q.  Did you not see the camera in the interview room?

23 A.  Nope.

24 Q.  Did you see any of the cameras in the Plainfield Police

25 Department?

Insley - cross by Mr. Lipuma

246

1    A.  I seen some of them, yes.

2    Q.  Okay.  You didn't see -- but you did not see a camera in

3    the interview room?

4    A.  No, sir.

5    Q.  Do you know that you had the opportunity to record that

6    conversation by audio means?

7    A.  No, sir.

8    Q.  Do you have access to a tape recorder?

9    A.  I do not, no.

10   Q.  Did you ask whether there was a single tape recorder --

11   A.  No.

12   Q.  -- in the whole Plainfield Police Department?

13   A.  No, sir.

14   Q.  About these calls and texts on June 23rd, would you agree

15   with me that you had the informant call my client and text my

16   client a total of -- 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12,

17   13, 14 -- 15 times between 5:54 p.m. and 7:05 p.m.?

18   A.  Yes.

19   Q.  And not once during that period of time did Mr. Haldorson

20   reach back to your informant, correct?

21   A.  Correct.

22   Q.  Did you know that agents went to Mr. Haldorson's apartment

23   in Plainfield on June 24th?

24   A.  I found out hours later, yes.

25   Q.  You weren't there?

1   A.  Correct, I was not there.

2   Q.  Did the agents tell you how they entered the apartment?

3   A.  No.

4   Q.  At some point on June 23rd, Mr. Haldorson's phone was

5   taken from him, correct?

6   A.  Yes.

7   Q.  Do you know where that phone is now?

8   A.  Today, I have no idea.

9   Q.  Okay.  But he had one phone on him, right?

10  A.  I have no idea, to be honest with you.

11  Q.  Let me ask you this.  If that -- when you receive evidence

12  like that, it's important to put it in the evidence vault at

13  some point, correct?

14  A.  Yes.

15  Q.  You inventory it, and then you put it in the evidence

16  vault, correct?

17  A.  Correct.  Somebody does, yes.

18  Q.  What did you do with Mr. Haldorson's cell phone?

19  A.  Someone -- I know somebody had it.  They took it, and from

20  there, honestly, I have no idea.  I'm sure it was placed in

21  evidence.

22  Q.  You prepared a report on this about Mr. Haldorson's cell

23  phone, didn't you?

24  A.  I'm sure.

25  Q.  Pardon me?

Insley - cross by Mr. Lipuma

1   A.  I'm sure I did, yeah.

2   Q.  Yeah.  And isn't it true that you turned his cell phone

3   into evidence on July 3rd of 2015?

4   A.  If that's what the report says, then that's what it says.

5   Q.  A full 11 days after he was arrested, right?

6   A.  Sounds right.  I'm going off what you're giving me, yes,

7   sir.

8   Q.  And you had that phone in your possession, and you were

9   trying to gain access to the contents of that phone, correct?

10  A.  At some point through means of a search warrant.  I

11  believe we got one.

12  Q.  No, no, no.  I'm not talking about a search warrant.

13  A.  Okay.

14  Q.  I'm talking about June 23rd to July 3rd.  When that phone

15  was in your possession as the case agent, prior to you turning

16  it in to the evidence vault, you tried to access the contents

17  of that phone without a warrant.

18  A.  No.

19  Q.  Where was that phone for those 11 days?

20  A.  I have no idea.

21  Q.  You have no idea -- you're the case agent.

22  A.  Sir, I understand that, but it's not always -- we all help

23  each other out, and maybe someone else took the phone.  I

24  honestly, I don't remember.

25  Q.  But on July 3rd, you had the phone because you then turned

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 249 of 292 PageID #:3311
Insley - cross by Mr. Lipuma
249

1    it into the evidence vault, correct?

2    A.  If that's what it says, then, yes.

3    Q.  Well, I don't want to say it if you don't believe or if

4    you're not going to accept it.  I can show you your report.

5    A.  I believe you if that's what it says, sir.  I'm fine with

6    that, actually.

7    Q.  Then let me ask you, if the phone wasn't in your

8    possession for those 11 days but you got it on July 3rd, who

9    gave it to you on July 3rd?

10   A.  I don't know.  Maybe the custodian from the State Police

11   was on vacation.  It doesn't mean when I turned it in and I

12   get the receipt back that I -- I have no idea.  That's a

13   question that -- I can't answer that one.

14   Q.  Are you saying there's only one technician who works the

15   evidence vault?

16   A.  At Illinois State Police, District 5?

17   Q.  Yes.

18   A.  Yes.

19   Q.  Are you saying that the other contraband that was

20   recovered from Mr. Haldorson was not entered into evidence

21   until July 3rd?

22   A.  I don't know.  Maybe someone in Plainfield, I have no

23   idea.

24   Q.  No, no, not Plainfield, your squad, the people working

25   under your direction as case agent.  People were turning in

Insley - cross by Mr. Lipuma

1  evidence --

2  A.  Okay.

3  Q.  -- immediately after the arrest of Mr. Haldorson --

4  A.  Okay.

5  Q.  -- to the Illinois State Police evidence vault.

6  A.  All right.

7  Q.  But you don't know where that phone was for 11 days?

8  A.  I have no idea.  There is no reason for us to keep it.

9  Q.  Isn't it true that when you interrogated Mr. Haldorson,

10  you told him, if you give us three names and make three cases

11  for us, we'll never take your case to court?

12  A.  I'm sure it's not verbatim like that, but we always --

13  that's the point of a drug unit is you try to keep working up

14  the chain, yes, sir.

15  Q.  You made him that offer --

16  A.  I'm sure we did, yeah.

17  Q.  -- you wanted three names from him.

18  A.  Sounds right.

19  Q.  And you told him that if you didn't get those three names,

20  you were going to make life hell for him; isn't that true?

21  A.  That is definitely not true.

22  Q.  Isn't it true that you said, you will not bond out, and if

23  you do bond out, I'm going to bring more cases against you so

24  you don't bond out?

25  A.  That is not true.

Insley - cross by Mr. Lipuma

1  Q.  Isn't it true that Mr. Haldorson was requesting an

2  attorney when he was in the lockup in the Plainfield Police

3  Department?

4  A.  If he was, I never heard it.

5  Q.  You did not receive a phone -- did you receive a phone

6  call from Master Sergeant Ladd at some point that night when

7  he was out on the street at the apartment?

8  A.  At some point we probably did.

9  Q.  And isn't it true that you either gave the phone to

10  Haldorson or allowed him to hear what Ladd was saying?

11  A.  I'm sure I did, yeah.

12  Q.  And isn't it true that Mr. Haldorson said, I want a

13  lawyer?

14  A.  That, I don't know.  I do remember him giving me his

15  rights again, though.  I know Wayne Ladd did do that.  This is

16  on our way back to the ATF in Will County.

17  Q.  After you already had one -- after you already had the

18  June 23rd case pending in Will County against Mr. Haldorson,

19  he was bonded out within a day, right, a day or two?

20  A.  Three hours more like it, yeah.

21  Q.  Okay.  But isn't it true that on July 3rd of 2015, you

22  went and got two more criminal complaints against

23  Mr. Haldorson?

24  A.  Yes.

25  Q.  2015-CF-1338 and 2015-CF-1339, correct?

Insley - cross by Mr. Lipuma

252

1    A.  Correct.

2    Q.  And isn't it true that you requested that there be

3    $1 million bail on the first case and $2 million bail on the

4    second case?

5    A.  That is not true.

6    Q.  Did you know that bail was set at 1 million and $2 million

7    on those two cases?

8    A.  I watched the judge sign it, yes, but I did not request a

9    bail amount.

10   Q.  At some point, you appeared before Judge Burmila in Will

11   County, and I'm going to direct your attention to July 2nd of

12   2015, to obtain a search warrant for Mr. Haldorson's phone and

13   for the two computers that were recovered from his bedroom;

14   isn't that true?

15   A.  Yes.

16   Q.  And isn't it true that in that affidavit, what you

17   submitted to a judge, you told the judge on June 24th of 2015

18   that agents requested the assistance of a K-9 to do a sniff at

19   the garages, garage 49 and garage 50, correct?

20   A.  Yes.  Somebody did, yes.

21   Q.  Okay.  And isn't it true that you wrote in that affidavit

22   that a K-9 air sniff around the garages showed a positive

23   alert for the odor of narcotics?

24            MR. HAXALL:  Objection, relevance, Judge.  This is

25   way beyond both scope of direct and the issues before the

Insley - cross by Mr. Lipuma

253

1    Court.

2              THE COURT:  What's it pertain to, Mr. Lipuma?

3              MR. LIPUMA:  It goes right to the witness'

4    credibility, Judge.  It's a false statement.  I'm going to be

5    able to prove it up.

6              THE COURT:  The objection is overruled.

7    BY MR. LIPUMA:

8    Q.  Isn't it true that you told Judge Burmila in your

9    affidavit that a K-9 alerted -- had a positive alert for the

10   odor of narcotics?

11   A.  Yes.

12   Q.  And that wasn't true, was it?

13   A.  That's what the K-9 officer told me.

14   Q.  Indeed, there were no narcotics in garage 49 or garage 50;

15   isn't that true?

16   A.  There wasn't, but I can't speak for a K-9.  All I know is

17   they alert to it, and this is what the K-9 officer told me.

18   Q.  Now, the K-9 officer, as a case agent, you saw his report,

19   correct?

20   A.  I'm not sure if I ever saw his report, to be honest with

21   you.

22   Q.  As the case agent, aren't you supposed to gather all the

23   reports and provide them to the state's attorney and/or a U.S.

24   attorney?

25   A.  Sure.

Insley - cross by Mr. Lipuma

254

1  Q.  And that's your job, right?

2          I'm going to ask you if you've seen this report.

3  A.  I may have seen it once.

4  Q.  Okay.  Let me ask you this.

5  A.  Sure.

6  Q.  This report is authored by Christopher D'Arcy, correct?

7  A.  He is the K-9 officer.

8  Q.  He is the K-9 officer.

9  A.  Correct.

10 Q.  And he responded to 1310 Pioneer Road in Crest Hill,

11 correct?

12 A.  Correct.

13 Q.  And it says, Upon doing a cursory sniff, both showed an

14 interest in garage 50, right?

15 A.  Correct.

16 Q.  It then says that they directed Bo on a detailed sniff of

17 the garages.  Bo did have an indication by laying down at the

18 corner of the garage door for garage 50, correct?

19 A.  Correct.

20 Q.  And isn't it true at the bottom it says, Bo is certified

21 in narcotics detection?

22 A.  That is a hundred percent correct.

23 Q.  And says, Bo is certified to detect the odors of

24 marijuana, cocaine, heroin, and meth amphetamine; isn't that

25 true?

Insley - cross by Mr. Lipuma

255

1   A.  That's what it reads.

2   Q.  It does not say that Bo is trained to detect explosive

3   material; isn't that true?

4   A.  You would have to ask the K-9 officer that question.

5   Q.  I'm asking you if that's what it says on this document.

6           MR. HAXALL:  Objection.  He is asking this agent --

7           THE COURT:  Just ask him what it says on the

8   document.

9           MR. LIPUMA:  That's what I did, Judge.

10          THE COURT:  Yeah, that's fine.  You can ask that.

11          THE WITNESS:  It does not say that on the document.

12  BY MR. LIPUMA:

13  Q.  It does not say trained for explosives, correct?

14  A.  That is correct, sir.

15  Q.  And actually, there was, again, no marijuana, no cocaine,

16  no heroin, and no meth amphetamines in that garage; isn't that

17  right?

18  A.  Correct.

19  Q.  You testified in the grand jury in state court on July 8th

20  of 2015; isn't that right?

21  A.  Correct.

22  Q.  In that testimony you said you saw Michael Haldorson

23  standing around his car.  Do you remember that testimony?

24  A.  Okay.  Yes.

25  Q.  You do remember that -- I can show it to you if you don't

Insley - cross by Mr. Lipuma

1  remember it.

2  A.  I have no idea, to be honest with you.

3  Q.  Let me see if I can show it to you, and it might refresh

4  your recollection.

5  A.  Sounds good.

6  Q.  This is the July 8th, 2015, CF 1266.  Directing the

7  witness' attention to page 5, and I have highlighted lines 14

8  through 19.

9  A.  That's what it says, yeah.

10  Q.  In your testimony today and in your reports, you never

11  indicated you've seen Michael Haldorson standing anywhere,

12  correct?

13  A.  I did not see him, no.  I wasn't even there the 23rd.

14  Q.  The first day you saw him was on June 23rd, right?

15  A.  In the interview room, correct.

16  Q.  Right.

17       But you said on the 23rd, we were out doing

18  surveillance.  We seen Mike Haldorson standing around his

19  vehicle.  That was your testimony, right?

20  A.  Correct.

21  Q.  Isn't it true that you testified in state court in Will

22  County on the 29th of July 2015?

23  A.  Yes.

24  Q.  And isn't it true that you told the grand jury then that

25  you had made deliveries -- that we had made deliveries on an

Insley - cross by Mr. Lipuma

257

1  individual and then pulled the traffic stop on him?

2  A.  Yes.

3  Q.  And when you said, "we had made deliveries," you were

4  referring to what?

5  A.  The June 1st date.

6  Q.  And you said plurals, so there's just one, or were there

7  more than one?

8  A.  No, there's just one.

9  Q.  And what do you know about a prior stop of Michael

10  Haldorson?

11  A.  As far as what, sir?

12  Q.  When was -- was Michael Haldorson ever subject to another

13  traffic stop other than the one with Officer Friddle on

14  June 23rd?

15  A.  I'm sure he's been stopped.  I have no idea if he's been

16  stopped.  I would assume.

17  Q.  Are you aware of any in Plainfield?

18  A.  I heard Plainfield did stop him at some point.  I couldn't

19  tell you when or who it was, but we heard that he's been

20  stopped before.  He lives in Plainfield, so I assume -- just,

21  I don't know.

22  Q.  You testified that you were with the informant and you saw

23  a text that the informant received purportedly from

24  Mr. Haldorson.

25  A.  Saying that he got rolled up on?

Insley - cross by Mr. Lipuma

258

1   Q.  Yeah.  Right?

2   A.  Yes.

3   Q.  You didn't put that down in any reports either, did you?

4   A.  Nope.

5   Q.  And, again, you didn't take a screen shot of that text,

6   did you?

7   A.  No.

8   Q.  No.  And you could -- you actually had your phone, so you

9   could have taken a photo of that text to corroborate your

10  version, even though it's not in a report; isn't it true?

11  A.  Absolutely, yes.

12  Q.  In fact, you did not see such a text on the CI's phone;

13  isn't that true?

14  A.  That is not true.

15  Q.  But you took no action to document it, right?

16  A.  Nope.

17  Q.  Is that a mistake or is that good law enforcement?

18              MR. HAXALL:  Objection.

19              THE COURT:  Sustained.

20              MR. LIPUMA:  Judge, if I may have a moment.

21              THE COURT:  Sure.

22              MR. LIPUMA:  Nothing further, Judge.

23              THE COURT:  Redirect?

24              MR. HAXALL:  Thank you.

25                            - - -

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 259 of 292 PageID #:3321
Insley - redirect by Mr. Haxall
259

1      THOMAS INSLEY, REDIRECT EXAMINATION

2   BY MR. HAXALL:

3   Q.  Good afternoon.

4   A.  Sir.

5   Q.  So the defense counsel asked you quite a bit about some of

6   the reports.  I want to talk to you about those.

7          So you indicated on cross-examination that in one

8   report, and they're both titled Document to Purchase of

9   Exhibit 1, you had two different source numbers listed,

10  correct?

11  A.  Correct.

12  Q.  I'm going to -- so the two reports labeled Document to

13  Purchase --

14          MR. HAXALL:  I'm sorry.  May I approach?

15          THE COURT:  Yeah, that's fine.  You don't need to

16  ask.  It's all right.

17  BY MR. HAXALL:

18  Q.  So calling your attention to these, the one with the Bates

19  numbering on the bottom indicates the CS number ends in 947;

20  is that right?

21  A.  Yes.

22  Q.  The other one ends in 828?

23  A.  Correct.

24  Q.  Do you know which one is the right one?

25  A.  I believe it's this one here.

Insley - redirect by Mr. Haxall

1   Q.  Just showing you then the documents surveillance for an

2   ongoing narcotics investigation report, does it indicate the

3   source number in the third paragraph?

4   A.  Yes.

5   Q.  And is it the 828 number?

6   A.  Yes.

7   Q.  And calling your attention to the "To document the

8   attempted purchase of cocaine from Mike Haldorson," does it,

9   again, indicate in the second paragraph the 828 number?

10  A.  Correct.

11  Q.  So were you trying to hide from the U.S. Attorney's Office

12  the source's number where you also had it correctly listed in

13  all these other reports?

14  A.  No, I was not.

15  Q.  So the defense attorney also asked you in the -- to

16  document surveillance for an ongoing narcotics investigation

17  report.  That's the one that you did write around that time.

18  A.  Correct, it is.

19  Q.  And he asked whether you lifted a finger to touch a key or

20  something to that effect to refer to the informant; is that

21  correct?

22  A.  Correct.

23  Q.  I'm going to ask you to read the paragraph starting on

24  "Tuesday, June 23rd," that paragraph in its entirety.

25  A.  Okay.  "On Tuesday, June 23rd, 2015" --

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 261 of 292 PageID #:3323
Insley - redirect by Mr. Haxall
261

1    THE COURT:  Talk into the microphone.  We can't hear

2    you.

3          THE WITNESS:  I'm sorry.

4          "On Tuesday, June 23rd, 2015, during the course of a

5    surveillance for a narcotics investigation, CS 14-15828 WC

6    contacted me and said the person he knows to be Mike Jones,

7    previously identified as Michael Haldorson, would be in the

8    area of Route 59 at Fort Beggs Drive in Plainfield, Illinois."

9    BY MR. HAXALL:

10   Q.  Okay.  So in that report, you referred to the CI.

11   A.  Correct.

12   Q.  And you said that he provided you information about where

13   the defendant would be.

14   A.  Correct.

15   Q.  Was that true?

16   A.  Yes.

17   Q.  So you just left out the fact that he had ordered drugs

18   from the defendant?

19   A.  Correct.

20   Q.  But did you lift your little finger and make a key stroke

21   talking about the --

22         THE COURT:  Okay.  That's argumentative, too.  It's

23   too late in the day.  Let's keep going.

24   BY MR. HAXALL:

25   Q.  Now, calling your attention back to the two different

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 262 of 292 PageID #:3324
Insley - redirect by Mr. Haxall
262

1   Purchase of Exhibit 1 Reports.  Do you happen to know whether

2   both of those actually went over to the U.S. Attorney's Office

3   along with all the documents from the state's attorney's

4   office and everything else in a huge pile?

5   A.  I would imagine so.

6   Q.  So do you know --

7            MR. LIPUMA:  Objection.  Speculation.

8            THE COURT:  I think I can understand what "I imagine

9   so" means.

10  BY MR. HAXALL:

11  Q.  Do you have any idea whether or not the dopey AUSA just

12  missed that and thought they were duplicate and got rid of one

13  and --

14           THE COURT:  Are you referring to Mr. Wallach?

15           MR. HAXALL:  No, I said "the dopey one."

16           THE COURT:  Okay.

17  BY MR. HAXALL:

18  Q.  Do you have any idea?

19  A.  I would have no idea, sir, no.

20  Q.  Did you intentionally try and keep those reports from my

21  office?

22  A.  No.

23  Q.  Defense counsel also asked you about the million-dollar

24  bail.  In your experience, who sets bail in criminal cases in

25  Will County?

1  A.  The judge.

2  Q.  The defense attorney also asked you a little bit about

3  Officer Ladd calling and providing rights to the defendant.  I

4  just want to make sure I'm clear on the timing.  Was that

5  before or after you had actually taken the defendant from the

6  Plainfield Police Department towards the county jail?

7  A.  It would have been after all that.

8  Q.  Okay.  So after your interview?

9  A.  Well after the interview, correct, yes.

10  Q.  After the ATF interview?

11  A.  Yes.

12  Q.  And at that time, did the defendant finally say he wanted

13  a lawyer?

14  A.  At some point he probably did, yeah.

15  Q.  Did you interview the defendant after that time?

16  A.  I did not, no.

17  Q.  And I'm going to show you what's been marked as Defense

18  Exhibit 2.

19         MR. HAXALL:  Is it okay, Judge, if I have the ELMO so

20  he can see it too?

21         THE COURT:  Sure.

22  BY MR. HAXALL:

23  Q.  I'm going to direct your attention to paragraph -- it's

24  labeled Termination of CS Services, and counsel has

25  highlighted the first line.  H.1, where my pen is, can you

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 264 of 292 PageID #:3326
Insley - redirect by Mr. Haxall
264

1  please read that sentence.

2  A.  "The ISP may terminate or deactivate the CS working

3  agreement for a number of reasons, including, but not limited

4  to the following."

5  Q.  So are you absolutely 100 percent required to terminate

6  this CS for committing an unauthorized criminal act, or is

7  that discretionary?

8  A.  It's discretionary.

9        MR. HAXALL:  I'm sorry, Judge.  Do you want that on

10  there still?

11        THE COURT:  That's fine.

12        MR. HAXALL:  I wasn't sure.  You looked like you were

13  looking at it.

14  BY MR. HAXALL:

15  Q.  Now, the defense attorney asked you about communications

16  with me regarding your supplemental report; is that correct?

17  A.  Yes.

18  Q.  Who else was present when you and I talked?

19  A.  I know Wayne Ladd was there, and I believe Agent Gallagher

20  was there as well.

21  Q.  Okay.  And during that conversation, I asked you to

22  write -- you told me what happened, and I asked you to write a

23  supplemental report.  Is that fair to say?

24  A.  Yes, it is.

25  Q.  And I warned you that if the case goes federal, there is a

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 265 of 292 PageID #:3327
Insley - recross by Mr. Lipuma
265

1  very good chance the informant's identity would be revealed?

2  A.  Correct.

3         MR. HAXALL:  No additional questions, your Honor.

4         THE COURT:  Anything based on the redirect,

5  Mr. Lipuma?

6         MR. LIPUMA:  Yes, Judge, very briefly.

7                        - - -

8         THOMAS INSLEY, RECROSS-EXAMINATION

9  BY MR. LIPUMA:

10  Q.  About the two different reports you prepared for June 23rd

11  with the different CI's number, you said you weren't trying to

12  hide anything.  Do you remember that testimony?

13  A.  Yes.

14  Q.  You said it was a mistake, correct?

15  A.  Correct.

16  Q.  You never documented it in any fashion, did you?

17  A.  No --

18  Q.  The fact you made a mistake?

19  A.  That was my mistake not to document it, correct.

20  Q.  And, in fact, you not only didn't document it, but you

21  never informed anybody that you prepared two reports.

22  A.  I don't know if that's true or not.  I'm sure I talked to

23  my Master Sergeant Wayne Ladd about it, that I did a mistake.

24  Q.  Did you tell the ASAs who were prosecuting Mr. Haldorson

25  you had actually two reports?

1  A.  I would imagine I would have spoken to them about it, but

2  I cannot say for sure.

3  Q.  Did you tell Mr. Haxall that you had two reports?

4  A.  I don't think so.

5  Q.  The report on June 23rd, it says -- Mr. Haxall just read

6  it to you.  It said "the CI contacted me," right?

7  A.  Correct.

8  Q.  But -- about Mr. Haldorson's location that he was getting

9  close, right?

10  A.  Yes.

11  Q.  Remind me what it says, just that one little section.  On

12  June 23.

13  A.  Do you want me to read the whole thing or just one

14  section?

15  Q.  Just what he had you read about the CI and his phone call

16  to you.

17  A.  So you want me to reread what I just read, correct?

18          THE COURT:  That's what he's asking you.

19          THE WITNESS:  I just want to be clear.  Thank you.

20          "On Tuesday, June 23rd, 2015, during the course of

21  the surveillance of a narcotics investigation, CS 14-15828 WC

22  contacted me and said the person he knows to be Mike Jones,

23  previously identified as Michael Haldorson, would be in the

24  area of Route 59 and Fort Beggs Drive in Plainfield,

25  Illinois."

Insley - recross by Mr. Lipuma

 1  BY MR. LIPUMA:

 2  Q.  Okay.  And we know that that wasn't originally where the

 3  site was supposed to be, based on your prior testimony.

 4  A.  Correct.

 5  Q.  It was supposed to be down Caton Farm Road further south,

 6  right?

 7  A.  Joliet somewhere, yes.

 8  Q.  But that changed at the last minute because it was going

 9  to be done in Plainfield.

10  A.  Correct.

11  Q.  And the CI's informing you of that.

12  A.  Yes.  He is sitting next to me, yes.

13  Q.  No, no, no.  You said he contacted you.

14  A.  Yes, he turned to me.

15  Q.  No, no, no, no.  No.  That's not what I'm asking.

16      THE COURT:  Just ask questions, rather than --

17  BY MR. LIPUMA:

18  Q.  You had said he called you.

19      MR. HAXALL:  Objection.  Misstates the evidence.  It

20  says "contacted."

21      THE WITNESS:  Contacted, sir.

22  BY MR. LIPUMA:

23  Q.  Okay.  So what you're saying is "contacted" means that you

24  are sitting in the vehicle next to him and he contacts you

25  somehow that, hey, the deal has been changed?

Insley - recross by Mr. Lipuma

1   A.  Yes.

2   Q.  But you don't say "contacted" for any of the other things

3   that you -- for instance, the screen shot about he rolled up

4   on me, did he contact you about that too?

5   A.  No.

6   Q.  You said he showed you his phone.

7   A.  Correct.

8   Q.  Because he's sitting right next to you, according to you,

9   showing you the phone?

10  A.  Sure.

11  Q.  Indeed, you weren't with the CI at that time, were you?

12  A.  That is not true.

13  Q.  Mr. Haxall asked you about the dopey AUSA who failed to

14  produce documents in this case, and you indicated that you did

15  not intentionally try to keep that -- those reports away from

16  the defense.  That's your testimony, right?

17          MR. HAXALL:  Objection, misstates.

18          THE COURT:  Just ask a question, please.  I have

19  heard the testimony.  We don't need to repeat that.  And it's

20  4:10 in the afternoon.

21  BY MR. LIPUMA:

22  Q.  However, you also didn't tell Mr. Haxall about the CI's

23  arrest, correct?

24          MR. HAXALL:  Objection, beyond the scope.

25          THE COURT:  You know what, it's pretty clear he

Insley - recross by Mr. Lipuma

1    didn't tell anybody.  He already testified on his cross who he

2    probably told and that he hadn't told anybody else, so I think

3    you've already made that point.

4    BY MR. LIPUMA:

5    Q.  I want to ask you about this directive, finally, which you

6    have indicated is a discretionary call now on your part as to

7    whether you can terminate a CI or not.  That's your testimony?

8    A.  It's not my decision.  It's the deputy director, Wayne

9    Ladd's decision.

10   Q.  It doesn't say that on here, does it?

11   A.  I don't know.  I don't work for the Illinois State Police,

12   sir.

13   Q.  You're tasked to the Illinois State Police.

14   A.  Correct.  I'm not a state police officer.

15   Q.  All your reports are on Illinois State Police forms.

16   A.  That would be correct.  Yes, sir, it is.

17   Q.  Let me ask you this.  Is it discretionary on your part to

18   report to prosecutors that your informant had been arrested?

19   Is that a discretionary thing?

20   A.  It is, yes.

21   Q.  So you think that you can withhold information about your

22   informants from prosecutors.  That's your testimony?

23   A.  We explain -- it's all case-by-case basis and what they're

24   doing, what they're working.  If someone gets arrested for DUI

25   and they're my informant, it's my decision to be, like, you're

Insley - recross by Mr. Lipuma

1  not working anymore.  It's based on the case agent and what

2  they want to do.  You talk to your deputy director and say,

3  this is what happened to my informant.  He was arrested for

4  whatever.  Do you want to continue to work him?  That's a

5  decision that you make together.

6  Q.  It's not exactly what I asked, but I'll pick up from

7  there.

8  A.  Sure.

9  Q.  Did you tell Ladd about your informant's arrest?

10 A.  I'm pretty sure I did.  But, honestly, until you mentioned

11 it today, sir, I completely forgot about that.  Not purposely,

12 obviously.

13 Q.  But you just said it's your call if your CI gets picked up

14 on a DUI.  You can terminate his services.

15 A.  No, it's the Master Sergeant Wayne Ladd.  We talk about it

16 after we know what happened.

17 Q.  I will get back to my last question again.  You think it's

18 discretionary whether you can terminate a CI, but it's

19 discretionary whether you can inform prosecutors about your

20 informant's criminal history.

21 A.  They may ask about it.  Again, it depends on am I getting

22 a search warrant.  There's cases you work and you don't charge

23 the person, and they never do anything for you.  You just --

24 you don't ever do anything with it; it never gets to the

25 prosecutor.  It all depends on a case-by-case basis per your

Insley - recross by Mr. Lipuma

1    arrest, per who your informant is going to be.

2    Q.  You have been a police officer for a long time, right?

3    A.  Yes.

4    Q.  Do you know how valuable information like that is to a

5    defendant and a defendant's lawyer, right?

6    A.  Correct.

7    Q.  And you know that there's legal obligations, there's case

8    law and statutes that require prosecutors to disclose that

9    identical information to defendants and their defense counsel.

10   You know that, don't you?

11   A.  Yes.

12           MR. LIPUMA:  That's all I have, Judge.

13           MR. HAXALL:  Nothing based on that.

14           THE COURT:  You are excused.

15           Next witness.

16           MR. WALLACH:  Your Honor, the government calls

17   Stephen Diehl.

18           THE COURT:  Is this one of the shorter ones?

19           MR. WALLACH:  This should be, I think --

20           MR. HAXALL:  We have two very short ones.

21           MR. WALLACH:  -- less than 10 to 15 minutes, would be

22   my guess.  Hopefully, even shorter.  I want to under-promise

23   and over-deliver.

24           THE COURT:  That's all we are going to get done today

25   then if it's 10 to 15 minutes.

Diehl - direct by Mr. Haxall

272

1    (Witness sworn.)

2                            - - -

3              STEPHEN DIEHL, DIRECT EXAMINATION

4    BY MR. HAXALL:

5    Q.  Good afternoon.

6    A.  Good afternoon.

7    Q.  Could you please state and spell your first and last name

8    for the court reporter.

9    A.  Stephen Diehl, D-i-e-h-l, S-t-e-p-h-e-n.

10   Q.  And are you currently employed?

11            Are you currently employed?

12   A.  Yes.

13   Q.  Where are you currently employed?

14   A.  With the Will County correction -- or Cooperative Police

15   Assistance Team.

16   Q.  How long have you been a member of the Will County

17   Cooperative Police Assistance Team?

18   A.  Approximately two and a half years.

19   Q.  Am I correct that you're actually detailed over to that

20   team from a different police department?

21   A.  Yes, the Joliet Police Department.

22   Q.  And what position did you hold at Joliet prior to being

23   detailed over?

24   A.  Detective.

25   Q.  You said you've been with -- and are you okay if I call it

Diehl - direct by Mr. Haxall

273

1   CPAT?

2   A.  Yes.

3   Q.  You said you've been with CPAT for about two and a half

4   years now?

5   A.  Correct.

6   Q.  Approximately how many investigations have you

7   participated in during that time?

8   A.  Over a hundred.

9   Q.  Now, were you a member of CPAT on June 1st, 2015?

10  A.  No, I was not.

11  Q.  Approximately when did you join CPAT?

12  A.  June 22nd of 2015.

13  Q.  And after joining CPAT, did you become involved in an

14  investigation into an individual named Michael Haldorson?

15  A.  Yes.

16  Q.  When, approximately, did you become involved in that

17  investigation?

18  A.  On the 23rd of June 2015.

19  Q.  Now, prior to becoming involved in this investigation, did

20  you know who Michael Haldorson was?

21  A.  No.

22  Q.  Now, if I could focus your attention on that June 23rd,

23  2015, date, were you with Inspector Insley that evening?

24  A.  Yes.

25  Q.  Why were you with Inspector Insley that evening?

Diehl - direct by Mr. Haxall

1   A.  I was driving the minivan we were in.

2   Q.  Was anyone else with you that evening?

3   A.  There was a confidential informant with us.

4   Q.  And when you say you were driving the minivan that you

5   were in, why were you, Inspector Insley, and the confidential

6   informant in that minivan?

7   A.  They were setting up a deal with Michael Haldorson.

8   Q.  And when you say "setting up a deal," what kind of deal?

9   A.  Like a controlled purchase.

10  Q.  A controlled purchase of --

11  A.  Of narcotics.

12  Q.  Now, you said you were driving the van that night?

13  A.  Correct.

14  Q.  In addition to driving the van, did you have any other

15  responsibilities that evening?

16  A.  I was supposed to call the Joliet Police Department, which

17  I did.

18  Q.  And what was your understanding of why you were supposed

19  to call the Joliet Police Department?

20  A.  To have them assist with a traffic stop of Michael

21  Haldorson.

22  Q.  And why is it that you were to call the Joliet Police

23  Department?

24  A.  Because the initial deal was going to take place in the

25  City of Joliet limits.

Diehl - direct by Mr. Haxall

1  Q.  Am I correct that you actually had been a member of the

2  Joliet Police Department before being detailed over?

3  A.  Correct.

4  Q.  Approximately two days before that?

5  A.  Correct.

6  Q.  Now, did a purchase of narcotics from Mr. Haldorson, in

7  fact, actually take place on the night of June 23rd, 2015?

8  A.  No.

9  Q.  Why not?

10  A.  Because he was stopped before that, a traffic stop.

11  Q.  And were you part of or were you physically there for that

12  traffic stop?

13  A.  No.

14  Q.  Did you subsequently find out that he had been stopped and

15  arrested?

16  A.  Yes.

17  Q.  How did you find that out?

18  A.  Through our radio.

19  Q.  And what did you do after you found out that Mr. Haldorson

20  had been arrested?

21  A.  Well, I drove the confidential informant to a

22  predetermined location, dropped him off, and then myself and

23  Inspector Insley proceeded to the Plainfield Police

24  Department.

25  Q.  And when you arrived at the Plainfield Police Department,

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 276 of 292 PageID #:3338
Diehl - direct by Mr. Haxall
276

1  did you proceed to meet with Mr. Haldorson?

2  A.  Yes.

3  Q.  Who else was with you when you met with Mr. Haldorson?

4  A.  Inspector Insley and Inspector Kaminski.

5  Q.  And at the start of that meeting or interview of

6  Mr. Haldorson, did Inspector Insley read him his rights?

7  A.  Yes.

8  Q.  Did he also show him a physical form?

9  A.  Yes.

10  Q.  I am going to pull up on the screen what has previously

11  been introduced into evidence as Government Exhibit Miranda

12  Waiver.  Do you recognize this document?

13  A.  Yes.

14  Q.  Is this the physical form that was shown to Mr. Haldorson

15  by Inspector Insley at the start of the interview?

16  A.  Yes.

17  Q.  Did defendant review this form when he was shown it by

18  Inspector Insley?

19  A.  Yes.

20  Q.  Did you observe the defendant review this form?

21  A.  Yes.

22  Q.  Did you observe the defendant place his initials on the

23  form next to each one of the rights?

24  A.  Yes.

25  Q.  Did you also observe the defendant sign the form?

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 277 of 292 PageID #:3339
Diehl - cross by Mr. Lipuma
277

1    A.  Yes.

2    Q.  Where did the defendant sign the form?

3    A.  On the bottom right where the X is.

4    Q.  You can actually touch the screen and circle it and it

5    will make a mark.

6            THE COURT:  Please, come on, let's go.  Seriously.

7    BY MR. WALLACH:

8    Q.  And did you, yourself, also sign this form?

9    A.  Yes.

10   Q.  Could you please indicate by circling on the screen where

11   your signature is?

12   A.  (Complying.)

13   Q.  And after this, did officers then proceed to interview

14   Mr. Haldorson?

15   A.  Yes.

16           MR. WALLACH:  One second, your Honor?

17           THE COURT:  Yes.

18           MR. WALLACH:  No further questions.

19           THE COURT:  Cross.

20           MR. LIPUMA:  Just quickly, Judge.

21                         - - -

22               STEPHEN DIEHL, CROSS-EXAMINATION

23   BY MR. LIPUMA:

24   Q.  Officer, you did not prepare a report of that interview of

25   Mr. Haldorson, did you?

Diehl - cross by Mr. Lipuma

1   A.  Nope.

2   Q.  And in that document that was just shown to you, you say

3   that's your signature, right?

4   A.  Yes.

5   Q.  And it says "313" right next to it?

6   A.  That's my Joliet badge number.

7   Q.  Okay.  Because you didn't have a badge number for the task

8   force yet because you had just joined?

9   A.  Correct.

10  Q.  Correct.  Okay.

11          I want to ask you about -- were you in the interview

12  room the whole time?

13  A.  Mostly for the initial interview with him, yes.

14  Q.  Were you in it the whole time?

15  A.  The whole time of that initial interview, yes.

16  Q.  Okay.  You didn't go in and out of the interview; you

17  stayed in there the entire time?

18          THE COURT:  When you say the "initial interview,"

19  what do you mean?

20          THE WITNESS:  Well, there -- we interviewed him, and

21  then later on, the ATF interviewed him.  I was not in there

22  for that.

23  BY MR. LIPUMA:

24  Q.  Okay.  You were in there for the first interview done by

25  Illinois State Police?

Case: 1:15-cr-00623 Document #: 392 Filed: 02/14/19 Page 279 of 292 PageID #:3341
Diehl - cross by Mr. Lipuma
279

1   A.  Correct.

2   Q.  Did you stay in there the whole time?

3   A.  Yes.

4   Q.  Did you -- are you aware of the searches that were done in

5   garage 49 and garage 50 in Crest Hill?

6   A.  There were searches of a vehicle, is that what you mean?

7   Yes.

8   Q.  No, no, no.  Searches of the garages?  Were you aware that

9   certain garages that were allegedly associated with

10  Mr. Haldorson were searched on June 24th in Crest Hill?

11  A.  Yes.

12  Q.  Okay.  Were you there at the time?

13  A.  At least one of those, yes.

14  Q.  Okay.  "One of those," meaning the garage?

15  A.  Storage space.  Is that what you mean?

16  Q.  Storage space.

17  A.  Yes.

18  Q.  Yes.

19  A.  Then, yes, I was there for -- not the beginning of it, but

20  I did arrive later.

21  Q.  Okay.  And no -- you saw what was taken out of that --

22  what contraband was taken out of that storage space, right?

23          MR. WALLACH:  Your Honor, I'm going to have to object

24  both on relevance and beyond the scope.

25          THE COURT:  It's beyond the scope, but unless

Diehl - cross by Mr. Lipuma

280

1  everybody wants to drag this man back here on another date,

2  I'm going to let him do it.  And I see heads shaking, so go

3  ahead.

4  BY MR. LIPUMA:

5  Q.  Okay.  Were you there for the search?

6          THE COURT:  The question was, did you see what

7  contraband was taken out of the storage space.

8          THE WITNESS:  I don't recall everything, but I know

9  there was contraband taken out.

10 BY MR. LIPUMA:

11 Q.  Okay.  But no narcotics, correct?

12 A.  Not that I know of.  Not that I recall.

13 Q.  Did you tell a Christopher Darcy, who was -- who had the

14 K-9, did you tell him that marijuana was found in the garage?

15 A.  No.

16          MR. LIPUMA:  Thank you.

17          THE COURT:  Is that it?

18          MR. LIPUMA:  Yes, your Honor.

19          THE COURT:  Any redirect?

20          MR. WALLACH:  No redirect based on that.

21          THE COURT:  You are excused.

22          Is there one more?

23          MR. HAXALL:  Yes.  He is only Miranda, and I don't --

24          THE COURT:  Fine.  Let's go.

25     (Witness sworn.)

Kaminski - direct by Mr. Haxall

1    THE COURT:  Mr. Haxall, you can go ahead.

2    MR. HAXALL:  Thank you.

3                      - - -

4         JEFFREY KAMINSKI, DIRECT EXAMINATION

5  BY MR. HAXALL:

6  Q.  Sir, can you please state your full name and spell your

7  last name?

8  A.  Jeffrey Kaminski, K-a-m-i-n-s-k-i.

9  Q.  How long -- or how are you currently employed?

10  A.  With the Village of Plainfield Police Department.

11  Q.  As a -- what's your position?

12  A.  I'm currently assigned to the Illinois State Police Will

13  County Cooperative Police Assistance Team Task Force as an

14  inspector.

15  Q.  How long have you been in law enforcement overall?

16  A.  Twenty years.

17  Q.  Did you assist in the investigation that led to the

18  charges in this case?

19  A.  Yes.

20  Q.  Prior to this investigation, were you familiar with the

21  defendant, Michael Haldorson?

22  A.  No.

23  Q.  I'd like to direct your attention to June 23rd of 2015.

24  At approximately 8:30 that evening, did you arrive in the area

25  of Fort Beggs Road, in Plainfield?

Kaminski - direct by Mr. Haxall

1   A.  Yes.

2   Q.  Did you witness the arrest of the defendant at that time?

3   A.  Yes.

4   Q.  After the defendant was arrested, did you go to the

5   Plainfield Police Department?

6   A.  Yes.

7   Q.  At approximately 9:30 that evening, were you present for

8   an interview of the defendant?

9   A.  Yes.

10  Q.  Between the defendant's --

11          MR. HAXALL:  Can we just stip to the identity?

12          MR. LIPUMA:  Yes, stipulation to the identity.

13          THE COURT:  Okay.

14          MR. HAXALL:  Thank you.

15          THE COURT:  That's fine.

16  BY MR. HAXALL:

17  Q.  Between the defendant's arrest and this interview, were

18  you generally informed of the kinds of items that were

19  recovered from the defendant's car?

20  A.  Yes.

21  Q.  Were you present for an interview at approximately 9:30?

22  A.  Yes.

23  Q.  Who else was present then?

24  A.  Inspector Insley and Inspector Diehl.

25  Q.  Where was the interview conducted?

Kaminski - direct by Mr. Haxall

1   A.  In an interview room attached to the booking area.

2   Q.  Was this interview videotaped?

3   A.  No.

4   Q.  How did the interview begin?

5   A.  He was provided and read a constitutional rights and a

6   waiver form.

7   Q.  Who -- when you say "he," to whom do you mean?

8   A.  Who was read?

9   Q.  Yes.

10  A.  The defendant.

11  Q.  Who read it?

12  A.  Inspector Insley.

13  Q.  Direct your attention to what's previously been admitted

14  as Government Exhibit Miranda Waiver.  Do you recognize that

15  item?

16  A.  Yes.

17  Q.  Is that a copy of the waiver that the defendant was read

18  and signed during that interview -- or before the interview?

19  A.  Yes.

20  Q.  Calling your attention to the portion I'm circling, who

21  did you observe sign that?

22  A.  The defendant.

23  Q.  Is your signature on this form?

24  A.  No.

25  Q.  Why not?

Kaminski - cross by Mr. Lipuma

1   A.  There is no space for me.

2   Q.  Okay.  There are already two officers that signed it?

3   A.  Correct.

4   Q.  Did the defendant indicate at any point that he didn't

5   understand his rights?

6   A.  No.

7   Q.  How many times did the defendant indicate that he didn't

8   want to talk?

9   A.  I don't recall.

10  Q.  Did he agree to talk to you?

11  A.  Yes.

12  Q.  Was he cooperative at that point?

13  A.  Yes.

14  Q.  Did you witness any law enforcement personnel ask the

15  defendant any questions about this case before providing him

16  his Miranda rights?

17  A.  No.

18          MR. HAXALL:  No other questions.

19          THE COURT:  Cross.

20                          - - -

21          JEFFREY KAMINSKI, CROSS-EXAMINATION

22  BY MR. LIPUMA:

23  Q.  You have been involved in hundreds of investigations?

24  A.  Including narcotics or in general?

25  Q.  In general.

Kaminski - cross by Mr. Lipuma

1   A.  Yes.

2   Q.  And how many times have you been involved in interviews of

3   suspects?

4   A.  I can give you a rough estimate.

5   Q.  Yes.  That'd be great.

6   A.  At least a hundred times.

7   Q.  Okay.  And you're familiar with the Miranda waivers?

8   A.  Yes.

9   Q.  And they were given in all those cases?

10  A.  In all those cases where --

11  Q.  That you had interviews?

12  A.  Yes.

13  Q.  Okay.  But you said -- in response to the question here,

14  you recognize this particular waiver?

15  A.  That is a form that the Illinois State Police uses, a

16  preprinted form when doing investigations with state police.

17  Q.  You saw it on June 23rd, 2015, according to your

18  testimony?

19  A.  Yes.

20  Q.  When was the last time you saw it?

21  A.  When is the last time I saw an Illinois State Police

22  constitutional waiver form?

23          THE COURT:  This particular one.

24  BY MR. LIPUMA:

25  Q.  This document.  This exhibit.

Kaminski - redirect by Mr. Haxall

1   A.  Since that day.

2   Q.  So you haven't seen it in over two years but you recognize

3   it?

4   A.  Well, I've been provided it during briefings with the

5   State's Attorney's Office.

6   Q.  The State's Attorney or U.S. Attorney?

7   A.  Sorry.  U.S. Attorney.

8   Q.  I only say that because there's been cases in both

9   jurisdictions.

10          Again, that's not your signature on that document?

11  A.  My signature is not on the document.

12  Q.  You didn't prepare any reports about the interview?

13  A.  No.

14          MR. LIPUMA:  Nothing further.

15          THE COURT:  Redirect.

16                          - - -

17          JEFFREY KAMINSKI, REDIRECT EXAMINATION

18  BY MR. HAXALL:

19  Q.  Between that date and today, was this the only case where

20  you did a post Miranda interview of a guy named Mike

21  Haldorson?

22  A.  Yes.

23          MR. HAXALL:  No other questions.

24          THE COURT:  Anything else, Mr. Lipuma?

25          MR. LIPUMA:  No, Judge.

1          THE COURT:  Thanks.  You are excused.

2          Are there other witnesses that --

3          MR. HAXALL:  We have one longer witness, Judge, Wayne

4    Ladd.  And given the cross-exam --

5          THE COURT:  Yeah, no -- no, there's just -- there's

6    no way we are going to do that today.

7          MR. HAXALL:  Do you want him here for setting dates?

8          THE COURT:  No, because I am just going to tell you

9    the date.  He can be here if he wants to be here and if you

10   want him to be here, but I am going to tell you what the date

11   is because I don't have much latitude.

12         So, Mr. Lipuma, as you stand there, are you --

13   assuming that Sergeant Ladd or whatever his rank is is called,

14   are you planning to call any witnesses?

15         MR. LIPUMA:  Yes, Judge.  Mr. Haldorson will testify.

16   I have already informed the government about that.

17         THE COURT:  Anybody other than him?

18         MR. LIPUMA:  I might call Agent Gallagher, Judge.

19         THE COURT:  Got it.  Okay.  Fair enough.

20         All right.  So I have two -- there are basically two

21   considerations that are significant for me.  Number one, as

22   Mr. Haxall has heard me say enumerable times, I have this

23   gigantic civil multi-district matter where I have these trials

24   going on, and everything else is kind of crammed into these

25   very tiny gaps between them.  So I have very teeny-tiny

1   limited windows that have gotten even more teeny-tiny and

2   limited.  That's number one.

3        Number two, probably equally important is the need

4   for me -- at least the preference for me to be able to get

5   this done in some relatively short time so I don't have to

6   kind of dredge everything up from long-term memory as opposed

7   to medium-term memory.  I am saying that only half

8   facetiously.

9        So one of these trials is starting on Monday.  I

10  don't know whether it's going to take 10, 11, 12, or 13 days.

11  My fervent hope is that it's going to take 12 days, which

12  means that I need to set you -- and I am clogged up on the 5th

13  of October already with other stuff, and I'm probably not

14  going to be here on the 6th and then for a few days the

15  following week.  So I need to set you for the 4th of October.

16       So you think one more witness, you think one,

17  possibly two.

18       MR. LIPUMA:  Yes, Judge.

19       THE COURT:  And if I can -- if you'd prefer not to

20  answer what I am about to ask you, Mr. Lipuma, it's fine.

21  Just tell me.  Do you anticipate Mr. Haldorson being called on

22  anything other than the Miranda issue?

23       MR. LIPUMA:  Yes, Judge --

24       THE COURT:  So it's going to be long -- it's not

25  going to be just focused on the one -- it's going to be other

1    stuff.  All right.  That just helps me plan.

2         So what I'd prefer to do is set it for the morning

3    because I am just concerned that, you know, if I set it for

4    1:30 or something, we won't have enough time.  So what I'd

5    like to tell you is 10:30 on the 4th.

6         MR. LIPUMA:  10:30 on the 4th.

7         THE COURT:  Yeah.  So the hearing is continued to

8    that date.  Do you want to check and make sure with Mr. Ladd?

9         MR. WALLACH:  If we could have a moment, your Honor.

10        THE COURT:  Yeah.  The caveat that I've got to give

11   you is that if this other trial doesn't finish -- and, you

12   know, they are actually on a time clock in that case, and if

13   everything works according to the time clock and according to

14   plan, they will be done before then, but I can't predict the

15   unpredictable.

16        MR. HAXALL:  The only thing I will tell you, Judge,

17   is I am scheduled to start a five-week trial on October 11th

18   with Judge Bucklo.

19        THE COURT:  One more reason why we got to get it done

20   on the 4th.

21        I am just waiting for Mr. Ladd to get moving.

22        MR. LIPUMA:  Judge, as long as we're waiting, can I

23   ask a question?  Judge, would the Court consider allowing us

24   to receive transcripts of today's hearing without cost to be

25   attributed to the Criminal Justice Act?

1          THE COURT:  I'd have to get an affidavit.

2          MR. LIPUMA:  I don't mind doing that, Judge.

3          THE COURT:  I mean, and I'll -- I can't guarantee it,

4    but I'd need to -- and, I mean, honestly -- well, let's get

5    this sorted out first.

6          MR. HAXALL:  I believe that Gallagher and Ladd are

7    both available.

8          THE COURT:  Okay.  Fine.

9          MR. LIPUMA:  And just to address that point a little

10   further, Judge, I certainly would like to give you a brief

11   when we are done with this rather than you collecting

12   short-term and medium term.

13         THE COURT:  No, because what that means is that I am

14   in November, and that ain't going to happen.  So what's going

15   to happen is that you're going to be -- this is going to be

16   the last piece.  You are going to argue this case on the 4th

17   right when we finish the testimony.  So you just need to be

18   prepared to do it.  There is not going to be a brief given.

19         The law -- I mean, everybody knows what the law is on

20   this stuff.  I mean, there's a lot of pieces, there's probable

21   cause, there's the issue whether there was cause to -- there's

22   the issue whether there was probable cause to stop the car,

23   there's the issue whether there was probable cause to search

24   the vehicle, there's issues about inventory searches, there's

25   issues about -- you know, the Miranda thing is a fairly

1  obvious issue, there's probably an Edwards issue going to be

2  in there somewhere, but that's part of Miranda.  But it's --

3  and I got -- I am not attributing anything prior counsel did

4  to you, I think I got a 46-page memorandum --

5                MR. LIPUMA:  I saw that.

6                THE COURT:  -- from one of the prior lawyers.

7                MR. LIPUMA:  I think it was 54 pages, Judge.

8                THE COURT:  Maybe it's 54 pages.  I can't imagine --

9  so, no, there's not going to be briefs.  Sorry.  Because I

10 just -- it just means it gets put off into God knows when.

11               So I think what I want to do is have you in here for

12 a status -- I don't need Mr. Haldorson in for the status --

13 the week before that, just so I can -- I'll have a much better

14 idea of how we're doing at that point.  So if you could maybe

15 come in and we could -- I'd prefer to do it in the morning,

16 actually, so maybe you could come in at 9:30 on like the 28th

17 of September.

18               MR. LIPUMA:  28th?

19               THE COURT:  Yeah.  Does that work?

20               MR. LIPUMA:  Yeah.

21               THE COURT:  Nothing special about the date.  If it's

22 a bad date, just tell me.

23               MR. HAXALL:  Could we do the 27th, your Honor?

24               THE COURT:  Sure .  Yeah.  That's fine.

25               So a status 9:30 on the 27th.  Mr. Haldorson's

1  appearance is waived, although Mr. Haldorson can certainly

2  come if he wants to, but it's just going to be a talk about

3  scheduling.

4       MR. WALLACH:  Judge, the government moves to exclude

5  time --

6       THE COURT:  Yeah, time is excluded through the

7  next -- through the hearing date.

8       Okay.  Thanks.

9       MR. LIPUMA:  Thank you.

10    (The hearing was adjourned at 4:30 p.m. on September 15,

11  2017, until 10:30 a.m. on October 4, 2017.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25