```
 1                 IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   UNITED STATES OF AMERICA,          )      Docket No. 15 CR 623
                                        )
 4                      Plaintiff,      )
                                        )
 5             vs.                      )
                                        )
 6   MICHAEL P. HALDORSON,              )      Chicago, Illinois
                                        )      November 3, 2017
 7                      Defendant.      )      9:45 o'clock a.m.

 8                     TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE MATTHEW F. KENNELLY
 9

10   APPEARANCES:

11
     For the Plaintiff:       HON. ZACHARY T. FARDON
12                            United States Attorney
                              BY:  MR. BOLLING W. HAXALL
13                                 MR. BRIAN WALLACH
                              219 S. Dearborn St., Suite 500
14                            Chicago, Illinois  60604

15

16   For the Defendant:       LAW OFFICE OF FRANCIS C. LIPUMA
                              BY:  MR. FRANCIS C. LIPUMA
17                            105 West Adams Street, 35th Floor
                              Chicago, IL  60603
18                            (312) 675-0089

19

20

21

22
     Court Reporter:          MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
23                            Official Court Reporter
                              219 S. Dearborn Street, Suite 2102
24                            Chicago, Illinois  60604
                              (312) 435-5639
25
```

1    (The following proceedings were had in open court:)

2         THE CLERK:  15 CR 623, USA v. Haldorson.

3         MR. LIPUMA:  Frank Lipuma on behalf of Mike

4    Haldorson, who is present in court.

5         MR. HAXALL:  Good morning, your Honor.  Bolling

6    Haxall and Brian Wallach on behalf of the United States.

7         THE COURT:  You go first.

8         MR. HAXALL:  First and last, and they go second?

9         MR. LIPUMA:  First.

10        THE COURT:  They have the burden of proof, searches

11   without warrants.

12        So let me just put on the record, I re-reviewed --

13   well, I didn't re-review it -- I reviewed the transcript of

14   all of the sessions of the hearing.  I have a rough version of

15   it, but it's -- when I say "rough," it's like 98 percent, at

16   least, within the last day and looked at all the exhibits.  So

17   I'm up to speed.

18        So, Mr. Haxall, you can go ahead.

19        MR. HAXALL:  Thank you.  Judge, as kind of an initial

20   matter, I wanted to address, given all the filings in this

21   case, in general terms what the issues are before the Court

22   and really what they're not.

23        The primary issue is was the search of the

24   defendant's car on June 23rd constitutional.

25        The second question the Court has to decide is

1  whether or not the initial entry of the officers into the
2  defendant's bedroom to look for explosives requires
3  suppression of the items later recovered pursuant to the
4  search warrant.

5          A couple of things that are not issues before the
6  Court.  First is the voluntariness of Allyson Figus' consent
7  to search the apartment.  That issue is not raised by the
8  defendant in his filings.  It is not before the Court now.
9  And that's relevant because during the hearing, there were
10  many, many questions pertaining to whether or not the officers
11  used the defendant's keys to unlock the ground floor door.

12          First of all, although I will concede it was a
13  somewhat tepid response, the officers generally said they
14  thought they didn't, they thought it was unlocked.  But even
15  if it was locked, that issue goes to the voluntariness of
16  consent.  Nothing was recovered from that trip up those stairs
17  to the landing.  Ms. Figas gave consent, which, again, is not
18  before the Court.  There has been no affidavit from Ms. Figas,
19  no information that her consent was anything but voluntary.
20  And because this case is -- this issue is really not before
21  the Court, we didn't give the Court these cases, but I have
22  them if the Court requires.  United States v. Robles-Ortega,
23  348 F.3d 679, it's a Seventh Circuit case from 2003, noting
24  that, "The critical issue is whether the consent was obtained
25  by means sufficiently distinguishable from an illegal and

1    violent entry so as to be purged of the primary taint."

2         Here the officers, even assuming they used the

3    defendant's keys to get in, knocked on the door.  There was no

4    guns, no cuffs, no show of force.  There's no evidence

5    discovered during that walk to the second floor that would

6    render the consent involuntary.

7         The same point is made in United States v. Valencia,

8    913 F.2d 378, a Seventh Circuit case from 1990.

9         THE COURT:  19-?  378?

10        MR. HAXALL:  Sorry.  913 F.2d 378.  It's a Seventh

11   Circuit case from 1990.

12        Again, the point in that case, the initial entry into

13   the apartment, even assuming it was illegal, did not taint the

14   defendant's subsequent consent to search.  In that case, one

15   of the factors -- and I'll concede that there was a time

16   pass -- but one of the major factors was that the police found

17   no evidence as a result of the entry and discovered no

18   information they could use to influence the defendant's

19   consent to search.  Again, however, that's not before the

20   Court.

21        Also not before the Court is the validity of the

22   warrant to search the defendant's storage garage.  In

23   questioning, the defendant seemed to indicate that because

24   drugs were not ultimately recovered from inside that storage

25   garage, that somehow there was dishonesty about the dog

1  alerting.  There's no evidence of that.  No Franks challenge
2  has been presented as to the search warrant.  That issue is
3  not before the Court.

4  Also not before the Court is the validity of the
5  warrant to search the apartment that was obtained after the
6  initial sweep through the defendant's apartment -- or bedroom,
7  which I'll discuss in a moment.  There's no Franks challenge
8  to the validity of that warrant.

9  There has been an indication that some of the
10 sequencing of events in that affidavit was different than in
11 the report, but, ultimately, there's no dispute that what was
12 contained in the search warrant was -- occurred before the
13 writing of that warrant and presented to the judge.

14 So I do want to discuss kind of the issues that are
15 before the Court.  And really -- I know the Court hears us
16 make this argument to juries all the time -- this is really a
17 case where it's just common sense much of what occurred here.

18 What the officers were doing is also corroborated by
19 other information:  phone records, the squad cam video, and
20 the testimony of other officers.

21 The cross-examination of the government's witnesses
22 show that they absolutely made some mistakes, and I will
23 address those in a little bit.  But, ultimately, these
24 mistakes were really just an effort to protect the informant's
25 identity, and there's nothing inappropriate about that as the

1   officers went through their duties.  And none of this, none of

2   their mistakes, changes the ultimate facts of this case.

3           So number one was June 1st, 2015.  Did the officers

4   have probable cause to believe that the defendant delivered

5   cocaine to the informant on that date.

6           Now, prior to the controlled delivery, the informant

7   provided information that someone known to him as Mike Jones

8   was involved in narcotics trafficking.  He provided a

9   photograph of the car used by Mike Jones, and that license

10  plate said MKJNZ; Mike Jones for short.  That's consistent

11  with the name provided by the informant.

12          Now, the car registration for that car confirms that

13  it was the defendant's.

14          The defendant -- or, sorry.  The informant then

15  identified a photograph of Mr. Haldorson as a person known to

16  him as Mike Jones.  The -- Investigator Insley then ran a

17  criminal history on the defendant that showed a significant

18  criminal history, including narcotics cases.

19          Now, as far as the alias Mike Jones, during his

20  testimony, the defendant even acknowledged that's an alias he

21  uses.

22          The informant also provided a telephone number that

23  he said was for Mike Jones.  Now, telephone records confirm

24  that that phone belongs to Mr. Haldorson.  Just to confirm,

25  this information that it was registered to Mr. Haldorson was

1   not available to the police before these events, and we are
2   not relying on it for probable cause, but what they do is they
3   corroborate the information from the informant and from
4   Officer Insley as to the phone number he said was in
5   communication with the informant.  The phone number is
6   registered to the defendant.
7           So on June 1st, there are numerous communications
8   between the defendant's phone number and that of the CI,
9   including phone calls.  And in these charts, your Honor, I
10  think you will likely recall, but the bold portions are phone
11  calls.  The yellow highlighting is when the defendant's phone
12  was the originating number.  So placing the call or sending
13  the text message.
14          So in this case, there were calls at 8:50 and 9:00
15  o'clock, including one placed by the defendant at 9:00.
16  That's important because at 9:03, the recorder is activated.
17  It makes sense, it's common sense, the recorder is activated
18  because officers believed the transaction was about to occur,
19  presumably and inferentially, based on the phone call with the
20  defendant three minutes earlier.  So at this point, officers
21  believe that the person using the defendant's phone was on his
22  way to deliver drugs to the informant.  And the timing is
23  important as to 9:03 because it then backs up these phone
24  records.
25          At 9:16, there's another phone call, and that call is

1   picked up by the audio recorder, which the officers also could

2   hear in realtime; the voice on the defendant's phone

3   acknowledging that he was on his way to meet the informant.

4          Same thing at 9:26.  It's clear that the person using

5   this phone was on his way to meet the informant.  And a short

6   time later, the defendant's car arrived at that Walmart

7   parking lot.  It's the same car that was in the picture shown

8   to the officers as belonging to Mike Jones and the

9   surveillance officer, Officer Marzetta, told you that he could

10  see that license plate.

11         There is then the recording of the drug deal.  It is

12  very clear from that recording, your Honor, that there was a

13  narcotics transaction that occurred in the defendant's car

14  shortly after the defendant's phone was in communication to

15  meet with the CI.  The CI turned over a white, powdery

16  substance that was confirmed to be cocaine.  He also said that

17  Mike Jones was the person who provided it.

18         At that time, the informant also said there was a

19  gun, although there is nothing in the transcript that

20  indicates it.

21         At that point, the CPAT officers had probable cause

22  to arrest defendant for distribution of cocaine, in violation

23  of 720 ILCS 570/401.  That probable cause did not dissipate by

24  June 23rd.

25         In our filing, and I'm going to quote it now, we

1    cited United States v. Mitchell, a Seventh Circuit case out of
2    2013.  It's unreported.  It's at 523 Fed. Appx. 411, and I'm
3    going to quote from page 414:  And that arrest, although made
4    while Mitchell was driving his car, was based on Mitchell's
5    participation in the controlled drug buy a month earlier.
6    That transaction provided the police with probable cause to
7    arrest Mitchell, which was not rendered stale by the passage
8    of one month.
9            At the end of that drug deal on June 1st, the
10   officers had probable cause to arrest the defendant and also
11   probable cause to search that car in which that narcotics
12   transaction occurred.  They could search it for items to link
13   the defendant to that car.  As your Honor knows, identity is
14   relevant and a element of every single case.
15           THE COURT:  Wait a second.  You're saying that
16   probable cause to arrest always gives the police probable
17   cause to search a car because you have to be able to prove
18   identity?  I mean, that exception would overwhelm the rule
19   that the Supreme Court established a few years ago.
20           MR. HAXALL:  I'm not saying that, your Honor.  What
21   I'm saying is when the drug deal occurred in that car, they
22   also -- they, one, had probable cause to arrest him based on
23   that drug deal.  They also had probable cause at that time to
24   believe there would be relevant evidence of that transaction
25   in that car.  That's where the drug deal occurred.

1          THE COURT:  I am going to quote back to you what you
2     actually said:  Officers had probable cause to arrest the
3     defendant and also probable cause to search the car in which
4     the narcotics transaction occurred.  They could search it for
5     items to link the defendant to the car.  As your Honor knows,
6     identity is relevant and an element of every single case, full
7     stop.

8          What you said was that identity is an element in
9     every case, they were entitled to search for items to link the
10    defendant, who, by the way, was driving the car, to the car,
11    and if you put those two things together with the probable
12    cause, that would mean that anytime an offense happens in a
13    car on some earlier date, the police can arrest the defendant
14    and not only arrest the defendant but also search his car
15    because identity is an issue in every case, quote, unquote.

16         MR. HAXALL:  I apologize if I was inartful in the way
17    I phrased it, your Honor.  My point is there are two different
18    issues, one is probable cause to arrest the defendant.

19         THE COURT:  Right.

20         MR. HAXALL:  The other is probable cause to search
21    the car.

22         THE COURT:  Right.

23         MR. HAXALL:  So where --

24         THE COURT:  Is probable cause to search the car
25    dependent upon whether a reasonable officer would believe that

1    there's evidence of illegality in the car?

2                MR. HAXALL:  Yes.

3                THE COURT:  Okay.  And the evidence of illegality,

4    you're saying, it would have been that they had probable cause

5    to believe what was in the car was something linking him to

6    the car?

7                MR. HAXALL:  Well, that would have been -- that would

8    be one item, your Honor.

9                THE COURT:  That's the only item you mentioned.

10               MR. HAXALL:  No.  Well, that's one.  And I am

11   actually going to --

12               THE COURT:  If that's the rule, then the Supreme

13   Court decision is effectively annulled.

14               MR. HAXALL:  And I will address some more items that

15   I have evidence shortly in my argument that would be relevant.

16               It's notable, your Honor, that the defendant, during

17   his filings and during his testimony, did not contest any

18   portion of the sequence of events, nor did he really raise it

19   in his filings.

20               So June 23rd, your Honor -- and, again, I will loop

21   back to that other issue because I address it more in the

22   staleness issue.

23               June 23rd, it's clear, your Honor, from the video

24   that Officer Friddle was waiting for the defendant's car to

25   come by.  When you watch that video, Officer Friddle is moving

1   even before the defendant hits that corner.  His car is

2   inching forward.  He knows that he is looking for that car at

3   that location at that time.  He knew the defendant would be

4   there.

5           Now, the question is how and why did he know that.

6   Well, he knew it based on communications between CPAT and the

7   informant and communications between the informant and the

8   defendant, communications that are corroborated by the

9   telephone records.

10          Now, a big issue was raised about whether or not the

11  defendant's lights were on.  It's the government's position,

12  your Honor --

13          THE COURT:  When you say "lights," you are talking

14  about --

15          MR. HAXALL:  The red --

16          THE COURT:  -- the interior red lights.

17          MR. HAXALL:  Yes, sir.  And I am going to show in

18  sequence three screenshots from this video.  And it appears

19  there is a red light glowing from that.

20          THE COURT:  You are talking not about the pinkish

21  thing that's basically at the level of the wheels.  You are

22  talking about the thing that's on the hood of the car, right?

23          MR. HAXALL:  Correct.  Actually, I think I can circle

24  it here.  Hold on.

25          THE COURT:  Yeah, it's a bad color, so it's blending

1    into the background.

2         MR. HAXALL:  I'm going to do red.

3         THE COURT:  I don't know what's happened to this

4    thing.  All of the colors have faded.  Can that happen on a

5    computer?  Probably not, right?

6         MR. HAXALL:  I didn't think so.

7         THE COURT:  I know where you're looking.

8         MR. HAXALL:  Okay.  So just to be clear, though, for

9    the record, there is an indentation in the hood, and there

10   appears to be red emanating from that portion, at least in my

11   view, your Honor, and certainly in Officer Friddle's view,

12   which is what he testified to.

13        And, again, the very first thing Officer Friddle says

14   to the defendant when he approaches him is, You've got those

15   red lights on your car, and the defendant replied in the

16   affirmative.

17        Now, he claims during his testimony that his

18   statement in the affirmative was he thought these interior

19   lights were somehow what Officer Friddle was speaking to, but

20   in the government's view, your Honor, it doesn't make much

21   sense that down the road, he would be able to see the interior

22   lights.

23        Now, ultimately, based on 625 ILCS 5/12-212, that was

24   an additional ground that Officer Friddle had to stop the

25   defendant, but it wasn't a necessary one.  But, significantly,

1    this is the only claim that the defendant made in his

2    pre-motion filings and his supporting affidavit.  He claimed

3    that he did not have red lights illuminated on the front of

4    his car.

5            Now, during his testimony, he made significantly

6    different and additional claims, which I will address, but at

7    least in the filings up until that point, your Honor, he did

8    not include anything other than, I didn't have the red lights

9    on.

10           Your Honor, the CPAT, as I noted, had probable cause

11   to arrest the defendant based on a June 1st transaction which

12   was not stale.  That probable cause under the collective

13   knowledge doctrine also Officer Friddle would be able to act

14   upon.

15           Now, there's also, as I indicated, the -- it's the

16   government's position that it was -- there was probable cause

17   for the officers to think that evidence relevant to the

18   June 1st deal would be in that car.  And although it's my

19   position, your Honor, that they had PC, under United States v.

20   Edwards, there's an indication that the quantum of evidence

21   was actually less than probable cause.  To quote Edwards, 769

22   F.3d 509, at 511, which is a 2014 Seventh Circuit case, The

23   quantum of evidence needed to justify the search of a vehicle

24   for evidence of the offense of an occupant's arrest is less

25   than the probable cause required for a search pursuant to the

1    automobile exception.

2         So here, your Honor, there are a few different

3    issues.  One is it is the government's position that

4    information tying the defendant to the car is relevant to the

5    June 1st transaction.  The government has to prove that the

6    defendant was the person who sold drugs to the informant on

7    that date.  The evidence tying the defendant to that car is

8    relevant to that determination.  Now, the weight of that might

9    be less given it was three weeks later, and maybe, given the

10   voice identification, it's not as important --

11        THE COURT:  So what parts of the car would that

12   theory, assuming that it's correct, which I am skeptical, but

13   let's just -- I'll go with it.  What part of the car would

14   they be able to search to confirm identity?  They just go

15   right to the trunk?

16        MR. HAXALL:  Well, I think, at a minimum, they could

17   look for an insurance card showing that --

18        THE COURT:  Where did they find the contraband in

19   this --

20        MR. HAXALL:  In this -- it was in the back seat and

21   the trunk.

22        THE COURT:  Okay.  So most people don't keep their

23   insurance cards in the back seat or trunk.

24        MR. HAXALL:  No, but they might keep a bag with

25   clothing of the defendant's size.  That would be pertinent.

1    He might have a CD showing -- which contains music that he

2    might list on a Facebook page, his likes and dislikes.

3         Again, most of this goes to weight rather than the

4    admissibility.  An insurance card would be relevant.  His

5    fingerprints would be relevant.  The CI's fingerprints, if

6    found in that car, would be relevant.  And I am not arguing

7    that they took fingerprints, but there was probable cause to

8    think that evidence would be in there.

9         In this case, it's increased because, based on the

10   phone communications, which I will discuss, they also had

11   probable cause to believe that the same telephone as used in

12   the June 1st deal would be in that car.  And that is

13   significant evidence tying the defendant to the June 1st

14   transaction.

15        THE COURT:  I need to back you up a little bit here.

16   So what page of Edwards does the statement appear that --

17        MR. HAXALL:  511.

18        THE COURT:  -- probable cause isn't really probable

19   cause?

20        MR. HAXALL:  It's 769 F.3d 509.  I have 511.

21        THE COURT:  I am looking at 511.  Do you have a quote

22   that I can --

23        MR. HAXALL:  I think it starts -- I thought this was

24   a quote, but maybe -- The quantum of evidence -- mostly

25   because "quantum" isn't a word that I would normally use.

```
 1           THE COURT:  Yeah.  So let me do a search for
 2   "quantum" and see if I can find that.
 3           So this is -- it's actually 514.
 4           MR. HAXALL:  I apologize.
 5           THE COURT:  The suspicion required for a vehicle
 6   search incident to arrest under Gant is key to the offense of
 7   arrest.  The automobile exception is not tied to an arrest.
 8   The quantum of suspicion necessary to justify the search may
 9   also differ.  Gant permits a search of a vehicle incident to
10   an arrest if it is reasonable to believe the vehicle contains
11   evidence of the offense of arrest.  The automobile exception
12   requires probable cause that the vehicle contains evidence of
13   criminal activity.  The court in Gant did not elaborate on the
14   precise relationship between the reasonable to believe
15   standard and probable cause, but the court's choice of
16   phrasing suggests that the former may be a less demanding
17   standard.
18           Okay.
19           MR. HAXALL:  So my point, your Honor --
20           THE COURT:  It's less than a square holding, but,
21   yeah.
22           MR. HAXALL:  I agree with that.  And, again, the
23   government's position is there was probable cause to think
24   that evidence of the June 1st transaction was in the car on
25   June 23rd, and there's -- at least this, as you indicated,
```

1    suggests that the standard might be lower than probable cause.

2    Now I'm going to move, though, that there was also

3    probable cause for officers to search based on the events of

4    June 23rd.  There was probable cause because the informant

5    ordered cocaine from the defendant, and the officers knew it.

6    Your Honor, if -- the phone calls between the

7    defendant's phone and the informant show numerous contact

8    immediately prior to and one after he was stopped.  So just

9    setting aside the content of those communications for a

10   moment, you can see all the communications back and forth

11   between --

12   THE COURT:  This is 6:23?

13   MR. HAXALL:  Yes, sir.  Yes, sir, it is.

14   And, again, the bold is a phone call at 7:05 and then

15   7:42.  The yellow is initiated --

16   THE COURT:  Those were calls from the informant?

17   MR. HAXALL:  Yes, sir.

18   THE COURT:  Because he is the 0607 number?

19   MR. HAXALL:  Yes, sir.

20   And the 7:05 call lasted a minute 34, the 7:42 call

21   was a minute 21 in duration, and then the highlighted yellow

22   are texts sent from the defendant --

23   THE COURT:  Right.

24   MR. HAXALL:  -- to the informant.

25   THE COURT:  Right.  Okay.

1      MR. HAXALL:  So putting aside the content of the

2  communications for one moment, these calls show repeated

3  communications between the two leading up to the defendant's

4  arrest.  Even in the defendant's testimony, my recollection,

5  and I have not had a chance to review those transcripts, was

6  that he -- that the defendant claimed that he told the

7  informant that he was at the car show in Plainfield but then

8  declined to meet with the informant --

9      THE COURT:  Right.

10      MR. HAXALL:  -- but nonetheless addressed --

11      THE COURT:  That's ballpark.

12      MR. HAXALL:  Right.

13      -- (continuing) nonetheless addressed where he was

14  and, essentially by that, the time that he was in that area.

15      But there was content.  The content was to arrange a

16  drug deal, and that drug deal, the location and time changed.

17  And because of that, CPAT contacted first Plainfield dispatch

18  and then Officer Friddle to seek his assistance in this stop.

19  That only makes sense if the officers were arranging the drug

20  deal.

21      Your Honor heard that this was discussed by the team

22  in advance.  Your Honor heard that officers Insley overheard

23  or listened to the calls on speakerphone and that he confirmed

24  that the -- it was the same voices in the prior transaction.

25      THE COURT:  If I can sort of put this in different

1  terms, what you are essentially arguing is that the way the

2  officers acted is consistent with their testimony what they

3  understand is going to happen?

4           MR. HAXALL:  Yes, sir.

5           THE COURT:  All right.  I want to make sure I got it.

6           MR. HAXALL:  And really the idea that they ordered up

7  narcotics makes perfect sense here, your Honor.  The issues

8  that do exist in the reports are an effort by the officers to

9  protect the CI's identity, and that in itself is permissible.

10 And I know we quoted in our filing a quote that I'm sure

11 you've seen in many, many drug cases from United States v.

12 Bender, which is located at 5 F.3d 267, Seventh Circuit case

13 from 1993, quote:  Drug dealers are not known for treating

14 informers with compassion, end quote.

15           There is a reason to protect informants:  their

16 safety, the ability to get future informants.  And the way the

17 officers here intended to protect this particular informant

18 was to arrest the defendant in a way that would obscure the

19 informant's involvement.

20           If the defendant was only charged with that June 1st

21 transaction, the informant was absolutely going to be

22 discovered.  If the defendant was stopped and arrested and

23 they noted that it was because the informant ordered up drugs,

24 again, his identity would be known from the outset.

25           So the goal of the officers, as they testified --

1    and, again, as makes perfect sense -- was to order drugs, stop

2    the defendant with them before he reached the informant, and

3    conduct a prosecution of those drugs with the informant walled

4    off from the transaction.  That was the point, and, again,

5    that's just a traditional police method and one that makes

6    common sense, given issues with informants.

7            And, again, the fact that cocaine was ultimately

8    recovered does, I think, corroborate to a certain degree some

9    of the information that the officers said about setting up a

10   drug deal.

11           And, significantly, these phone records tell this

12   story.  Again, these records show numerous communications

13   between the informant and the defendant.

14           We also presented Officer Marzetta's phone records,

15   and here, your Honor, you see a call to Plainfield dispatch

16   and then a series of communications with Officer Friddle.

17           THE COURT:  Remind me which one Marzetta was?  Where

18   was he?

19           MR. HAXALL:  He was -- he was the surveillance

20   officer for June 1st, and then for June 23rd, he was actually

21   parked south of where Friddle was.

22           THE COURT:  Got it.  Okay.

23           MR. HAXALL:  And then he is the one that showed up,

24   and he is actually in the video.

25           THE COURT:  Okay.  Right.  He is the one in the

1    video, yeah.

2            MR. HAXALL:  Yeah.  And these communications are

3    consistent with both Friddle and Officer Marzetta's testimony,

4    which is Marzetta was updating Friddle as the plan changed.

5    And, your Honor, I do have a very brief timeline, and I will

6    tell you it's not every single communication, but I think it

7    lays out what happened.

8            At 7:30, the defendant sent a text to the informant.

9            At 7:34, Marzetta calls dispatch, then Friddle.

10           7:42, there is a telephone call between the informant

11   and the defendant.  And, again, this was placed by the

12   informant.  I'm not suggesting otherwise.

13           At 8:10, the defendant sends a text to the informant,

14   so initiated by the defendant.

15           A minute later, Marzetta calls Friddle.

16           At 8:18 and 8:19, the defendant sends two texts to

17   the informant.  And just to clarify, not two at 8:18 and two

18   at 8:19.  It was one and one.

19           8:19, Marzetta calls Friddle.

20           Now, at 8:26, Friddle calls Marzetta, and you heard

21   testimony that he was calling him as he was behind the

22   defendant getting ready to stop him.

23           8:27 is the time of the traffic stop.

24           Two minutes later, the defendant sent a text to the

25   informant.  That's significant, and I will get back to it in a

1  second.

2          Now, the defendant's story, which, again, was not

3  included in his initial motions or his supporting affidavit,

4  was that he was not heading to meet the informant, he was

5  headed to Joliet to meet a friend of his.  My recollection is

6  a woman named Jessica, but --

7          THE COURT:  Jessica, correct.

8          MR. HAXALL:  -- I might have that wrong.  And, your

9  Honor, his story does not ring true.  I am going to ask the

10  Court to take judicial notice of maps of the area, which I

11  think the Court is aware it can do.  I would just cite Cloe v.

12  City of Indianapolis, 712 F.3d 1171.  It's at actually

13  footnote 3.  It's a Seventh Circuit case from 2013.

14          Judge, here is a Google map, which, again, that case

15  Cloe speaks to taking judicial notice of Google maps.  In this

16  version, Plainfield Central High School is in the far -- the

17  top left corner and Joliet is southeast by a significant

18  distance from the high school.

19          Now, the defendant testified under direct examination

20  that he could have taken -- I believe it's Route 30, again, I

21  don't have it, but I think Route 30, to get to Joliet, but he

22  testified that he turned on Fort Beggs Road because of

23  traffic.  Again, that's my recollection, your Honor, and to

24  the extent that that differs from the transcript, I apologize.

25          Now, to draw in a little closer, however, your Honor,

1    and hopefully you can see this pretty clearly --

2              THE COURT:  Yep.

3              MR. HAXALL:  -- Fort Beggs Road heads due west.  That

4    is not a way to avoid traffic.

5              THE COURT:  Which one is Fort Beggs?

6              MR. HAXALL:  It's the one just south of --

7              THE COURT:  It's not marked as "Fort Beggs."  It's

8    the one south of the high school?

9              MR. HAXALL:  Yes, sir.

10             THE COURT:  Okay.

11             MR. HAXALL:  So he heads due west, and you can see

12   that Fort Beggs dead ends at, it looks like --

13             THE COURT:  At River Road.

14             MR. HAXALL:  River Road, which turns into James

15   Street.

16             THE COURT:  James Street/River Road, yeah.

17             MR. HAXALL:  So if he's avoiding traffic by heading

18   due west, he hits that point and has two options:  One is to

19   head north away from Joliet, the other is to head southwest

20   away from Joliet.  In either case, your Honor, it doesn't make

21   sense that that would be his route to get to Jessica in

22   Joliet.

23             THE COURT:  Well, you can certainly imagine a

24   situation -- I am not saying this is the testimony -- so that

25   if there was -- if there was, let's say, construction on that

1   little stretch of Route 30, that you might go out of your way

2   for a short stretch to bypass the construction.

3        I mean, when I drive -- I live in a north suburb.

4   When I drive to Evanston, I am not always driving south.

5   Sometimes I drive north to get to a road that gets me to a

6   road that takes me south.

7        MR. HAXALL:  And, Judge, in this instance, he

8   indicated Joliet Road, which I believe is Route 30, was the

9   problem.  He was on 59, so he could have headed south on 59

10  and then over on, it looks like, Renwick Road.

11       THE COURT:  Fair enough.  I get your point, though.

12       MR. HAXALL:  And I think if you watch the video,

13  actually, as the traffic passes -- and it's a brief period.  I

14  am not suggesting otherwise --

15       THE COURT:  You are saying it doesn't seem all

16  that --

17       MR. HAXALL:  It doesn't seem that bad on 59.

18       But, again, what's important, your Honor, is after

19  the defendant is stopped -- and this is in the chart, but I'd

20  also call your attention, just if you want to backstop it, to

21  Mobility Records Item 32569, the defendant sent a text to the

22  informant.  After being stopped, the one person on the entire

23  planet the defendant contacts is the informant that he claims

24  he was not going to meet.  And that was the guy who was --

25       THE COURT:  And we know it's post stop just from the

1 | timing on the records?

2 | MR. HAXALL: On the timing on the phone records, then
3 | as the timing of Officer Friddle. I think actually even the
4 | squad cam captures it.

5 | THE COURT: There is a time stamp on it.

6 | MR. HAXALL: I think so, but I think he also
7 | testified to that.

8 | So, again, your Honor, at that point, officers have
9 | probable cause to believe the defendant was on his way to
10 | complete a drug deal. It's also notable that -- and this
11 | isn't a major point I am going to dwell on -- but because
12 | there was also probable cause to arrest the defendant for
13 | June 1st, had they not taken that car away, Plainfield was
14 | required by their tow policy to do so, and they would have
15 | inventoried it. Therefore, this was inevitable discovery.

16 | Assuming for the sake of argument only that there was
17 | PC for the June 1st arrest but not to take the car at that
18 | time, the defendant would have been removed, and Plainfield,
19 | under their policy, would have had to inventory and tow that
20 | vehicle, and they would have found the items inside of it.

21 | Also important, your Honor, is the defendant told the
22 | officers before his car was searched that he had illegal
23 | fireworks in it. Now, he didn't use the term "illegal
24 | fireworks." Officer Marzetta asked him, do you have anything
25 | illegal in there or in your car, it was one or the other, and

1    the defendant replied, fireworks.  Under the Illinois

2    Pyrotechnic Use Act, and I actually brought a copy of the

3    relevant portions, if the Court needs, it's a class A

4    misdemeanor to possess the kind of fireworks that were

5    ultimately discovered.

6              And, again, when asked specifically --

7              THE COURT:  What are you talking about?  M-80s, that

8    kind of thing?

9              MR. HAXALL:  M-80s.  They're actually -- I think

10   they're defined as commercial or display fireworks.  But,

11   nonetheless, the specific terminology is less important, the

12   defendant was asked, do you have anything illegal, and he

13   responded in the affirmative.  Based only on that, they have

14   probable cause to search his car.

15             Now, I would note that the defense has not filed a

16   motion to suppress that statement, but even if they did, it

17   would not be valid under United States v. -- I think it's

18   Patane, 542 U.S. 630.  That holds in it, it's a plurality

19   opinion, that failure to give Miranda warnings does not

20   require suppression of the physical fruits of the suspect's

21   unwarned but voluntary statements.  So even if there was a

22   motion to suppress the evidence, under that case, it would not

23   be a winning argument.

24             So I want to address what I anticipate are going to

25   be some of the arguments from the defense, at least as to this

1    issue, before I move on to the apartment.

2          The claim seems to be primarily that none of this

3    happened, none of the ordering of the drugs, because it was

4    not in Insley's initial report.

5          Now, first of all, Insley's report did have a

6    specific reference to the informant's involvement.  On

7    Tuesday, June 23rd, 2015, during the course of surveillance

8    for narcotics investigation, it lists the CS number, and I

9    believe that's the accurate one, contacted me and said the

10   person he knows to be Mike Jones, previously identified as

11   Michael Haldorson, would be in the area of Route 59 and Fort

12   Beggs Drive in Plainfield, Illinois.  So that is in the

13   initial report.

14         Insley omitted a couple details, but there's

15   nothing -- there's been no case presented to indicate that

16   that's improper or that renders the search invalid.  He

17   admitted, although he used the term "contacted in a clear

18   effort to obscure the informant's participation," it's not

19   inaccurate.  He also admitted that the informant ordered

20   drugs.  But, again, these were efforts to protect the CI's

21   involvement.  They are not false.  They do omit details, but

22   it's not false.

23         I also anticipate that counsel might argue that the

24   defendant asked why he was being arrested and he was told

25   falsely that there was a warrant.  Now, under Kladis,

1    K-l-a-d-i-s, v. Brezek, B-r-e-z-e-k, which is at 823 F.2d

2    1014, it's a Seventh Circuit case out of 1987, I'm going to

3    quote, and I think I've got the page right, 1018, We conclude

4    that neither the Sixth Amendment nor the Fourth Amendment

5    provided Kladis the right to be informed of the reason for his

6    arrest.  Although the Sixth Amendment provides an accused the

7    right to be informed of the nature and cause of the

8    accusation, we have previously explained that the Sixth

9    Amendment's protection does not come into play until the

10   government has committed itself to prosecution.

11          Just to take a brief aside, we've -- you've heard

12   testimony that their warrant had not been issued at that

13   point.

14          THE COURT:  That's not even what they are talking

15   about.  They are talking about the initiation of a criminal

16   proceeding.

17          MR. HAXALL:  Right.  But in my experience in state

18   court is it's an information warrant which includes the

19   charge.

20          THE COURT:  Oh, got it, yeah.  That's what you are

21   talking about.  Fair enough.  Yeah.

22          MR. HAXALL:  So, clearly, the state was not committed

23   to prosecuting Kladis during the brief period he remained in

24   custody.  He therefore had no Sixth Amendment right to be

25   informed of the reason for his arrest.

1          The Fourth Amendment guarantee against unreasonable

2    seizures might also provide a basis for the right to be

3    informed of the reason for an arrest.  However, the Fourth

4    Amendment requires only that the police have probable cause to

5    believe that an individual has broken the law before arresting

6    him or her.  Although the police would do well to inform

7    arrested persons of the charges against him, the Fourth

8    Amendment does not require the police to do so.

9          I also anticipate that there will be some claims

10   about the informant, and I would point out that

11   notwithstanding counsel's statement about what the informant

12   told him, the informant did not testify.  The only statement

13   from the informant was what the defendant said, which was that

14   afterwards, the informant called him to apologize.  And that

15   was elicited by his direct examination.

16         But that actually makes it more likely that this

17   occurred.  The informant would have no reason to call him to

18   apologize for getting him in trouble unless, one, there was

19   the controlled purchase on June 1st, and/or he ordered drugs

20   from the defendant on June 23rd.  Otherwise, he'd have nothing

21   to apologize for.  So that statement elicited from the

22   defendant actually supports the government's view of the

23   evidence.

24         I also want to address what I anticipate will be some

25   significant issues or some significant argument related to

1    Officer Insley.  He made some mistakes.  No doubt about it,
2    and at least as to one issue I will get to, there will be a
3    very one-sided conversation with him and his supervisors about
4    at least one of those mistakes, which I'll get to.

5           First, he wrote down the wrong CI number in one
6    report.  He corrected it.  And the fact that that report was
7    then tendered actually is most likely my fault.  But that he
8    corrected it in the same report shows that he was not trying
9    to hide the informant's number.  In fact, the informant's
10   number was listed over and over and over again in other
11   reports that were provided.

12          He also did not originally put down information about
13   the CI ordering drugs on June 23rd.  I have explained why that
14   was.  But he did note the informant's involvement in the
15   report on that date by the correct CI number.

16          The supplemental report, it has the information.  It
17   has an incorrect date at the top.  That is a mistake.  But
18   it's an understandable one.  People frequently open the same
19   document to start it.  I would actually note in this case, if
20   your Honor looks at docket number 72, one of the defendant's
21   filings is listed as defendant Dexter Wells' motion for
22   production of informant.  The defense was not trying to hide
23   from the Court who -- on who's behalf they were filing this.

24          THE COURT:  Was that with --

25          MR. HAXALL:  No, it was actually Ms. Mikailis

1    (phonetic).

2         THE COURT:  I was going to say I would not be

3    offering Ms. Johnson as an example --

4         MR. HAXALL:  I'm not, your Honor.

5         THE COURT:  -- of a reasonable person.

6         MR. HAXALL:  My point is just that in this day and

7    age, people open documents --

8         THE COURT:  Yeah, I get what you're saying.

9         MR. HAXALL:  And to be clear, Officer Insley, even if

10   he wanted to, that would be such an absurd way to try and pull

11   a fast one when I was the one who months later directed him to

12   write the report.  Certainly, the government -- the

13   prosecution knew when that was written and, in fact, provided

14   that information to the defense.

15        You may recall months and months and months ago,

16   Ms. Johnson was complaining about it, and I informed the Court

17   then when I thought it was written and that I had previously

18   informed the defense.

19        Now, the biggest issue in his mistakes is a failure

20   to disclose the additional CI arrest, and that's where, again,

21   now that the testimony is over, he will be getting an earful

22   from me.

23        THE COURT:  Well, that's not part of the evidence,

24   though, so --

25        MR. HAXALL:  Okay.  Well, what I will say then, your

1    Honor, it's important to first note when that information

2    would be necessary to provide to a Court and what happened

3    here.  In these search warrants presented to the state court

4    judge, the informant wasn't referred to.  They were not

5    relying on his information.  They really start out with the

6    arrest.  Therefore, the failure to notify the issuing judge

7    there is -- they didn't notify anything about the informant

8    because they weren't relying on him.

9            Where it is an issue, and I will concede this is in

10   our complaint, our complaint affidavit notes the informant,

11   and we -- as we usually do, we listed his -- what we always

12   call his baggage.  We would have put that in had we known.

13   But, ultimately, I don't think it mitigates the probable cause

14   contained in that complaint.  And even if it did, the

15   subsequent indictment --

16            THE COURT:  That's a moot point --

17            MR. HAXALL:  Exactly.

18            Now, one thing that Insley screwed up, and there were

19   several, changes what is on that June 1st recording, what

20   Marzetta saw, what those phone records show, and what happened

21   in that squad cam video.  Simply put, your Honor, there are no

22   grounds for suppression of the items recovered from that car.

23            I now would like to talk about the defendant's locked

24   bedroom.  The defendant, in his car were located multiple home

25   made pipe bombs just a few hours before the search of that

1  apartment.  And I'm going to put up two pictures that were

2  admitted into evidence.  These are the items.  This is the

3  information that William Ladd, who was the one that ultimately

4  decided to go into the defendant's bedroom, had in his mind

5  when he made that call.

6        Ladd told you that ATF warned him about the danger

7  these types of items presented and actually accompanied CPAT

8  throughout the night because there was concern that more items

9  might be recovered, which was appropriate because the

10 defendant made a statement that he might have another item at

11 his parents' house.  And, again, I will concede that he said

12 his parents' house, according to the testimony.

13       But what's also important is the defendant repeatedly

14 lied about where he lived.  He first said he was homeless, he

15 was specifically asked about the Plainfield location because

16 they had seen his car in that area, and he denied that he

17 lived there, making a claim about having a relationship with

18 Allyson, who turns out to be living there, and stating that he

19 lived with his parents.

20       Now, based on cross-examination, it seems to be a

21 claim that officers knew the whole time where he lived.  But,

22 again, this is common sense.  The officers would not have

23 wasted their time going out to his parents' house if they knew

24 he lived in that Plainfield apartment.  The defendant lied

25 about it.  And he really would not -- in my opinion, would not

1    even acknowledge that during his testimony.

2           And it's significant evidence to an officer when a

3    person lies about where they live because that really tells

4    officers that there's something problematic for the defendant

5    at that location.

6           But, anyway, based on the defendant's lies, they went

7    to his parents' house.  They found, I believe, a scale, some

8    needles.  They then learned from the defendant's father where

9    he actually lived.  And they located his apartment.  They met

10   with Ms. Figas, who consented to a search, stated that she had

11   seen the defendant with fireworks, that her prior apartment

12   burned down -- now, there's not necessarily a connection

13   between the two but, again, just highlights the danger of fire

14   to apartments, and the search of the common area yielded

15   steroids.

16          At that point, Sergeant Ladd made a decision to do an

17   initial sweep of the defendant's room for explosives.  We are

18   not saying that Ms. Figas' consent applied to that room.

19   Absolutely not.  However, exigent circumstances permitted them

20   to enter.  Again, a short time earlier, a few hours, and maybe

21   "few" is understating it, several hours earlier, these

22   explosives had been recovered from his car.

23          THE COURT:  So just so I'm clear on exactly what you

24   contend the exigent circumstances are, it's the fact that --

25   put it in a nutshell for me.

1          MR. HAXALL:  Put it in a nutshell --

2          THE COURT:  Reason to believe there were other bombs

3    or explosives in the --

4          MR. HAXALL:  In the bedroom.  Yes, sir.

5          THE COURT:  Okay.  And so just to kind of -- because

6    I want to see -- I want to get a sense of where the line would

7    get drawn.

8          So what if it was firearms that were found in the

9    trunk?  Would that give --

10         MR. HAXALL:  No, I don't believe so.

11         THE COURT:  Okay.

12         MR. HAXALL:  I think the difference is the lack of

13   stability in these kinds of items, and I think they spoke to

14   that.  And I think even Agent Marcus, my recollection is that

15   he made points --

16         THE COURT:  So the exigency isn't that it was -- it

17   isn't that there was something illegal there.  The exigency is

18   there's something there that presents a current danger to

19   others in the area.

20         MR. HAXALL:  Exactly.  And I'm actually going to -- I

21   will move ahead and quote something that we put into our

22   filing.  The Ninth Circuit in United States v. Lindsey, 877

23   F.2d 777, quote, Exigent circumstances are frequently found

24   when dangerous explosives are involved.

25         I am also going to note, and we did in our filing,

1   Corrigan v. District of Columbia, 841 F.3d 1022, it's a D.C.

2   circuit case from 2016, quote, And this Court has noted that

3   evidence suggesting the presence of a bomb or explosive device

4   might constitute exigent circumstances.

5          So that's our point, your Honor, and, again, drawing

6   the line between the guns, it's a different situation with

7   these devices.

8          So they had, in our view, probable cause to believe

9   that an explosive or at least significant fireworks would be

10  in the defendant's bedroom.

11         They did not have time to wait.  They testified that

12  it would take several hours for a search warrant, and in this

13  case, it actually took some time.  The consent form is signed

14  at 4:18, the search warrant was issued at 6:49, so two and a

15  half hours.  They did not believe they had time to wait.

16         They also had an ATF expert with them.  In some of

17  the cases the defense cited, they noted that, basically, the

18  search was done without, I think, calling the bomb squad.

19  They didn't have to.  They had the expert with the truck, with

20  the steel box where they ultimately put those fireworks.

21         It's also notable this is a strictly circumscribed

22  search.  They did not, as your Honor heard, go through every

23  little nook and cranny of his bedroom.  They went in, saw the

24  fireworks, they cleared them out.  And they noted, your

25  Honor -- this is the area where the apartment is.  The danger

1   to this area -- this is a main street in Plainfield -- is

2   significant.  So, your Honor, they did, in the government's

3   view, the exact right thing.  They secured the apartment, then

4   they went and got a search warrant.  And that is significant.

5   It's something in the defendant's filings he tries to gloss

6   over.

7          So even if the Court determines that the initial

8   sweep was improper and suppresses the fireworks, it's the

9   government's position that the evidence acquired pursuant to

10  that search warrant breaks the chain, and it is appropriate --

11  it would be inappropriate to suppress that evidence.

12         In that search warrant, by the time it was issued,

13  the defendant was again contacted and denied that he lived at

14  that apartment, even denied -- I can't recall if it was

15  knowing Ms. Figas or that she was his roommate.  No, I think

16  he said, I don't have a roommate, is my recollection.  They

17  cleared the area to wait for the search warrant, which was

18  reviewed by an ASA and approved by a judge.

19         Under Ross, which is 565 Fed. Appx. 505, Seventh

20  Circuit out of 2013, and we cited this in our filings, the

21  defendant must demonstrate that the warrant itself is tainted.

22         Now, here, your Honor, there is one minor provision

23  from what was found in that initial search in the warrant.

24  It's the government's view that that does not taint the

25  warrant.

1        THE COURT:  What was it?

2        MR. HAXALL:  My recollection is they said something

3   about the fireworks being found and being told by ATF that

4   they could be dangerous.

5        So I will concede, your Honor, that the case law

6   seems to indicate that if the judge relied on the statements,

7   that it could -- that it is actually tainted.

8        First, as a policy matter, and I --

9        THE COURT:  Remind me.  Do I have the warrant

10  application?

11       MR. HAXALL:  I believe you do, your Honor.  I believe

12  it is an attachment to our filings.

13       THE COURT:  I mean as part of the hearing exhibits?

14  If I have to go looking through the findings, you'll find me

15  in about three days after I dig through everything.

16       I got warrants -- yeah, I think I have it here.  It's

17  towards the end of the binder you have given me.

18       MR. WALLACH:  Correct, your Honor.  It's the

19  second-to-last --

20       THE COURT:  Second-to-last thing, yeah, yeah.  I do

21  have it.  Okay.

22       MR. HAXALL:  Do you want me to find that citation,

23  your Honor?

24       THE COURT:  So --

25       MR. HAXALL:  And, your Honor, again, I will

1    acknowledge, in this respect, I am kind of swimming upstream.
2    It's surprising that in a Franks context, courts are directed
3    to excise even intentionally false information, review the
4    warrant without it.  Here it's whether or not the judge relied
5    on it.  I concede it's not that you excise it and see if
6    there's still probable cause.

7         But here, your Honor, it's the government's position
8    that --

9         THE COURT:  And the proposition that what's relevant
10   is whether the judge relied on it comes from this Ross case
11   that you cited, or is it something else?  Because --

12        MR. HAXALL:  Actually, we cite Etchin also, your
13   Honor, which is 614 F.3d 726.  The evidence seized pursuant to
14   a subsequent search warrant is not subject to suppression
15   unless the previously illegally obtained evidence affected the
16   judicial officer's decision to issue a warrant or the
17   officer's decision to seek the warrant was prompted by
18   anything that was discovered during the illegal entry.  That's
19   Etchin, 614 F.3d 726.

20        THE COURT:  It's kind of a strange standard, because
21   how would you ever prove that without calling a judge?  So,
22   presumably, what they mean by that is that you have to look at
23   this sort of from an objective standpoint and what one thinks
24   that a judge would have been looking at and considering.

25        MR. HAXALL:  I think that's probably right, your

1  Honor.

2         But, ultimately, even if the Court finds it was

3  tainted -- and the government's position is the warrant was

4  not tainted -- first the good-faith exception applies.  The

5  officers at, whatever it was, 4:00 in the morning went and got

6  a warrant.  After having an ASA bless it, after getting a

7  judge's signature, and, again, the good old Hollingsworth,

8  which I know we cite to courts all the time, 495 F.3d 795, an

9  officer's decision to obtain a warrant is prima facie evidence

10 that he acted in good faith.  They could rely on the warrant

11 even if it ultimately was tainted, your Honor.

12         And I'd like to point out that if they had not

13 included that provision, had they not informed the state court

14 judge that they had already made entry into the bedroom, I can

15 easily see a scenario which a defense attorney is claiming --

16         THE COURT:  Franks issue right there, I mean, for a

17 material omission.

18         MR. HAXALL:  I believe that would be correct, your

19 Honor.

20         THE COURT:  You didn't tell the judge that you had

21 made an illegal entry.

22         MR. HAXALL:  Now, I think maybe in the light of day,

23 you put it as a footnote and say, we're not asking the Court

24 to rely on it, just for informational purposes, but I don't

25 think that technicality should carry the day.

1    And, finally, your Honor, the officers would have --
2  even, putting all this aside, had they not gone in the room,
3  they would have sought a search warrant anyway.  You heard
4  that from Ladd.  They were investigating this case.  They
5  were, in the government's position, really doing the right
6  things when they were going through this.  And on the facts
7  that they had before them, it's the government's position that
8  the state court judge would have issued the warrant anyway,
9  and so this would have been inevitably discovered.

10    At a certain point, the defendant in his filings
11  concedes this.  This is quoting from the defendant:  The
12  fact -- and I added "is" -- that the WCPAT officers could
13  easily have obtained a warrant to search defendant's locked
14  bedroom but chose not to get a warrant until after they made
15  their first illegal, warrantless entry, searched the room and
16  seized the fireworks.  That's in the defense filing.

17    Your Honor, based on that, it's the government's
18  position -- it's the government's position that, first, there
19  was probable cause really in a variety of ways, there were
20  constitutional grounds for the officers to search the
21  defendant's car, and, second, the evidence seized from his
22  locked bedroom should not be suppressed.

23    THE COURT:  I thought from something you said earlier
24  that you were going to argue that the girlfriend, whose name
25  escaped me, Allyson, consented to the search of the bedroom.

1    MR. HAXALL:  No, no, no, absolutely not.  She did not

2    have authority.  His bedroom was locked.  We are not relying

3    on that.

4         THE COURT:  You made some reference to her consent,

5    and I just thought maybe that was --

6         MR. HAXALL:  My only point --

7         THE COURT:  It was consent to go into the place in

8    the first instance?

9         MR. HAXALL:  Exactly.  So even if they --

10        THE COURT:  I got it.

11        MR. HAXALL:  Okay.  Thank you, Judge.

12        THE COURT:  All right.  Mr. Lipuma.

13        MR. LIPUMA:  Thank you, Judge.

14        Judge, can you put the ELMO on?

15        THE COURT:  Sure.

16        MR. LIPUMA:  Good morning, your Honor.

17        Judge, the evidentiary hearings in this case

18   established beyond any doubt that there was a pervasive

19   pattern of police misconduct in the investigation of this case

20   that was followed up by an immense cover-up that begins with

21   lies in little police reports and ends with perjury in at

22   least two courtrooms in this building; not simple mistakes

23   that the government claims.

24        Contrary to the government's claim, additionally,

25   Judge, there was no probable cause for the traffic stop in

1   this case, and there's no legal basis to admit the evidence

2   that the government illegally seized from the car, from the

3   apartment, and, indeed, from the storage garages, Judge, and

4   even the post-arrest statement.  Even though Mr. Haldorson

5   withdrew a portion of that, even his post-arrest statement

6   must be barred, and I will get into each of these reasons for

7   the Court.

8           And I would begin, Judge, with prior to June 1st,

9   2015.  Prior to June 1st of 2015, Judge, there's no prior

10  reports about Michael Haldorson or Mike Jones.  There's not

11  even a CI debriefing report about it.  Insley testified that

12  the CI simply provided him with a picture of Mr. Haldorson's

13  car, Judge.

14          Judge, that photograph, if it existed, was not

15  documented in a single page of any report in this case.

16  Indeed, Judge, we were never even informed that there was this

17  alleged photograph until I was sitting in that chair hearing

18  Insley testify about it for the very first time.

19          No picture has ever been produced in discovery,

20  Judge.  There is a persuasive pattern of lies here, they start

21  small, and they accumulate.

22          What happened on June 1st of 2015, Judge?  Well, we

23  start off with this proposition, which is pretty much a

24  foregone conclusion.  The Illinois State Police recorded

25  Michael Haldorson illegally under Illinois law.  The CI wore a

1  wire, and Insley had an overhear device.  They did not seek to

2  have a court order.  They certainly didn't have two-party

3  consent.

4         Instead, what does Insley say?  It's in the

5  Government's Exhibit 6/1/2015 Transcript.  Here is Insley:  I

6  also give consent to this recording.

7         This is an experienced -- a very experienced police

8  officer, Judge, who does an abundant amount of investigations

9  and uses CIs, according to his own testimony, and recordings

10 and CIs.  He knows this.  He can't give consent under Illinois

11 law.

12        And how do we know he knows this, Judge?  Because

13 Mr. Haxall asked him about it when the case was brought up to

14 the federal courts.  Mr. Haxall asked him:  And is it true

15 that under Illinois state law, there is no such thing as

16 single party consent to record phone calls?  Correct.

17        Okay.  So unlike federal agents, you don't have the

18 ability to record a CI's phone call based only on his correct

19 (sic)?  Correct, yeah.

20        THE COURT:  You misread it, but I saw it.

21        MR. LIPUMA:  Okay.  I apologize.

22        THE COURT:  You didn't say "consent" on the last one.

23        MR. LIPUMA:  Okay.

24        THE COURT:  You made one of those errors.

25        MR. LIPUMA:  Yes.  I apologize, Judge.

1          THE COURT:  I read it, though.

2          MR. LIPUMA:  Okay.  So he knows better, Judge.  He

3    knew that what he was doing on June 1st, and --

4          THE COURT:  So, I mean, you are not -- obviously, you

5    are not arguing that that requires suppression of that --

6          MR. LIPUMA:  Tape?

7          THE COURT:  -- tape.

8          MR. LIPUMA:  No, Judge.  You have --

9          THE COURT:  If it was in state court, probably it

10   would.

11         MR. LIPUMA:  It would, Judge, and I submit I tried to

12   get into this in cross-examination, I don't know if it came

13   out, but I tried to get some information as to why the case

14   was kicked to federal court.  Sure enough --

15         THE COURT:  You know, the silver platter doctrine

16   died probably before I was born or maybe right around the time

17   I was born.  You know, I guess the -- you know, you can -- it

18   may be teased into the narrative that you're describing about

19   this sort of pattern, but it really doesn't get us too far.

20         MR. LIPUMA:  Okay.  Judge, I think --

21         THE COURT:  I mean, am I missing something?

22         MR. LIPUMA:  I think, Judge, you are going to have to

23   consider the totality of the circumstances in this case, and I

24   think there's --

25         THE COURT:  Basically, your argument is that they

1   were willing to sort of blithely ignore the law.  It suggests

2   that they would be willing to do the same in other places.

3          MR. LIPUMA:  I absolutely do believe that this is not

4   a controlled law enforcement group, Judge.  A very small group

5   of officers who are protecting each other, protecting the boys

6   in blue, and they came in the courtroom, and they lied.  And

7   they have no regard for the law, and --

8          THE COURT:  Let me close this door.

9          MR. LIPUMA:  Judge, I could spend a lot of time here

10  going through some --

11         THE COURT:  Let me ask you one other thing before we

12  get off of this point, because the couple times that that was

13  asked, and I think both times, it was asked during your

14  cross-examination of one or other witnesses, they said, well,

15  we are allowed to do that for, quote, unquote, officer safety.

16  You recall that testimony, I assume?

17         MR. LIPUMA:  Officer safety for what --

18         THE COURT:  To do the one party -- one-party consent

19  is okay when we are doing it for officer safety.

20         MR. LIPUMA:  Yeah, I don't get that, Judge.  I don't

21  think that that's what the law allows.  I don't think there is

22  an exception --

23         THE COURT:  I just wondered if you had made any

24  effort to look into that.  Like I say, the illegality by

25  itself isn't a basis for suppression.  I think there was

1  actually a motion that one of the earlier lawyers filed in
2  that regard on that subject that I denied.

3        Anyway, go ahead.

4        MR. LIPUMA:  That's correct, Judge.  That was
5  presented, you did deny it, but I just wanted to point out how
6  Insley knew better based on his testimony in the federal grand
7  jury.

8        And, Judge, I can talk about a number of other
9  things, like the $150 payment for the alleged drugs on
10  June 1st and the fact that only 120, allegedly, was
11  transacted.  Where did the other $30 go, the official advanced
12  funds directed from ISP, Judge?  That requires that kind of
13  information to be documented.  None of that information has
14  been documented.  There's nothing in the report about the CI
15  even returning the $30.

16        But those are small things, Judge, compared to the
17  major lies which we know exist in this case.

18        One of the first witnesses, if not the first witness,
19  Judge, was Mario Marzetta, the officer who showed up on the
20  scene later and you see him in the dash cam.  Marzetta says,
21  Judge, that he supposedly was on surveillance on June 1st.
22  However, no report was prepared by Marzetta.  No surveillance
23  photographs were taken by Marzetta.  Indeed, the only report
24  that was prepared was from Insley, who said he saw the
25  transaction, but at the hearing, he said he didn't see the

1  transaction.  But Marzetta now says he saw the transaction.

2  But how do we know that Marzetta lied in this very

3  courtroom, Judge?  He falsely testified that when Haldorson's

4  car pulled up next to the informant's car in the Walmart

5  parking lot on June 1st, it had its grill lights on.  Judge,

6  we presented the evidence that those grill lights weren't even

7  available on June 1st.  We have a receipt from June 4th

8  of 2015 discussing and documenting the installation of the

9  grill lights and what other accent lights were put in there.

10 So Marzetta just came in here and lied straight out.

11 Judge, here's another thing that I can't give you a

12 receipt or a documentation that he lied, but I can ask you,

13 just like Mr. Haxall asks the Court, to use common sense, just

14 common sense.

15 They say that Mike Jones is in a car selling cocaine

16 out of his car with a gun, even though there is no gun on the

17 tape recording, the CI doesn't say, oh, you have a gun with

18 you.  And, of course, June 23rd, there is no gun either.  But

19 they say that Michael Haldorson had a gun or the CI told him

20 that Michael Haldorson had a gun.  But they couldn't stop him

21 because they were purportedly stopped by traffic lights.

22 That's a ridiculous assertion, Judge.  It's outright false.  I

23 wish I can prove it up, but it just doesn't make sense.

24 They knew who Mike Jones was, they knew he was

25 Michael Haldorson because they had the registration records,

1   and they had his home address, at least his parents' home
2   address in Joliet.

3       Judge, according to the government, based on
4   June 1st, the police officers can basically at any time after
5   that go after someone, a suspect who engaged in a drug
6   transaction in a car, and immediately stop their car, and that
7   would be constitutional and comply with all the authorities.
8   Judge, I submit that that's just not the case.  The law
9   doesn't read that broadly.

10      Indeed, the government cites this case U.S. v.
11  Mitchell, and they mention it again in front of your Honor,
12  523 Fed. Appx. 411, for the proposition that a controlled
13  purchase a month earlier provided law enforcement with
14  probable cause.

15      Judge, I would submit that by June 23rd, that
16  evidence is stale or otherwise tainted based on what I'm going
17  to show the Court, additional police misconduct.

18      But the authority the government relies on, Judge,
19  this Mitchell case, I'd ask you to look at it.  Judge, it's a
20  non- -- it has non-precedential value.  It's an unpublished
21  two-page order of the Seventh Circuit that was based on an
22  Anders brief where the appeal was dismissed, and so that's
23  hardly -- that hardly gives me confidence that the Seventh
24  Circuit actually considered the substantive weight of that
25  comment in ruling on the case.

1          Judge, we will move on then.

2          After June 1st, what happens?  Well, from June 1st to

3    June 23rd, according to discovery, according to the Illinois

4    State Police, there's no activity whatsoever with respect to

5    the investigation of Michael Haldorson.  They certainly didn't

6    go to an ASA or a judge and seek a warrant.  There was no

7    arrest warrant in this case, no search warrant in this case,

8    we know that makes things, per se, unreasonable unless there's

9    exceptions.

10          Judge, bottom line, three weeks and a day pass

11    without any activity to advance the investigation.

12          Then what happens on June 23rd, Judge?  On June 23rd,

13    in an Illinois State Police office, in the morning, Ladd came

14    in here and told us that he and Insley decided it was time to

15    get Mike Haldorson.  That's how plainly Ladd said it.

16          What happened on June 23rd, per Officer Friddle?

17    According to Officer Friddle's testimony, he received a call

18    from Marzetta about 8:00 p.m., and there were multiple calls

19    thereafter.  Marzetta told him, according to his testimony,

20    make a traffic stop on a vehicle.  The vehicle may -- this is

21    Friddle relaying what Marzetta said:  The vehicle may or may

22    not have red lights in the grill area, but, Marzetta said,

23    they had probable cause -- according to Friddle, Marzetta said

24    they had probable cause for a narcotics offense, but they

25    didn't tell Officer Friddle that it allegedly occurred three

1   weeks and a day earlier.  But what he did tell him, per
2   Friddle, Marzetta said it was from a previous traffic stop,
3   which is absolutely false.
4           No further description is given, Judge.  We saw
5   this -- we see a map with the -- of the car on Union Street
6   quite a distance away.  I would disagree with Mr. Haxall; that
7   street is a very busy street.  As you can see from the dash
8   cam video, numerous cars were in front of Mr. Haldorson's car.
9   He was the seventh car in the right-turn lane.  And, Judge,
10  what you know is there were no red lights in the grill area,
11  no red lights in the hood vent area.
12          And I'm going to show you what's been admitted as
13  Defendant's Exhibit 1, Judge.  This is Officer Friddle's
14  report from that evening as to why he stopped Michael
15  Haldorson's car.  Judge, the primary reason for the stop,
16  according to this report, is an equipment violation.  That's
17  what the report says.
18          And to the right of that, it indicates that there was
19  a written warning given to him.  Nothing about the drugs,
20  Judge.  Indeed, where it says -- and I'm indicating here, Was
21  a search requested or performed?  No, no search performed.
22          And so this is -- and I would add one more thing
23  about Defendant's Exhibit 1, Judge.  At the bottom, he
24  indicates improper lights, which was the basis of this
25  equipment violation.

1  And, Judge, the government has provided you with the
2  statute 625 ILCS 5/12-212, which basically says that no person
3  shall drive or move any vehicle or equipment upon any highway
4  with any lamp or device on the vehicle or equipment displaying
5  a red light, a red light visible from directly in front of the
6  vehicle.

7  Judge, what we have here is absolutely proof that
8  there was no red light from the grill area.  You can see it on
9  this photograph.  It's Defendant's Exhibit 6.  It's taken from
10 the dash cam.  It's a screenshot from the dash cam camera
11 after the turn onto Fort Beggs Drive.  Judge, you see multiple
12 lights in that picture -- you see lights on other vehicles,
13 you see lights on Mr. Haldorson's vehicle -- but you see
14 absolutely nothing coming from the grill area, Judge, or the
15 hood vents.

16 And how do we know that, Judge?  We know that because
17 we introduced Defendant's Exhibit 7, which is what it looks
18 like, what the grill -- the hood vents and the grill area look
19 like when the accent lights are engaged.  And we remember
20 they're engaged on a toggle switch that is only accessible by
21 lifting the hood and turning it on.  So it's not as if Mr.
22 Haldorson had the -- the ability to control an on-and-off
23 switch on those grill lights.  This is indisputable evidence
24 that there's no basis for the stop based on a traffic
25 violation.

1     Judge, it's classic pretextual stop.  And, indeed,

2   Mr. Haldorson did say something on the dash cam to Officer

3   Friddle, saying something about red lights on the front, and

4   it's clear that Mr. Haldorson misunderstood him, as he

5   testified, Judge.  The picture shows they weren't on.

6     But this is what Mr. Haldorson understood him to

7   mean.  He separately had installed, even earlier than -- June

8   5th, I think it was, of 2015, a floorboard light system that's

9   always on.  Any time the car is engaged, the ignition is on,

10   those bottom lights are on.  When he heard Officer Friddle say

11   that, that's what he thought he was alluding to, and that's

12   why he said yes, lighting in the floorboard area.  That's what

13   he understood Friddle to mean.

14     What happens next, Judge?  Well, what happens next is

15   a series of questions by Officer Friddle:  Were you just at

16   the car show?

17     Were you just at the car show?  How did Officer

18   Friddle know that, Judge?  It must have been communicated to

19   him by Insley or Marzetta.  He must have been told that.  And

20   how do we know that?  Well, there was Plainfield cruise nights

21   that evening, and Mr. Haldorson was out there standing next to

22   his vehicle showing off his car with the hood up and his new

23   accent lights.  And how do we know that, Judge?  Well, let's

24   go to Insley's grand jury testimony when the case was in Will

25   County.

1          What happens?  This is what Insley says:  On the

2    23rd, there was a -- we were out doing surveillance.  We seen

3    Mike Haldorson standing around his vehicle.  We had a marked

4    squad car seen him do a traffic infraction.  Basically, he had

5    an equipment violation.  We pulled him over, and then we

6    placed him under arrest at that time for previous charges,

7    which was on the 1st.

8          Judge, this -- at the very beginning of this case,

9    you asked me to make an opening statement, and I said I was

10   going to have difficulty making it because I didn't know what

11   they were going to testify to in this case because there's

12   been a fluid sequence of stories as to what's been going on in

13   this case.  This, while still in Will County, indicates CI

14   wasn't even involved on June 1st, Judge, that they had done

15   surveillance.  And this --

16         THE COURT:  This transcript comes from where again?

17         MR. LIPUMA:  This comes -- and I'll go to the front

18   page, Judge.  This is the Will County -- in the Circuit Court

19   of Will County.

20         THE COURT:  The state grand jury.  Okay.

21         MR. LIPUMA:  Yes, Judge.

22         THE COURT:  Go back then to the testimony.

23         MR. LIPUMA:  This is what Insley testifies to from

24   the ASA.

25         THE COURT:  So his testimony is, we saw him do a

1    traffic infraction, the equipment violation.

2              MR. LIPUMA:  Yeah.

3              THE COURT:  We pulled him over, and then we arrested

4    him for the June 1st previous charge, quote, unquote.

5              MR. LIPUMA:  Yes.  Not arrested him for anything that

6    happened on June 23rd, Judge.  He's referring to June 1st.

7              And what's also significant about this, Judge, is it

8    fits exactly with where Mr. Haldorson was.  He was at the

9    Plainfield cruise night, they saw him there, they saw him

10   standing by his vehicle, and they said, it's time to take down

11   Mike Haldorson.

12             How does Friddle proceed, Judge?  Did you get in a

13   pissing match with someone?  Did you do a burnout?  The guy

14   said to look for a -- there was a sweet G8 with red lights,

15   took off fast and squealed his tires.

16             He told Mr. Haldorson multiple lies.  He said, wait

17   for the officer to come.  If he's not here, you'll be out of

18   here -- if it's not you, you will be out of here in 30

19   seconds.

20             Then he lied about the warrant because Marzetta told

21   him to lie about a warrant.  We can hear it on the dash cam,

22   Judge.  Marzetta tells Insley, Tell him he's got a warrant.

23             We know that Haldorson didn't have any warrants,

24   Judge, because you can hear on the dash cam recording the

25   dispatch communication and basically getting the all clear on

1   Haldorson.  Sure, he has a prior criminal history.  He has a
2   couple drug cases.  He's not a violent man, though.  But they
3   said -- they told him he had a warrant supposedly to put him
4   at ease because Haldorson was possibly armed.

5        Judge, their approach on Mike Haldorson on June 23rd
6   betrays that claim.  There's not a single report, Judge, in
7   Friddle's contemporaneous report about a possible gun.  It's
8   not in Marzetta's report either, Judge.  Judge, if they were
9   told about a gun, I respectfully submit that there would be
10  greater safety measures that would have been put in place
11  here.  At a minimum, Judge, two officers would have approached
12  that car with their guns drawn, probably.  But, no, Friddle
13  proceeded alone, gun snapped in holster, and I respectfully
14  submit that law enforcement doesn't proceed like that when
15  they believe a suspect is armed and dangerous.

16       Then what happens?  Well, then Marzetta lied to
17  Haldorson three times, saying, you got a warrant, you got a
18  warrant, you got a warrant.

19       How did Michael Haldorson handle all this?  Full
20  compliance with the law, Judge.  No traffic violations, no
21  warrant.  He gave his driver's license with the proper
22  identification.  And then they searched him, and they took
23  custody of his cell phone and some money off him.  And you'll
24  remember, Judge, that Marzetta testified that he searched
25  Haldorson, but as we pointed out to impeach him again, he's

1  not searching Haldorson.  Friddle is searching Haldorson.
2  This is Marzetta here to the left.

3  　　　　　THE COURT:  Marzetta is the one holding -- it looks
4  like he is talking on the radio?

5  　　　　　MR. LIPUMA:  Yes, your Honor, all the way to the
6  left.  And between him and Haldorson is Friddle conducting a
7  pat-down search.

8  　　　　　And I want to just make a real quick comment about
9  the fact that, you know, the cell phone was taken from
10 Mr. Haldorson at this time, which I'm going to get back to,
11 Judge.  But I'm also going to get -- I'd also like to comment
12 on $2,000 was taken off of Mike Haldorson at this time, and
13 you heard Mr. Haxall cross-examine Mr. Haldorson about that as
14 if to make it sound like he was some big drug dealer.

15 　　　　　But the bottom line, Judge, is you need to have that
16 information before the seizure occurs.  This is after-the-fact
17 probable cause, propping up probable cause by saying, well,
18 look what we found after the fact.  Look at the fireworks.
19 Look at the couple --

20 　　　　　THE COURT:  Honestly, you don't need to spend much
21 time on that argument.

22 　　　　　MR. LIPUMA:  Okay.  I'm going to proceed, Judge, then
23 to another exhibit we entered, which was this, and it probably
24 is like bizarre, like why are we -- why are we submitting
25 this?

1      Well, this is a picture, Judge, another extraction

2   from the dash cam video.  And what this shows is Marzetta, the

3   officer who saw the grill lights on June 1st when they weren't

4   even installed then, with another man in the picture, Judge,

5   and that's a Joliet police officer.

6      And the Joliet police officer, Judge, is there

7   because they did not know which way Haldorson was going to go,

8   despite their protestations that there was this ongoing

9   conversation and they knew this deal was going to go down in

10  Plainfield Central High School.

11      First of all, Judge, it belies common sense to think

12  that any person who sells drugs would do so in a school zone

13  because everybody knows penalties get enhanced there.  But

14  that's not my primary argument.

15      My primary argument is this, as it's shown in the

16  dash cam video, Judge, as you can hear it in the dash cam

17  video, how did you know which way he was going to go?  He was

18  going to go one way or the other, they said.  He was going to

19  go one way or the other, meaning they didn't know which way he

20  was driving, contrary to what they're telling you, that they

21  were meeting at the high school to do a drug transaction.

22  That's the significance of the Joliet police officer, Judge.

23      And I take strong issue -- I'll ask the Court to take

24  judicial notice of -- here's our map, Defendant's Exhibit 5.

25  You can see Fort Beggs Drive, Judge.  But I don't have that

1   map with me that the government has.  But I can tell you,

2   Judge, take judicial notice of the fact, because Fort Beggs

3   Drive leads to River Road, which goes southwest into Joliet,

4   depending on what route you take.

5           Joliet is a very big city.  It's one of the largest

6   cities in Illinois.  Mr. Haldorson could have arrived at

7   Joliet from perhaps any of those three options.  Joliet Road

8   goes to Joliet, 66 goes to Joliet, and Fort Beggs where the

9   River Road bends goes to Joliet.

10          The government had the opportunity to cross-examine

11  Mr. Haldorson, Judge, and pinpoint the location of Jessica's

12  or Jennifer's home.  They didn't.  They passed on it because

13  he could have pointed out or it would have been pointed out

14  precisely where she lived.  That's on them that they didn't

15  follow up on that.

16          Judge, there was absolutely no evidence that the CI

17  was involved in that case.  The CI was not even with Insley.

18  And let's just get started on the CI.

19          The CI started cooperating in 2014, your Honor.  And

20  we know that because his ID number is 14, dash, and then

21  numbers following, and that indicates what year they signed

22  up.

23          Insley was the control agent of this CI, Judge,

24  although there was a contradiction between Insley and Marzetta

25  as to who had the first control or contact with this

1   particular CI.  Neither -- Marzetta certainly doesn't want to

2   touch him because he denied it; whereas, Insley said he had

3   the initial -- that Marzetta had the initial contact with the

4   CI.

5        And I submit, Judge, that Insley lied when he

6   testified that the CI was working for money.  In fact, he was

7   working off an arrest, setting up people as Insley demanded.

8        And, Judge, you asked the government to provide you

9   with the CI's file in camera following the last hearing, and

10  I'm assuming that's been done.

11       THE COURT:  You know, I forgot to bring that up.

12  I've got it here, and I wanted to ask a question about it.  Do

13  you mind me interrupting you for a second?

14       MR. LIPUMA:  No, Judge, not at all.

15       THE COURT:  I planned to do this at the beginning.  I

16  just need to make sure we have a clear record of the purpose

17  for which I was looking at this.  I know I asked for it, and

18  it came up after a couple of sidebars --

19       MR. HAXALL:  My recollection, your Honor, maybe

20  Mr. Wallach can speak to this as well, is that you wanted to

21  confirm that there was no reference to the arrest that

22  purportedly occurred shortly before the events in question

23  here.

24       THE COURT:  And that's what I remembered.

25       Is that consistent with your understanding also,

1  Mr. Lipuma?

2  MR. LIPUMA:  Judge, I think you were going to look at

3  the CI file for completeness, for one, but --

4  THE COURT:  How would I ever know if it's complete?

5  MR. LIPUMA:  And that's the point, Judge.  And I

6  submit it isn't complete because based on --

7  THE COURT:  How would you know if it's complete?

8  MR. LIPUMA:  Because the government told me.  They --

9  THE COURT:  That it's not complete.

10  MR. LIPUMA:  Well, they said the -- it is not

11  complete, Judge, because they said the Peoria arrest of the CI

12  10 days before June 1st, when they set up Haldorson, that's

13  not contained in that -- it's not contained in the CI's file.

14  That's what they told me.  So how can that not be in the CI's

15  file?

16  THE COURT:  Okay.  So there's complete and there's

17  not complete.  When you say it's not complete, if you mean it

18  doesn't include all of the information that is out there in

19  the world regarding the CI, I suppose everybody would agree

20  with that.

21  If you mean by "not complete" that this isn't the

22  entire file and that something was withheld, that's a whole

23  different meaning.  Both are within the meaning of "complete."

24  So which do you mean?

25  MR. LIPUMA:  I can't speak to the latter, but I

1   certainly am affirmative on the former.

2           THE COURT:  Okay.  So maybe if you can just tell

3   me -- and, again, I apologize for interrupting the argument --

4   but Mr. Haxall or Mr. Wallach, whoever wants to do it, if you

5   can tell me, if you will, what the provenance of the -- of

6   this --

7           MR. HAXALL:  My recollection, your Honor, is that the

8   criminal history in the informant's name, and there's also one

9   under the alias -- which, to be honest, I have no idea why

10  that's even run -- the alias that they give for use is also --

11  they include one there.  The one for the informant's true name

12  was -- the date on it, I believe, is January.

13          MR. WALLACH:  I think it's either December or

14  January.

15          MR. HAXALL:  So it's prior to the alleged Peoria

16  arrest.

17          THE COURT:  Depending upon -- and a lot of this is

18  just kind of a printout that's in -- you know, I don't want to

19  say "code," that's the wrong word, but just --

20          MR. HAXALL:  I believe it's the LEADS check or

21  something --

22          THE COURT:  Yeah, it's a LEADS check.  The date

23  12/23/14 or what appears to be the date 12/23/14 appears all

24  over the thing.

25          MR. HAXALL:  And if you look at the actual content,

1  there's no reflection of an arrest contemporaneous with that.

2  THE COURT:  And that is correct.

3  MR. HAXALL:  Yes.  And that was our understanding of

4  what the Court was looking for.  I will tell the Court that we

5  asked the Illinois State Police to provide the CI file, and

6  this is what we were provided.

7  THE COURT:  And then there's another set of documents

8  that have what -- again, appears to be a date of 1/6/15.  So I

9  assume that would be January 6, 2015; 01/06/15.  And that,

10  likewise, didn't have any reference to the Peoria.  I mean, I

11  look at what I have, and there was no reference to it.

12  MR. LIPUMA:  Judge, may I ask one question about the

13  contents of that?  Can I ask what the CI's number is listed

14  as?

15  THE COURT:  You could if I can figure out where to

16  find it.

17  MR. HAXALL:  It might be on the front sheet, your

18  Honor.

19  THE COURT:  All right.  Let's see here.  So

20  14-15828WCA.  I assume "WC" means Will County.  And it gives a

21  name, and it gives the name of Insley and his ID number.  And

22  that's on -- there's a closed -- there's what's called a

23  closing file, a closing document, administrative closing dated

24  12/9/2015.

25  There is another document with the same CI number

1    dated November 12, 2015, which identified him as currently

2    active.  There is a personal history report, which is a couple

3    of pages long.  It has the same CI number, 14-15828, gives a

4    whole bunch of identifying information.

5         There's what -- I mean, I don't know what the guy

6    looks like, but it appears to be a couple of pictures of him,

7    also with the identification of 14-15828.  There's

8    fingerprints with that same ID number.

9         And then the LEADS reports, which is basically

10   every -- pretty much everything else, obviously, you don't

11   have that number on it.  There is an Illinois State Police

12   confidential source report, which is like the agreement, same

13   ID number, 14-15828.  That's dated from 12/23/2014, which

14   happens to be the same date as the first -- or the LEADS

15   report.

16        There's a couple of investigative reports bearing

17   dates in late December 2014, likewise with the same CI number,

18   14-15828.  There's documentation of a payment regarding the

19   arrest of somebody else, it appears.  Same ID number.  A

20   couple reports like that.

21        And then there's a report of a payment relating to

22   Mr. Haldorson, $50, on June 3rd, 2015.  Same ID number.

23        So anyway, the same ID number appears on all the

24   documents.

25             MR. LIPUMA:  Judge, that's obviously contradictory to

1    what we received in this case.

2            THE COURT:  What's contradictory to what?

3            MR. LIPUMA:  The CI number, Judge, because the CI

4    number we received in this case, and it's evidenced by the

5    Bates stamp at the bottom here, United States v. Michael

6    Haldorson, 15 CR 623, in fact, it's indeed --

7            THE COURT:  Isn't that the one that the guy said was

8    a mistake?

9            MR. LIPUMA:  No.  This is the one that they -- this

10   is the one they've been proceeding under, 14-12947.  This is

11   the one that was produced after, Judge, after 15828.  This is

12   what was produced to Mr. Haldorson in Will County.  There's no

13   Bates stamp here.

14           THE COURT:  So you're saying "this," and I know what

15   you're talking about.  The transcript doesn't.  So what's the

16   "this"?

17           MR. LIPUMA:  Oh, I apologize.

18           THE COURT:  Yeah.

19           MR. LIPUMA:  Judge, I'm showing you two identical

20   reports, two identical reports prepared by case agent Insley,

21   both indicating, Document the purchase of Exhibit 1, document

22   the purchase of Exhibit 1.  The one I started with, Judge, was

23   the one we received in federal court in discovery in this case

24   as reflected by the Bates stamp at the bottom of the page.

25           THE COURT:  That has a different ID number from the

1    one I read.  It's 14-12947.

2          MR. LIPUMA:  And, Judge, we would move --

3          THE COURT:  Hang on a second.  Then you put up

4    another one.

5          MR. LIPUMA:  This is what -- this is what

6    Mr. Haldorson received in state court in which we did not

7    receive from the federal government in this case.

8          THE COURT:  And that had -- the text of the report is

9    the same, it just has a different ID number, or no?

10         MR. LIPUMA:  Judge, exactly the same.  It's a

11   two-page report, Judge, containing a lot of information,

12   identical information.

13        THE COURT:  Okay.  I get it.  So, basically, what

14   you're telling me is that the report that you got in this case

15   has a different informant ID number from what the informant

16   file has.

17        MR. LIPUMA:  Yes.

18        THE COURT:  So without being flip about it, so what?

19        MR. LIPUMA:  Well, Judge, first of all, I would move

20   to have the government produce to you the CI file for --

21        THE COURT:  The other ID number?

22        MR. LIPUMA:  Yes, sir, Judge.  Yes, sir, Judge.  For

23   the other ID number.  I would ask that that CI file be turned

24   over as well because we have two different CI numbers.

25        Judge, I'm going to tie this up for you --

1        THE COURT:  Okay.  Keep going.

2        MR. LIPUMA:  -- but I'm telling you, what we have

3  here is a out-of-control case agent in Insley who's very

4  reckless, indeed, intentionally so, in dealing with his CI,

5  and he's concealing something here with these different --

6  with these different CI numbers, Judge, relating to the very

7  first incident in this case.  It's very suspicious, Judge.  In

8  my too many years being in this practice, I have never seen

9  anything quite like this in my life.

10        And how do we -- how can I say, Judge, it's

11  misconduct?  I can say it because of this.  This is --

12        MR. HAXALL:  Objection.

13        THE COURT:  Okay.  Hang on a second.  Take it off the

14  screen.

15        MR. LIPUMA:  I apologize.

16        THE COURT:  Let me put it up so only me, you, and the

17  government can see it.

18        MR. LIPUMA:  I do apologize.  I forgot.

19        THE COURT:  Yeah, you wouldn't have known that the

20  screens behind you were on, so let me just turn those off.

21        MR. HAXALL:  I'd just ask that counsel provide it to

22  the Court.  I don't need to see it.

23        THE COURT:  Just hand it to me.

24        MR. LIPUMA:  It's in evidence, Judge.  We did submit

25  it as part of our package of materials.

1        THE COURT:  So it's Defense Exhibit 3.

2        I tell you what.  I have --

3        MR. LIPUMA:  You have my exhibit.

4        THE COURT:  I have your exhibits.  You keep it.

5        MR. LIPUMA:  Yes, Judge.

6        Judge, this is why the CI's file is so important,

7   because there's something beyond reasonably suspicious here.

8   There is --

9        THE COURT:  Time out.  This is the person -- the

10  person who is identified in Defendant's Exhibit 3 --

11       MR. LIPUMA:  Yes.

12       THE COURT:  -- is the person you understand to be the

13  CI?

14       MR. LIPUMA:  Yes, Judge.  He is the CI.

15       MR. HAXALL:  Judge, just -- I would ask if the Court

16  doesn't put on the record confirming -- there's two reports

17  there, Judge.  One under the alias they gave him, and there's

18  one under his accurate name.  There's two different LEADS

19  reports there, Judge.

20       THE COURT:  I want to make sure I'm understanding

21  this.

22       So I'm going to tell you.  At this point, the defense

23  is absolutely entitled to the CI file.  It's just not even a

24  close question.  I am not crediting all of the implications

25  that Mr. Lipuma is drawing for it, but there's just too many

1   discrepancies here.  I mean, seriously.

2         He's going to get the file, I am going to make a copy

3   of it for him myself, and I will give it to you after the next

4   break.

5         The personal history report has two names for the CS.

6   It has the CS name, which is one thing, which is not the name

7   on Defense Exhibit 3.  Then there's a section that says

8   "descriptive and identifying data," which says full name,

9   which is the name that's on Defense Exhibit 3.  So I assume

10   what that means is it's an alias or he uses two names or

11   something like that.  I don't know.

12         But through -- when he's -- you know, so some of the

13   documents in this file list him under one of the names, and

14   some of them list him under the other.  They all have the same

15   identification number that I quoted earlier.

16         MR. HAXALL:  Judge, I would ask when you provide it

17   that it would be for counsel's eyes only.

18         THE COURT:  Yeah.  For now, at least, it's attorneys'

19   eyes only.  But, yeah.  So he's a name and his true name.

20         Anyway, go ahead.

21         MR. LIPUMA:  Judge, we have this -- how this

22   information is not in the CI's file indicates to me that there

23   is police misconduct here because the CI is not being handled

24   in an appropriate manner.  It is required for controlling

25   agents to document such information, Judge.  And I'll get to

1   the Illinois State Police report in a minute, but what we have

2   here, Judge, is -- and I think that's why we need two CI files

3   for both of those numbers to see if that CI has a different

4   number as well and if this information is in that other

5   number.

6          What we know is 10 days before the June 1st

7   transaction, which has not been produced in discovery and not

8   disclosed ever to us, this is our legwork.  We found that out.

9   The government didn't tell us --

10         THE COURT:  What's the "that"?

11         MR. LIPUMA:  The arrest 10 days earlier, Judge.

12         THE COURT:  All right.  Okay.

13         MR. LIPUMA:  Yeah.  Never -- the government didn't

14   tell us this.  We had to find this out.  And under Kyles v.

15   Whitley, Judge, the government is required to do this, and the

16   fact that their agents -- I'm not saying anything about the

17   two prosecutors at this table except they're doing their job,

18   but the misconduct of the police officers is imputed to the

19   prosecution team.

20         THE COURT:  So pause for a second.  I mean, I

21   certainly agree that that's information that, you know, ought

22   to have been in the person's file at some point.  We'll just

23   sort of be agnostic at this moment on exactly when, you know,

24   whether it's two days after the arrest or 10 days or two

25   months or whatever.  So my question, my question is what -- I

1       just want to refer back to something you just said.

2               So when you're talking about Kyles v. Whitley, I

3       mean, Kyles v. Whitley basically talks about, you know, who

4       all on the team -- how far the obligation runs to turn over

5       exculpatory and impeaching information.

6               So it's impeaching if the government is going to call

7       this person as a witness, which they are not.  So that comes

8       out of the picture.  Then the other is exculpatory.  How is

9       this exculpatory?

10              MR. LIPUMA:  Well, Judge, first of all, the

11      government has presented to Magistrate Judge, I think,

12      Finnegan in this case in the original complaint the CI's

13      criminal history, which did not include this.  Would Judge

14      Finnegan have issued the criminal complaint if she had known

15      --

16              THE COURT:  What you're saying is that evidence that

17      reflects a potential misstatement used to obtain an arrest

18      warrant is Brady material.

19              MR. LIPUMA:  It is, and when you -- I apologize.

20              THE COURT:  Even if -- I mean, what's the interval

21      between the arrest warrant and the return of the indictment by

22      the grand jury?

23              MR. LIPUMA:  I don't think it was that significant a

24      period of time, Judge.

25              THE COURT:  So then what's the -- I mean, if we want

1    to talk about this in Fourth Amendment terms, okay, because

2    you're talking about Franks, so then the question would be,

3    okay, fine, maybe the -- maybe the grand jury indictment

4    purges whatever issue there would have been from the arrest

5    that was obtained pursuant to the warrant that was obtained as

6    a result of not disclosing the full criminal history, assuming

7    that that information is imputed to the person who filled out

8    the criminal complaint or the application, which I am not

9    necessarily buying off on.  That would be significant only if

10   some evidence had been obtained probably from Mr. Haldorson in

11   the interim period.

12            And I don't think any -- is anybody saying that he

13   made any kind of a statement or admission between the date of

14   his arrest and the date of the indictment?

15            MR. LIPUMA:  The date of the arrest in federal court?

16            THE COURT:  The arrest is probably October the --

17            MR. LIPUMA:  No, Judge.

18            THE COURT:  -- the 13th or 14th of 2015.  And then

19   the indictment gets returned about a little less than two

20   months later.

21            So, I mean, I get what you're saying.  I get what

22   you're saying, but --

23            MR. LIPUMA:  But, Judge --

24            THE COURT:  And, again, I got to put this in the

25   context of what it is that I'm being asked to do here.

1          MR. LIPUMA:  Okay.  And this, Judge, will take me

2    back to Insley, because we are attacking Insley's credibility

3    here.  And he got up on that witness stand, and when I

4    confronted him with that, he said, oh, yeah, I remember now, I

5    just remembered now, that my CI was arrested.  And, in fact, I

6    questioned him, he was also convicted.  He pleaded guilty.

7    Yeah, he did plead guilty too.  But none of that's in the

8    file.

9          So this goes to the very core of this investigation,

10   Judge.  I have very -- and I think the evidence supports

11   this -- we have very strong concerns about the CI's

12   involvement in this case, particularly when the government is

13   saying the CI was present on June 23rd when the evidence

14   establishes he wasn't.

15         THE COURT:  Okay.  So where this is going as it

16   relates to the matters that are before me right now is that

17   this is basically part of your argument that what the officers

18   are saying happened on June 23rd did not really happen?

19         MR. LIPUMA:  And June 1st.

20         THE COURT:  Okay.  Fair enough.

21         MR. LIPUMA:  And June 1st.

22         THE COURT:  But that's how it ties into what we are

23   talking about here.

24         MR. LIPUMA:  It does, Judge.  It does.

25         THE COURT:  Government misconduct in the air

1 somewhere doesn't really matter unless it relates to what I
2 have to decide, right?

3           MR. LIPUMA:  Right, Judge.  And I believe you even
4 heard Insley testify in my follow-up cross-examination that
5 this information would be valuable to a defendant in a
6 criminal case.

7           THE COURT:  Yeah, you said that, for sure.

8           MR. LIPUMA:  It's something a defense attorney -- to
9 conduct a proper investigation for due process consideration.

10           THE COURT:  Yes, but there's -- okay.  You're missing
11 my point.  There is no motion before me that says, dismiss
12 indictment because the police did A, B, C, D, and E and my due
13 process rights have been violated.

14           What's before me is a motion to suppress evidence
15 that's derived from allegedly improper stop of the car and
16 allegedly illegal search of the car and allegedly illegal
17 entry and search of the apartment and the bedroom.  That's
18 what's before me.

19           MR. LIPUMA:  Okay.

20           THE COURT:  So, in other words, let's say, for
21 example, that Insley, you know, had, you know, killed his cat
22 two weeks before this.  It may mean he is an awful person, but
23 unless it has something to do with something I have to decide,
24 unless you can tie it to that, it doesn't really make much
25 difference, does it?

1          MR. LIPUMA:  Well, Judge --

2          THE COURT:  So, again, what I am trying to do is

3    let's tie this into something that I am dealing with it.

4    Let's pull the threads together, in other words.

5          MR. LIPUMA:  And I'm trying to do that, and I think I

6    will tie it up for you at the end, Judge.  But, basically what

7    we're looking at is a corrupt cop.  He's a corrupt cop with

8    the CI and committing perjury in this courtroom and getting

9    his fellow officers to cover for his misdeeds.  All of this

10   goes to credibility, to the integrity of the investigation, to

11   the accuracy of their recounting to the Court of what they did

12   in this case.  And that all implicates Mike Haldorson's Fourth

13   Amendment rights.

14         THE COURT:  Is Insley the -- I'm momentarily blanking

15   on this.  Is Insley the one who testifies about overhearing

16   the conversation or what he says is the conversation on

17   June 23rd?

18         MR. LIPUMA:  Yes, Judge.

19         THE COURT:  All right.

20         MR. LIPUMA:  And I'm going to get to that.

21         THE COURT:  Okay.  Now I'm getting it.

22         MR. LIPUMA:  Great.  Thank you so much, Judge.  Thank

23   you.

24         And let's go on to -- we did the June 1st report with

25   the two different CI numbers.  Now we have the June 23rd

1　report called Purpose to Document the Attempted Purchase of

2　Cocaine with Mike -- from Mike Haldorson.

3　　　　　Now, this report by Insley also is suspect, Judge,

4　very suspect, and -- because this is the report that was not

5　prepared.  This report was not prepared.  When the case was

6　presented --

7　　　　　THE COURT:  You can go back to using the ELMO again.

8　　　　　MR. LIPUMA:  Thanks, Judge.

9　　　　　THE COURT:  It's helpful for me to see what you're

10　talking about.

11　　　　　MR. LIPUMA:  Yes, Judge.  Thank you.

12　　　　　This report, which is -- the reporting date says

13　June 23rd of 2015, and I'm pointing to where it says the date

14　this report was prepared, June 25, 2015.

15　　　　　Judge, this report was prepared on October 29, 2015.

16　　　　　THE COURT:  This is the one that was -- that was

17　testified was prepared at the request of --

18　　　　　MR. LIPUMA:  Exactly, Judge.  Exactly.

19　　　　　So why was it prepared like that, and why was the

20　date concealed from us?  Well, what does Insley say, Judge?  I

21　didn't prepare the report for June 23rd because I didn't want

22　it to go back on the CI.  I wanted to try to keep the CI out

23　of it.  That was his testimony.  And to some extent,

24　Mr. Haxall is bolstering that with his argument today.  And I

25　submit that is completely illogical, Judge, because we already

1   had the report -- we already had the report from June 1st,

2   wherever I just placed it.  We already had the report from

3   June 1st with the two different CI numbers which trace back to

4   the CI.  So it's an empty excuse on his part.  And that 6/1

5   report was produced in discovery by the government.

6           Indeed, Judge, Insley, you know, he said he didn't

7   want to go back on the CI.  Indeed, Judge, Insley didn't want

8   it to go back on himself.  He mishandled the CI, he lied about

9   the CI, and the government continues to say oh, he's

10  protecting the CI's identity.  Is he protecting the CI's

11  identity, Judge, or is he hiding the CI's identity, or -- and

12  is he hiding the CI's misconduct?  Because our legwork finds

13  that arrest and later conviction.  Or is he concealing his

14  mishandling of the CI?  These are all substantive, substantial

15  questions, Judge.

16          This brings us to something that we don't have a

17  document for, Judge.  Insley comes before you and says that

18  once Haldorson was pulled over, he's with the CI, and the CI

19  gets a text that says, I just got rolled up on, I'll be with

20  you in a few minutes.  This is the text --

21          THE COURT:  Yeah.

22          MR. LIPUMA:  Not documented in any manner, Judge.

23  Not documented in any manner.  Not a line in a single report.

24  No screenshots of that alleged text.

25          Judge, this is extremely valuable evidence, as you

1    know and as any experienced law enforcement officer would

2    know.  And they would document that.  They would take the CI's

3    phone and -- or subpoena the account for the text, but somehow

4    they -- or take a screenshot, you can take a screenshot of the

5    CI of your text -- of your phone.  Did nothing.  Did not

6    document it.  Nothing.

7           Judge, it did not happen in that manner.  And how can

8    I say it did not happen in that manner?  Again, because I

9    don't believe a thing Insley has to say here, because of this,

10   Judge, this report that I questioned him on.  This is another

11   report he wrote, that he actually did write, apparently, on

12   June 25th.  And I point down to the -- in red:  On Tuesday,

13   June 23rd, during the course of surveillance for a narcotics

14   investigation, 14-15828 contacted me and said that he knows a

15   person named Mike Jones, previously identified as Michael

16   Haldorson, would be in the area of Route 59 and Fort Beggs

17   Drive in Plainfield.

18          So I asked him, he contacted you.  And I said, did he

19   call you?  No, he couldn't say that, Judge, because he

20   supposedly --

21          THE COURT:  He's with him.

22          MR. LIPUMA:  He's with him.  He's with him.

23          So I asked him, how did he contact you?  Well, he

24   turned to me and he told me.  That's how he -- the language

25   matters in these reports, Judge.  It's important that

1 | language -- language has its common meaning. "Contact" means
2 | by phone call, by text. He wasn't with him. His own -- his
3 | own words betray him in this report, Judge. It's a ridiculous
4 | interpretation of the English language.
5 | THE COURT: So you infer what from this, or you think
6 | I should infer what from this particular thing? That he
7 | wasn't really with the guy?
8 | MR. LIPUMA: The CI wasn't there on June 23rd. The
9 | CI wasn't there. The government has a gaping hole in this
10 | investigation, and --
11 | THE COURT: Take your Post-it note off so I can see
12 | the next paragraph.
13 | MR. LIPUMA: I'm sorry.
14 | THE COURT: So is basically your theory of what
15 | happened was that the police had decided that that was the
16 | day -- "that" being June 23rd -- was the day they were going
17 | to arrest Mr. Haldorson, they were all there ready to go, and
18 | at some point, the informant who is somewhere else contacts
19 | him and says, okay, this is where Haldorson is going to be?
20 | MR. LIPUMA: I don't think -- we know the CI wasn't
21 | present.
22 | THE COURT: Yeah.
23 | MR. LIPUMA: And I say the CI wasn't even -- wasn't
24 | really even involved, because we don't know. This is what
25 | happened on that date, Judge.

1          THE COURT:  We were out doing surveillance, we saw

2  him standing around his vehicle.

3          MR. LIPUMA:  Nothing about the CI in state court,

4  Judge.  I mean, nothing about it in that testimony in the

5  grand jury in state court.  Nothing about it.

6          The CI -- the CI contacted me.  Even if he contacted

7  him, Judge, by text or phone, he lied in this courtroom by

8  saying, he was in the same car with me and told me these

9  things.

10          And here's another example, Judge, of Insley's lies.

11          THE COURT:  Do I have that report?  The CI contacted

12  me report, is that an exhibit?  The one that had all the

13  highlighting on it where it says, the CI contacted me, is that

14  report --

15          MR. LIPUMA:  I don't have that.  I cross-examined him

16  on this report, Judge, but it wasn't admitted into evidence.

17          THE COURT:  All right.  That was my question.

18          MR. LIPUMA:  Okay.  Here's another example.  And I'm

19  not -- the little things I'm skipping over, Judge, because

20  there were -- I could spend a day here going through the

21  contradictions between these officers, but I'm just giving you

22  the material points.

23          Let's talk about Mike Haldorson's cell phone, Judge.

24  It was taken from him on June 23rd.  You saw the pat-down.

25  Insley did not turn that into evidence until July 6th,

1   according to his report.  June 23rd and July 6th.  Ten, 11, or
2   14 days.  You get two different dates on there, Judge.
3           Here it is.  Here it is.  And I questioned him on
4   this as well.  To document evidence received for Exhibit 16,
5   reporting date 7/6, date 7/6, attachment, one evidence
6   receipt, one page.  And being entirely fair here, even though
7   this says June 6th, there is something here that says -- I'm
8   sorry -- it says July 6th.  Received as attached says
9   July 3rd.  So it was either turned in on July 3rd or July 6th.
10  So that's 10 days or some two weeks after the arrest and
11  seizure of Mike Haldorson and the seizure of his phone.
12          And then he lied about the Illinois State Police
13  evidence vault being closed and that's why it took him so long
14  to bring that in.  Judge, I showed other reports from other
15  officers where they were turning in their evidence between
16  June 23rd and July 3rd or July 6th.  And who would even think
17  that, Judge, oh, we have to all hold on to our evidence in all
18  of our cases because the evidence vault technician is not
19  available today or for a week because she's on vacation?  It's
20  ridiculous.  There's other reports showing that the evidence
21  was being logged in.
22          And that takes us to the phone, Judge.  This phone --
23  and I'm not sure what the status of the phone is before the
24  Court, but Insley said, he testified to this, Judge, he was
25  responsible for controlling that phone.  No one else said they

1    had that phone.  And Insley himself, when questioned about it,

2    he didn't know where that phone was during that period -- that

3    interim period.  He had amnesia --

4           THE COURT:  The "interim period" meaning after the

5    arrest and before this.

6           MR. LIPUMA:  Yes, exactly, Judge.  No one has had

7    accountability for that.  Where was that phone held?  And we

8    submit to you that Insley tried to break into that phone.  You

9    heard Mr. Haldorson --

10          THE COURT:  There's testimony from Mr. Haldorson

11   about how he kept getting messages about how he had five

12   attempts and three attempts and whatever.

13          MR. LIPUMA:  Thank you, Judge.  Yeah.

14          I don't know if that search warrant is still before

15   the Court, I wasn't his attorney at the time, but I understand

16   that there's still a potential search warrant before the Court

17   about --

18          THE COURT:  I issued it.  I don't know that it's

19   not -- no, I didn't issue it?

20          MR. HAXALL:  You said pending the determination here,

21   your Honor.

22          THE COURT:  Okay.  There we go.  I guess it is.

23          MR. LIPUMA:  Yeah.  So I'm asking the Court to not

24   allow them to grant -- to get a search warrant on that because

25   there's no chain of custody.  There's -- we have no idea where

1    that phone was.  It's corrupt in the process.  There is no

2    chain of custody on it, Judge.

3           And then what do we have?  We have in the affidavit

4    that's presented to your Honor from Agent Gallagher, who lied

5    to the Court.  Marzetta lying to the Court.  Insley lying to

6    the Court.  And now their ATF special agent's lying to the

7    Court, because this is the affidavit he submitted to you in

8    order to get --

9           THE COURT:  For this warrant.

10          MR. LIPUMA:  Yes, Judge.  This is document 156,

11   page 5.  For this warrant, the subject phone has remained in

12   the government's custody since Haldorson's arrest, which is a

13   lie.

14          THE COURT:  Okay.  Let's unpack that a little bit.

15   So I assume you're not saying by the government --

16   "government" only means federal government, right?  It

17   doesn't.

18          MR. LIPUMA:  Well, I -- first of all, I think

19   "government" technically means the federal government, but to

20   the extent he wants to argue --

21          THE COURT:  You don't call the government in the

22   state of Illinois a government?  And I am not asking for

23   political commentary there.

24          MR. LIPUMA:  I used to refer to the state when I'm in

25   state court, but it's not a big deal.

1        But the fact of the matter is --

2        THE COURT:  If you're talking about -- when you say

3   this is not correct, you're talking about that gap between the

4   23rd of June and the inventory report that shows it goes into

5   the locker on either the 3rd or the 6th of July.

6        MR. LIPUMA:  Combining with the Insley testimony and

7   the absence of any other testimony along these lines that no

8   one knew where that phone was.  And then you couple that with

9   the notification Mr. Haldorson is receiving about you have --

10       THE COURT:  I follow what you're saying.  I get it

11   now.

12       MR. LIPUMA:  Okay.  So no chain of custody, no

13   accountability, there should be no search here, Judge.

14       And then what else do we have?  Other

15   misrepresentations by Officer Gallagher -- or Agent Gallagher,

16   there's plenty.  The affidavit in support of the criminal

17   complaint and the other affidavits said Michael Haldorson

18   called the CI at 8:22 on June 23rd.  That's false.  Maybe just

19   a mistake.  But indeed, the CI called Mr. Haldorson, according

20   to the records.

21       Agent Gallagher also claimed in his affidavits to the

22   Court that officers were able to hear the speakerphone on

23   June 23rd and that officers reviewed the texts, rolled up on

24   texts, plural.  The only person who ever said that was Insley,

25   and we know the credibility of Insley at this point is

1   worthless.

2          Gallagher also falsely testified in the grand jury

3   about officers and the CI showed the text to them.  Judge,

4   frankly -- frankly, when it comes to the CI and their handling

5   of their law enforcement people in this case, I'm embarrassed

6   for the government because --

7          MR. HAXALL:  Objection, your Honor.

8          THE COURT:  It's an argument.  Don't worry about it.

9   Go ahead.

10         MR. LIPUMA:  Well --

11         THE COURT:  There's no jury in the box.

12         MR. LIPUMA:  It's a -- here's point one, Judge.

13  We -- and I can't show you this because it's a confidential

14  document, but Defendant's Exhibit 2 is in evidence, and you

15  have it before the Court.  It's an eight-page document.

16  Page 7 of that, termination of CS services.  Termination of --

17         THE COURT:  Oh, these are the guidelines.  Yeah,

18  right.

19         MR. LIPUMA:  Yes.  And what does it say?  It says,

20  The ISP designates the CS is undesirable because he or she

21  commits an unauthorized criminal act.  Okay?

22         And then after that -- and then after that -- so

23  rather than the government being upset with Insley and Ladd

24  and them, and we now get this lecture that they are going to

25  get a stern one-sided talking to about it, instead of handling

1  business, Judge, they want to protect him by saying, oh, it's
2  just a discretionary call.
3        So when they found out, Judge -- and this goes back
4  to your question.  I'm looping back to how does this all
5  affect the Fourth Amendment analysis.  Because 10 days before
6  the June 1st deal, he's arrested, and they should have
7  terminated him for that.  They didn't even document it, Judge.
8  We haven't seen one shred -- I've already covered that.
9        But then the government -- the prosecutor calls
10 himself a dopey AUSA.  Oh, I am a dopey AUSA.  I didn't notice
11 a difference and I didn't produce it in discovery, meaning the
12 two different CI numbers.  He's not a dope.  He's not a dope.
13 I am not saying he's done anything wrong except taking this
14 case because they begged him to take this case because I bet
15 you he regrets taking this case at this point.
16       MR. HAXALL:  Objection.
17       THE COURT:  Well, okay.  Now I need to tell you
18 there's no jury in the box, okay?
19       MR. LIPUMA:  Okay.  Okay.  Judge, we got this --
20       THE COURT:  And it's not my first rodeo.
21       MR. LIPUMA:  I get it, Judge.
22       You know, the CI reports, unfortunately, he never
23 told anybody about it, didn't document it in any manner, and
24 they didn't give us two identical reports, with the exception
25 of the CI.

1    What they're doing here, Judge, they're not dopey.
2  They're enabling.  They're enabling Insley to commit a deceit
3  in this courtroom under oath in order to save a prosecution.
4  You don't make excuses for an officer of this ilk, Judge.  The
5  minimum you do is you go back to your office, and you open up
6  a Giglio file on this cop, and you report him to the Illinois
7  State Police or whatever department he's with now, because
8  everything he's done has run counter to DOJ directives in law.

9    And I would add in a second hearing, Judge, that
10  supervisor Ladd came in, who was Insley's supervisor.  He was
11  just as evasive and contradictory as Insley.  Remember I asked
12  him, do you remember if a CI caught a case or was he simply
13  working for money?  I don't remember.  It could be either.
14  But for sure, he said he didn't disclose it to the U.S.
15  Attorney's Office.

16    Here's supervisor Ladd, Judge.  He sends drafts back
17  to his officers when he notices grammatical errors and typos,
18  yet he didn't submit Insley's report back to Insley when he
19  had two different CI numbers.  No, he just let that go and
20  didn't tell anybody.

21    He didn't have any problem with Insley preparing a
22  report on October 29th and claiming that he prepared the
23  report on June 25th.  No problem with that either.  Does not
24  remember if Insley told him about the CI's arrest 10 days
25  before the controlled delivery but never documented if he did.

1     It's perfectly fine with none of this being

2  documented at all.  It's perfectly fine with law enforcement

3  not informing prosecutors about any of this information and

4  indeed covering it up.  And, again, the government is

5  responsible for this under Kyles v. Whitley.

6     And let's not forget, Judge, this is Ladd who said

7  there's no difference in a report where he said the door was

8  closed as opposed to locked or open as opposed to unlocked.

9  He's got conflicting reports on the way he entered Mike

10  Haldorson's bedroom, and as the government admits, he's also

11  got conflicting statements between his reports and affidavits

12  as to the timing of certain events.

13     What happened on June 23rd, Judge, is Insley saw

14  Haldorson standing by his car.  There's nothing about a CI.

15  There were no previous charges, as he said in state court, as

16  he testified in state court.  We know Haldorson was at

17  Plainfield cruise nights with his car.  We know Haldorson's

18  getting a barrage of calls and texts from the informant.  He

19  refused to meet up with him.  He had plans with a friend in

20  Joliet, and Haldorson was proceeding to meet that friend.

21     Like I said, Fort Beggs Drive turns southwest and

22  becomes River Road and heads towards Joliet.

23     Judge, Mr. Haxall brought up the fact, well, the

24  informant didn't testify to these things, and that's indeed

25  true.  Indeed, the informant didn't appear in court and

1    testify.  And that's not on us.  The government has the burden
2    of proof to bring this information in.  When they saw this
3    case bloating up and where we were going with it and the
4    responsibility that Insley had to this informant, it should
5    have been the government's responsibility to bring that
6    informant in here and have him testify.  But they didn't bring
7    him in here.  They are not carrying their burden of proof,
8    Judge.

9           About the warrantless search of Haldorson's
10   residence, Judge, we know this.  The Illinois State Police --
11   and this is Defense Exhibit 13 -- we know -- we know they --
12   we know they entered this home illegally.  As you can see,
13   this is the entrance on the street to the apartment.  You see
14   that there's two locks there, Judge.  This is another view of
15   it with both locks.

16          Obviously, there was some claim here by the
17   government that Ms. Figas was asleep upstairs and she
18   ultimately let the agents in there.  And that's true.  We are
19   not contesting the voluntariness of the search of the common
20   area.

21          And to the extent the government says there's an
22   intervening point here between the illegal entry at the street
23   door level and getting that consent, I am going to agree with
24   the government, Judge.  There is -- there is that intervening
25   event because nothing was seized as they went up the

1    staircase.

2         But the point is, Judge, that was an area of their

3    apartment, and there was a reasonable expectation of privacy

4    even in that staircase because, as you heard from

5    Mr. Haldorson, there were three doors at the top of that

6    staircase, and one of those doors was a closet where they kept

7    their coats, unlocked.  So they felt that it was safe to go in

8    there.

9         And also, Judge, Ms. Figas, living alone or being

10   home alone that night, a single woman, a very busy street,

11   bars and restaurants on that street, of course she's going to

12   lock that door.

13        But did she let them in?  She let them in.  And they

14   did a search.  And they're not saying that she had apparent

15   authority or actual authority to allow the search of

16   Haldorson's bedroom.  But the point I want to make with this,

17   Judge, is even if there was a sufficient attenuation or a

18   sufficient change in circumstances between the illegal entry

19   at the street door level and Ms. Figas giving them authority

20   to search the common area of the apartment, at least I'd like

21   the Court to consider the fact that their testimony -- again,

22   the credibility of the officers here is in doubt.  And, again,

23   there was a contradiction as to what happened here.

24        And probably the person who told us initially was

25   Agent Marcus.  They didn't go directly to the apartment,

1   Judge, because they didn't know which apartment it was.

2   Someone had the keys and does not remember who had the keys.

3   They were walking up and down the block checking doors.  And

4   they asked -- I asked, the door was locked.  And all of a

5   sudden, Agent Marcus, or former Agent Marcus, he's retired

6   now, had amnesia.  I was in the back of the line, he said.  I

7   couldn't see.  Back of the line, Judge.  They were ready to

8   come in there.  I was in the back of the line was his

9   testimony.

10          So -- but what does Marzetta say about it?  Marzetta

11  says, I had the keys at 8:30 when we took them off of

12  Haldorson, I had the keys when I unlocked the door to his

13  bedroom, but I can't for the life of me remember who had the

14  keys when we entered the street level door.

15          What did Ladd say about it?  I also don't remember if

16  the door was locked.  But he contradicted Marcus.  He said, we

17  were all spread around the street trying different doors;

18  whereas, Marcus was like, I was at the end of the line,

19  someone else was the front, I couldn't see it if they had to

20  unlock the door or if the door was open.  The door was locked.

21  They had an expectation of privacy.  Sure enough, she did

22  allow them in, but it, again, goes to their credibility,

23  Judge.

24          About the exigent circumstances, your Honor, and I'll

25  just briefly show the Court, this is -- there were two doors

1   to Mr. Haldorson's bedroom.  This was the main door to get in

2   there, and you can see the top bolt is missing.  This was the

3   back area to get in there, and you remember Ladd's

4   contradictory testimony about how -- whether that door was

5   open or closed or locked or unlocked.

6           But here's why, Judge, this is not an exigency.  They

7   did not remove Ms. Figas from the premises.  They all admitted

8   that.  They did not call the fire department.  They did not

9   call HazMat.  They did not warn the neighbors, even though

10  there's apartments all around that neighborhood.  They did not

11  search and remove people who were nearby.  They did not even

12  attempt to do so.  Nothing was done.

13          Here, Judge, what we have here is they had the

14  effective control of the apartment.  Haldorson was in custody.

15  Nobody had access to his bedroom.  The apartment was fully

16  secured.  The alleged explosives, Judge -- and remember,

17  they're just fireworks.  They're not bombs.  The alleged

18  explosives were stable and inert.  The exigency, Judge, was

19  abated.  And law enforcement is not --

20          THE COURT:  Time out.  So, I mean, you made the point

21  before, correctly, I might add, when we were talking about the

22  car, that it doesn't matter that they actually found cocaine

23  in the car; you can't use what you find afterwards to justify

24  what you did before.

25          You've just done exactly the same thing when you say,

1    well, we now know that what they found in there was stable
2    fireworks, not explosives, and, therefore, there wasn't an
3    exigency.

4         MR. LIPUMA:  Okay.

5         THE COURT:  You can't have it both ways.  You either
6    don't look at what happens after or you do, and the answer is
7    you don't.

8         MR. LIPUMA:  Well, Judge, I would respectfully submit
9    that those fireworks, and even if they thought there were pipe
10   bombs in there, they had been in there for who knows how long,
11   and nothing had happened.

12        THE COURT:  Yeah.  So let me ask you this question
13   about that.  So you make the point, you know, properly, based
14   on the evidence, that wait a sec, they're saying it's an
15   exigency, but they didn't get the woman out of the house, they
16   didn't notify the neighbors, they didn't bring the fire
17   department in, they didn't do anything to clear the block or
18   anything like that.

19        So, you know, this, like most Fourth Amendment
20   questions, I believe is determined from the perspective of a
21   reasonable officer, it's an objective test not a subjective
22   test.

23        MR. LIPUMA:  Yes.

24        THE COURT:  That doesn't mean that subjective
25   evidence is irrelevant.  But the test is still objective.  And

1  so what does how they behaved after the fact by not getting

2  the woman out of the apartment, not notifying the fire

3  department, and so on bear on what a reasonable officer would

4  have thought before they went in, which is what I have to

5  evaluate?

6          MR. LIPUMA:  Judge, I think it establishes quite

7  concretely their state of mind and their intentions.  Because

8  if they, walking in there, actually did believe that there was

9  a danger to the community, they would have taken more severe

10  actions, which immediately would have included having the

11  roommate, after she gave consent, having her leave the

12  premises.  She stayed the entire time.  And notifying the

13  neighbors.

14          So all these actions -- I'm not looking at in

15  hindsight like what they could have done.  I'm looking at what

16  they failed to do that any reasonable police officer with a

17  concern about public safety would have done.

18          THE COURT:  Okay.

19          MR. LIPUMA:  And we know how law enforcement is

20  excused from the warrant requirement in a situation like this,

21  Judge, is hot pursuit.  Didn't apply.  Prevention of imminent

22  destruction of evidence.  Not applicable.  No prevention of

23  escape.  And the only other thing is no imminent risk to

24  anyone.

25          And we did cite -- and there's a lot of criticism

1   about Mr. Haldorson's motions, and I think very unfairly so

2   because one of his attorneys did write that we are not waiving

3   any other arguments or claim that may appear from the

4   proceedings in this case.

5         THE COURT:  Well, I tell you what I was criticizing.

6   I was criticizing, I think, the 57-page brief that I got in

7   support of one of the motions by one of the lawyers who is no

8   longer in the case.

9         MR. LIPUMA:  And I understand that, Judge.  But I do

10  want to point out that a case was cited in there that does

11  stand for the propositions that I just stated.

12        THE COURT:  Okay.

13        MR. LIPUMA:  U.S. v. Yengel, 711 F.3d 392.  This

14  case, law enforcement responded to an armed domestic dispute,

15  they searched a locked closet without a warrant, and this is

16  after the suspect was arrested and removed, they believed a

17  grenade was in the closet.  And this is the Fourth Circuit, I

18  believe, said the exigent circumstances did not justify the

19  search.  Even though the wife asked law enforcement to remove

20  the grenade, law enforcement -- and these are the same things

21  that are applicable here, Judge -- law enforcement did not

22  evacuate the home.  They did not evacuate nearby homes.

23        Indeed, in this case, Judge -- and I use the word

24  "stable" and "inert," and I understand what you're saying,

25  like hindsight, I'm not -- this is from the Fourth Circuit

1   talking about a grenade is stable, and a grenade is inert,

2   which is just no different than a firearm or firearms that

3   they were looking at.

4           And no one was warned either, Judge.

5           And so I respectfully submit that that case is on

6   point -- close enough on point to these facts such that all of

7   the evidence from Mr. Haldorson's bedroom should be held

8   inadmissible.

9           I also submit, Judge, that his post-arrest statement

10  should be inadmissible.  And I'm saying it should be

11  inadmissible on the basis of Brown v. Illinois.  What we have

12  here is -- we are not arguing about the Miranda warnings --

13          THE COURT:  He's confronted with the evidence that

14  seized illegally, is essentially what you're arguing.

15          MR. LIPUMA:  Yes, Judge.  Yes, exactly.

16          He's -- in Brown, he was only separated from the

17  arrest by two hours.  We're looking at about a similar period.

18  There's no intervening event of significance.  In that case --

19  you know, in our case, we think the illegality was purposeful.

20  And what they said was -- the Supreme Court said the giving of

21  Miranda warnings does not under Wong Sun always purge the

22  taint of an illegal arrest.  And in that case, there was no

23  attenuation.

24          And the distinction between Brown v. Illinois and

25  Utah v. Strieff, if I'm pronouncing it right, S-t-r-i-e-f-f,

1    is that Strieff is inapplicable because of the attenuation

2    doctrine because there was an outstanding warrant for that

3    defendant's arrest and because the officers in that case acted

4    in good faith.

5            I submit we don't have that here, Judge.  We submit

6    that Wong Sun and the fruit of the poisonous tree is

7    applicable to everything that followed; the illegal seizure of

8    Mr. Haldorson.  It's also applicable to search of the storage

9    garages.  The initial taint of the unconstitutional seizure

10   and illegal arrest precludes the admissibility.

11           And why are we asking for these things, and what --

12   would there be a terrible miscarriage of justice by the Court

13   granting our motion?  I respectfully submit not because the

14   Supreme Court has said, Judge, and I know you know this, but,

15   basically, Wong Sun has a purpose, and the fruit of the

16   poisonous tree has a purpose, and that's to deter police

17   officers from police misconduct on the firsthand, and

18   secondly, to maintain judicial integrity.

19           And in this instance, Judge, if you decide to deny

20   our motions, police misconduct will have won the day.  And

21   this will be a message back to Insley and Ladd and Marzetta

22   and Gallagher, all who have lied in this courtroom, that it's

23   okay.  Because, you know, Mike Haldorson is a fireworks

24   enthusiast, and perhaps he's an alleged small-time drug

25   dealer, but we can't let -- we can't let that happen.  We have

1  to put him in prison, and so we're going to let this all go by

2  the wayside.  And you know what that's going to do, Judge?

3  That's going to reinforce them for the next motorist they pull

4  over or the next person they target.

5          Judge, all this information, all of this evidence

6  that we are requesting, should be suppressed, and we thank you

7  for your time.

8          THE COURT:  Mr. Haxall, about how much time do you

9  have, do you think?

10         MR. HAXALL:  Fifteen, 20 minutes.

11         THE COURT:  Okay.  So this is what I need to do.  Is

12  everybody here that needs to be here?  All right.  We're going

13  to take a break that I think is going to take about 15 or 20

14  minutes.  That will give my court reporter a break.  That will

15  enable me to do another meeting that I have to do which I

16  don't think should take any longer than that.  And then we

17  will pick up with your rebuttal at that point.

18         MR. HAXALL:  Yes, sir.

19         THE COURT:  Okay.  I do have -- there's a couple of

20  things that I want to address.  One of them is more

21  pertinent -- more directly pertinent to these motions than the

22  other.  I'm assuming you're going to do this anyway, but I

23  guess I would -- I'm wondering -- for you to address after the

24  break, in other words, if you can shed any light on this issue

25  regarding the informant's identification number being one

1    thing in all the documents and then another thing in this

2    report.  That's one.

3            Number two, with regard to the I guess still pending

4    warrant application, I guess just as a preview, I think I'm

5    going to want some clarification, elaboration, more

6    information, whatever you want to call it, on this question

7    of --

8            MR. HAXALL:  Chain of custody?

9            THE COURT:  -- custody of the phone, yeah.  The

10   latter is really not directly pertinent to what we are doing

11   today, but I wanted to tell you while I still have it --

12           MR. HAXALL:  I think that would take me a little

13   time.

14           THE COURT:  Yeah, I just want to let you know.

15           So take a break.  Let's say about 20 after or so.

16      (Short break.)

17           THE COURT:  Okay.  We are back on the record.  All

18   the lawyers are present, as is Mr. Haldorson.

19           Mr. Haxall, you've got the floor.

20           MR. HAXALL:  Thank you, your Honor.

21           Your Honor, obviously, counsel makes some very strong

22   statements which, the government's position is, dramatically

23   overstates the nature of what he has shown the Court and in no

24   way undermines the evidence that has been presented.  And

25   notably, the defense doesn't address at all many of the

1     significant items that were presented to the Court.

2            So I want to go through some specific items that

3     counsel talked about, and I am going to, to a certain degree,

4     track his general order because that's how my notes are.

5            THE COURT:  Okay.

6            MR. HAXALL:  So from the outset, your Honor, he

7     showed you Officer Friddle's written report.  This is the

8     typed version.  He notes -- just from the outset, it notes,

9     Improper lighting, red lights on front.  It also does, in

10    fact, note the manufacture and delivery of controlled

11    substance in the typed version from Officer Friddle.

12           With respect to the -- this is actually the admitted

13    exhibit, your Honor.  I don't know if you have the copy.

14           THE COURT:  What's the number?

15           MR. HAXALL:  It's Plainfield 2.  This is the one that

16    we asked to supplement at the end of the hearing.  It was not

17    in our original binder.

18           THE COURT:  Then I probably don't have it.

19           MR. LIPUMA:  Oh, sure, sure.

20           MR. HAXALL:  I present it to the Court.

21           Thank you.

22           So that's the typed version --

23           THE COURT:  Is this the one you just showed on the

24    screen?

25           MR. HAXALL:  It is.

1      THE COURT:  Okay.

2      MR. HAXALL:  Now, I do want to talk a little bit

3  about the phone issue, your Honor.  First of all, I would

4  note -- and this was tendered in discovery in counsel -- this

5  is dated June 23rd, 8:35.  There is a Plainfield itemized list

6  of evidence seized on an Illinois State Police -- oh, sorry,

7  Plainfield PD, Illinois State Police, evidence inventory

8  receipt.  Again, I'd note the date and time, and, in fact,

9  that telephone is listed on the form.

10      Now, counsel notes the submission form that was part

11  of this case and notes -- I think it was this version, if I am

12  not mistaken --

13      THE COURT:  Correct, and there was an attachment to

14  it.

15      MR. HAXALL:  Yeah.  Now, this report, though, doesn't

16  show -- I don't know that it shows what counsel argues its

17  point for, because most notably, your Honor, and this was in

18  our prior filings, there was a search warrant in state court

19  issued for that phone on July 2nd.  So Officer Insley did not

20  keep it out until this later September 6th date.  It appears

21  he would have taken it back out because they had a search

22  warrant for the phone.

23      Now, in the affidavit that counsel showed you for the

24  subsequent search warrant, what the government told you is

25  they tried to get into the phone, but it was locked, and they

1    couldn't.  But they did try, and it was in evidence.  And to

2    the extent that Officer Insley even had it, it's not at all

3    clear that he had it outside of evidence, given that there was

4    an evidence receipt dated June 23rd.

5          So I don't think that tells the story that counsel

6    was making, and I'm not saying that he was trying anything

7    inappropriate there, your Honor.  I think it just doesn't

8    match some of this documentary evidence.

9          So that was the one issue that I think the Court

10   asked us to address.  Obviously, we will need to go more into

11   the chain of custody in fifteen minutes.

12         THE COURT:  That was one of the two.  The other was

13   the ID number.

14         MR. HAXALL:  And, again, on July 1st, this is the

15   other report.  The custodian retrieved it from evidence.  So I

16   think this is -- that tells the story, I think, your Honor.

17         THE COURT:  Okay.

18         MR. HAXALL:  Now, the other issue the Court I believe

19   asked us to address would be the --

20         THE COURT:  Informant ID number.

21         MR. HAXALL:  -- the informant ID.  So I think there's

22   two.  One is -- there's no doubt in this report -- and this

23   was tendered, there's the Bates stamp --

24         THE COURT:  Right.

25         MR. HAXALL:  -- has the incorrect number.

1       THE COURT:  The Bates stamp is your Bates stamp.

2       MR. HAXALL:  That's what we tendered.

3       THE COURT:  Right.

4       MR. HAXALL:  But in all of the other reports, your

5  Honor, it is, in fact, the correct number.  So there is in

6  this report -- and just for the record -- I'm sorry, that was

7  not clean -- this is the report titled Purpose to Document the

8  Attempted Purchase of Cocaine from Mike Haldorson.  The one

9  with the incorrect number is labeled Document of Purchase of

10  Exhibit No. 1.

11       Now, this is 1 again with the correct number labeled

12  To Document Surveillance for an Ongoing Narcotics

13  Investigation.

14       So there was an incorrect number.  And I'm not going

15  to put it on the screen, but I know the Court has it, to, I

16  think, deal with the informant file.

17       THE COURT:  Yeah.

18       MR. HAXALL:  The correct number is listed throughout

19  the file.  And your Honor asked about the different names.

20  And I don't know if there's a good way to do this, your Honor.

21  The informant on the personal history report has the correct

22  name.

23       THE COURT:  That's this thing?

24       MR. HAXALL:  Yes, I believe that's right.

25       THE COURT:  Box 13 is his actual name?

1      MR. HAXALL:  Yes, box 7 is his CS name, and then it's
2    all his true identifiers.
3          I would then go to the confidential source report,
4    which I think makes this even clearer.  It looks like this.
5          THE COURT:  Hang on.
6          MR. HAXALL:  And I know it's not page numbered.
7          THE COURT:  Is it before or after the other thing in
8    the packet?
9          MR. HAXALL:  It is, I think, after the criminal
10   history check, the first page after those.
11         THE COURT:  I'm there.
12         MR. HAXALL:  Again, it has the CS number correctly.
13         THE COURT:  And it has --
14         MR. HAXALL:  And then it says, CS name.  It has that
15   fake name.  And then right under it, it says, Full (true)
16   name.
17         THE COURT:  Two names.  Right.
18         MR. HAXALL:  And it has the correct name.
19         THE COURT:  Right.
20         MR. HAXALL:  Now, the signature is under the assumed
21   name, but then there's the signature under true name
22   immediately below it.  So I don't think this is an effort to
23   hide.  They just give him a CI -- a covert name to use during
24   the course of their time --
25         THE COURT:  Okay.

1      MR. HAXALL:  -- is how it appears, your Honor.

2          And I think if your Honor goes back, actually, to

3   even the transcript, I think my recollection is that --

4          THE COURT:  Transcript of our hearing here?

5          MR. HAXALL:  The transcripts of the recorded

6   purchase.

7          THE COURT:  Oh, the phone --

8          MR. HAXALL:  My recollection, your Honor, is -- so

9   the very first page of that, your Honor, during the preamble,

10  Inspector Insley says, And what is your assumed name, the

11  informant then says, Mike King.

12         So I don't think it's an attempt to hide within the

13  CI file his true identity.  I think it's just, for whatever

14  reason --

15         THE COURT:  Yeah, so my -- that part I kind of

16  figured out.

17         The part that I was wondering more about was Insley's

18  use of a number that seems to come out of left field in a

19  report that he prepares later.

20         MR. HAXALL:  Well, I think that was a mistake,

21  because every other report, he has it correct.  And let's go

22  through what happened here.  Counsel had the report from the

23  state prosecution, which predates ours --

24         THE COURT:  Right.

25         MR. HAXALL:  -- which had the correct number in it.

1    He then gets our report, or the report we tendered in our

2    discovery, which has the incorrect.  He was able to hold them

3    up and see that there was a mistake.  And I think that's what

4    it was.

5         It doesn't make sense that Insley is trying to

6    obscure the true number when he gave it to him in the state

7    court discovery.

8         THE COURT:  I mean, it's certainly -- it's certainly

9    a plausible explanation that when Insley does the report, the

10   second report, that he just botches the number and then

11   continues the identical botch throughout the memo.

12        There are other theoretically conceivable

13   explanations, so I guess my ultimate question is is there some

14   reason why I shouldn't say, you got to go get the CS file for

15   whoever -- 14, whatever the other number is, and at least let

16   me look at it.

17        MR. HAXALL:  And certainly if that's the Court's

18   ruling, we will do it.

19        THE COURT:  Is there any reason I shouldn't do it?

20   Because I guess I'm -- if nothing else, I'm just concerned

21   about clearing up that discrepancy and making sure whether

22   it's a discrepancy or something far more --

23        MR. HAXALL:  Given that the same number -- the

24   correct number -- I'll use that term so I'm being more

25   accurate.  Given that the correct number, the one that's

1   assigned in the CI file, is in every other report and then is
2   in the -- I don't want to use the word "corrected" because
3   that implies a certain view of it -- in the report with the
4   same CI number as is reflected in the CI file that was
5   tendered in state court, it doesn't make sense that there
6   would be some nefarious attempt to hide it when the correct
7   number was given even before the incorrect number, and then on
8   the date the incorrect number was provided by the U.S.
9   Attorney's Office, there were numerous other reports with the
10  correct number.
11          The incorrect number appeared on one report.   The
12  correct number appeared in the exact same report that was
13  previously tendered and in every other report.
14          So I think --
15          THE COURT:  We will come back to that at the end.
16          MR. HAXALL:  And I think this really ties into
17  counsel's primary argument, which is that Inspector Insley has
18  apparently had it out for the defendant, a guy he had no prior
19  familiarity with, and went out of his way to put a case on
20  him.
21          And what counsel doesn't discuss at all, for example,
22  is that recording.  There's really no doubt after listening to
23  that recording that a drug deal went down there.
24          So the question is why is it -- so either it is the
25  defendant or it's not.  And if it's not him, why would Insley

1    go out of his way to fabricate the entirety of this case

2    against the defendant.

3              And I would submit, your Honor, you had the

4    opportunity to sit and watch not only Insley but everybody

5    testify that Insley does not come off as somebody that has the

6    wherewithal to put together such a masterful and nefarious --

7              THE COURT:  You are saying he's not Oliver Stone.

8              MR. HAXALL:  I think that's fair to say, your Honor.

9    And if he was, you certainly wouldn't see the mistakes that

10   you see elsewhere in his paperwork.  He would have covered it

11   better if that was really what this was all about.

12             And I would also say that to imply that all these

13   other officers perjured themselves -- and not to imply;

14   counsel flat out stated it -- is just simply inaccurate,

15   particularly when you look at their testimony.

16             Diehl confirmed that the CI was present as they sat

17   in that Joliet parking lot.  That's why Joliet officers were

18   in the area.  They were supposed to do the arrest when the

19   deal went down where they thought it was going to.  It was

20   switched to Plainfield because the defendant got stuck in

21   traffic.  It makes sense.

22             Now, to the statement that they weren't sure which

23   way the defendant was going to go, they knew where he was

24   going to end up, but there are multiple routes to different

25   locations.  And that's, I think, one of defense counsel's

1    points.  So maybe he would have gone straight down 59, maybe

2    he would have turned left on another route, and that's why,

3    for example, Officer Marzetta was farther south down 59; in

4    case he needed to assist with the stop.

5           So I think that's a perfectly appropriate statement.

6    They knew where he was headed.  They didn't necessarily know

7    the route he was going to take.  But once Friddle saw him on

8    that -- one of the possible routes, he stopped him.

9           So, again, I would go through the, quote, unquote,

10   pervasive pattern of lies that defense counsel talked about.

11   And really, at worst, there is a series of sometimes

12   boneheaded mistakes, but nothing nefarious, nothing

13   perjurious.  The idea that accusing an ATF agent of committing

14   perjury because he said the phone was in the government's

15   possession when it was in law enforcement's possession the

16   whole time, that's beyond the pale, your Honor.  It simply is.

17          The receipt -- so, again, I'm going to try and track,

18   generally, the order.  The receipt that counsel presented does

19   purport to show the installation of lights, but it doesn't

20   mean that he did not have other lights on that car before he

21   put those -- that version on.  You can see the interior lights

22   that he already had, for example.

23          So the idea that he didn't have other lights and

24   maybe some that are similar to what Marzetta testified to,

25   there's no evidence that he did not have those lights on.

1          As far as the no gun and that they couldn't -- they
2     were lying about being able to stop him, there was nothing on
3     the recording about a gun that the informant said, so they had
4     no idea until they followed the informant back to the meeting
5     place, debrief him, and he tells them.  By that point the
6     defendant was out of sight.
7          Now, maybe had they known about the gun as he was
8     leaving the parking lot, they would have stopped him
9     immediately, but they didn't know about it until at least
10    whatever time it took for the informant to drive away, the
11    defendant cleared the scene, they wait for him to clear so he
12    doesn't double back.  Then the informant leaves, Insley
13    follows him, they get to a meeting point, and that's where
14    they receive the information.
15         So, again, where counsel repeatedly ascribes ill will
16    and criminal conduct by these officers, it just makes sense.
17    They didn't know in time to stop him.  And maybe they could
18    have gone to his Joliet house, but the likelihood of being
19    able to find the gun is significantly less there, and had they
20    done so, the informant would have been outed.
21         Counsel also has a problem with Mitchell because it
22    is a non-published decision.  Really, the reason it's
23    included, your Honor, is the language is so on point.  The guy
24    participated in a controlled delivery, he's arrested in his
25    car a month later, and it's not stale.  That's why it's there.

1   I mean, it's exact.

2         So although it's unpublished, the legal propositions

3   for which it stands, there's nothing that counsel has offered

4   to show that the PC evaporated or dissipated over 22 or 23

5   days.

6         Also, he notes that Mitchell was in an Anders brief,

7   and I didn't have a chance to read it, but my recollection is,

8   essentially, the attorney would say, yeah, the

9   counter-argument that it was stale is so untenable that I

10  can't pursue it.

11        THE COURT:  That's basically it.

12        MR. HAXALL:  So, again, the legal underpinning is

13  appropriate.

14        Counsel also indicated there was no activity related

15  to this case over those couple of weeks.  First of all, even

16  if there wasn't, that doesn't change the PC.  But you heard

17  testimony that they told the CI to try and set up another

18  deal.  If you take the time to go through that disc of all the

19  phone records, I think you will see that there are additional

20  phone calls during that intermediate period between them, at

21  least for the couple of days leading into the June 23rd.

22        In fact, my recollection is prior counsel essentially

23  made a pseudo entrapment claim that the CI was harassing

24  Mr. Haldorson throughout that intermediate period.

25        The red lights in the grill, counsel referred to it

1   as indisputable evidence that Marzetta is lying.  Well, first
2   of all, that's only the case if you believe the defendant and
3   only the defendant, because that's the only evidence that he
4   did not have other lights in his car that they could see
5   before that time.  Again, that receipt is not determinative
6   because he could have had other lights.  And the fact that he
7   had the one at his feet kind of indicates that he had already
8   souped up the car to a certain degree.
9           Again, the issue with the Will County grand jury
10  transcript, while I concede the point about him standing on
11  the corner, putting that aside, had they said that the CI
12  ordered up the drugs, again, that would have outed the CI at
13  that point.
14          Counsel made a big point about Friddle and Marzetta
15  lying to the defendant.  So what?  There's nothing that says
16  there's no PC because they told him he had a warrant when he
17  didn't.
18          And counsel's preferred version was apparently that
19  they approached his car with guns drawn.  I submit that the
20  better choice is to diffuse the situation just as they did,
21  which is to make him think this is a routine traffic stop, you
22  are going to be out of here in a second.  And, in fact,
23  counsel's point about multiple cops, Friddle goes, says, hey,
24  somebody's going to be here in a minute, then you're on your
25  way.  That diffuses the situation, and he did not ask

1    Mr. Haldorson to get out of the car until he did have other

2    officers on the scene with him.

3          I would also note that -- counsel also notes that the

4    pat-down search is actually Friddle who is patting him down.

5    Yes, that's true.  Ultimately, though, Marzetta is the one

6    that takes the stuff off the car and is the one that recovers

7    it.  So, yes, technically, Friddle did not do the search.  He

8    was the one who received the items from the search.  Friddle

9    takes them out, puts them on the car, and then Marzetta

10   recovers them, if you watch that video, again, is my

11   recollection, your Honor.

12         So I don't think it's a -- again, I think it's

13   inartful to say that he did the search.  Absolutely, that's

14   true.  But it's not an attempt to lie about who recovered it.

15         And by the way, $2,000 were recovered from him,

16   approximately, at that time, which, again, I think goes to the

17   PC before they actually searched the car; that, again, they

18   ordered up drugs from this person who has a large amount of

19   currency in his pocket at the time he is stopped and taken

20   into custody.

21         Counsel notes that it would be impossible that nobody

22   would be, I guess, dumb enough to commit an offense in a

23   school zone.  If your Honor looks at the Cook County docket,

24   you will see lots and lots of cases with school zones and

25   churches and the like.

1    Counsel also takes the government to task for not
2    pointing out where Jessica lives.  They had that option too.
3    They called the defendant.  And maybe it is true that you can
4    get to Joliet from the southwest.  The defense counsel asked
5    the defendant, you could have taken Joliet Road to Jessica's,
6    and he acknowledged in the affirmative.  So maybe headed way
7    southwest can still get you there somehow, but the evidence
8    they presented is that it was -- implied, at least, that it
9    was a different direction.

10   He also referred to Marzetta having contact with the
11   CI and how somehow there's a negative connotation there.
12   There is a difference between having initial contact with the
13   informant and being his controlling officer.  So my
14   recollection, again, I don't have the transcript, your Honor,
15   is that Marzetta may have had exactly that, initial contacts,
16   but, ultimately, he was assigned to Insley.

17   Again, with respect to the CI numbers all of the
18   other reports, and there are many, have the correct CI number
19   listed.

20   Counsel then spent a lot of time with Insley, who he
21   called a corrupt cop.  Again, your Honor, at worst, he was
22   clumsy at times, but to call him a corrupt cop and state that
23   he repeatedly perjured himself is just not borne out by the
24   evidence in this case.

25   These reports which the defendant had in state court

1    with the correct number, he acknowledges that, were produced

2    shortly after the charging determination.  He had them.

3    Again, your Honor, at no point does counsel address that

4    recording of his client dealing narcotics to the CI.

5        He talks about, he contacted me, the CI contacted me,

6    and he points out language matters.  Yes, there's a reason

7    that Insley chose that term; again, to deflect from the CI's

8    involvement.  But Diehl, Special Agent -- or Inspector Diehl

9    also confirmed that the CI was there as they sat in that

10   parking lot.  It's corroborated.  And it also makes sense,

11   your Honor, given all the phone contacts with the CI.

12        I think I addressed the phone into evidence issue.

13   It appears from this paperwork and the search warrant that was

14   issued that, in fact, Insley did not hold onto it for weeks

15   and weeks and weeks at that point.

16        Counsel, with respect to the phone, makes lots of

17   allegations regarding the chain of custody.  We didn't present

18   evidence regarding the chain of custody, which I think goes to

19   your Honor's point mostly because it's not an issue that was

20   presented to the Court in these filings.

21        With respect to the affidavit where Gallagher refers

22   to officers told him, I really don't see how that's

23   perjurious, your Honor.  First of all, simply because only

24   one -- only Insley testified to it doesn't mean that there

25   weren't conversations with other officers about it or that

1    other officers may have seen that text message.  I don't know.

2    Evidence wasn't presented.  But, again, to claim that officers

3    are perjuring themselves there is so outside of the evidence,

4    and I think it ultimately undercuts their argument.  Because

5    by making such grandiose statements and claims about officer

6    perjury when it's not supported by the record, I think it

7    swallows whole their argument and its believability.

8            Again, your Honor, with the decision to -- whether or

9    not to deactivate the CI, it is discretionary.  And

10   repeatedly, counsel has implied, if not outright stated, that

11   it was a shall standard, it is a may standard.  And counsel's

12   view that they should have terminated the CI notwithstanding,

13   the officers get to make that determination.  And they chose

14   to continue to use the CI, and there's nothing indicating that

15   they were prohibited from doing so.

16           Again, I am conceding absolutely that that should

17   have been included in the complaint affidavit, but as I noted

18   before, nothing about the CI was included in the state search

19   warrants, so it wouldn't have been necessary there, and to the

20   extent that one additional fact in that paragraph at the

21   bottom of our complaint would have changed the magistrate

22   judge decision to issue it, first of all, I don't think that's

23   the case, secondly, it was cured when the grand jury returned

24   the indictment.

25           And as far as the grand jury, counsel used the

1   transcript where I did tell the grand jury that -- or not
2   me -- the agent testified to my questions that there is no
3   single party consent in Illinois.  So that was presented to
4   the grand jury.  If Insley is trying to hide and get around
5   that, that certainly is an odd way to do so.
6           Counsel also then really didn't address too much the
7   calls, which, as I noted, lays out what happened here.  The
8   calls back and forth from the CI and the defendant -- sorry,
9   calls one way, texts back and forth, and he talks about the
10  barrage of calls from the CI.
11          There were text messages sent by the defendant,
12  including right before he appears to have left the area of his
13  apartment and including right after he was arrested.  Again,
14  the idea that these officers had nothing better to do than get
15  the defendant, who they had no prior dealings with, is just
16  contrary to logic and the evidence in this case.
17          Counsel notes that they are not contesting the
18  voluntariness of Ms. Figas' consent but then goes out of his
19  way to argue that they broke in and went storming upstairs.
20  And I know that's not exactly what he said .
21          I would like to point out that the photos of the door
22  were taken significantly later.  You see the lock is missing.
23  The officers conceded they unlocked the door with his keys.
24  They didn't rip it off the door.  And I don't think that's
25  what counsel was implying at all, I'm not suggesting that, but

1    I think the photos leave that impression.

2           But they testified, we unlocked one of the doors to

3    get in.  There's no dispute about that.  In fact, that's part

4    of the reason we had this motion at this point.

5           I want to distinguish, and we did so in our written

6    filing, but just briefly, counsel cited Yengel, Y-e-n-g-e-l,

7    711 F.3d 392, from the Fourth Circuit, in support of their

8    claim that there were no exigent circumstances.

9           This case is dramatically different than that case.

10   The Yengel court noted that, The officer did not immediately

11   call for the assistance of explosives experts, and then later,

12   At this point, Sergeant Staton, S-t-a-t-o-n, still did not

13   notify explosives experts.

14          These officers had them with them.  They didn't need

15   to call the bomb squad, they didn't need to call the fire

16   department, because the experts were standing right there.

17   And, in fact, when they didn't have the experts, they called

18   them out.  When they first noticed the pipe bombs, they called

19   the Cook County bomb squad, which is how the ATF was alerted.

20   These officers know this is dangerous, it's stuff not to be

21   messed around with, and they sought the appropriate people.

22          In addition, the officer in Yengel was told by the

23   defendant's wife that the grenade had been placed in the

24   closet two years earlier.  That's night and day from this case

25   and the stability.  Homemade pipe bombs that they had seen a

1   few hours -- sorry -- several hours before, and Ms. Figas told

2   them they had only been living in that apartment for a short

3   time, I want to say a month-ish, I don't recall exactly, your

4   Honor, but that is completely different than the case in

5   Yengel where the grenade was static for two years.  And,

6   again, it's a very different situation where you have an

7   expert on the scene to handle these items.

8         And, again, they did so, they did the consent search

9   what they -- I think they indicated was, I want to say, 15

10   minutes, no more.  In the Yengel case, they noted that law

11   enforcement had been on the scene approximately three and a

12   half hours at this point, that was the time of the seizure of

13   the grenade.  So Yengel is just -- it's not on point, your

14   Honor.

15         I don't believe counsel also addressed the fact that

16   when asked if he had anything illegal in his car, the

17   defendant stated fireworks.  Again, that in itself gives

18   probable cause for the search.

19         And, your Honor, again, just looking at this case and

20   the probable cause, there was significant commonality between

21   both the June 1st and June 23rd events.  The same car with the

22   same license plate was at both.  The defendant was the driver

23   at both.  The defendant used that same telephone number for

24   both.  The transactions were to be with the same CI at both.

25         Certainly, the agents had probable cause to stop the

1    defendant on June 23rd in part because of what they were aware

2    of from June 1st, putting aside the fact that they also had

3    probable cause to arrest him from that prior transaction.

4    They had a complete -- they had a complete and independent

5    basis to do so on June 23rd as well.

6              And as far as the search warrant goes, your Honor, I

7    don't believe counsel really addressed the taint claim, but

8    what's noteworthy is within the search warrant, the state

9    court approved there was information about drugs in the

10   defendant's car, pipe bombs in the car, prior lies to officers

11   over and over and over again, and his involvement in criminal

12   activity that the state court judge signed.

13             In this case, there were numerous constitutional

14   grounds for the officers to search the defendant's car.  There

15   were exigent circumstances for them to go into his bedroom for

16   that first search.  And even if there weren't, the search

17   warrant, the intervening search warrant, should permit the use

18   of the items seized subsequent to it.

19             In any event, your Honor, it would have been

20   inevitably discovered, either the evidence in his car or in

21   his apartment.  And with respect to the -- the purpose of the

22   exclusionary rule in the apartment where officers secured the

23   apartment and went in good faith to secure a search warrant,

24   the purposes of the exclusionary rule would not be met by

25   precluding the use of that evidence in any event.

1    There's no grand conspiracy by the CPAT team, your

2  Honor.  Officer Insley, while making some mistakes, they tend

3  to be the more typographical kind than the nefarious kind,

4  although, again, there are some issues that extend a little

5  bit beyond that, but nothing to the level of police

6  misconduct.

7    The government respectfully requests that the

8  defendant's motions be denied.

9    THE COURT:  Okay.  So a couple of things.  Number

10  one, I said I was going to make a copy of the CI file, but it

11  turns out I wrote all over it, so --

12    MR. HAXALL:  I have a second one.  We can do it right

13  now.

14    THE COURT:  Okay.  Produce that to Mr. Lipuma.

15    I think -- I just have enough queasiness, if you

16  will, at the moment, at least, about the use of this other

17  informant number in the later prepared report that I am going

18  to direct you to get a copy of whatever informant file exists

19  under that number -- it may be that there is none; it may be

20  it's just a dead number, it's a blank -- and provide it to me

21  in camera.  I'm going to figure that's going to take more than

22  a day or two, so I'd like to have it by, you know, 10 days or

23  two weeks from now, but hopefully 10 days.

24    And I'm going to hold off ruling on this until I've

25  seen that.  I mean, it may be that there's nothing there of

1    any significance, in which case, I'll just proceed to rule.
2    But if there is, then I am going to have to get you back
3    together.
4           So we will talk about the next status date in a
5    second, but we are going to talk about a trial date because I
6    said we were going to do that, and we need to have one.
7           Let's assume for purposes of discussion that you're
8    trying everything that's on the table right now.  Ballpark,
9    how long of a trial do you think it's likely to be?
10          MR. HAXALL:  Probably a week for the government's
11   case, your Honor.  And I would note one outstanding issue will
12   be, depending on the Court's ruling and then the Court's
13   ruling on the pending search warrant --
14          THE COURT:  You got to send that out for analysis.
15          MR. HAXALL:  Send it out for analysis, which I don't
16   think will take a long time, but that we would also -- that
17   would require us to present that additional witness as well.
18          THE COURT:  Fair enough.  And so on the question of
19   the -- yeah, okay, fair enough.
20          Do you have a sense of how long -- so the warrant
21   application asked to have basically the text messages
22   downloaded or the call history or both?
23          MR. HAXALL:  Yes, your Honor.  Yes, it was mostly --
24   yes.  It was mostly the text messages, based on the phone
25   records.

1          THE COURT:  All right.  Right.  And so they'd have to
2   get into it, and then -- I mean, once they get into it,
3   downloading and all that stuff is a pretty quick proposition.
4   It's just a question of waiting in line.
5          Okay.  You know, as you have heard me say in the
6   past, my life is largely under the control of this large
7   multidistrict proceeding I have.  So I have a sense, though,
8   that one of those cases that I have set for trial at the tail
9   end of January is potentially going to go away.  So what I'm
10  hoping is that you might be able to set a trial date at the
11  tail end of January or the beginning of February.  Is that
12  possible?
13         MR. HAXALL:  So are you talking about the week of the
14  22nd or the 29th?
15         THE COURT:  29th.
16         MR. HAXALL:  I think that should work, your Honor.
17         THE COURT:  Mr. Lipuma?
18         MR. LIPUMA:  I am free, Judge.
19         THE COURT:  Okay.  That's the trial.  And I'll have
20  to get -- my substitute courtroom deputy isn't in here, so I
21  am going to set it for trial on the 29th of January at 9:45.
22         I want to have a status date, which will probably end
23  up being the -- well, which, depending upon what comes out of
24  this production of this other informant file, may be the date
25  that I rule on it.  I am going to cross my fingers on this

1    one.

2            So how available are you on the morning of the 22nd,

3    which is the day before Thanksgiving?  If anybody is going out

4    of town, just tell me.  I won't do it on that date.

5            MR. LIPUMA:  I am, Judge.

6            THE COURT:  You're one of them that's going out of

7    town.  Okay.

8            MR. LIPUMA:  I can do it before that, the --

9            THE COURT:  No, I can't, because I'm going to have a

10   trial.  So now I'm basically just going to have to dictate a

11   date to you.  And I know you may still be on trial.  I don't

12   know --

13           MR. HAXALL:  Actually, we should be wrapping up.

14           THE COURT:  Okay.  Afternoon of the 29th.

15           MR. HAXALL:  November 29th?

16           THE COURT:  Yeah.

17           MR. LIPUMA:  Judge, also, I apologize.  I could do

18   the day before or the 27th or the 28th.

19           THE COURT:  I can't.  If it's not the 29th, then it

20   has to be the 30th, and there really are no other options,

21   because then I am going to be out of town the week after that.

22   I am not going to let this carry over.

23           So pick between the 29th and the 30th.

24           MR. LIPUMA:  I'm out of town on the 30th, so...

25           MR. HAXALL:  Is there a time that works better for

1   you?

2            THE COURT:  The problem is that at the end of a

3   three-and-a-half-week trial with a jury in the box, I am not

4   going to take an hour out, which is -- I mean, if I make an

5   oral ruling on this, which is probably what I'm going to do, I

6   am not going to do that to those 12 people.  I just won't.

7   So -- it's going to be at the very end of the trial.  I just

8   won't do it.  My best guess is that that trial is going to end

9   on the 28th, but we will probably take that whole day.

10           MR. HAXALL:  You wouldn't let them out at 4:00 and

11  rule at the end of the day?  No?  Okay.

12           THE COURT:  Yeah, if you were to understand -- so the

13  brain of the person presiding over the trial is only slightly

14  less fried than the brain of the lawyers conducting the trial

15  at 4:00 o'clock in the afternoon.

16           MR. HAXALL:  Sure.

17           THE COURT:  Actually, more fried because the lawyers

18  actually get to do stuff.  I just have to listen to it.

19           MR. LIPUMA:  If you are talking the 29th, Judge --

20           THE COURT:  I mean, I go back to the -- so you're not

21  here at all on the 22nd?  You can't do it in the morning of

22  the 22nd?

23           MR. LIPUMA:  If it's between the 22nd and the 29th,

24  I'll take the 22nd.

25           THE COURT:  Okay.  So I am going to set it for 9:30

1   on the 22nd then.

2          If what happens on the -- when I get the in camera

3   stuff, which I'll look at as soon as I get it, you know, if --

4   let me put it this way.  If I see something that I think ought

5   to be turned over, what I'll probably do is whistle you in

6   very fast, and then I'll probably just move that date.  So I

7   wouldn't maybe yet go cancelling anything.  The quicker I get

8   it, the quicker I'll look at it.  The quicker I look at it,

9   the quicker I'll let you know.

10         MR. HAXALL:  Judge, I don't know if this assists, and

11  it probably doesn't assist, but I guess the --

12         THE COURT:  I have already made the decision that I

13  need to see it.

14         MR. HAXALL:  I understand.

15         THE COURT:  If you are going to try to talk me out of

16  it, don't waste your breath.

17         There you go.  Okay.  Don't waste your breath.  I

18  want to see it.

19         All right.  Time is excluded through the next status

20  date, and you'll get an order that sets all these dates.

21         Thanks.

22         MR. LIPUMA:  Thank you, Judge.

23    (Which were all the proceedings had in the above-entitled

24  cause on the day and date aforesaid.)

25

1      I certify that the foregoing is a correct transcript from
2  the record of proceedings in the above-entitled matter.

3  Carolyn R. Cox                         Date
   Official Court Reporter
4  Northern District of Illinois

5  /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25