IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>vs. )<br>)<br>MICHAEL HALDORSON )  | Case No. 15 CR 623 |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

A jury found Michael Haldorson guilty on charges of distribution of cocaine; possession of cocaine with intent to distribute; possession of MDMA (ecstasy) and cocaine; and carrying an explosive—smokeless powder—during the commission of a felony. The jury acquitted Mr. Haldorson on a charge of possessing an unregistered explosive device and a charge of possessing a firearm after a felony conviction. The narcotics charges all involve controlled purchases of narcotics in 2015 pursuant to an undercover investigation by law enforcement in Will County. When Mr. Haldorson was arrested in June 2015 at the site of the last arranged purchase, three pipe bombs and another device were recovered from the trunk of his vehicle. The Court notes that the carrying-an-explosive charge *did not* require the jury to find any relationship between the possession or carrying of the explosive and the narcotics offenses; the jury was specifically instructed that "[t]he explosive does not have to be related to" the underlying narcotics offense.

The narcotics charges involved, respectively, a purchase of 1.7 grams of cocaine for $120, and possession of 4.9 grams of cocaine and 3.2 grams of MDMA, as well as 11.5 grams of psilocybin mushrooms and 7 grams of cannabis. None of those charges

carried a mandatory minimum prison term. The charge involving carrying an explosive did; it required a ten-year consecutive sentence.

At the time of his offenses, Mr. Haldorson was 34 years old; he was 36 at the time of sentencing. His prior criminal record all involved charges in Will County state court. His prior convictions were: a misdemeanor battery charge at age 18, resulting in a sentence of probation; at age 20, charges for sale of fake narcotics (a "look-alike substance," in legal lingo) and distribution of under 100 grams of cocaine, resulting in a six-year prison sentence on which Mr. Haldorson served about 27 months; a weapon possession charge at age 24, resulting in a three-year prison sentence; and conviction for delivery of approximately 15 grams of cocaine at age 25, resulting in a ten-year prison sentence. On the last two of these cases, Mr. Haldorson served a total of about 44 months imprisonment. He had last been released from custody in January 2012 and committed the offenses of conviction in 2015.

At sentencing in the present case, given his prior convictions, Mr. Haldorson was classified under the Sentencing Guidelines as a "career offender." Without that, his criminal history category would have been IV and his adjusted offense level would have been 16, which would have resulted in an advisory sentencing range of 33 to 41 months on the narcotics charges. With the career offender enhancement, the sentencing range was multiplied by a factor of more than six; his criminal history category was VI and his adjusted offense level was 32, resulting in an advisory range of 210 to 262 months on the narcotics charges—plus the ten-year mandatory consecutive sentence on the charge of carrying an explosive.

At sentencing, the Court found the advisory range under the career offender guideline to be excessive. The Court imposed concurrent sentences of 72 months on

Case: 1:15-cr-00623 Document #: 424 Filed: 02/14/24 Page 3 of 12 PageID #:4277

the three narcotics charges, plus the 120 mandatory consecutive sentence on the explosive charge, for a total sentence of 192 months, or 16 years. To date, Mr. Haldorson has served just a little over six years of imprisonment; he went into custody on February 5, 2018.

Mr. Haldorson has filed a motion for early release under 18 U.S.C. § 3582(c)(1)(A). He cites the medical condition of his father; his father's need for a caregiver; and the absence of other available care given his father's needs. Mr. Haldorson also discusses his positive adjustment while incarcerated and his plans if released. The government opposes Mr. Haldorson's motion.

Mr. Haldorson's motion is made under section 603(b) of the First Step Act, which amended 18 U.S.C. § 3582(c)(1)(A) to provide a greater role for courts in determining whether to reduce a defendant's sentence based on "extraordinary and compelling reasons" warranting a reduction. As amended, and as applicable here, the statute provides that

> [t]he court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction;
>
> . . .

      and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). The parties agree that Mr. Haldorson has satisfied the statute's administrative exhaustion requirement.

    The government disputes that Mr. Haldorson has established, as required, "extraordinary and compelling reasons" warranting a sentence reduction "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The relevant Sentencing Commission policy statement, effective as of November 1, 2023, states that extraordinary and compelling reasons exist in a case involving "[t]he incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent." U.S.S.G. § 1B1.13(b)(3)(C).

    It appears to be undisputed—and, in any event, Mr. Haldorson has clearly shown—that Mr. Haldorson's father Raymond Haldorson is incapacitated. Specifically, he was diagnosed with Parkinson's Disease in 2019 and also suffers from diabetes. By way of example, according to one of Raymond Haldorson's health care providers, he is confined to a chair; he cannot stand on his own; he is unable to walk; he has limited range of motion and use of his upper extremities; and he has significant difficultly speaking and swallowing. "These motor defects have caused [Raymond] Haldorson to become chair bound requiring maximum total assistance for all activities of daily living." Def.'s Ex. B. He "requires round-the-clock assistance and supervision." *Id.* His needs include "total assistance" for mobility, bathing, dressing, administering medications, preparation of food, eating and drinking, toileting, and personal hygiene. There is plenty of additional evidence on this point as well. In short, there is no question that Mr. Haldorson's father meets the "incapacitation of the defendant's parent" element of

4

U.S.S.G. § 1B1.13(b)(3)(C).

The Court also finds that Mr. Haldorson has established the "only available caregiver" element of the Guideline provision. His mother Patricia Haldorson—who the Court will refer to as "Patricia" for the sake of simplicity—was initially able to provide sufficient care for her husband—who the Court will refer to as "Raymond." But this is no longer possible given Raymond's more significant mobility limitations as the Parkinson's has progressed. In addition, Mr. Haldorson has provided documentation showing that Patricia herself has experienced health issues, including a number of serious falls that have required medical care, and in some of which she has hit her head. Patricia now moves with the use of a walker. She is not available to perform most of the more significant care that Raymond requires.

Mr. Haldorson has a brother and a sister, but a realistic assessment of the record reflects that they are not "available" either. Mr. Haldorson's brother serves in the U.S. Army, was recently redeployed to a remote location (overseas, as best as the Court can tell), and even before that was not stationed in the Chicago area. See Def.'s Ex. E. Mr. Haldorson's sister lives in the area and helps out with her parents when she can. But her availability is limited to visiting three or four times per week, largely due to her own household responsibilities, including two young children, ages nine months and eight years.

In the Court's view, the only reasonable reading of the term "available" as used in the Guideline provision is that alternative caregivers are *actually available*. In this case, Mr. Haldorson has shown that other potential family caregivers are not actually available. Along the same lines, some of Raymond and Patricia's neighbors have helped out from time to time, but they cannot realistically be considered "available caregiver[s]" in view of

5

the around-the-clock, total care required for Raymond.

The government, in opposing Mr. Haldorson's motion, contends that there is a combination of services that renders the Guideline provision inapplicable. Specifically, the government references assistance from Patricia, visits from Mr. Haldorson's sister, and "regular home health services." Gov't's Resp. at 10. The Court respectfully disagrees. The government's argument represents an unrealistic assessment of the adequacy of a cobbled-together amalgam to provide the level of care needed for someone in Raymond Haldorson's position. Evidence submitted by Mr. Haldorson regarding Raymond's recent hospitalization for unhealed bed sores—a condition that is often, indeed typically, the result of lying or sitting in one position for too long, sometimes combined with insufficient hygiene—tends to confirm that Raymond's current situation is not realistically understood to qualify as "available care[ ]" sufficient to meet Raymond's needs.

Finally, although the government does not make the argument—and has therefore waived it—the theoretical possibility of nursing home care that might be paid for in part by public assistance benefits does not, at least in this case, undercut the proposition that there are no other "available caregiver[s]." If it did, the Guideline provision would effectively be a dead letter, as that theoretical possibility (which the government has not argued in any event) exists for *any* incapacitated parent. That would not be a reasonable reading of section 1B1.13(b)(3)(C).

The government suggests that it's not apparent that Mr. Haldorson would be able to provide the necessary care for his father. *See* Gov't's Mem. at 10. The Court disagrees. A good deal of what is needed in this situation—as the record reflects—is someone who's *there*, able to help Raymond in using the bathroom, personal hygiene,

6

eating, moving around at home, and getting back and forth to a vehicle for the purpose of medical visits and other necessary transport. Mr. Haldorson is unquestionably in a position to do all of that. Beyond this, from the Court's recollection (and as confirmed via the presentence report, *see* Presentence Report ¶ 62, as well as some of the photographic material accompanying the motion), Mr. Haldorson is a big person who plainly has the physical capability to assist and care for Raymond, and he is of course capable of preparing food for him and performing the other tasks needed. He is not a trained home healthcare provider, but from the Court's experience with elderly parents, that's not needed for most of what is called for. And Mr. Haldorson has stated a willingness and intention to undertake any training that is available that would assist him in providing his father with care.

In sum, the Court finds that Mr. Haldorson has established that, under the circumstances, he is the only available caregiver for his incapacitated parent. And although it is not a separate or independent basis for compassionate release, Mr. Haldorson appears to have significantly rehabilitated himself while incarcerated, well beyond the norm. That is a factor the Court is permitted to take into account. *See United States v. Peoples*, 41 F.4th 837, 841, 842 (7th Cir. 2022) (rehabilitation "cannot serve as a stand-alone reason for compassionate release," but "there is no indication that successful rehabilitation efforts may not be considered as one among other factors warranting a reduced sentence under § 3582(c)(1)(A).") (cleaned up). The Court will discuss this point in more detail later in this ruling.

Finally, section 3582(c)(1)(A) requires the Court to consider the factors regarding imposition of an appropriate sentence set forth in 18 U.S.C. § 3553(a). These include Mr. Haldorson's history and characteristics; the nature and circumstances of the crimes;

7

due consideration of the seriousness of the crimes; promoting respect for the law; providing just punishment; affording adequate deterrence; protecting the public from further crimes by Mr. Haldorson; and providing him with any necessary services and treatment.

Mr. Haldorson's crimes were serious, but their seriousness should not be overstated. If there was anything remarkable about the narcotics offenses here, it was certainly not the quantities involved, which were quite small; rather it was the multiple types of drugs that were involved. The carrying-an-explosive offense was perplexing, given the absence (aside from a relatively old misdemeanor battery charge) of a history of violent conduct. It was an offense with serious *potential* depending on what Mr. Haldorson intended to do with the smokeless powder, as well as the devices found in his car trunk, but by itself the possession was ambiguous. At trial and sentencing, the defense chalked this offense up to an excessive and imprudent interest in serious fireworks. It seemed possible to the Court at the time that there could be more to it than that, but again, nothing in Mr. Haldorson's past or in his dealings with the undercover operative that led to his arrest indicated an intention to use explosives in any sort of a nefarious way. On the sentence, however, the Court's hands were tied by the mandatory minimum penalty for the explosives charge.

Mr. Haldorson had a reasonably significant criminal history before this case: his criminal history category, before application of the career offender guideline, was IV. As discussed earlier, this was based primarily on two convictions for narcotics offenses and a weapon possession offense, all felonies. Mr. Haldorson had served an appreciable amount of time in prison before the present case. But the narcotics offenses in particular were on the relative low end of the narcotics dealing offense scale: one involved sale of

a look-alike substance, and the other involved delivery of about 15 grams of cocaine, which is a relatively modest amount. The sentencing judges in those cases imposed significant sentences, but it is important not to overstate the severity of Mr. Haldorson's criminal background: it hardly painted him as a significant drug dealer.

That said, what *was* significant about Mr. Haldorson's criminal history is his repeat offenses, including those in this case, even after he had been arrested, charged, convicted, and served prison time in earlier cases. This history of recidivism suggested either an unwillingness, or an inability, or both, to conform his conduct to the requirements of the law. Prison time is not easy, and it's particularly not easy in Illinois state prisons. The fact that Mr. Haldorson kept committing crimes, more than once, even after serving reasonably significant prison time was a noteworthy factor that this Court took into account in imposing sentence. The Court found excessive the range suggested by the career offender guideline, but it imposed a sentence (on the narcotics charges) higher than the guideline range that would have applied without the career offender enhancement. The Court did so largely due to Mr. Haldorson's prior criminal history.

Mr. Haldorson's track record while incarcerated in the federal prison system suggests, however, that he may have turned a corner, put his criminal past behind him, and, perhaps, finally grown up. There is reason to believe, based on Mr. Haldorson's background as discussed in the presentence report, that his criminal history is associated with drug abuse and, perhaps, mental health issues. But at this point, his record while in BOP custody has been stellar. He has maintained sobriety and has completed drug education and drug treatment programs. And beyond this, he has taken on responsibilities that involve rendering service to others, both as an instructor for other

9

imprisoned person and doing volunteer work for a charity. He has also completed numerous classes, both vocational-related and, importantly, in stress management, anger management, and cognitive skills. The BOP has lowered his risk assessment and security level.

In addition, Mr. Haldorson has done significant planning in anticipation of release and to take on the responsibility of caring for his father. This would be a significant responsibility that would occupy a very significant part of Mr. Haldorson's time if released. He has also written a detailed letter to the Court that evinces significant insight regarding the issues and poor decision making that contributed to his criminal past.

The time that Mr. Haldorson has served to date—a little over six years—is considerably less than the Court anticipated when it sentenced him. But it is nonetheless a significant amount of prison time. It would be difficult to say, credibly, that serving six years in a federal prison is anything other than significant punishment, even given Mr. Haldorson's prior incarceration. And although six years is significantly less than the Court expected when it imposed sentence, matters have changed significantly since that time, as the Court has discussed. The Court also believes that the amount of time that Mr. Haldorson has served to date is sufficient to deter him from committing similar crimes in the future.

For these reasons, the Court concludes, having considered the factors set out in 18 U.S.C. §3553(a), that there are extraordinary and compelling reasons warranting a sentence reduction, and that a reduction to the time Mr. Haldorson has already served is consistent with the Sentencing Commission's policy statements. The Court therefore grants Mr. Haldorson's motion to reduce his sentence. As a condition of reducing his prison term, however, the Court will increase the concurrent terms of supervised release

on Counts 1 and 2 to eight years, to ensure that Mr. Haldorson remains under supervision for a period sufficient to monitor his compliance with the law and ensure his reintegration into the community as a law-abiding citizen. The Court will also amend the conditions of supervised release to add as conditions that Mr. Haldorson must live at his parents' home and must serve eighteen months of home confinement with location monitoring. In this way, his liberty will continue to be restricted in a significant way for a significant period.

The Court is giving Mr. Haldorson a significant break in reducing his prison sentence and is placing a great deal of trust in him not to reoffend. As the saying goes, however, "trust, but verify." The Court wishes to make clear to Mr. Haldorson that if he violates the conditions of his supervised release, knowing full well that this will subject him to reimprisonment, the Court will not hesitate to reincarcerate him, irrespective of his father's care needs. There will be no further breaks.

## Conclusion

For the reasons stated above, the Court grants defendant Michael Haldorson's motion for compassionate release [413]. The Court reduces the defendant's prison sentence to time served. The effective date of the sentence reduction will be stayed for fourteen days (until February 29, 2024) to permit BOP to perform necessary safety and background checks and release planning. The sentence reduction is conditioned upon amendment of the judgment to include a term of supervised release of eight years on count 1 and on count 2, to be served concurrently; addition of a supervised release condition requiring Mr. Haldorson to live at his parents' home in Joliet, Illinois; and addition of a condition requiring Mr. Haldorson to serve the first eighteen months of his supervised release on home confinement. Compliance with this condition shall be

monitored by a form of location monitoring technology selected at the discretion of the probation officer, and the defendant shall abide by all technology requirements. the defendant shall abide by all technology requirements.  The Clerk will prepare an amended judgment and commitment order.

Date: February 14, 2024

                                                _____
                                                MATTHEW F. KENNELLY
                                                United States District Judge